Adam R. Alper (SBN 196834)
adam.alper@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone:     (415) 439-1400
Facsimile:     (415) 439-1500

Michael W. De Vries (SBN 211001)
michael.devries@kirkland.com
KIRKLAND & ELLIS LLP
555 S. Flower Street
Los Angeles, CA 90071
Telephone:     (213) 680-8400
Facsimile:     (213) 680-8500

Sharre Lotfollahi (SBN 258913)
sharre.lotfollahi@kirkland.com
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, CA 90067
Telephone:     (310) 552-4200
Facsimile:     (310) 552-5900

Attorneys for Plaintiffs
COMET TECHNOLOGIES USA INC., COMET
AG, and YXLON INTERNATIONAL GMBH

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COMET TECHNOLOGIES USA INC., a Delaware corporation, COMET AG, a Swiss corporation, and YXLON INTERNATIONAL GmbH, a German corporation,<br><br>             Plaintiffs,<br><br>      v.<br><br>XP POWER LLC, a California Limited Liability Company,<br><br>             Defendant. | CASE NO.<br><br>**COMPLAINT FOR TRADE SECRET MISAPPROPRIATION**<br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs COMET TECHNOLOGIES USA INC. ("Comet USA"), Comet AG ("Comet AG"), and YXLON International GmbH ("YXLON") (collectively, "Comet" or "Plaintiffs') allege against Defendant XP Power LLC ("XP" or "Defendant") as follows:

**INTRODUCTION**

1.      The Comet Group is a global leading technology firm, headquartered in Switzerland. In business for almost 70 years, Comet Group has over 1200 employees in seven countries, including in the United States through a wholly owned subsidiary Plaintiff Comet Technologies USA Inc, in Switzerland through a wholly owned subsidiary Plaintiff Comet AG, and in Germany through a wholly owned subsidiary Plaintiff YXLON International GmbH.

2.      Comet's commitment to reliable, high-quality products for its customers is the result of significant investment of time and resources.  In addition to other cutting-edge products and technologies, Comet specializes in the design and development of RF power generators ("RF Generators") and impedance matching networks ("Matching Networks") for sale to customers in the semiconductor industry worldwide.  Comet heavily invests in the research and development of these technologies in order to create industry-leading products for its customers.  Comet's substantial investments in innovation require protection, and Comet relies on its trade secrets to guard the intellectual property created by the ingenuity and industry of its employees.

3.      These innovations are critical to the businesses of Comet's customers, including companies based in California such as LAM, Applied Materials, Mattson and Aixtron.  These customers produce the plasma chambers in which silicon chips are produced.  Comet's customers, in turn, sell their products (the plasma chamber along with the Matching Networks and RF Generators) to foundries, which manufacture silicon chips used in electronic devices throughout the world.

4.      Unlike Comet, XP chose not to invest in the substantial, time-consuming research and development required to produce innovative RF technologies and products.  In fact, XP began working on RF power technologies only recently, through its October 2017 acquisition of Comdel Inc., an aging RF power manufacturer that had not innovated its product line in many years.  Eager to tap into the lucrative market for RF generator and matching network products, XP embarked on an unlawful plot to surreptitiously take Comet's confidential and proprietary trade secrets related to

1                                    COMPLAINT

its latest generation innovations and technologies.  Rather than design its own products to compete fairly in the marketplace, XP chose to misappropriate Comet's proprietary technologies and critical business strategies.

5.      XP's plan to steal Comet's technologies began with a scheme to target Comet from within, through its personnel—namely, by recruiting senior Comet personnel who had substantial access to Comet's proprietary technologies, and who, at XP's direction, absconded with large volumes of highly confidential materials from Comet's computers shortly before their departure in order to serve and benefit XP's business.  Specifically, XP orchestrated a simultaneous group hire of Comet employees Douglas Beuerman, Christopher Mason, and Eiji Mori (collectively, the "XP Employees") on the RF Match Network team in order to create a standalone business unit comprised of these XP Employees to jump start development of its own RF matching technology.  The XP Employees, previously senior-level Comet engineers, took analogous roles at XP.  Beuerman, who was the Director of Match Network R&D at Comet, took on the role of Engineering Director, RF Matching Networks at XP.  Mason, who was Comet's Senior Member of Technical Staff ("SMTS") RF Engineer, took on the role of SMTS RF Engineer at XP.  Mori, who was Comet's Senior RF Engineer, took on the role of RF Engineer at XP.  Each of the XP Employees was a key member of the R&D team working on the development of Comet's next generation matching network technology when they left to do the same work at XP.

6.      During their employment at Comet, Comet trusted the XP Employees with Comet's confidential information on highly sensitive and proprietary technologies and products.  While at Comet, they were privy to Comet's proprietary technical documents and other materials, design ideas, product testing technologies, product planning, and many other confidential aspects of Comet's business.  And while that knowledge alone presented incalculable value to Comet, in the weeks and days prior to their coordinated resignations from Comet (and unbeknownst to Comet), the XP Employees intentionally and maliciously took Comet's most innovative research and development and product designs for both its RF Generators and Matching Networks.  Critically, many of these unlawfully-acquired materials provided Comet's specific technology implementations and other highly detailed technical information relating to critical technologies that took Comet

2                                    COMPLAINT

years and substantial monetary investment to develop and implement.  XP, through its employees including the XP Employees, unlawfully accessed and acquired Comet's trade secret information to develop its own competing products to be sold in the United States and around the world.

7.      XP's theft has been intentional, malicious, and egregious.  The XP Employees were working under the direction of XP and in the process of misappropriating Comet's trade secrets for the benefit of XP, when they repeatedly lied to Comet's management about their next employer to fraudulently conceal their theft so that Comet would not suspect foul play.  And while XP and the XP Employees kept their secret plan hidden from Comet, they internally and among themselves brazenly discussed their intent to damage Comet by developing a competing Matching Network at XP, stating to each other in emails about how it would be "fun" to build a competing match control system and product line based on Comet's trade secrets, to take away business from Comet.

8.      XP had knowledge of, and encouraged these illegal acts, and allowed the XP Employees free reign to harm Comet for XP's benefit.  XP knowingly engaged in misappropriation, including when its newly-created XP Division stole Comet's most valuable trade secrets to use as shortcuts for its own development efforts in developing products that compete against Comet in the marketplace.  XP was aware that the XP Employees' actions were in breach of the employees' employment contracts with, and fiduciary duties to, Comet, but did nothing to discourage or dissuade them from these illegal acts.

9.      For these reasons and as alleged in detail below, Comet brings this action against XP for trade secret misappropriation, in violation of the Defend Trade Secret Act, 18 U.S.C. § 1836, *et seq.* and California Uniform Trade Secret Act, Cal. Civ. Code § 3246, *et seq.*

**PARTIES**

10.      Plaintiff Comet USA is a Delaware corporation with a principal place of business located at 100 Trap Falls Road Extension, Shelton, Connecticut 06484.

11.      Plaintiff Comet AG is a Swiss corporation with a principal place of business located at Herrengasse 10, 3175 Flamatt, Switzerland.

12.      Plaintiff YXLON International GmbH is a German corporation with a principal place of business located at Essener Bogen 15, 22419 Hamburg, Germany.

13.     Defendant XP is California Limited Liability Company with a principal place of business located at 990 Benecia Avenue, Sunnyvale, California 94085.

## JURISDICTION

14.     This Court has original jurisdiction over this action pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836 and 28 U.S.C. § 1331.

15.     This Court has supplemental jurisdiction over Comet's California state law trade secret misappropriation claim pursuant to 28 U.S.C. § 1367.

## VENUE

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because XP resides in Sunnyvale, California, which is within the Northern District of California, and conducts business in this District.  Venue is also proper because a substantial part of the events or omissions giving rise to the claims pled herein occurred in the Northern District of California and a substantial part of the property that is the subject of the claims is situated in the Northern District of California. Specifically, the misappropriated trade secret and confidential information was accessed, viewed and downloaded by Defendant and the XP Employees in the Northern District of California.  Comet is informed and believes that its trade secret and confidential information resides in the Northern District of California on, at minimum, external memory drives in Defendant's possession.

## INTRADISTRICT ASSIGNMENT

17.     This is an action for trade secret misappropriation, where a substantial part of the events or omissions which give rise to the claims have taken place in and where a substantial part of the property that is subject to the action is situated in Santa Clara and Santa Cruz County.  Thus, pursuant to Civil L.R. 3-2(c) and (e), this action should be assigned to the San Jose Division.

## FACTUAL ALLEGATIONS

### *Comet Diligently Protects Its Trade Secret and Confidential Information*

18.     Comet heavily invests in research and development in order to offer its customers the most cutting-edge technology in RF power and match network solutions.  Through Comet Technologies USA Inc.'s facility in San Jose, the Comet Group develops Comet's Matching Networks.  Through Comet AG in Switzerland and YXLON in Germany, the Comet Group develops

RF Generators and other related equipment.  RF Generators serve as the RF power source for semiconductor chip manufacturing, among other applications; these RF Generators produce high frequency power with precise control.  Matching Networks, which are connected to RF Generators, transform the generator's RF output signal so that it can be supplied into the plasma chamber (which is the final application used by the end customer).  This plasma chamber is where the end customer produces the silicon chips that are used in all types of electronic products from servers and personal computers to cell phones to televisions.

19.     Most recently, Comet's European team undertook development of new RF Generators under the internal project name, "Da Vinci."  Comet has devoted millions of dollars towards the Da Vinci project.  Da Vinci represents one of the most important ongoing development projects for the Comet Group, and Comet expects to generate hundreds of millions of dollars in annual revenues based on this technology alone.  Through its Da Vinci project, Comet expects a significant first-mover advantage over its industry competitors.

20.     In San Jose, the Comet research and development team, including the XP Employees, was working on technology related to improving its Matching Networks.  This included research and development related to its latest technology that was internally-described as "Generation 2.5" and "Generation 3.0" of its Matching Network for Comet's key customers.  All such work was highly-confidential and much of it was done subject to not only Comet's own confidentiality protocols, but also subject to customer non-disclosure agreements.

21.     Comet has acted reasonably and diligently to protect the secrecy of its trade secret and confidential information, including its future RF Generator and Matching Network technology by the following measures:

- requiring employees to execute Proprietary Information and Inventions Agreements, which includes confidentiality, non-disclosure, and return of property obligations;
- requiring employees to sign acknowledgments in which they agree to abide by Comet's non-disclosure/confidentiality agreements and Technology Use Policies, which prohibit improper use and disclosure of Comet's trade secret and confidential information;

- using a database exchange and collaboration system called Jira/Confluence ("Confluence"), which allows permission assignment ("who can see what" and tracking "who changed what, when and why");

- granting permission rights to the Confluence system in a restrictive fashion: only members of the R&D core team have access to it, and mirroring the hierarchy levels in the Comet R&D organization;

- maintaining high password and technical standards for access and security of the Confluence database;

- performing exit interviews in which Comet's managers discuss the continuing nature of one's duties of confidentiality to Comet, as well as detailed questions about return of company documents, diligently seeking return of its property including its trade secret and confidential information; and

- requiring that employees reaffirm their confidentiality, non-disclosure, employee nonsolicitation and return of property obligations upon termination of employment through the execution of a Separation of Employment Agreement and Termination Certificate, which reiterates their continuing confidentiality obligations and seeks affirmative representation that no company documents are retained.

### *The XP Employees*

22.     Comet hired Beuerman in 2011 as its Director of Match Network Research and Development ("R&D") in the San Jose location, reporting directly to the Comet Group's Vice President of Global R&D, André Grede.  Beuerman was responsible for providing management, leadership and all oversight functions for Comet's Matching Network R&D.  Beuerman's responsibilities included all aspects of managing the 19 employees of the R&D group in San Jose (including hiring and firing employees), R&D document management (including file storage, retrieval and sharing), and managing product transfers from R&D to production.  Beuerman also had signing authority for Matching Network R&D and no budgetary limit.  Due to these functions, Beuerman was part of the overall R&D management team.

23. Since mid-2017, Beuerman's primary job responsibilities were to manage and lead the San Jose software and hardware teams, which were working on the improvement of the actual Matching Network controls (based on an older technology "Generation 2.0" first developed in or around 2011). This included responsibility for the research and development of Generation 2.5 and 3.0 of Comet's Matching Networks.

24. Beuerman managed this technology exclusively in the San Jose location, and he had no technological interface with the latest Da Vinci technology, currently under development in Europe for RF Generators.

25. Comet hired Mason in 2013 as a Senior Member of Technical Staff ("SMTS") RF Engineer of the PCT Business Unit, reporting directly to Beuerman. Mason was responsible for the development of Matching Networks according to the specifications from Comet's Original Equipment Manufacturer ("OEM") and end user customers. Mason's responsibilities included supporting customers in specifying and setting up matching networks, designing electrical circuits for match control and high-power RF diagnostics, and designing and documenting match test loads and methods. Mason also supported the compliance testing of new matches, the reliability testing and assessment of Matching Networks, and the setup of equipment for testing and characterizing Matching Networks and components at high-power RF conditions.

26. Mason's additional job responsibilities were to travel in support of customer installations and new business development and to train Comet employees and external partners in areas such as RF high-power techniques, circuit design, system design, design of test fixtures and plasma processes. Due to these functions and his critical role on the research and development team, Mason had access and firsthand knowledge of Comet's proprietary software and hardware information. Mason's most recent responsibilities included the design, development, and testing of Generation 2.5 and 3.0 of Comet's Matching Network.

27. Comet hired Mori in 2016 as a Senior RF Engineer of the PCT Business Unit, reporting directly to Beuerman in San Jose. Similar to Mason, Mori was responsible for the development of Matching Networks and evaluation and testing of RF Generators. Mori's responsibilities included supporting customers in specifying and setting up Matching Networks,

designing of electrical circuits for match control and high-power RF diagnostics, and the design and documentation of match test loads and methods.

28.     Mori also supported the compliance testing of new matches, the reliability testing and assessment of Matching Networks, and the setup of equipment for testing and characterizing matching networks and components at high-power RF conditions.  Mori's responsibilities included the design, development and testing of Generation 2.5 and 3.0 of Comet's Matching Network.

29.     During their years of employment at Comet, Comet trusted the XP Employees with Comet's confidential information on highly sensitive and proprietary technologies and products. While at Comet, they were privy to Comet's proprietary technical documents, schematics, design ideas, product planning, cost management, and research and development efforts; and they were intimately familiar with Comet's development efforts into Comet's Matching Networks, including the trade secret technologies at issue in this case.

### The XP Employees' Confidentiality Obligations

30.     On February 11, 2016, Beuerman entered into a Proprietary Information, Inventions and Non-Compete Agreement (the "Confidentiality Agreement") with Comet (attached hereto as Exhibit A), which provides that:

> [Beuerman] agree[s] to hold in confidence and not directly or indirectly use or disclose, either during or after termination of [his] employment with [Comet], any Proprietary Information [he] obtain[s], accesses] or create[s] during the period of [his] employment, whether or not during working hours, except to the extent authorized by [Comet], until such Proprietary Information becomes generally available to the public. [Beuerman] agree[s] not to make copies of such Proprietary Information except as authorized by the Company. [Beuerman] will not reproduce or appropriate for [his] own use, or for the use of others, any property, Proprietary Information or Company Inventions.

The Confidentiality Agreement defines Proprietary Information as follows:

> [A]ny and all confidential and/or proprietary knowledge, data or information of [Comet], its parents, subsidiaries, and affiliated entities, customers and suppliers, including but not limited to information relating to employees, customer lists, products, services, processes, know-how, business plans, designs, formulas, methods, developmental or experimental work, improvements, discoveries, inventions, ideas, source and object codes, data, programs, other works of authorship, and plans for research and development, whether learned or acquired prior to or after this Agreement.

COMPLAINT

The Confidentiality Agreement also required that Beuerman return and not retain any Comet Proprietary Information upon his exit or termination.  The Confidentiality Agreement also contained an employee non-solicitation provision:

> During the term of [his] employment and for twelve (12) months following [his] termination of employment for any reason, [Beuerman] will not recruit any employee of [Comet] as of the date of the termination of [his] employment or solicit or induce, or attempt to induce, any such individuals or contractors to terminate their employment with, or otherwise cease their relationship with [Comet].

31.    On October 31, 2013, Mason entered into a Confidentiality Agreement with Comet (attached hereto as Exhibit B) with provisions nearly identical or identical to Beuerman's Confidentiality Agreement as set forth above.

32.    On February 11, 2016, Mori entered into a Confidentiality Agreement with Comet (attached hereto as Exhibit C) with provisions nearly identical or identical to Beuerman's Confidentiality Agreement as set forth above.

33.    Further, Comet's Technology Use Policy in Comet's Employee Handbook (the Technology Use Policy and acknowledgments of the Employee Handbook are attached hereto collectively as Exhibit D), which applies to "all Company employees" who are "responsible for understanding this [technology use] policy" and "ensuring that their conduct and actions are wholly consistent with its requirements," provides:

> All Company IT Assets, including any and all data accessible by or set forth therein, are furnished or made available to users are property of COMET, are intended for business use only, and shall only be used for authorized Company business. All Company IT Assets, and all communications and data created, transferred, transmitted, downloaded, copied, received or stored on, by or to a Company IT Asset, are the exclusive property of COMET to the extent consistent with applicable law.

> Company data, databases, programs, and other proprietary information represent Company assets and can only be used for authorized Company business. Use of Company assets for personal gain or benefit is prohibited. Sharing Company proprietary information with unauthorized Company personnel or third parties is prohibited.

> . . .

COMPLAINT

All information on user computers is considered Company property. Deleting, altering, or sharing confidential, proprietary, or any other information upon termination requires management authorization.

34.     The Technology Use Policy also states that "[o]nly the IT Department is authorized to purchase and install computer software or hardware on COMET-managed systems."

### The XP Employees Conspire with XP to Leave Comet and Join XP

35.     In or around November 2017, the XP Employees discussed leaving Comet.

36.     Senior XP executives plotted to steal Comet technology and business in conjunction with hiring the XP Employees as a shortcut to developing its own technology.  On November 27, 2017, Mason had a three-hour phone interview with Jay Warner of XP and Warner prepared a record of the call.  During the call, Warner solicited confidential and trade secret information about Comet technology and sales strategy from Mason.  XP understood from that call that the XP Employees were in possession of valuable Comet trade secrets that they would bring to XP to create competing RF match technology.  The confidential and trade secret information solicited by Warner was shared within XP for the benefit of XP.

37.     In a December 5, 2017 meeting at XP, Mason recommended to Warner that XP also hire Beuerman.

38.     Also in December 2017, Mori learned that both Mason and Beuerman were in job discussions with XP.

39.     Over the next two months, the XP Employees, who had already been recruited as senior executives and managers at XP, coordinated as a group regarding (1) the timing and logistics of their departure to XP; (2) their compensation and benefits at XP; and (3) as described below, whether they were breaching their contractual obligations to Comet in their coordinated group departure.

40.     The XP Employees had job offers from XP in January 2018 and were acting as XP employees for the benefit of XP at the time they engaged in largescale theft of Comet confidential information and trade secrets for the benefit of new employer XP.

41.     Additionally, the XP Employees conspired to lie during their exit interviews and conversations with Comet management of their intent to compete at XP.

COMPLAINT

42. After Beuerman's own exit interview where he repeatedly lied about his plans, Beuerman discussed with Mori via email his hope that Mason would not slip up and reveal their competitive plans. Mori responded by advising Beuerman that he texted Mason to keep quiet.

43. Indicative of the coordinated nature of the group departure, Beuerman contacted Warner on January 16, 2018 inquiring about the joint start date for the group since they had all just accepted their positions.

44. On January 16, 2018, one day after Beuerman gave notice of his resignation, his direct reports Mason and Mori simultaneously gave notice.

45. Beuerman provided a template to Mason and Mori for their notices, thus each of the XP Employees' letters contain nearly identical phrases and language.

46. Beuerman and Mori additionally conspired to poach more employees and skilled independent contractors from Comet to join XP.

47. Defendant XP knew or should have known, at least through the XP Employees and others at XP they were in contact with, that the XP Employees operated under mutual employee non-solicitation provisions. Indeed, XP required the XP Employees to agree to substantially similar employee non-solicitation restrictions as a condition of joining XP. Nevertheless, despite this actual or constructive knowledge, XP, at least through the XP Employees and others in contact with them, caused the XP Employees to breach those restrictions and coordinated a timed group departure that would have a maximal negative impact to Comet.

### Beuerman's Unlawful Theft of Comet's Trade Secret and Proprietary Information for the Benefit of New Employer Defendant XP

48. In the days leading up to his resignation from Comet, Beuerman investigated methods to conceal his unauthorized download and misappropriation of Comet's trade secrets and and confidential information.

49. Beuerman began discussions with Jay Warner, XP's Executive Vice President, in December 2017.

50. Beuerman performed Google searches and queried a webpage to determine the legal implications of recruiting Comet's employees.

51.     On January 6, 2017, Beuerman performed the following Google searches:

- "California laws recruiting employees;"

- "prohibited hiring practices California;" and

- "can I recruit employees from my previous employer."

52.     Beuerman also visited a webpage titled, "Legally Poaching Employees From Another Company (and Preventing It)."

53.     On January 9, 2018, Beuerman, Mason and Mori attended a group interview with Warner and others at XP.  XP's Warner encouraged the group to "come together" to the meeting and texted about XP's strong motivation for the group hire.

54.     On or about January 11, 2018, Beuerman received an offer of employment from XP as its Engineering Director, RF Matching Networks.

55.     On January 14, 2018, the same day on which Beuerman misappropriated Comet's trade secrets and confidential information, Beuerman queried an internet site providing instructions on how to avoid detection when emailing documents to personal Google accounts.  The webpage detailed how Beuerman could prevent others from "Find[ing] out what searches you did or sites you visited" and from, "See[ing] that your account was signed in."

56.     On that same day, Beuerman used his work laptop to log into Comet's collaboration system, Confluence.  He entered into the "R&D team space," and then entered into the separate space "RF Power Amplifiers."  Beuerman had never before accessed or contributed to this space because it relates to Comet's RF Generators designed and developed in Europe.

57.     Nevertheless, Beuerman accessed and downloaded to a private external memory device over one hundred documents from various Sub-Folders containing Comet's newest intellectual property developments by Comet's European R&D teams (including the Da Vinci project).

58.     These files contained all R&D information required to reproduce Comet's future RF power amplifiers, combining networks and control systems including:

- Complete schematics and PCB layouts;

- 3D drawings and models of new components;

COMPLAINT

- Assembly and production instructions of new components;

- Simulation as well as measurement results;

- Pictures of newly assembled and tested components; and

- Drawings describing the intellectual property for future RF power delivery concepts.

Beuerman methodically accessed these folders, one after the other.

59. On the most competitively sensitive pages, he used the function "download all attachments/data from this page" to download large swaths of Comet's technology documents.

60. Beuerman did not download the data to his work laptop, instead copying directly to a newly created folder that Beuerman titled, "Confluence," on a private external USB storage device.

61. Beuerman had no legitimate business purpose to access, view, use, or download such trade secret and confidential information in his position at Comet.

62. The documents that Beuerman accessed and downloaded, in the hands of a competitor such as XP, would unfairly deprive Comet of its significant competitive advantage.

63. On the morning of January 26, 2018, Beuerman attached yet another external memory device to his work computer and downloaded company documents to that device. While this particular device was attached to his computer, Beuerman accessed numerous Comet consultant and independent contractor agreements.

64. The Da Vinci trade secrets taken by Beuerman detailed Comet's most innovative work on generator technology developed in Europe.

65. Beuerman also hand-selected the San Jose-based ongoing R&D and product development concerning a specific Comet Generation 2.0 Matching Network designed for one of Comet's largest customers and copied that data to multiple external devices.

66. Beuerman brought Comet's confidential and trade secret information to XP, and while at XP, accessed and used Comet's confidential and trade secret information, including copying stolen Comet files and information onto his XP computer, creating XP documents using copied confidential Comet information, and using the stolen trade secrets for XP's benefit.

67.     Months after joining XP, Beuerman conveyed Comet's valuable trade secret pricing and manufacturing capacity information to senior XP employees and officers for XP's benefit in competing with Comet.

### Mason's Unlawful Theft of Comet's Trade Secret and Proprietary Information for the Benefit of New Employer Defendant XP

68.     On January 15, 2018, Mason received an offer of employment from XP as a Senior Member of Technical Staff RF Engineer, reporting directly to Beuerman.

69.     Immediately thereafter and right before his resignation, on January 16, 2018 and January 24, 2018, Mason connected external memory drives to his Comet computer and proceeded to copy numerous documents containing Comet's confidential information and trade secrets.  These documents included files related to a Comet-developed software program for automation, as well as files related to a capacitor developed by Comet.

### Mori's Unlawful Theft of Comet's Trade Secret and Proprietary Information for the Benefit of New Employer Defendant XP

70.     In the weeks prior to his resignation and on at least three different occasions, Mori connected private external memory drives to his Comet computer and created at least 42 folders related to Comet on those drives.

71.     On the day prior to his resignation, Mori connected two different external memory drives to his Comet computer.

72.     Mori performed many of his R&D and product development tasks locally on his Comet-issued laptop.

73.     Mori connected external memory drives to his Comet computer and proceeded to copy numerous documents containing Comet's confidential information and trade secrets.  These documents include files related to Comet's current voltage current sensor, including software programs for the development of such sensors, data collected from the sensors, and a schematic of the sensor.

74.     Mori sent multiple emails to XP detailing the work he had performed for Comet.

COMPLAINT

75.     In addition, Mori provided XP with a "resume" comprised substantially of photographs, CAD drawings and screen shots of Comet's match network trade secret materials, including trade secrets for Comet's Generation 2.5 matching network.

76.     Despite Mori's emails to XP detailing his work at Comet and submission of a "resume" containing trade secret CAD drawings of Comet products, XP took no actions to admonish Mori or return Comet's trade secrets to Comet.  Instead, XP invited Mori for an interview and hired him to join its research and development team.

77.     The misappropriation of Comet's trade secrets gave XP a head start in developing matching network technology that XP was able to develop in a matter of months.

78.     As set forth above, XP and the XP Employees knew that the information they downloaded without permission was confidential, and knew that those materials were replete with Comet's trade secrets.  But despite this knowledge, XP acquired and continues to possess those trade secret materials for use in developing its own competing products.  XP's misappropriation was deliberate, wholesale, and systematic—leaving no doubt about its unlawful scheme.

### Beuerman Resigns from Comet and Reaffirms His Promises to Protect Comet's Trade Secrets/Confidential Information

79.     On January 15, 2018—the day after Beuerman's mass misappropriation of documents—Beuerman provided Andre Grede, his direct supervisor, with a letter notifying Comet of his resignation of employment from Comet.

80.     Beuerman's last day of employment with Comet was January 26, 2018, before starting work at XP as a director.  On that day, Comet conducted an exit interview with Beuerman.  An outside counsel to Comet attended the interview, which should have highlighted to Beuerman the importance that Comet placed upon his honesty and candor during this interview.

81.     During the exit interview, Beuerman reaffirmed his promises to protect Comet's trade secrets and confidential information and return all Comet property.  Beuerman executed a Separation of Employment Agreement (attached hereto as Exhibit E) that reaffirmed the same commitments contained in his confidentiality agreements and confirmed Beuerman had returned all company documents and records to Comet.

82.     Beuerman also executed a Termination Certification (attached hereto as Exhibit F) during his exit interview that again certified that Beuerman retained no Comet materials, had not violated his employee non-solicitation prohibition, and would not solicit any Comet employees or contractors within the next year.

83.     During the exit interview, Comet confronted Beuerman about accessing and viewing various trade secret and confidential information in Comet's Confluence data system.  Beuerman did not deny accessing those pages and was unable to come up with a rational explanation for his actions.  Beuerman then lied once again, stating that he only downloaded certain documents to his work laptop and no other devices.  When specifically asked to turn in any external memory devices or thumb drives containing Comet property, Beuerman stated that he had no such devices or drives.  Next, he lied about his next employer, refusing to identify them and falsely claiming they were not in competition with Comet.  As well known to Beuerman, XP directly competes with Comet as both companies sell match networks and generators to companies in the semiconductor industry such as Applied Materials and LAM.  Finally, Beuerman concluded this string of falsehoods by denying that Mason and Mori were joining him at his unstated next employer.

### Mason Resigns from Comet and Reaffirms His Promises to Protect Comet's Trade Secrets/Confidential Information

84.     On January 16, 2018—days following Mason's misappropriation of documents and one day after Beuerman's resignation—Mason accepted a position at XP reporting to Beuerman.  He then went through the charade of providing Beuerman with a letter (substantially drafted by Beuerman) notifying Comet of his resignation of employment from Comet.

85.     Mason's last day of employment with Comet was February 1, 2018.  A few days prior to his last day, January 26, 2018, Comet conducted an exit interview with Mason.  An outside counsel to Comet attended the interview, which should have highlighted to Mason the importance that Comet placed upon his honesty and candor during this interview.

86.     During the exit interview, Mason reaffirmed his promises to protect Comet's trade secret and confidential information and return all Comet property.  Mason executed a Separation of

Employment Agreement (attached hereto as Exhibit G) with provisions substantially identical to Beuerman's Separation of Employment Agreement as quoted above.

87.    Mason also signed a Termination Certification (attached hereto as Exhibit H) with provisions identical to Beuerman's Separation of Employment Agreement as quoted above.

88.    During the exit interview, Mason lied about his next employer, stating he had not accepted other employment when in fact he had already accepted an offer from XP.

### *Mori Resigns from Comet and Reaffirms His Promises to Protect Comet's Trade Secrets/Confidential Information*

89.    On January 15, 2018—within days of misappropriating Comet's trade secrets—Mori accepted his position at XP and provided his direct supervisor, Beuerman, with a letter (substantially drafted by Beuerman) notifying Comet of his resignation of employment from Comet.

90.    Mori's last day of employment with Comet was February 7, 2018.  On that day, Comet conducted an exit interview with Mori.

91.    During the exit interview, Mori reaffirmed his promises to protect Comet's trade secret and confidential information and return all Comet property.  Mori executed a Separation of Employment Agreement (attached hereto as Exhibit I) with provisions substantially identical to Beuerman's Separation of Employment Agreement as quoted above.

92.    Mori also signed a Termination Certification (attached hereto as Exhibit J) with Comet during his exit interview with provisions substantially identical to Beuerman's Termination Certification as quoted above.

93.    During the exit interview, Comet specifically reminded Mori of his obligations under his Confidentiality Agreement and asked him to adhere to the terms of his Confidentiality Agreement.  Mori also lied about his next employer stating he was not going to the same place as Beuerman and did not know where Beuerman was going, when in fact Mori, along with Beuerman and Mason, all conspired to leave Comet to work for XP together.

***XP Recruits Comet's Independent Contractors to Misappropriate Comet's Trade Secrets and
Create a Competing Product***

94.     In March 2018, Beuerman reached out via email to Comet Independent Contractor Yibing Ma stating that he wished Ma to join the new XP team to create a new product line to compete with Comet.  XP hired Ma shortly thereafter.  In a situation perfectly conducive to trade secret misappropriation, Ma joined XP's "RF Matching Networks" division comprised exclusively of the four Comet engineers: Beuerman, Mason, Mori and Ma.

95.     Then in April 2018, Beuerman reached out to yet another Comet independent contractor, Gerald Boston, via email expressing his desire to continue to work with him at XP and describing Beuerman's intent to get a new project funded at XP that would mean Boston could join the group.

96.     On the next day, Beuerman again emailed Boston advising that his sought-after budget had been approved by XP.  On the same date, Boston replied to Beuerman providing information about certain match technology utilized by the company with whom he was consulting (believed to be Comet) and discussing how it could benefit the new team at XP.

***Additional Allegations Regarding XP's Misappropriation of Comet's Match Network Trade
Secrets***

97.     As set forth in detail above, others besides the XP Employees at XP knowingly facilitated and joined the XP Employees' trade secret misappropriation in numerous ways.  For example, XP sequestered the Comet group in its own RF Matching Network Division, comprised solely of the XP Employees and Comet contractor Ma.  XP approved Beuerman's proposed project and budget which is precisely the match control system that Beuerman had touted as designed to take business away from Comet.

98.     Even after receiving an evidence preservation demand from Comet, XP still allowed Director Beuerman to continue breaching his contract with Comet by poaching and targeting its independent contractors, Ma and Boston.

99.     Despite a demand that XP return any and all Comet trade secret materials, XP retained the Mori "resume" materials and allowed the XP Employees to retain and use the stolen Comet trade secrets for the benefit of XP.

100.    But most egregiously, XP allowed its Director of RF Matching Networks Beuerman to use Comet's trade secret materials at and for the benefit of XP.  While at XP, Director Beuerman attached at least one hard drive to his XP workstation and opened numerous documents comprising Comet's most valuable San Jose-based trade secret materials detailing a specific Generation 2.0 Match Network designed for one of Comet's biggest customers.

**FIRST CAUSE OF ACTION**
**Violation of the Defend Trade Secrets Act (18 U.S.C. § 1836 *et seq.*)**

101.    Comet re-alleges and incorporates by reference the allegations in paragraphs 1 through 100 as though fully set forth herein.

102.    Comet's trade secret and confidential information relates to products or services used, sold, purchased, or transported, or intended for use, sale, purchase, or transport, across the country and throughout the world.

103.    Comet is the owner of trade secret and confidential information, that as described above, constitute "trade secrets" within the meaning of 18 U.S.C. § 1839(3).

104.    The above-detailed trade secret and confidential information that Defendant accessed, used, copied, forwarded and downloaded derives independent economic value, both actual and potential, from not being generally known to and not being readily ascertainable through proper means by Comet's competitors, including XP, or to other persons or entities who might obtain economic value from their disclosure or use.

105.    At all times relevant herein, Comet has taken the above-described reasonable measures to protect the secrecy of its trade secrets and confidential information, including that which Defendant has misappropriated.

106.    At Defendant's direction, the XP Employees gained access to Comet's trade secrets in the course of an employee-employer relationship between Comet and the XP Employees.  At

Defendant's direction, the XP Employees improperly acquired and retained Comet's trade secrets upon termination of their employment with Comet for use in their competing work for Defendant.

107.    Defendant is in possession of the foregoing trade secrets due to the XP Employees subsequently taking these trade secrets, which are subject to confidentiality agreements in which the XP Employees expressly acknowledged and confirmed the confidential nature of these secrets, with them to Defendant for use.  At all relevant times, Defendant was aware that the XP Employees had obligations to Comet to refrain from taking Comet's trade secrets.

108.    Defendant improperly acquired Comet's trade secrets from the XP Employees and have since improperly used and disclosed those trade secrets, including by incorporating them into products Defendant develops as its own.

109.    Defendant's actions, as set forth herein, constitute "misappropriation" within the meaning of 18 U.S.C. § 1839(5).

110.    Defendant accessed, used, copied, forwarded and downloaded Comet's trade secret and confidential information by improper means, without Comet's express or implied consent.

111.    Defendant knew or had reason to know at the time it accessed, used, copied, forwarded and/or downloaded Comet's trade secret and confidential information that this information was acquired and maintained by improper means and/or under circumstances giving rise to a duty to maintain secrecy or limit use.

112.    Defendant has failed to return to Comet the trade secret and confidential information that it misappropriated.

113.    Defendant is retaining and using Comet's trade secret and confidential information to compete with and/or otherwise harm Comet.  As alleged herein, Defendant committed numerous acts in furtherance of its misappropriation in the United States and in this District, including misappropriating trade secrets that it obtained and/or originated from this District with knowledge and intent to harm Comet in this District, as well as attempting to sell and/or selling products in the U.S. and this District that benefit from Defendant's theft.

114.    Defendant's misappropriation has proximately caused damage to Comet, including but not limited to, loss of profits, goodwill, competitive advantage and business opportunities.

115.     Defendant has been unjustly enriched as a further proximate result of its misappropriation of Comet's trade secret and confidential information.

116.     Defendant's actions in misappropriating Comet's trade secret and confidential information was willful, fraudulent, malicious, and was done with the intent to injure and oppress Comet and improve Defendant's own economic opportunities, thereby justifying an award of punitive damages against Defendant pursuant to 18 U.S.C. § 1836(b)(3)(C) and attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

117.     Comet is also entitled to injunctive relief to protect its confidential information and trade secrets by 1) enjoining Defendant from using or disclosing Comet's trade secrets and confidential information; 2) enjoining Defendant from altering or deleting Comet's trade secrets and confidential information; and 3) requiring Defendant to turn over any and all copies of Comet's trade secrets and confidential information to Comet.

### SECOND CAUSE OF ACTION
### Violation of the California Uniform Trade Secrets Act (Cal. Civ. Code § 3426 *et seq.*)

118.     Comet re-alleges and incorporates by reference the allegations in paragraphs 1 through 117 as though fully set forth herein.

119.     Comet is the owner of trade secret and confidential information, that as described above, constitute "trade secrets" within the meaning of Cal. Civil Code § 3426.1.

120.     The above-detailed trade secrets and confidential information that Defendant accessed, used, copied, forwarded and/or downloaded derives independent economic value, both actual and potential, from not being generally known to and not being readily ascertainable through proper means by Comet's competitors, including XP, or to other persons or entities who might obtain economic value from its disclosure or use.

121.     At all times relevant herein, Comet has taken the above-described reasonable measures to protect the secrecy of its trade secrets and confidential information, including that which Defendant has misappropriated.

122.     At Defendant's direction, the XP Employees gained access to Comet's trade secrets in the course of an employee-employer relationship between Comet and the XP Employees.  At

Defendant's direction, the XP Employees improperly acquired and retained Comet's trade secrets upon termination of their employment with Comet for use in their competing work for Defendant.

123.    Defendant is in possession of the foregoing trade secrets due to the XP Employees subsequently taking these trade secrets, which are subject to confidentiality agreements in which the XP Employees expressly acknowledged and confirmed the confidential nature of these secrets, with them to Defendant for use.  At all relevant times, Defendant was aware that the XP Employees had obligations to Comet to refrain from taking Comet's trade secrets.

124.    Defendant improperly acquired Comet's trade secrets from the XP Employees and have since improperly used and disclosed those trade secrets, including by incorporating them into products Defendant develops as its own.

125.    Defendant's actions, as set forth herein, constitute "misappropriation" within the meaning of Cal. Civil Code § 3426.1.

126.    Defendant accessed, used, copied, forwarded and/or downloaded Comet's trade secret and confidential information by improper means, without Comet's express or implied consent.

127.    Defendant knew or had reason to know at the time it accessed, used, copied, forwarded and/or downloaded Comet's trade secret and confidential information that this information was acquired and maintained by improper means and/or under circumstances giving rise to a duty to maintain its secrecy or limit its use.

128.    Defendant has failed to return to Comet the trade secret and confidential information that it misappropriated.

129.    Defendant is retaining and using Comet's trade secret and confidential information to compete with and/or otherwise harm Comet.

130.    Defendant's misappropriation proximately caused damages to Comet, including but not limited to, loss of profits, goodwill, competitive advantage and business opportunities.

131.    Defendant has been unjustly enriched as a further proximate result of its misappropriation of Comet's trade secrets and confidential information.

132.    Defendant's actions in misappropriating Comet's trade secret and confidential information was willful, fraudulent, malicious, and was done with the intent to injure and oppress

1  Comet and improve Defendant's own economic opportunities, thereby justifying an award of

2  punitive damages against Defendant pursuant to Cal. Civil Code section 3426.3(c) and attorneys'

3  fees pursuant to Cal. Civ. Code § 3426.4.

4       133.   Comet is also entitled to temporary, preliminary, and permanent injunctive relief to

5  protect its confidential information and trade secrets by 1) enjoining Defendant from using or

6  disclosing Comet's trade secrets and confidential information; 2) enjoining Defendant from altering

7  or deleting Comet's trade secrets and confidential information; and 3) requiring Defendant to turn

8  over any and all copies of Comet's trade secrets and confidential information to Comet.

9                                **PRAYER FOR RELIEF**

10      WHEREFORE, Plaintiffs pray for judgment in their favor and against Defendant XP,

11  inclusive as follows:

12      1.   Awarding damages as described in each of the above claims, in favor of Plaintiffs and

13  against Defendant in amounts to be determined at trial;

14      2.   Granting temporary, preliminary and permanent injunction against Defendant,

15  requiring Defendant to return all stolen information and documents (and all material derivative from

16  such information) to Plaintiffs and enjoining Defendant from further misappropriating or using

17  Plaintiffs' trade secrets and confidential information, and other such injunctive relief as is proper;

18      3.   Awarding punitive damages in favor of Plaintiffs and against Defendant in an amount

19  to be determined at trial;

20      4.   Awarding Plaintiffs pre-judgment and post-judgment interest, attorneys' fees and

21  costs, and other expenses incurred in this action;

22      5.   Granting Plaintiffs such other further relief as this Court deems just and proper.

23                                **JURY DEMAND**

24      Comet demands a jury trial for all issues triable.

25

26

27

28

1    DATED:  September 11, 2020                Respectfully submitted,

2                                  KIRKLAND & ELLIS LLP

3

                                By: /s/ *Adam Alper*

4                                Adam R. Alper (SBN 196834)
                                adam.alper@kirkland.com

5                                KIRKLAND & ELLIS LLP
                                555 California Street

6                                San Francisco, CA 94104
                                Telephone:    (415) 439-1400

7                                Facsimile:    (415) 439-1500

8                                Michael W. De Vries (SBN 211001)
                                michael.devries@kirkland.com

9                                KIRKLAND & ELLIS LLP
                                555 S. Flower Street

10                               Los Angeles, CA 90071
                               Telephone:    (213) 680-8400

11                             Facsimile:    (213) 680-8500

12                               Sharre Lotfollahi (SBN 258913)
                              sharre.lotfollahi@kirkland.com

13                             KIRKLAND & ELLIS LLP
                              2049 Century Park East

14                             Los Angeles, CA 90067
                              Telephone:    (310) 552-4200

15                             Facsimile:    (310) 552-5900

16                             Attorneys for Plaintiffs

17                             COMET TECHNOLOGIES USA INC.,
                             COMET AG, and YXLON

18                             INTERNATIONAL GmbH

19

20

21

22

23

24

25

26

27

28

                                COMPLAINT