# EXHIBIT 3

** HIGHLY C O N F I D E N T I A L **

** OUTSIDE ATTORNEYS' EYES ONLY **

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

COMET TECHNOLOGIES USA     )
INC., A DELAWARE           )
CORPORATION, COMET AG, A   )
SWISS CORPORATION, AND     )   CASE NO. 5:20-cv-6408-NC
YXLON INTERNATIONAL GMBH, A)
GERMAN CORPORATION,        )
                           )
          PLAINTIFFS,      )
                           )
     VS.                   )
                           )
XP POWER LLC, A CALIFORNIA )
LIMITED LIABILITY COMPANY, )
                           )
          DEFENDANT.       )
_____)

** C O N F I D E N T I A L **

(FOLLOWING TRANSCRIPT AND EXHIBITS HAVE BEEN

DESIGNATED HIGHLY CONFIDENTIAL -

OUTSIDE ATTORNEYS' EYES ONLY)


VIDEOTAPED REMOTE ZOOM DEPOSITION

KEVIN T. CROFTON

THURSDAY, JULY 8, 2021


JOB NO. 4638404

REPORTED BY:  DAYNA HESTER, C.S.R. 9970

PAGES 1 - 230

Page 1

** HIGHLY CONFIDENTIAL **
** OUTSIDE ATTORNEYS' EYES ONLY **

camera the whole time.                              14:49

         THE WITNESS:  Oh.  I'm not going to look    14:49

at you.                                            14:49

         (Laughter elicited.)                       14:49

         MS. LOTFOLLAHI:  You can look at me in      14:49

the -- in the Zoom.                                14:49

                                                   14:49

                   EXAMINATION                      14:49

BY MS. LOTFOLLAHI:                                 14:49

    Q.   Mr. Crofton, does it harm your company    14:49

that a competitor accessed Comet's trade secrets'  14:49

documents reflecting years of Comet's R&D efforts?  14:49

         MR. FARRELL:  Objection.  Leading.         14:49

         THE WITNESS:  First of all, from my        14:49

perspective, it's without a doubt that -- that Comet  14:49

has been harmed by this.                           14:49

         We have spent -- and I don't know the     14:50

exact figure, as I have given testimony to earlier.  14:50

I know that we have spent a significant amount of  14:50

money developing these products.                   14:50

         We have paid the price of learning our    14:50

failures.                                          14:50

         We have created a documentation set that  14:50

speaks for itself in terms of the design of the    14:50

products and what the product looks like.          14:50

Page 219

And in this escape that has occurred, we have, potentially, in a situation where a competitor has been able to leap frog and learn what we have done, to get to the point where -- where they might be on par or perhaps ahead, maybe they are faster than we are in some cases; probably are, in some cases because of this.

So we have paid to play and they -- they have not.  And this is a really big deal for us.

I -- it -- it galls me that -- that an XP Power didn't start from scratch to develop their own product without potentially using the material that we have, our design material, our design documentation.

And when these employees -- actually, they are operating as if they are XP Power employees at that point, they accessed the information, they downloaded the information, they took it with them, to go and operate in the exact same job that they were doing here at Comet and developing the exact same technology.

It's not -- it's not different technology -- different technology.  It's the same.

And why would -- why would somebody -- now, I don't know if it's being used within

Page 220

XP Power.  I don't know that.                            14:51

          At the same time, why would anybody           14:51

download that material and why would they take them     14:52

with them?  It beggars belief.  You have to             14:52

under- -- you have to logically conclude this is to     14:52

go and be at the benefit for XP Power.  You can't --    14:52

you can't assume anything else in my opinion.           14:52

          And it's unethical.  It's flat unethical.     14:52

          So -- and I -- you know, I take personal      14:52

umbrage with this and Comet takes umbrage with this,    14:52

and we want this to be stopped.  We want it to stop,    14:52

and that's important to us as a company.                14:52

          So, yeah, I think we have been harmed, and    14:52

I think that -- I think that it's quite clear           14:52

that -- that -- that -- it's -- it's a risk             14:52

situation for the company.                              14:52

BY MS. LOTFOLLAHI:                                      14:52

    Q.   Why is this case important to Comet?           14:52

    A.   Well, I have sort of answered parts of         14:52

that already.                                           14:52

          The -- but we -- first of all, we need to     14:52

make it clear that we will protect our trade            14:53

secrets.  We need the industry to understand -- the     14:53

industry to understand that we will protect our         14:53

trade secrets vigorously; they -- it needs to be        14:53

                                            Page 221

well understood.                                         14:53

          Our employees and our -- and our             14:53
stakeholders -- our stakeholders need to know that     14:53
we are going to protect our trade secrets.  So it      14:53
sends the proper message into the -- into the          14:53
environment.                                            14:53

          I -- I just -- it's about -- it's about      14:53
how do we treat our own -- our own information.        14:53

          And it's also an assurance, in my opinion,   14:53
that our customers will understand that we will        14:53
treat their data in the same manner.                   14:53

          And we will treat -- we will treat our       14:53
competitors's data -- if we ever get it, we'll treat   14:53
it in the same manner.  We would not -- we would not   14:53
allow that to exist in the company.                    14:53

     Q.   And to your knowledge, is the situation      14:54
that -- like what occurred here, where employees       14:54
leave and go to a competitor and take company          14:54
information with them, is that -- is that common in     14:54
this industry based on your experience?                14:54

          MR. FARRELL:  Objection.  Foundation.        14:54
Vague.  Incomplete hypothetical.                       14:54

          You can answer.                              14:54

          THE WITNESS:  My -- my experience in the     14:54
industry -- and again, it's with multiple different    14:54

Veritext Legal Solutions
866 299-5127