```
1                 IN THE UNITED STATES DISTRICT COURT

2             FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                         SAN JOSE DIVISION

4

5    COMET TECHNOLOGIES USA INC. ET    )   CV-20-6408-NC
     AL,                               )
6                                      )   SAN JOSE, CALIFORNIA
                      PLAINTIFF,       )
7                                      )   MARCH 21, 2022
                 VS.                   )
8                                      )   VOLUME 6
     XP POWER LLC,                     )
9                                      )   PAGES 1113-1342
                      DEFENDANT.       )
10                                     )
     _____
11

12                    TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE NATHANAEL M. COUSINS
13               UNITED STATES MAGISTRATE JUDGE

14                    A P P E A R A N C E S

15   FOR THE PLAINTIFF:    BY:  ADAM R. ALPER
                                AKSHAY DEORAS
16                         KIRKLAND & ELLIS LLP
                           555 CALIFORNIA STREET
17                         SAN FRANCISCO, CA 94104

18

19   FOR THE PLAINTIFF:    BY:  MICHAEL WOODROW DE VRIES
                           KIRKLAND & ELLIS LLP
20                         555 SOUTH FLOWER STREET, SUITE 3700
                           LOS ANGELES, CA 90071
21

22            APPEARANCES CONTINUED ON NEXT PAGE

23   OFFICIAL COURT REPORTER:    SUMMER FISHER, CSR, CRR
                                 CERTIFICATE NUMBER 13185
24

25        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
             TRANSCRIPT PRODUCED WITH COMPUTER
```

```
 1    A P P E A R A N C E S (CONTINUED)

 2    FOR THE PLAINTIFF:      BY:  SHARRE S LOTFOLLAHI
                              KIRKLAND AND ELLIS LLP
 3                            2049 CENTURY PARK EAST
                              LOS ANGELES, CA 90067
 4

 5    FOR THE PLAINTIFF:      BY:  LESLIE M SCHMIDT
                              KIRKLAND AND ELLIS LLP
 6                            601 LEXINGTON AVENUE
                              NEW YORK, NY 10022
 7

 8    FOR THE DEFENDANT:      BY:  JOSEPH FARRELL
                                   THOMAS YEH
 9                            LATHAM & WATKINS
                              650 TOWN CENTER DRIVE, SUITE 2000
10                            COSTA MESA, CA 92673

11    FOR THE DEFENDANT:      BY:  PATRICIA YOUNG
                                   JEFFREY HOMRIG
12                            LATHAM & WATKINS LLP
                              140 SCOTT DRIVE
13                            MENLO PARK, CA 94025

14    FOR THE DEFENDANT:      BY:  MATTHEW W. WALCH
                              LATHAM & WATKINS LLP
15                            233 S. WACKER DRIVE, SUITE 5800
                              CHICAGO, IL 60606
16

17    FOR THE DEFENDANT:      BY:  STEPHEN O'DONOHUE
                              LATHAM & WATKINS LLP
18                            1271 AVENUE OF THE AMERICAS
                              NEW YORK, NEW YORK 10020
19

20    ALSO PRESENT:           JACQUELIN BAINTON
      COMET
21

22    ALSO PRESENT:           DUNCAN PERRY
      XP POWER
23

24

25
```

<pre>
 1                        INDEX OF PROCEEDINGS

 2


 3           DEFENDANT'S

 4           JOHN SPENCER (CONT.)
             REDIRECT EXAM BY MR. DAVIS              P. 1124
 5

 6           PAUL SMITH (VIDEO DEPOSITION)           P. 1130

 7           DAVID COWEN
             DIRECT EXAM BY MR. MANGAS               P. 1131
 8           CROSS-EXAM BY MS. LOTFOLLAHI            P. 1147
             REDIRECT EXAM BY MR. MANGAS             P. 1155
 9

10           MARKUS PFIEFFER (VIDEO DEPOSITION)      P. 1157

11           CARLYN IRWIN
             DIRECT EXAM BY MR. MANGAS               P. 1158
12           CROSS-EXAM BY MS. SCHMIDT               P. 1197
             REDIRECT EXAM BY MR. MANGAS             P. 1211
13

14           CLOSING ARGUMENT BY MR. ALPER          P. 1266, 1331

15           CLOSING ARGUMENT BY MS. YOUNG          P. 1298

16

17

18

19

20

21

22

23

24

25
</pre>

1116

1                        INDEX OF EXHIBITS

2                                    MARKED      ADMITTED

3        PLAINTIFF'S

4        3217, 3430, 3229                        1123
         2850                                    1131
5        2640, 2641                              1216

6

7

8        DEFENDANT'S

9        5062                                    1122
         5072, 5121                              1131
10       5096, 5097, 5098                        1158

11       5175, 5171, 5160, 5317, 5158,          1216
         5164, 5619, 5618, 5014, 5149
12       5173

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1            SAN JOSE, CALIFORNIA              MARCH 21, 2022

2                     P-R-O-C-E-E-D-I-N-G-S

3         (THE PROCEEDINGS WERE HELD OUT OF THE PRESENCE OF THE JURY

4    AT 9:30 A.M.)

5              THE COURT:  GOOD MORNING.  HAPPY MONDAY.  LET'S SEE

6     IF OUR JURORS ARE READY.

7              THE CLERK:  WE ARE MISSING ONE, YOUR HONOR.

8              THE COURT:  ALL RIGHT.

9         LET'S ALL BE SEATED.  WE CAN CATCH UP ON THE WEEKEND.

10        IT IS DAY SEVEN OF TRIAL.  WE ARE ON THE RECORD.  AS LUCK

11   WOULD HAVE IT, IT'S OUR THIRD MONDAY TOGETHER.  WE HAVE TO STOP

12   MEETING LIKE THIS.  I HOPE NO ONE'S BRACKET WAS BUSTED OVER THE

13   WEEKEND.

14        WE DID HAVE SOME DEVELOPMENTS IN THE CASE, WHICH I WILL

15   TRY TO SUMMARIZE HERE FOR OUR PROCEDURAL RECORD.

16        THANK YOU TO THE PARTIES FOR WORKING OUT THE STIPULATION

17   ON COUNT 2, THE CALIFORNIA TRADE SECRETS MISAPPROPRIATION

18   CLAIM, WHICH NOW HAS BEEN SPECIALLY DISMISSED WITH PREJUDICE,

19   SUBJECT TO CONDITIONS SET FORTH IN THE STIPULATION.  BUT THAT

20   CLAIM WILL NOT BE PRESENTED TO THE JURY, AND IT'S BEEN

21   RESOLVED.

22        WE PUT OUT, LAST NIGHT, REVISIONS TO THE CLOSING JURY

23   INSTRUCTIONS AND VERDICT FORM AFTER RECEIVING AND REVIEWING

24   VARIOUS FILINGS ON FRIDAY, WHICH WE DISCUSSED BRIEFLY ON FRIDAY

25   AND THEN ON SUNDAY.
```

```
1        IN SUMMARY, THIS IS NOT CAPTURING EVERY ASPECT BUT TRYING

2   TO HIT THE MORE SIGNIFICANT ONES.  THERE'S ONLY ONE CLAIM TO BE

3   PRESENTED TO THE JURY, THAT'S THE FEDERAL DTSA CLAIM, WITH FOUR

4   TRADE SECRETS ALLOCATED AND DESCRIBED IN THE VERDICT FORM AND

5   INSTRUCTIONS.

6        AS TO THE BURDEN, WE HAVE REMOVED THE CLEAR AND CONVINCING

7   EVIDENCE INSTRUCTION FROM THE FIRST DRAFT AND ALSO FROM THE

8   VERDICT FORM.

9        AS TO REMEDIES, WE'VE REMOVED THE NOMINAL DAMAGES REMEDY,

10  AT COMET'S OBJECTION TO IT AND TRACKING THE DTSA FEDERAL

11  STATUTE.

12       WE'VE KEPT IN THE REASONABLE ROYALTY ALTERNATIVE DAMAGES

13  IN THE ALTERNATIVE TO UNJUST ENRICHMENT.

14       AS TO PUNITIVE DAMAGES, WE TRACKED TO THE FEDERAL STANDARD

15  FOR PREPONDERANCE OF THE EVIDENCE FOR AN AWARD OF PUNITIVE

16  DAMAGES AND HAVE ADDED IN A CALCULATION INSTRUCTION FOR THE

17  JURY TO MAKE THAT DETERMINATION UP TO THE STATUTORY CAP OF TWO

18  TIMES THE COMPENSATORY DAMAGES.

19       OF COURSE, ATTORNEYS' FEES AND OTHER INJUNCTIVE RELIEF IS

20  NOT INCLUDED IN THE JURY'S DETERMINATION.

21       I THINK THAT'S THE SUMMARY OF THE CHANGES IN THE REMEDY

22  SECTION.

23       NO CHANGES MADE TO A NUMBER OF OTHER SECTIONS AS TO THE

24  SUBSTANCE OF THE TRADE SECRET CLAIMS.  AND WE CAN DISCUSS THAT

25  LATER AT A BREAK TO MAKE SURE THAT THERE'S NO ERRORS IN MY
```

1    EDITING PROCESS.

2         THE VERDICT FORM ALSO TRACKS.  IT IS DERIVED PRINCIPALLY

3    FROM XP'S PROPOSED VERDICT FORM WITH ONE DELETION BEING THE

4    INTERSTATE COMMERCE.  I THINK IT WAS QUESTION 3 OR 4 ON THE

5    PROPOSED FORM.

6         AND THE REASON I DID NOT INCLUDE AN INTERSTATE COMMERCE

7    INSTRUCTION ARE TWO:  FACTUALLY, AT TRIAL, I DON'T BELIEVE THAT

8    THIS WAS A DISPUTED ISSUE, THAT IT WAS AN AGREED-UPON ISSUE.

9    IT'S A JURISDICTIONAL ISSUE, OF COURSE, BUT I DIDN'T FIND THAT

10   THERE WAS A REAL DISPUTE ABOUT THAT COMING INTO OR DURING THE

11   TRIAL.

12        I DON'T THINK THERE'S ANYTHING FOR THE JURY, REASONABLY,

13   TO DETERMINE IN THAT AREA, SO I REMOVED THAT INSTRUCTION BUT

14   KEPT ALL THE OTHERS FROM XP, WITH THE ADDITION OF THE LINE FOR

15   PUNITIVE DAMAGES ADDED AS THE FINAL QUESTION, AS SUGGESTED BY

16   COMET.

17        SO THAT'S KIND OF THE WORK PRODUCT THAT WENT INTO THE

18   REVISED VERDICT FORM.

19        THERE WERE TWO FILINGS THAT I DID NOT ANTICIPATE OVER THE

20   WEEKEND, ONE FROM EACH SIDE.

21        ON THE COMET SIDE, THERE WAS A REPLY BRIEF ON THE JURY

22   INSTRUCTIONS, WHICH WAS IN RESPONSE TO THE NOON FILING

23   YESTERDAY.  AND I REVIEWED IT AND DECIDED TO PERMIT IT.  I

24   CONSIDERED IT IN RULING ON THE JURY INSTRUCTIONS AND VERDICT

25   FORM, AS IT WAS RESPONSIVE TO THE XP BRIEF FILED EARLIER IN THE

1    DAY.

2         ON THE XP SIDE, THERE WAS AN AMENDED EXHIBIT LIST FILED

3    LAST NIGHT.  I COULD SEE ON IT THAT IT HAS SOME ANNOTATIONS FOR

4    THINGS THAT WERE ADMITTED, BUT I COULD NOT DEDUCE, FROM A QUICK

5    REVIEW OF IT, WHAT ELSE WAS CHANGED IN IT.

6         SO I MIGHT START -- NOT START, BUT JUST PROCEDURALLY ASK:

7    WHAT WAS CHANGED IN THE AMENDED EXHIBIT LIST?

8              MR. DAVIS:  GOOD MORNING, YOUR HONOR.  BLAKE DAVIS

9    FOR XP.

10             THE COURT:  YES.  GOOD MORNING.

11             MR. DAVIS:  SO IN THE PROCESS OF THE AGREED

12   STIPULATION TO REMOVE THE CONFIDENTIALITY DESIGNATIONS, THE DOC

13   PROCESSING VENDOR THAT WE USED INADVERTENTLY DELETED SOME OF

14   THE ACTUAL CONFIDENTIALITY LANGUAGE IN THE UNDERLYING

15   DOCUMENTS, AND SO WE WANTED TO AVOID ANY SORT OF APPEARANCE

16   THAT THAT WAS SOMETHING THAT SHOULD BE OMITTED.  AND SO THAT'S

17   ALL THAT THE REPLACEMENTS ARE.

18             THE COURT:  ALL RIGHT.  SO IS THE NUMBERING OF THE

19   AMENDED EXHIBITS CHANGED?

20             MR. DAVIS:  NO.  THEY ARE IDENTICAL.  AND, REALLY, IT

21   IS JUST TO REFLECT THE ORIGINAL DOCUMENTS AS THEY EXISTED,

22   REMOVING, AS IT WAS SUPPOSED TO BE, ONLY THE HIGHLY

23   CONFIDENTIAL ATTORNEYS' EYES ONLY.

24             THE COURT:  ALL RIGHT.  THANK YOU FOR THAT

25   CLARIFICATION.  I APPRECIATE IT.

1        AND I INDICATED THAT THAT WAS COMMUNICATED COMET SIDE.

2     LET ME CHECK AND SEE IF COMET HAS ANY QUESTIONS ABOUT THAT

3     PROCESS.

4              MS. LI:  GOOD MORNING, YOUR HONOR.  KAT LI FOR COMET.

5        YES, THEY ALREADY NOTIFIED US OF THIS, AND WE ARE IN

6     AGREEMENT.

7              THE COURT:  ALL RIGHT.

8        AND IT WASN'T LONG AGO, BUT DID YOU HAVE A CHANCE TO

9     REVIEW THEIR AMENDED EXHIBIT LIST TO SEE IF THERE'S ANYTHING

10    ELSE IN THERE THAT RAISES QUESTIONS?

11             MS. LI:  WE DIDN'T RECEIVE AN EXCEL YET OF THAT, BUT

12    I WILL TELL YOU, THE PARTIES ARE ALREADY WORKING CURRENTLY,

13    COOPERATIVELY, TO MAKE SURE THAT THE EXHIBITS ARE READY FOR THE

14    JURY WHEN WE CLOSE.  SO I DON'T ANTICIPATE ANY ISSUES.

15             THE COURT:  GREAT.  THANK YOU VERY MUCH FOR WORKING

16    ON THAT, BOTH SIDES.

17        (OFF-THE-RECORD DISCUSSION.)

18             THE COURT:  ANY OTHER LOGISTICAL ISSUES AS WE PREPARE

19    FOR TODAY'S EXAMINATIONS AND NEXT STEPS?

20             MR. ALPER:  YES, VERY BRIEFLY, YOUR HONOR.  TWO

21    THINGS.  ONE IS, AT THE CLOSE OF XP'S CASE -- WE'VE CONFERRED

22    OUTSIDE THE PRESENCE OF THE JURY -- WITH YOUR PERMISSION, WE

23    WILL MAKE OUR 50(A) MOTION, IF THAT IS ACCEPTABLE.

24             THE COURT:  YES.

25             MR. ALPER:  AND, SECONDLY, WE HAVE CHECKED WITH

1      MS. HARRELL, AND WE BELIEVE WE HAVE AN HOUR 28 MINUTES LEFT,

2      AND, OF COURSE, WE WILL USE OUR TIME IN ACCORDANCE WITH THAT.

3              THE COURT:  VERY GOOD.  AND I SEE THAT CALCULATION,

4      AND IT LOOKS LIKE THREE HOURS AND 27 MINUTES.  I HAVE TO GO

5      THROUGH THE PLEXIGLASS HERE, WHICH IS NOT EASY.

6          YES.  GOOD MORNING, MR. FARRELL.

7              MR. FARRELL:  YES.  TWO THINGS, YOUR HONOR:  ONE, WE

8      NEED TO MOVE IN EXHIBIT 5062.  THAT WAS IN MR. RUMMEL'S

9      TESTIMONY.  AND THERE'S NO OBJECTION, AS I UNDERSTAND IT.  I

10     WANT TO BRING THAT TO YOUR ATTENTION.

11         THE OTHER IS WE ARE GOING TO USE VIDEO TODAY.  AND THERE

12     WERE SOME TECHNICAL DIFFICULTIES WITH PART OF IT.  SO IT'S

13     GOING TO BE VIDEO, AUDIO, VIDEO.  AND WE CAN STATE THAT WHEN WE

14     INTRODUCE IT, BUT I THOUGHT YOU SHOULD BE AWARE OF THAT.

15             THE COURT:  I APPRECIATE THAT.

16         SO, FIRST, 5062 IS ADMITTED.

17         (DEFENDANT'S EXHIBIT 5062 WAS ADMITTED INTO EVIDENCE.)

18             THE COURT:  AND THE VIDEO, AUDIO, VIDEO, WHICH

19     WITNESS IS BEING PRESENTED THAT WAY?

20             MR. FARRELL:  THAT'S MR. SMITH.

21             THE COURT:  MR. SMITH.  ALL RIGHT.

22         AND YOU ARE READY FOR THAT.  ARE THERE ANY OBJECTIONS

23     REMAINING TO THAT PORTION?

24             MR. ALPER:  NO OBJECTIONS, YOUR HONOR.

25             THE COURT:  ALL RIGHT.  VERY GOOD.

```
1          AND ANY CHANGE IN THE FORECAST IN THE ORDER OF YOUR

2    WITNESSES THIS MORNING?

3              MR. FARRELL:  I'M NOT SURE IF THIS IS A CHANGE, BUT

4    IT WILL BE MR. SPENCER, OBVIOUSLY CONTINUING; THEN THE VIDEO OF

5    MR. SMITH; THEN MR. COWEN, THE TECHNICAL EXPERT, FORENSICS

6    EXPERT; THEN MR. PFEIFFER'S VIDEO DEPOSITION; AND, FINALLY,

7    MS. IRWIN.

8              THE COURT:  ALL RIGHT.  AND ANY ISSUES FOR THE

9    PFEIFFER VIDEO?

10             MR. FARRELL:  NO.  APPARENTLY THAT ONE WAS NOT A

11   PROBLEM.

12             THE COURT:  AS FAR AS OBJECTIONS GO, THOSE ARE

13   RESOLVED?

14             MR. ALPER:  NO, WE HAVE RESOLVED ALL OF THOSE.

15             THE COURT:  GREAT.  ALL RIGHT.  SOUNDS LIKE A GOOD

16   PLAN.  I SEE A STICKY ON THE COMET SIDE.

17             MR. ALPER:  I HAVE BEEN HANDED A STICKY NOTE.

18         WE HAVE THREE EXHIBITS TO MOVE INTO EVIDENCE THAT ARE

19   UNOBJECTED TO, THAT IS PX3217, PX3430, AND PX3229.

20             THE COURT:  ALL RIGHT.  GOT IT.  3217, 3430, AND 3229

21   ARE EACH ADMITTED.

22         (PLAINTIFF'S EXHIBITS 3217, 3430, 3229 WERE ADMITTED INTO

23   EVIDENCE.)

24             THE COURT:  AND I THINK OUR JURORS ARE READY, SO WE

25   WILL TAKE A BREAK AND BRING THEM IN.
```

1          (JURY IN AT 9:41 A.M.)

2               THE COURT:  GOOD MORNING.

3          WE WILL WAIT FOR OUR LAST JUROR, AND WE WILL GET BACK ON

4     THE RECORD.  ALL RIGHT.  EVERYBODY MAY BE SEATED.

5          GOOD MORNING TO OUR JURORS.  I HOPE YOU HAD A RESTFUL

6     WEEKEND.  WHEN WE BEGAN THE TRIAL, IT WAS WINTER, NOW SPRING

7     HAS SPRUNG.

8          AND DR. SPENCER IS BACK ON THE STAND AND REMAINS UNDER

9     OATH CONTINUING HIS EXAMINATION.  AND ONCE HE'S COMPLETED, WE

10    WILL HAVE ADDITIONAL WITNESSES FROM THE XP SIDE AS THE DAY GOES

11    ALONG.

12         ALL RIGHT.  COUNSEL, YOU MAY CONTINUE.

13              MR. DE VRIES:  GOOD MORNING, YOUR HONOR.

14         COMET CHECKED OVER THE WEEKEND AND CONFIRMED THAT WE DO

15    NOT HAVE ANY ADDITIONAL QUESTIONS THAT WE NEED TO ASK

16    DR. SPENCER.

17              THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

18         LET ME CHECK IN WITH THE XP SIDE TO SEE IF THERE'S ANY

19    FURTHER QUESTIONS.

20              MR. DAVIS:  YES, YOUR HONOR.

21              THE COURT:  YOU MAY PROCEED.

22                       **REDIRECT EXAMINATION**

23    BY MR. DAVIS:

24    Q.   GOOD MORNING, DR. SPENCER.

25    A.   GOOD MORNING.

1    Q.   SO I WANT TO FOLLOW UP ON A FEW THINGS THAT WERE DISCUSSED

2    DURING YOUR CROSS-EXAMINATION.

3    A.   CERTAINLY.

4    Q.   AND FIRST, I WANT TO ASK YOU ABOUT SOME OF THE QUESTIONS

5    REGARDING XP'S ACTIONS THAT MR. DE VRIES ASKED YOU.

6         MR. DAVIS:  MR. SCHMOLLER, COULD YOU PLEASE PUT UP

7    TRIAL TRANSCRIPT 1100, 13 THROUGH 16.

8    BY MR. DAVIS:

9    Q.   AND, DR. SPENCER, YOU WERE ASKED:

10        "QUESTION:  AND THE OPINION THAT YOU EXPRESSED IN

11   YOUR REPORT AND AT YOUR DEPOSITION WAS THAT THE ACTIONS THAT XP

12   TOOK IN 2018 WERE APPROPRIATE, RIGHT?

13        "ANSWER:  AT THE TIME THEY WERE APPROPRIATE, THAT WAS

14   MY TESTIMONY."

15        CAN YOU EXPLAIN WHAT YOU MEAN BY "AT THE TIME THEY WERE

16   APPROPRIATE"?

17   A.   WELL, IN 2018, XP HAD INFORMATION THAT WAS GIVEN TO THEM

18   BY COMET, AND THEY TOOK STEPS -- THEY TOOK APPROPRIATE STEPS.

19   THEY WERE ACTING WITHOUT THE BENEFIT OF HINDSIGHT.  IT WAS

20   ACTIONS THAT WERE TAKEN AT THE TIME.  SO I WOULD SAY MY

21   TESTIMONY THERE WAS THEY WERE APPROPRIATE.

22   Q.   AND YOU MENTIONED "HINDSIGHT."  IN 2018, DID COMET PROVIDE

23   XP WITH THE INFORMATION THAT COMET HAS PRESENTED TO US ALL HERE

24   AT TRIAL, PARTICULARLY WITH REGARDS TO MR. BEUERMAN AND

25   MR. MASON?

1    A.   YES.  WOULD YOU REPEAT THAT, PLEASE.

2    Q.   YEAH.  SO IN 2018, DID COMET PROVIDE -- WE'VE SEEN A LOT

3    OF INFORMATION HERE AT TRIAL.

4         DO YOU AGREE WITH THAT?

5    A.   YES.

6    Q.   AND IS ALL OF THAT INFORMATION SOMETHING THAT WAS PROVIDED

7    TO XP BY COMET BACK IN 2018?

8    A.   I BELIEVE THAT EVERYTHING THAT I'VE HEARD HERE TODAY WAS

9    PRESENTED AT THE TIME.  THERE IS OTHER MATERIAL THAT HAS NOT

10   BEEN DISCUSSED.

11   Q.   WITH RESPECT TO THE MATERIALS THAT WE'VE SEEN HERE, HAVE

12   YOU HEARD TESTIMONY THAT ADDITIONAL INFORMATION WAS PROVIDED

13   TO -- OH, AND ACTUALLY, LET ME CLARIFY.

14        WHEN I SAY "XP," I MEAN XP THE COMPANY, RATHER THAN XP,

15   INCLUDING THE ATTORNEYS.

16        DO YOU UNDERSTAND WHAT I MEAN?

17   A.   I BELIEVE SO.

18   Q.   AND DO YOU UNDERSTAND THAT SOME OF THE MATERIALS IN THE

19   CASE WERE PRODUCED AS ONLY TO THE ATTORNEYS AND NOT TO XP, THE

20   COMPANY?

21   A.   COMET MATERIALS WERE PRESENTED ONLY TO XP -- TO XP'S

22   ATTORNEYS?

23   Q.   CORRECT.

24   A.   ACTUALLY, I'M NOT SURE ABOUT HOW I SHOULD ANSWER THAT

25   QUESTION.

1     Q.   SO LET ME ASK A SLIGHTLY DIFFERENT QUESTION.

2          WHEN MR. BEUERMAN HAD BEEN SUED IN FEBRUARY OR MARCH 2018,

3     HAD MR. MORI AND MR. MASON BEEN ADDED TO THE LAWSUIT YET?

4     A.   NO, THEY HAD NOT.

5     Q.   HAD XP BEEN PROVIDED WITH THE INFORMATION AND ALLEGATIONS

6     AGAINST MR. MORI AND MR. MASON IN MARCH OF 2018?

7     A.   NO, THEY WERE NOT.

8     Q.   AND AS XP LEARNED THE ADDITIONAL INFORMATION FROM COMET

9     REGARDING THE FORMER EMPLOYEES, DID XP TAKE ADDITIONAL STEPS TO

10    ADDRESS THAT ADDITIONAL INFORMATION?

11    A.   YES, THEY DID.

12    Q.   AND WERE THOSE ADDITIONAL STEPS REASONABLE AND CONSISTENT

13    WITH INDUSTRY PRACTICES?

14    A.   YES, THEY WERE.

15    Q.   SO MOVING TO A SECOND TOPIC THAT YOU WERE ASKED ON

16    CROSS-EXAMINATION, MR. DE VRIES ASKED ABOUT THE SECRECY OF THE

17    ALLEGED TRADE SECRETS AND EFFORTS TO PROTECT THE ALLEGED TRADE

18    SECRETS?

19    A.   YES, HE DID.

20    Q.   DID YOU HEAR DR. SHANFIELD TESTIFY ABOUT THE LAW AND HOW

21    IT REQUIRES BOTH SIDES TO LOOK AT COMET AND WHAT THEY DID TO

22    PROTECT THE INFORMATION THAT IT ALLEGES AS ITS TRADE SECRETS?

23          MR. DE VRIES:  OBJECTION, YOUR HONOR.  FOUNDATION.

24          THE COURT:  SUSTAINED.

25    BY MR. DAVIS:

1    Q.   DR. SPENCER, MR. DE VRIES ASKED YOU ABOUT WHETHER

2    PRESENTATIONS THAT WERE MADE BY COMET BEFORE THIS LITIGATION TO

3    THIRD PARTIES DISCLOSED ALL OF COMET'S PARTICULAR TRADE SECRETS

4    A THROUGH T.

5         DO YOU RECALL THAT?

6    A.   WELL, IT WOULD BE HELPFUL IF WE COULD REVIEW THE ACTUAL --

7    MY ACTUAL TESTIMONY.

8             MR. DAVIS:  MR. SCHMOLLER, COULD YOU PLEASE PULL UP

9    TRIAL TRANSCRIPT 1094, 14 THROUGH 18.

10   BY MR. DAVIS:

11   Q.   DO YOU RECALL THIS TESTIMONY NOW?

12   A.   YES.

13   Q.   DID COMET GIVE PRESENTATIONS TO THIRD PARTIES BEFORE THIS

14   LITIGATION THAT DISCLOSED SOME OF THE SPECIFICS OF COMET'S

15   ALLEGED TRADE SECRETS?

16   A.   YES, THEY DID.

17   Q.   AND DID YOU ANALYZE THAT INFORMATION?

18   A.   YES, I DID.

19             MR. DAVIS:  MR. SCHMOLLER, CAN WE PLEASE PUT UP

20   PX002.0007.

21             MR. DE VRIES:  MAY WE ASK THE GALLERY MONITORS BE

22   TURNED OFF, PLEASE.

23             THE COURT:  YES.  THANK YOU.

24   BY MR. DAVIS:

25   Q.   IS PX0002 ONE OF THE PRESENTATIONS THAT COMET GAVE TO

1    THIRD PARTIES BEFORE THIS LITIGATION?

2    A.   WELL, IT LOOKS TO BE, YES.  IT'S THE COMET MATCH TECHNICAL

3    ROAD MAP THAT WAS THE ONE PRESENTED TO LAM RESEARCH.  YES, I'M

4    VERY FAMILIAR WITH THAT.

5    Q.   AND WAS THIS MARKED CONFIDENTIAL?

6    A.   NO, IT WAS NOT.

7    Q.   WAS LAM OBLIGATED TO KEEP THE INFORMATION SECRET?

8    A.   NO.

9    Q.   DR. SPENCER, MR. DE VRIES ALSO ASKED YOU ABOUT YOUR

10   OPINIONS ON OWNERSHIP AS WELL, CORRECT?

11   A.   YES, HE DID.

12   Q.   AND DURING YOUR TESTIMONY, YOU TESTIFIED THAT YOU HAVE

13   LISTENED TO EVERY WORD THAT'S BEEN SAID AT THIS TRIAL SINCE DAY

14   ONE; IS THAT RIGHT?

15   A.   THAT IS CORRECT.

16   Q.   AND HAVING HEARD AND SEEN ALL OF THE EVIDENCE AT TRIAL,

17   WERE XP'S ACTIONS REASONABLE AND CONSISTENT WITH INDUSTRY

18   PRACTICES?

19   A.   YES, THEY WERE.

20   Q.   DID COMET SHOW OWNERSHIP?

21   A.   WITH RESPECT TO THE APPLIED MATERIALS, NO, THEY DID NOT.

22   Q.   WERE THE ALLEGED TRADE SECRETS SECRET AT THE TIME?

23   A.   NO, THEY WERE NOT.

24   Q.   AND DID COMET TAKE MEASURES TO PROTECT THE ALLEGED TRADE

25   SECRETS THAT ARE REASONABLE AND PROPORTIONATE TO THEIR ALLEGED

```
1    VALUE?

2    A.   NO.

3              MR. DAVIS:  THANK YOU.

4         NO FURTHER QUESTIONS FOR DR. SPENCER.

5              THE COURT:  THANK YOU, DR. SPENCER, YOU MAY STEP

6    DOWN.

7              AND IF XP WILL CALL ITS NEXT WITNESS, PLEASE.

8              MR. FARRELL:  OUR NEXT WITNESS WILL BE THE VIDEOTAPED

9    DEPOSITION TESTIMONY OF MR. SMITH.

10        AND I WANTED TO NOTE FOR THE COURT AND THE JURY, THAT IT

11   WILL BE VIDEO WITH A SEGMENT OF AUDIO, BECAUSE OF THE TECHNICAL

12   PROBLEM IN THE MIDDLE, AND THEN BACK TO VIDEO.

13             THE COURT:  VERY GOOD.

14        AND FOR THE JURY'S ATTENTION SPAN, APPROXIMATELY HOW LONG

15   IS THIS?

16             MR. FARRELL:  I BELIEVE IT'S ABOUT TEN MINUTES,

17   YOUR HONOR.  IT WON'T BE VERY LONG.

18             THE COURT:  VERY GOOD.  YOU MAY PROCEED.  THANK YOU.

19             **(THE VIDEO DEPOSITION OF PAUL SMITH WAS PLAYED INTO THE**

20   **RECORD.)**

21             MR. FARRELL:  YOUR HONOR, FOR THE RECORD, I WANTED TO

22   MOVE INTO EVIDENCE WHAT WAS MARKED AS EXHIBIT 1 IN THE

23   DEPOSITION, WHICH IS PX2850.  EXHIBIT 5, WHICH WAS REFERENCED,

24   IS DX5143, BUT I BELIEVE THAT'S ALREADY IN EVIDENCE.

25             EXHIBIT 7, WHICH WAS REFERENCED, I WOULD MOVE INTO
```

1    EVIDENCE, THAT'S DX5072.

2         AND EXHIBIT 6, WE WOULD ALSO MOVE INTO EVIDENCE, THAT'S

3    DX5121.

4              THE COURT:  ALL RIGHT.  I WILL ADMIT 2850, WHICH IS A

5    COMET EXHIBIT, 5072, AND 5121.

6         (EXHIBITS 2850, 5072, 5121 WERE ADMITTED INTO EVIDENCE.)

7              THE COURT:  ALL RIGHT.  THANK YOU.  AND IF YOU WILL

8    CALL YOUR NEXT WITNESS, PLEASE.

9              MR. FARRELL:  OUR NEXT WITNESS IS OUR FORENSICS

10   EXPERT, DAVID COWEN.

11             THE COURT:  HE MAY COME FORWARD.  THANK YOU.

12             **(DEFENSE WITNESS, DAVID COWEN, WAS SWORN.)**

13             THE WITNESS:  I DO.

14             THE CLERK:  PLEASE BE SEATED.  PLEASE STATE YOUR FULL

15   NAME AND SPELL YOUR LAST NAME FOR THE RECORD.

16             THE WITNESS:  MY NAME IS DAVID LAWRENCE COWEN,

17   C-O-W-E-N.

18             THE COURT:  YOU MAY PROCEED.  GOOD MORNING.

19             MR. MANGAS:  GOOD MORNING, LADIES AND GENTLEMEN OF

20   THE JURY.  RUSSELL MANGAS ON BEHALF OF XP POWER.

21                        **DIRECT EXAMINATION**

22   BY MR. MANGAS:

23   Q.   GOOD MORNING, MR. COWEN.

24   A.   GOOD MORNING.

25   Q.   WOULD YOU PLEASE INTRODUCE YOURSELF TO THE JURY.

1     A.   MY NAME IS DAVID COWEN.  I'M A MANAGING DIRECTOR AT KPMG

2     IN OUR CYBER RESPONSE SERVICES.

3     Q.   AND, MR. COWEN, HAVE YOU PREPARED SOME SLIDES TO AID IN

4     YOUR TESTIMONY TODAY?

5     A.   I HAVE.

6          MR. MANGAS:  YOUR HONOR, WITH YOUR PERMISSION I WOULD

7     LIKE TO PUBLISH THOSE TO THE JURY.

8          THE COURT:  YOU MAY.

9     BY MR. MANGAS:

10    Q.   MR. COWEN, I'M GOING TO START BY PUTTING A SUMMARY OF YOUR

11    RESUME UP ON THE SCREEN.  I SEE THAT YOU WENT TO THE UNIVERSITY

12    OF TEXAS IN DALLAS.  IS THAT WHERE YOU LEARNED TO PERFORM

13    DIGITAL FORENSICS?

14    A.   NO, THEY DIDN'T HAVE A DIGITAL FORENSIC'S DEGREE BACK

15    THEN.

16    Q.   WHEN DID YOU LEARN TO PERFORM DIGITAL FORENSICS?

17    A.   I STARTED PERFORMING DIGITAL FORENSICS INVESTIGATIONS IN

18    1999, TESTIFIED FOR THE FIRST TIME IN 2002.

19    BY MR. MANGAS:

20    Q.   AND, MR. COWEN, LET'S TALK ABOUT YOUR EXPERIENCE AFTER

21    GRADUATING FROM COLLEGE.  CAN YOU BRIEFLY WALK THE JURY THROUGH

22    YOUR EXPERIENCE WITH DIGITAL FORENSICS?

23    A.   SURE.  AT THAT TIME I HAD ALREADY STARTED A BOUTIQUE FIRM

24    CALLED G-C PARTNERS WHERE WE WERE DOING DIGITAL FORENSICS AND

25    PROVIDING TESTIMONY IN CASES LIKE THIS, AND INCIDENT RESPONSE.

1    AND THEN IN 2019, I WENT TO KPMG AND BECAME A MANAGING DIRECTOR

2    THERE.

3    Q.   AND, MR. COWEN, I'M GOING TO PUT A LIST OF YOUR

4    ACCREDITATIONS AND CERTIFICATIONS UP ON THE SCREEN, AND I WOULD

5    LIKE YOU TO JUST BRIEFLY DESCRIBE TO THE JURY WHAT THOSE

6    CERTIFICATIONS MEAN.

7    A.   SURE.  THE CISSP, WHICH IS THE FIRST ONE, IS STANDARD KIND

8    OF OVERALL INFORMATION SECURITY CERTIFICATION SAYING YOU

9    UNDERSTAND THE DOMAINS OF INFORMATION SECURITY.

10        THE GIAC CERTIFIED FORENSIC EXAMINER IS A WINDOWS DIGITAL

11   FORENSICS EXAMINATION THAT SHOWS YOU ARE PROFICIENT IN DIGITAL

12   FORENSICS IN WINDOWS.  I HAD TO GET THAT CERTIFICATION BECAUSE

13   I WAS TEACHING THE CLASS, THAT WAS ONE OF THE REQUIREMENTS TO

14   TEACH THE CLASS.

15        AND WHICH -- NEXT IS YOU CAN SEE I BECAME A CERTIFIED

16   INSTRUCTOR FOR THE SANS ORGANIZATION.  I NOW NOT ONLY TEACH FOR

17   THEM, BUT I HAVE A CLASS ON CLOUD FORENSICS FOR THEM AS WELL.

18   AND THEN BECAUSE OF THAT, I WENT AHEAD AND GOT A CERTIFICATION

19   FROM AWS ON BASICS OF AWS CLOUD.

20   Q.   WHAT DOES AWS STAND FOR?

21   A.   AMAZON WEB SERVICES.

22   Q.   MR. COWEN, I SEE YOU HAVE A NUMBER OF BOOKS LISTED ON YOUR

23   RESUME.  ARE THOSE BOOKS THAT YOU WROTE?

24   A.   THOSE ARE BOOKS THAT EITHER I WROTE PRINCIPALLY OR I WAS A

25   CO-AUTHOR ON ALL-AROUND DIGITAL FORENSICS.

1    Q.   PLEASE BRIEFLY EXPLAIN TO THE JURY THE SUBJECT MATTER THAT

2    YOU'VE AUTHORED IN.

3    A.   DIGITAL FORENSICS AND INCIDENCE RESPONSE HAS BEEN THE BULK

4    OF MY CAREER SINCE 1999.

5    Q.   MR. COWEN, HAVE YOU BEEN QUALIFIED AS AN EXPERT WITNESS

6    EITHER BY AN ARBITRATION PANEL AT ARBITRATION OR BY A COURT AT

7    TRIAL IN THE FIELD OF DIGITAL FORENSICS?

8    A.   YES.

9    Q.   AND ABOUT HOW MANY TIMES?

10   A.   IF WE WERE TO ESTIMATE, ONCE A YEAR SINCE 2002, AROUND 20

11   TIMES.  I COULDN'T SAY, I HAVEN'T KEPT TRACK BEYOND THE FOUR

12   YEARS I'M ASKED TO DO.

13        MR. MANGAS:  YOUR HONOR, AT THIS TIME XP POWER

14   TENDERS DAVID COWEN AS AN EXPERT IN DIGITAL FORENSICS.

15        MS. LOTFOLLAHI:  NO OBJECTION.

16        THE COURT:  ALL RIGHT.  I WILL PERMIT MR. COWEN TO

17   TESTIFY AS AN EXPERT IN DIGITAL FORENSICS SUBJECT TO

18   CROSS-EXAMINATION AND WITHIN THE SCOPE OF HIS PRETRIAL

19   DISCLOSURES.  YOU MAY PROCEED.

20        MR. MANGAS:  THANK YOU, YOUR HONOR.

21   BY MR. MANGAS:

22   Q.   MR. COWEN, I WOULD LIKE YOU TO BRIEFLY EXPLAIN TO THE JURY

23   THE WORK THAT YOU'VE PERFORMED IN THIS CASE.

24   A.   SURE.  I WAS ASKED TO REVIEW MR. FAULKNER'S WORK IN THIS

25   CASE.  REVIEWING THE DOCUMENTS HE PUT TOGETHER, THE THINGS THAT

1    HE RELIED UPON, THE OTHER EXPERTS HE RELIED UPON.  AND TO DO

2    SO, I ALSO REVIEWED THE DEPOSITION TESTIMONY OF THE INDIVIDUALS

3    INVOLVED IN THE FORENSIC EXAMINATION.

4         I ALSO READ THE RELEVANT PLEADINGS THAT WOULD BE

5    REFLECTIVE OF THAT.  AND THEN OF COURSE TO DO THAT, I HAD TO

6    REVIEW THE FORENSIC DATA THAT CAME ALONG WITH IT.

7    Q.   AND, MR. COWEN, AS A RESULT OF THAT WORK, HAVE YOU FORMED

8    OPINIONS IN THIS CASE?

9    A.   I HAVE.

10   Q.   AND CAN YOU AT A HIGH LEVEL JUST BRIEFLY EXPLAIN WHAT

11   THOSE OPINIONS ARE THAT YOU WILL BE DISCUSSING TODAY.

12   A.   SURE.  SO ONE IS THAT THERE IS A LARGE AMOUNT OF DATA THAT

13   WAS CONTAINED ON THE DRIVES THAT THE INDIVIDUALS HAD ACCESS TO,

14   BUT THE FORENSIC RECORDS SHOW A SMALLER SUBSET OF DATA THAT WAS

15   ACTUALLY ACCESSED FROM XP'S COMPUTERS.

16        AND THEN THE SECOND IS THAT IN REVIEWING THE EVIDENCE IN

17   THIS CASE, I DON'T SEE THAT THE FILES THAT MR. FAULKNER AND I

18   HAVE DISCUSSED ARE ACTUALLY BEING COPIED AROUND TO OTHER XP

19   SYSTEMS AND MADE AVAILABLE TO THEM.

20   Q.   AND, MR. COWEN, I WANT TO START BY ASKING YOU SOME

21   QUESTIONS ABOUT DOCUMENTS THAT COMET CLAIMS THAT DOUG BEUERMAN

22   DOWNLOADED BEFORE HE LEFT, AND SPECIFICALLY I WANT TO ASK YOU

23   ABOUT, IN COMET'S OPENING STATEMENT, ITS ATTORNEYS PUT A SLIDE

24   UP ON THE SCREEN SHOWING 10,000 DOCUMENTS AND THEN A SLIDE

25   SHOWING -- I'M GOING TO ADVANCE TO THAT SLIDE SHOWING

1    MR. BEUERMAN'S DOWNLOADS AT COMET, AND COMET'S ATTORNEY CLAIMED

2    THAT XP GOT THOSE FILES.  I WANT TO ASK YOU ABOUT THAT.

3         SO WHAT WE'RE LOOKING AT HERE ON THE SCREEN IS A COPY OF

4    PDX6.17, WHICH IS A SLIDE THAT MR. FAULKNER USED DURING HIS

5    TESTIMONY.  DID YOU REVIEW MR. FAULKNER'S TESTIMONY AND HIS

6    SLIDES?

7    A.   I DID.

8    Q.   AND FOCUSING ON PDX6.17, CAN YOU TELL THE JURY WHAT DEVICE

9    MR. BEUERMAN DOWNLOADED ALL THESE DOCUMENTS TO?

10   A.   I BELIEVE MR. FAULKNER AGREES THAT THIS WAS DOWNLOADED ON

11   THE SILICON POWER DEVICE.

12   Q.   AND FOCUSING ON THE CLAIM THAT COMET'S ATTORNEY MADE IN

13   HIS OPENING STATEMENT, DID XP GET THOSE DOCUMENTS?

14   A.   I DON'T SEE HOW THEY COULD, THAT DRIVE WAS FORMATTED

15   BEFORE HE WENT TO WORK AT XP.

16   Q.   AND HOW DO YOU KNOW THAT?

17   A.   WE ACTUALLY HAVE THE FORENSIC RECORDS ON THE DRIVE ITSELF

18   SHOWING THAT IT WAS FORMATTED.  AND THERE IS NO ACCESSIBLE DATA

19   LEFT OF ANY OF THESE PARTICULAR FILES, AS WELL AS THE RECORDS

20   ON THE SYSTEM ITSELF THAT IT WAS PLUGGED INTO.

21   Q.   AND WAS THAT DEVICE EVER PLUGGED INTO MR. BEUERMAN'S

22   XP POWER LAPTOP?

23   A.   NOT FROM ANY EVIDENCE THAT I'VE SEEN.

24   Q.   MR. COWEN, I'M GOING TO PUT UP ANOTHER DEMONSTRATIVE THAT

25   COMET'S EXPERT, MR. FAULKNER, USED DURING HIS TESTIMONY.

1       WE JUST DISCUSSED THE SILICON POWER DEVICE LISTED THERE AT

2   THE TOP.  BUT I WANT TO ALSO ASK YOU ABOUT THE SAMSUNG DEVICE

3   THAT'S LISTED NEXT.

4       DID XP RECEIVE ANY DOCUMENTS FROM THAT DEVICE?

5   A.   AGAIN, THAT WAS FORMATTED ON JANUARY 28TH, SO -- IT WAS

6   NEVER PLUGGED INTO THE XP COMPUTER, THAT DATA SHOULD NOT HAVE

7   BEEN ACCESSIBLE TO THEM.

8   Q.   LET'S TALK ABOUT THE SEAGATE DEVICE THAT'S LISTED NEXT.

9       WAS THAT DEVICE EVER CONNECTED TO MR. BEUERMAN'S XP

10  LAPTOP?

11  A.   NO.

12  Q.   AND DID YOU, IN THE COURSE OF YOUR WORK IN THIS CASE,

13  DETERMINE HOW MR. BEUERMAN WAS USING THAT DEVICE IN FEBRUARY OF

14  2018?

15  A.   IN MY REVIEW, WHAT I SAW WAS MR. BEUERMAN HAD DELETED

16  DOCUMENTS FROM THIS DEVICE AT SOME POINT, AND THEN, ACCORDING

17  TO HIS TESTIMONY, DECIDED HE SHOULD TRY TO RECOVER THE DATA

18  THAT WAS DELETED BECAUSE, IN HIS WORDS, THERE WAS SOME PERSONAL

19  DATA THERE.  THAT DATA WAS RECOVERED AND THEN PLACED ON THE

20  WESTERN DIGITAL MY BOOK DEVICE.

21  Q.   AND HAVE YOU REVIEWED MR. FAULKNER'S TRIAL TESTIMONY ON

22  THAT POINT?

23  A.   I HAVE.

24  Q.   AND IS HIS TESTIMONY CONSISTENT WITH WHAT YOU WERE SAYING

25  TODAY?

1    A.   I BELIEVE SO.

2    Q.   BEFORE WE MOVE ON, MR. COWEN, I WANT TO ASK:  DID YOU SEE

3    ANY EVIDENCE OF THE KIND OF MASS DOWNLOADS THAT COMET'S

4    ATTORNEYS ARE CLAIMING THAT MADE THEIR WAY FROM THE SEAGATE

5    DEVICE TO MR. BEUERMAN'S LAPTOP?

6    A.   THE ENTIRE CONTENTS OF THAT WERE NOT COPIED ONTO THE XP

7    SYSTEM, PORTIONS WERE.

8    Q.   LET ME ASK YOU ABOUT MR. FAULKNER'S TESTIMONY WHERE HE

9    CLAIMS -- I'M GOING TO PUT MR. FAULKNER'S DEMONSTRATIVE UP ON

10   THE SCREEN AGAIN.

11        AND I WANT TO ASK YOU SOME QUESTIONS ABOUT MR. FAULKNER'S

12   TESTIMONY WHERE HE CLAIMED THAT MR. BEUERMAN'S PERSONAL LAPTOP

13   WAS, AS HE CALLED IT, THE GO-BETWEEN BETWEEN MR. BEUERMAN'S

14   COMET LAPTOP AND THE XP LAPTOP.

15        DO YOU AGREE WITH THAT?

16   A.   IT SEEMS TO KIND OF CONFUSE THE ISSUE.  THREE OF THE FOUR

17   DEVICES -- THREE OF THE DEVICES WERE PLUGGED INTO THE COMET

18   SYSTEM, WHO WERE NEVER PLUGGED INTO THE XP SYSTEM, TO BE CLEAR.

19   AND TWO OF THE DEVICES PLUGGED INTO HIS PERSONAL LAPTOP WERE

20   FORMATTED ON JANUARY 28.  SO THE DATA NEVER COULD HAVE BEEN

21   USED AS ANY TYPE OF TRANSFER VEHICLE.

22        YOU COULD TRY TO MAKE THE ARGUMENT ABOUT THE DATA THAT WAS

23   RECOVERED FROM THE GO-FLEX.

24   Q.   AND WHAT DO YOU MEAN BY THAT?

25   A.   OF THE FOUR DRIVES WE ARE TALKING HERE, THAT'S THE ONLY

1     ONE THAT WAS PLUGGED INTO A COMET COMPUTER.  AND SOME SUBSET OF

2     THAT DATA WAS ACTUALLY ACCESSIBLE FROM AN XP COMPUTER.

3     Q.   AND, MR. COWEN, AS I HEARD HIS TESTIMONY, MR. FAULKNER

4     MADE IT SOUND LIKE MAYBE WE COULDN'T BE SURE ABOUT WHAT WAS

5     GOING ON ON THIS PERSONAL LAPTOP OF MR. BEUERMAN'S, AND SO I

6     WANT TO ASK YOU SOME QUESTIONS ABOUT THAT.

7          FIRST, WAS MR. BEUERMAN'S PERSONAL LAPTOP PRODUCED TO

8     COMET AND MADE AVAILABLE TO MR. FAULKNER TO EXAMINE?

9     A.   YES.

10    Q.   AND, NEXT, I WANT TO ASK YOU:  WERE THE FORENSIC LOGS FROM

11    MR. BEUERMAN'S XP LAPTOP PRODUCED TO COMET AND MADE AVAILABLE

12    TO MR. FAULKNER?

13    A.   YES.

14    Q.   AND THEN, FINALLY, WAS THE DATA THAT MR. FAULKNER WAS

15    PUTTING UP ON THE SCREEN FROM MR. BEUERMAN'S COMET LAPTOP

16    AVAILABLE TO COMET AND TO MR. FAULKNER?

17    A.   THOSE WERE COMET SYSTEMS, SO I WOULD ASSUME SO.

18    Q.   AND YOU HAD ACCESS TO THAT DATA TOO, DID YOU NOT?

19    A.   I BELIEVE THAT MR. FAULKNER AND I HAD ACCESS TO THE SAME

20    DATA.  YES, SIR.

21    Q.   AND DID YOU SEE ANY OTHER EVIDENCE OF FILES, OTHER THAN

22    THE ONES WE'VE TALKED ABOUT, MAKING THEIR WAY FROM

23    MR. BEUERMAN'S COMET LAPTOP ONTO HIS XP LAPTOP?

24    A.   I'M SORRY.  COULD YOU REPEAT THAT.

25    Q.   SURE.

1     OTHER THAN THE FILES THAT WE'VE TALKED ABOUT ALREADY, DID

2     YOU SEE ANY OTHER EVIDENCE OF FILES MAKING THEIR WAY FROM

3     MR. BEUERMAN'S COMET LAPTOP ONTO THE XP LAPTOP?

4     A.   NO.  THE ONLY DEVICE THAT I SAW THAT COULD BE USED TO

5     TRANSMIT THAT DATA WAS THE WESTERN DIGITAL MY BOOK DEVICE.

6     Q.   MR. COWEN, I'M PUTTING UP ON THE SCREEN ANOTHER ONE OF

7     MR. FAULKNER'S SLIDES, AND IT'S A SLIDE THAT MR. FAULKNER

8     CHARACTERIZED AS SHOWING ACCESS BY MR. BEUERMAN TO

9     COMET-RELATED FILES FROM HIS XP LAPTOP.

10         HAVE YOU REVIEWED THAT DEMONSTRATIVE?

11    A.   I HAVE.

12    Q.   AND I WANT TO ASK YOU WHETHER YOU'VE IDENTIFIED ANY

13    DUPLICATE FILES IN THAT OF FILES THAT MR. FAULKNER PUT ON THE

14    SCREEN?

15    A.   I HAVE.  SO WHEN YOU'RE USING A WINDOWS 10 SYSTEM AND

16    YOU'RE IN THE GUI AND YOU ARE DOUBLE-CLICKING TO OPEN A FILE,

17    YOU ARE ACTUALLY ALWAYS GOING TO GET TWO ENTRIES INSIDE OF WHAT

18    WE CALL THESE JUMPLISTS.  THAT'S BECAUSE ONE OF THE ENTRIES IS

19    GOING TO BE FOR THE UNDERLYING SYSTEM THAT RUNS THE GUI THAT WE

20    CALL WINDOWS EXPLORER, OR FILE EXPLORER, AS YOU WILL.  AND THEN

21    THE SECOND IS GOING TO BE THE ACTUAL APPLICATION THAT OPENS THE

22    FILE.

23         AND SO WHAT WE ARE SEEING HERE -- AND IF YOU COULD SEE ALL

24    THE DATA, THERE WOULD BE COLUMNS SHOWING YOU THIS -- IS THAT

25    THERE IS AN APPLICATION ID REPRESENTATIVE OF THE WINDOWS

1    PROGRAM ITSELF BEING USED TO OPEN THE FILE.  AND THEN THE

2    SECOND ENTRY BEING THE ACTUAL APPLICATION OPENING THE FILE.

3        AND EVEN THOUGH IT LOOKS LIKE TWO DIFFERENT FILES, IT IS,

4    IN FACT, ONE FILE BEING ACCESSED.

5    Q.   AND WE HEARD SOME TESTIMONY THE OTHER DAY ABOUT THE ISSUE

6    OF A FILE PATH.  AND I'M GOING TO DIRECT YOUR ATTENTION TO THE

7    BEGINNING OF THAT FILE PATH WHERE IT LOOKS LIKE EACH OF THOSE

8    DUPLICATE ENTRIES.  ONE OF THEM SAYS "RGF01" AND THE OTHER SAYS

9    "RGOFLEX01."

10       WHY ARE THOSE DIFFERENT?

11   A.   THIS IS SOMETHING THAT CONFUSES A LOT OF PEOPLE WHEN YOU

12   START LOOKING INTO HOW WINDOWS DOES THINGS INTERNALLY.  WINDOWS

13   DOESN'T CARE ABOUT FILE NAMES OR DIRECTORY NAMES, IT'S JUST

14   NUMBERS, REFERENCES POINTING TO DIFFERENT PARTS OF THE FILE

15   SYSTEM AND WHERE THINGS SHOULD BE LOCATED.

16       SO IN THIS CASE, THE WINDOWS EXPLORER APPLICATION ACTUALLY

17   RECORDED ONE PATH, THE APPLICATION RECORDED A SECOND PATH.  WE

18   KNOW IT'S THE SAME FILE BECAUSE IT'S ACTUALLY POINTING TO THE

19   SAME REFERENCE NUMBER ON THE DISK WHERE THE DATA IS LOCATED,

20   AND BOTH POINTING TO THE SAME DISK.  SO IT HAS TO BE THE SAME

21   DATA.

22   Q.   AND, MR. COWEN, THIS ISSUE THAT YOU'VE IDENTIFIED WITH

23   DUPLICATE ENTRIES IN MR. FAULKNER'S FORENSIC LOGS, IS THAT

24   PROBLEM PRESENT IN ALL OF THE FORENSIC LOGS THAT MR. FAULKNER

25   DISPLAYED DURING HIS TESTIMONY?

1    A.   I WOULDN'T CALL IT A PROBLEM, IT'S JUST HOW THE OPERATING

2    SYSTEM WORKS.

3         AND, IN FACT, IF YOU LOOK DEEPER, YOU WILL SEE THAT

4    THERE'S ACTUALLY ADDITIONAL DUPLICATES FROM SHADOW COPIES,

5    WHICH ARE BACKUPS ON THE SYSTEM.

6         SO SOMETIMES YOU MAY SEE SIX OF THESE ENTRIES FOR ONE

7    FILE, SOMETIMES TWO.  IT JUST DEPENDS HOW MANY TIMES IT WAS

8    ACTUALLY SAVED ONTO THE SYSTEM.

9         BUT, YES, YOU WOULD EXPECT TO SEE THIS FROM ANY SYSTEM

10   THAT HAS WINDOWS 10 INSTALLED.

11   Q.   AND SO IS IT CORRECT THAT EACH OF THE FORENSIC LOGS THAT

12   MR. FAULKNER PUT UP DURING HIS DIRECT TESTIMONY CONTAINED THESE

13   MULTIPLE ENTRIES FOR THE SAME DOCUMENT ACCESS?

14   A.   IN REGARDS TO THE JUMPLISTS, YES, SIR.

15   Q.   MR. COWEN, I WANT TO DRILL DOWN A BIT MORE ON YOUR OPINION

16   THAT THERE WAS ONLY LIMITED ACCESS TO COMET DOCUMENTS BY

17   DOUG BEUERMAN AND CHRIS MASON WHILE THEY WORKED AT XP.

18        AND, AGAIN, I WANT TO FOCUS AND HIGHLIGHT THE CLAIM THAT

19   COMET'S ATTORNEY MADE DURING OPENING ARGUMENTS THAT XP HAD

20   RECEIVED OVER 10,000 DOCUMENTS.

21        DID YOU REVIEW THE FORENSIC LOGS OF MR. BEUERMAN AND

22   MR. MASON'S XP LAPTOPS?

23   A.   I DID.

24   Q.   AND DID MR. BEUERMAN OR MR. MASON ACCESS 10,000 COMET

25   DOCUMENTS WHILE THEY WORKED AT XP?

1      A.   NO.

2      Q.   DID MR. BEUERMAN OR MR. MASON HAVE 10,000 COMET DOCUMENTS

3      ON THEIR XP LAPTOPS?

4      A.   ON THEIR XP LAPTOPS?  NO.

5      Q.   DID YOU DETERMINE HOW MANY COMET DOCUMENTS THAT

6      MR. BEUERMAN OR MR. MASON ACCESSED FROM THEIR XP LAPTOPS?

7      A.   SO BASED UPON REVIEWING MR. FAULKNER'S REPORT, HE CITED

8      SEVERAL FILES THAT HE BELIEVED TO BE COMET'S.  I BELIEVE I GOT

9      TO AN APPROXIMATE RANGE IN THE 60S BETWEEN EXTERNAL DRIVE

10     ACCESS AND INTERNAL DRIVE ACCESS, MEANING FROM THE EXTERNAL

11     DRIVE OR ON THE ACTUAL LAPTOP ITSELF.

12     Q.   AND, MR. COWEN, I WANT TO ASK YOU SOME QUESTIONS ABOUT

13     WHEN MR. BEUERMAN OR MR. MASON ACCESSED THOSE DOCUMENTS.  AND

14     SPECIFICALLY I WANT TO ASK YOU THOSE QUESTIONS BECAUSE DURING

15     MR. FAULKNER'S TESTIMONY HE HAD SOME SLIDES THAT MADE IT APPEAR

16     SORT OF UNCLEAR WHEN THAT ACCESS OCCURRED.

17          AND SO WHAT I WANT TO ASK YOU IS WERE YOU ABLE TO

18     DETERMINE WHEN MR. BEUERMAN AND MR. MASON WERE ACCESSING THESE

19     COMET-RELATED FILES ON THEIR XP LAPTOPS?

20     A.   IN REGARDS TO THE FILES THAT MR. FAULKNER IDENTIFIED

21     SPECIFICALLY, YES.

22     Q.   AND COULD YOU EXPLAIN TO THE JURY WHEN THAT ACCESS

23     OCCURRED?

24     A.   IN EARLY 2018, BETWEEN FEBRUARY 14TH AND MARCH 13TH, FOR

25     BOTH MR. BEUERMAN AS WELL AS MR. MASON.  AND THEN MR. MASON

1    AGAIN ACCESSED FILES THAT MR. FAULKNER IDENTIFIED IN 2020.

2    Q.   AND WAS THERE ANY ACCESS BY MR. MASON OR MR. BEUERMAN

3    DURING 2019?

4    A.   NOT THAT MR. FAULKNER IDENTIFIED.

5    Q.   AND WAS THERE ANY ACCESS BY MR. BEUERMAN OR MR. MASON

6    AFTER JUNE OF 2020?

7    A.   I DON'T BELIEVE SO.

8    Q.   MR. COWEN, BEFORE WE DISCUSS YOUR SECOND OPINION, I WANT

9    TO ASK YOU ABOUT ONE OTHER THING THAT MR. FAULKNER SAID DURING

10   HIS DIRECT TESTIMONY.

11        AND SPECIFICALLY HE WAS ADDRESSING THESE TWO IMAGES OF

12   MR. BEUERMAN'S XP LAPTOP THAT WERE PRODUCED TO COMET.

13   MR. FAULKNER TESTIFIED THAT THERE WERE, I'M QUOTING, THUMB

14   DRIVE CONNECTIONS, SHELLBAGS, JUMPLISTS, AND LNK FILE ENTRIES

15   MISSING FROM THE 2019 IMAGE.

16        DID YOU REVIEW THAT TESTIMONY BY MR. FAULKNER?

17   A.   I DID.

18   Q.   AND MR. FAULKNER ALSO CLAIMED THAT IF A COMPUTER WAS IN

19   NORMAL USE, WE WOULDN'T SEE THAT OCCUR, THAT THE DATA WOULD

20   GENERALLY BE GROWING.

21        DID YOU REVIEW THAT TESTIMONY?

22   A.   I DID.

23   Q.   AND DO YOU AGREE WITH IT?

24   A.   NOT IN ITS ENTIRETY, NO.  SOME THINGS SHOULD; SOME THINGS

25   WILL NOT.

1    Q.   AND CAN YOU BE MORE SPECIFIC ABOUT WHAT YOU MEAN.

2    A.   SURE.  IN THIS CASE SPECIFICALLY, THERE WAS A WINDOWS

3    UPDATE THAT OCCURRED BETWEEN THESE TWO TIMES THAT ACTUALLY

4    CHANGED A LOT OF DATA ON THE SYSTEM, BUT LUCKILY WE HAD AN

5    IMAGE BEFORE THE UPDATE OCCURRED, SO WE ACTUALLY SAW WHAT DATA

6    PREVIOUSLY EXISTED.

7    Q.   AND JUST SO THAT THE RECORD IS CLEAR, WERE BOTH OF THESE

8    IMAGES PRODUCED TO COMET AND MADE AVAILABLE TO MR. FAULKNER FOR

9    REVIEW?

10   A.   FORENSIC LOGS FROM BOTH OF THESE SYSTEM COPIES WERE MADE

11   AVAILABLE TO MR. FAULKNER.

12   Q.   AND JUST SO THAT THERE'S NO MISUNDERSTANDING, BECAUSE I

13   WANT THE RECORD TO BE CRYSTAL CLEAR ON THIS POINT, DID YOU SEE

14   ANY EVIDENCE THAT ANYONE FROM XP HAD DELETED OR REMOVED DATA

15   FROM EITHER ONE OF THOSE IMAGES?

16   A.   NO.

17   Q.   MR. COWEN, LET'S MOVE ON AND TALK BRIEFLY ABOUT YOUR

18   SECOND OPINION, THAT NONE OF THESE COMET FILES WERE SHARED WITH

19   OTHER XP EMPLOYEES.

20        AND I JUST WANT TO ASK YOU ABOUT A FEW THINGS.  FIRST, IN

21   YOUR REVIEW OF THE FORENSIC EVIDENCE, DID YOU SEE ANY EVIDENCE

22   THAT MR. BEUERMAN OR MR. MASON TRANSFERRED FILES FROM THEIR XP

23   COMPUTERS TO OTHER XP EMPLOYEE COMPUTERS?

24   A.   NOT BASED UPON THE FORENSIC LOGS THAT I REVIEWED.

25   Q.   AND I WANT TO TALK NEXT ABOUT E-MAIL.

1          DID YOU SEE ANY EVIDENCE, BASED ON THE FORENSIC LOGS OR

2     THE E-MAIL DOCUMENTS THAT WERE PRODUCED IN THIS CASE, THAT

3     MR. BEUERMAN OR MR. MASON WERE E-MAILING COMET FILES TO OTHER

4     XP EMPLOYEES?

5     A.   NONE OF THE FILES THAT MR. FAULKNER IDENTIFIED AS

6     COMET-RELATED, I BELIEVE, I SAW ANY INDICATION WERE E-MAILED.

7     Q.   AND, FINALLY, I WANT TO ASK YOU, MR. COWEN, DID YOU SEE

8     ANY EVIDENCE THAT THESE COMET FILES THAT MR. BEUERMAN AND

9     MR. MASON WERE ACCESSING WERE SAVED ANYWHERE ELSE ON COMET'S

10    COMPUTING SYSTEMS OR ITS SERVERS OR NETWORK?

11    A.   NO.  THE ONLY OTHER PLACE I SAW THEM SAVING ANY KIND OF

12    DOCUMENTS WAS A PERSONAL ONEDRIVE THAT WAS ISSUED TO THEM THAT

13    WOULD HAVE BACKED UP THEIR SYSTEMS TO THE CLOUD.

14    Q.   AND WAS THE PERSONAL ONEDRIVE BACKUP OF THEIR XP LAPTOPS

15    ACCESSIBLE TO OTHER XP EMPLOYEES?

16    A.   AS FAR AS I KNOW, ONLY THE I.T. STAFF.

17    Q.   MR. COWEN, I'M JUST GOING TO ASK YOU ONE MORE TIME:  CAN

18    YOU REMIND THE JURY OF THE TWO OPINIONS THAT YOU ARE PROVIDING

19    IN THIS CASE?

20    A.   SURE.  FIRST, THAT THERE WAS A LARGE AMOUNT OF DATA

21    AVAILABLE TO BOTH INDIVIDUALS, BUT THE FORENSIC RECORDS SHOW A

22    SMALLER NUMBER OF ACCESSES TO ACTUAL DATA THAT WAS AVAILABLE TO

23    THEM ON THE XP SYSTEMS.

24         AND THE SECOND BEING THAT IN THE FORENSIC EVIDENCE THAT

25    I'VE REVIEWED, I DON'T SEE INDICATIONS THAT I'VE SEEN IN OTHER

1    CASES WHERE THEY ARE ACTUALLY COPYING THIS DATA AROUND TO OTHER

2    SYSTEMS OR TO NETWORK SHARES OR MAKING IT AVAILABLE TO OTHER

3    EMPLOYEES.

4    Q.   AND CAN I ASK YOU ONE FINAL QUESTION, MR. COWEN.  YOU

5    REFERRED TO THERE BEING A LARGER SET OF INFORMATION THAT WAS

6    AVAILABLE TO MR. BEUERMAN OR MR. MASON, BUT WAS NOT ACCESSED BY

7    EITHER OF THEM AT XP.

8         WHAT I WANT TO ASK IS, OF THAT LARGER SET OF INFORMATION

9    THAT YOU'RE DESCRIBING, DID YOU SEE ANY EVIDENCE THAT THAT

10   INFORMATION WAS PROVIDED TO XP POWER?

11   A.   IT WAS MADE ACCESSIBLE ON THEIR XP SYSTEMS, BUT I DON'T

12   BELIEVE IT WAS -- I SEE NO EVIDENCE TO SHOW THAT IT WAS SENT TO

13   ANYONE ELSE AT XP.

14   Q.   SO I'M JUST TRYING TO BE VERY CLEAR.  WHEN YOU SAY IT WAS

15   AVAILABLE ON THEIR XP SYSTEMS, ARE YOU REFERRING TO ANYONE

16   OTHER THAN MR. BEUERMAN OR MR. MASON?

17   A.   NO, JUST THOSE TWO INDIVIDUALS.

18   Q.   THANK YOU, MR. COWEN.

19        THE COURT:  CROSS-EXAMINATION?

20        MS. LOTFOLLAHI:  YES, YOUR HONOR.

21   ALL RIGHT.  YOUR HONOR, MAY I PROCEED?

22        THE COURT:  YES, PLEASE.

23                         **CROSS-EXAMINATION**

24   BY MS. LOTFOLLAHI:

25   Q.   HELLO AGAIN, MR. COWEN.

1    A.   HELLO.

2    Q.   PROBABLY TO THE JURY'S RELIEF, I WON'T BE ASKING YOU ALL

3    THAT MANY MORE QUESTIONS ABOUT FORENSICS.

4         FIRST, JUST TO TOUCH ON A COUPLE OF THINGS THAT YOU SAID

5    IN YOUR DIRECT, YOU MENTIONED MR. BEUERMAN'S PERSONAL LAPTOP,

6    RIGHT?

7    A.   CORRECT.

8    Q.   YOU KNOW THAT ERASER WAS EXECUTED ON THAT PERSONAL LAPTOP

9    AFTER THIS LAWSUIT WAS FILED, RIGHT?

10   A.   THAT IS CORRECT.

11   Q.   OKAY.  NOW, YOU ALSO PUT UP A TIMELINE AND TOLD THE JURY

12   THAT THERE WERE LIMITED ACCESSES TO COMET DATA, BASED ON WHAT

13   YOU REVIEWED, RIGHT?

14   A.   BASED UPON WHAT MR. FAULKNER IDENTIFIED, YES, MA'AM.

15   Q.   OKAY.

16        MS. LOTFOLLAHI:  IF WE COULD PLEASE PUT UP,

17   MR. SCHLAIFER, PDX19.1.

18   BY MS. LOTFOLLAHI:

19   Q.   SO THIS IS YOUR TIMELINE, RIGHT?

20   A.   CORRECT.

21   Q.   ALL RIGHT.  SO IT'S IMPORTANT THAT THE JURY GET AN

22   ACCURATE VIEW OF WHAT HAPPENED, FORENSICALLY, RIGHT?

23   A.   YES.

24   Q.   OKAY.  SO IF WE START WITH YOUR TIMELINE, IT GOES ALL THE

25   WAY TO 2022, RIGHT?

CROSS-EXAMINATION BY MS. LOTFOLLAHI                                  1149

1    A.   IT DOES, YES.

2    Q.   AND WE'RE IN MARCH 2022.  AS HIS HONOR SAID, IT'S SPRING

3    NOW, RIGHT?

4    A.   CORRECT.

5    Q.   NEITHER MR. BEUERMAN, NOR MR. MASON WERE EMPLOYED AT COMET

6    IN 2022, RIGHT?

7    A.   THEY WERE NOT, NO.

8    Q.   OKAY.

9         MS. LOTFOLLAHI:  CAN WE CLICK THROUGH, MR. SCHLAIFER,

10   I THINK IT WILL ADD THAT DETAIL.  OKAY.

11   BY MS. LOTFOLLAHI:

12   Q.   AND THEN IF WE DRILL DOWN A LITTLE BIT MORE, THE LATEST

13   FORENSIC DATA THAT WE HAVE FOR MR. BEUERMAN WAS ACTUALLY FROM

14   FEBRUARY OF 2019, RIGHT?

15   A.   THAT'S CORRECT.

16   Q.   OKAY.

17        MS. LOTFOLLAHI:  CAN WE CLICK THROUGH.  THERE WE GO,

18   SO THERE'S THAT DETAIL.

19   BY MS. LOTFOLLAHI:

20   Q.   AND MR. BEUERMAN WAS TERMINATED A YEAR LATER IN FEBRUARY

21   OF 2020, RIGHT?

22   A.   I BELIEVE THAT'S CORRECT.

23   Q.   OKAY.

24        MS. LOTFOLLAHI:  CAN WE ADD THAT.  THANK YOU,

25   MR. SCHLAIFER.

1    BY MS. LOTFOLLAHI:

2    Q.    OKAY.  AND WE DON'T KNOW WHAT MR. BEUERMAN WAS ACCESSING

3    IN THAT INTERIM BECAUSE WE DON'T HAVE AN IMAGE OF HIS LAPTOP

4    FROM XP DURING THAT TIME PERIOD, RIGHT?

5    A.    ONE WAY OR ANOTHER, WE DO NOT KNOW, THAT IS CORRECT.

6    Q.    OKAY.  ALL RIGHT.

7          AND WITH RESPECT -- NOW MOVING ON TO MR. MASON, YOU HAVE A

8    DATE RANGE HERE, JANUARY TO JUNE, RIGHT?

9    A.    CORRECT.

10   Q.    AND YOU TESTIFIED THAT YOU BELIEVE THAT THOSE ARE THE

11   RIGHT DATE RANGES, RIGHT?

12   A.    YES.

13   Q.    OKAY.  AND I KNOW YOU WEREN'T HERE LAST WEEK, RIGHT?

14   A.    NO.

15   Q.    OKAY.  THE JURY DID HEAR TESTIMONY FROM DR. SHANFIELD,

16   COMET'S TECHNICAL EXPERT, AND THEN DR. PHINNEY, XP'S TECHNICAL

17   EXPERT, THAT COMET FILES WERE ACTUALLY ACCESSED BY MR. MASON

18   AFTER JUNE.

19          DO YOU RECALL THAT, WHEN YOU READ THE TRIAL TRANSCRIPT?

20   A.    I DIDN'T SEE THAT, I READ MR. FAULKNER'S TESTIMONY.

21   Q.    OKAY.  LET'S SHOW YOU SO THAT YOU CAN SEE FOR YOURSELF.

22          MS. LOTFOLLAHI:  IF WE PULL UP PDX7.144.

23   BY MS. LOTFOLLAHI:

24   Q.    SO IF WE SEE HERE, THIS IS AN ACCESS BY MR. MASON OF A

25   COMET FILE CALLED MATCH -- "COMET MATCH EM SENSOR DESIGN AND

1    SIMULATION."  AND THAT ACCESS WAS ON SEPTEMBER 25, 2020.

2         DO YOU SEE THAT?

3    A.   I DO.

4    Q.   OKAY.  AND YOU DIDN'T READ THIS, BUT THE JURY WILL RECALL

5    DR. PHINNEY ALSO AGREED THIS SHOWED USE OF COMET'S TRADE

6    SECRETS, FROM LAST WEEK.  I WILL JUST GIVE YOU ANOTHER EXAMPLE

7    OF AN ACCESS POST-JUNE.

8              MS. LOTFOLLAHI:  IF WE GO TO, MR. SCHLAIFER,

9    PDX7.100, PLEASE.

10   BY MS. LOTFOLLAHI:

11   Q.   AND HERE'S ANOTHER EXAMPLE THAT THE JURY HEARD ABOUT LAST

12   WEEK.  SO THIS IS AN ACCESS BY MR. MASON OF A COMET SCHEMATIC

13   FILE, THIS INSULATOR THAT WE TALKED A BUNCH ABOUT LAST WEEK,

14   AND THAT ACCESS WAS ON OCTOBER 15, 2020.

15        DO YOU SEE THAT?

16   A.   I DO.

17   Q.   OKAY.  SO IF WE GO BACK NOW TO YOUR TIMELINE, SO PDX19.1,

18   AND WE CORRECT FOR ADDITIONAL EVIDENCE THAT THE JURY SAW --

19             MS. LOTFOLLAHI:  MR. SCHLAIFER, COULD WE MOVE

20   THROUGH.

21   BY MS. LOTFOLLAHI:

22   Q.   THESE ACCESSES ACTUALLY GO BEYOND THE DATE RANGE YOU HAVE

23   LISTED THERE, RIGHT?

24   A.   FOR THOSE TWO FILES, THAT'S CORRECT.

25   Q.   OKAY.  AND THE JURY ALSO HEARD THIS, BUT YOU DIDN'T

1      TESTIFY ABOUT IT SO I WANTED TO MAKE SURE WE'RE ON THE SAME

2      PAGE.

3           YOU DON'T DISPUTE THAT MR. MASON ACTUALLY KEPT A BACKUP

4      COPY OF HIS ENTIRE COMET LAPTOP THROUGHOUT HIS ENTIRE

5      EMPLOYMENT AT XP, RIGHT?

6      A.   I DO NOT DISPUTE THAT.

7      Q.   OKAY.  SO IF WE ADD THAT -- AND SO THAT WAS UNTIL OF

8      JULY 2021 WHEN HE WAS TERMINATED.

9           AND WE TALKED ABOUT THIS IN YOUR DEPOSITION, BUT JUST FOR

10     THE JURY'S BENEFIT, ONE OF THOSE BACKUPS COULD BE USED TO

11     RESTORE COMET DATA ON ANOTHER LAPTOP, RIGHT?

12     A.   THEY COULD BE USED, WE DIDN'T HAVE ANY PROOF TO SHOW THAT

13     IT HAPPENED, THAT'S CORRECT.

14     Q.   RIGHT.  WE DIDN'T HAVE ANY INFORMATION ABOUT ANY PERSONAL

15     LAPTOP OF MR. MASON, RIGHT?

16     A.   NOT THAT I'M AWARE OF.

17     Q.   OKAY.  ALL RIGHT.

18          MS. LOTFOLLAHI:  THANK YOU, MR. SCHLAIFER.  WE CAN

19     TAKE THAT DOWN.

20     BY MS. LOTFOLLAHI:

21     Q.   SO YOU ALSO TOLD THE JURY A LITTLE BIT ABOUT, YOU KNOW,

22     THAT THERE WAS NO EVIDENCE THAT THESE FILES, THESE COMET FILES

23     WERE CIRCULATED AT XP, RIGHT?

24     A.   BASED UPON THE FORENSIC LOGS, YES.

25     Q.   OKAY.  AND SO JUST SO WE'RE ALL ON THE SAME PAGE, YOU

1    DIDN'T PERFORM ANY ANALYSIS OF XP COMPUTERS OTHER THAN

2    MR. BEUERMAN, MR. MASON, AND MR. MORI, RIGHT?

3    A.   CORRECT.  MR. FAULKNER AND I HAD THE SAME SCOPE.

4    Q.   RIGHT.  OKAY.

5         AND THAT DATA THAT YOU DID REVIEW DOESN'T TELL THE WHOLE

6    STORY IN TERMS OF WHAT COULD HAVE HAPPENED TO COMET DATA,

7    RIGHT?

8    A.   IN REGARDS TO THEIR SYSTEMS AND THE PERSONAL SYSTEMS FOR

9    MR. BEUERMAN, IT DOES TELL THE STORY OF WHAT HAPPENED TO THOSE

10   DEVICES.  I DON'T KNOW WHAT OTHER SYSTEMS YOU COULD BE TALKING

11   ABOUT.

12   Q.   OKAY.  WELL, LET'S GIVE A COUPLE OF EXAMPLES, AS WE TALKED

13   ABOUT IN YOUR DEPOSITION.  IF YOU ATTACH COMET FILES TO

14   E-MAILS, THAT WOULDN'T BE REFLECTED IN THE FORENSIC DATA THAT

15   YOU REVIEWED, RIGHT?

16   A.   CORRECT.  AS WE TALKED ABOUT AT MY DEPOSITION, THERE WERE

17   OTHER ARTIFACTS THAT COULD SHOW THAT AND THE E-MAILS THAT WERE

18   PRODUCED IN THIS CASE WOULD SHOW THAT.

19   Q.   RIGHT.  BUT WE TALKED ABOUT HOW YOU DON'T KNOW THE PROCESS

20   THAT XP WENT THROUGH TO PROVIDE THE E-MAILS THAT THEY PRODUCED

21   IN THIS CASE, RIGHT?

22   A.   THAT'S CORRECT.

23   Q.   AND THE FORENSIC ARTIFACTS YOU REVIEWED DON'T ACTUALLY

24   SHOW IF A COMET FILE WAS ATTACHED TO AN E-MAIL, RIGHT?

25   A.   THERE IS AN ADDITIONAL ARTIFACT THAT WAS NOT PRODUCED IN

1      THIS CASE THAT WOULD HAVE SHOWN IF AN ATTACHMENT WAS SELECTED,

2      BUT, NO, THERE IS NO EVIDENCE THAT WAS MADE AVAILABLE TO

3      MR. FAULKNER OR I THAT WOULD FORENSICALLY DETERMINE THAT, ONLY

4      THE E-MAILS PRODUCED IN THIS CASE.

5      Q.   OKAY.  AND SIMILARLY, THERE WERE NO FORENSIC ARTIFACTS

6      PRODUCED FROM THOSE XP LAPTOPS THAT WOULD SHOW, FOR EXAMPLE, IF

7      COMET FILES WERE UPLOADED TO A GOOGLE DRIVE THROUGH A BROWSER?

8      A.   SPECIFICALLY YOU SAID "THROUGH A BROWSER," AND I BELIEVE

9      WE TALKED ABOUT THIS AT MY DEPOSITION.  THERE WAS A LOCAL

10     CLIENT INSTALLED FOR A GOOGLE CLOUD.  IF THAT WAS BEING USED,

11     THEN ABSOLUTELY THERE WOULD BE FORENSIC EVIDENCE TO SHOW THAT

12     OCCURRED.  BUT IF IT HAPPENED THROUGH THE BROWSER SPECIFICALLY,

13     THERE ARE NO FORENSIC ARTIFACTS FOR THE BROWSER THAT WERE

14     PRODUCED TO EITHER PARTY.

15     Q.   RIGHT.  SO NO FORENSIC DATA THAT WOULD SHOW USE OF A

16     BROWSER TO UPLOAD COMET DATA, RIGHT?

17     A.   EITHER WAY, YES, MA'AM.

18     Q.   YES, OKAY.

19          AND, AGAIN, YOU DON'T HAVE ANY DETAILS OF HOW XP COLLECTED

20     E-MAILS FOR PRODUCTION IN THIS CASE, RIGHT?

21     A.   I DO NOT.

22     Q.   AND YOU ACTUALLY NEVER OPENED UP ANY OF THE CONTENTS OF

23     ANY OF THE COMET TRADE SECRET FILES, RIGHT?

24     A.   I DON'T BELIEVE MR. FAULKNER OR I DID THAT.

25          MS. LOTFOLLAHI:  OKAY.  THOSE ARE MY QUESTIONS,

1     YOUR HONOR.  THANK YOU.

2              THE COURT:  THANK YOU.  MR. MANGAS, ANY FURTHER

3     QUESTIONS?

4              MR. MANGAS:  JUST BRIEFLY, YOUR HONOR.

5                      **REDIRECT EXAMINATION**

6     BY MR. MANGAS:

7     Q.   MR. COWEN, I WANT TO ASK YOU SOME QUESTIONS ABOUT THE --

8     WELL, LET ME START HERE.  I WANT TO ASK YOU SOME QUESTIONS

9     ABOUT THE TIMELINE THAT YOU TESTIFIED THAT MS. LOTFOLLAHI PUT

10    BACK UP DURING CROSS-EXAMINATION.  AND SOME OF THE QUESTIONS

11    THAT MS. LOTFOLLAHI ASKED YOU DEALT WITH THE DATES, PLURAL,

12    THAT CERTAIN OF THOSE LAPTOP IMAGES WERE CREATED?

13    A.   CORRECT.

14    Q.   AND I UNDERSTAND THAT YOU TESTIFIED THAT MR. BEUERMAN AND

15    MR. MASON CONTINUED TO BE EMPLOYED AT XP FOR SOME CERTAIN

16    AMOUNT OF TIME AFTER THOSE IMAGES WERE CREATED; IS THAT

17    CORRECT?

18    A.   THAT'S CORRECT.

19    Q.   MR. COWEN, YOU'RE AWARE THAT E-MAILS AND OTHER DOCUMENTS

20    FROM THOSE COMPUTERS AND FROM XP'S SYSTEMS WERE PRODUCED TO

21    COMET IN THIS CASE AFTER THOSE IMAGES WERE CREATED, CORRECT?

22    A.   THAT'S WHAT I WAS TOLD, I DIDN'T HAVE ANY PART OF THAT.

23    Q.   AND DID MR. FAULKNER IDENTIFY ANY ADDITIONAL ACCESS FROM

24    THOSE E-MAILS OR OTHER DOCUMENTS THAT WERE PRODUCED IN THIS

25    CASE?

1    A.   NO, MR. FAULKNER AND I BOTH RELIED ON THE SAME DATA WHICH

2    IS THE FORENSIC DATA FROM THE SYSTEMS.

3    Q.   I WANT TO ASK YOU NEXT ABOUT -- I'LL ASK YOU ANOTHER

4    QUESTION ABOUT THE TIMELINE.  MS. LOTFOLLAHI INCLUDED TWO FILES

5    THAT SHE CLAIMED MR. MASON HAD ACCESSED AFTER THE PERIOD YOU

6    IDENTIFIED IN YOUR TIMELINE?

7    A.   CORRECT.

8    Q.   AND I WANT TO ASK YOU TO EXPLAIN WHY YOU DID NOT INCLUDE

9    THOSE FILES IN YOUR TIMELINE?

10   A.   IT WAS NOT INCLUDED AS PART OF MR. FAULKNER'S REPORT.  IT

11   WAS NOT SOMETHING THAT I WAS INITIALLY LOOKING AT, TO BE QUITE

12   HONEST, AND THEN WHEN IT WAS BROUGHT UP TO ME, I WILL NOW

13   INCLUDE THEM.

14   Q.   FINAL QUESTION I WANT TO ASK.

15        WHEN WE WERE LOOKING AT YOUR SLIDE, YOUR DEMONSTRATIVE

16   THAT APPLIED TO YOUR SECOND OPINION WITH THE XP COMPUTING

17   SYSTEMS AND THE E-MAIL, I THINK I MAY HAVE MISSPOKE WHEN I

18   ASKED YOU A QUESTION AND I JUST WANT TO CONFIRM.

19        LOOKING AT THE FAR RIGHT OF YOUR DEMONSTRATIVE AND

20   FOCUSING ON XP POWER'S SERVERS AND NETWORKS, DID YOU SEE ANY

21   EVIDENCE THAT ANY OF MR. BEUERMAN OR MR. MASON'S COMET FILES

22   WERE SAVED OR TRANSFERRED ANYWHERE ON XP POWER'S COMPUTING

23   SYSTEM, OTHER THAN THE PERSONAL LAPTOPS?

24   A.   NO.  AND THOSE FORENSIC ARTIFACTS WERE MADE AVAILABLE.  WE

25   WOULD HAVE SEEN IF THEY WERE ACCESSING DIRECTORIES OR COPYING

```
 1        DIRECTORIES OVER TO THOSE PATHS.

 2                  MR. MANGAS:  THANK YOU, MR. COWEN.

 3                  THE COURT:  ANY FURTHER QUESTIONS?

 4                  MS. LOTFOLLAHI:  NO, YOUR HONOR.

 5                  THE COURT:  ALL RIGHT.  THANK YOU.

 6        MR. COWEN, YOU MAY STEP DOWN.  THANK YOU FOR YOUR

 7   TESTIMONY.

 8        LET ME CHECK IN ON OUR JURORS, SEE IF WE NEED A BREAK.

 9   YES TO A BREAK.  ALL RIGHT.  LET'S TAKE A TEN-MINUTE BREAK, AND

10   WE WILL COME BACK FOR THE NEXT WITNESS.  THANK YOU.

11        (RECESS FROM 10:38 A.M. UNTIL 10:49 A.M.)

12                  THE COURT:  EVERYONE MAY BE SEATED.

13        NEXT WITNESS, PLEASE.

14                  MR. FARRELL:  THANK YOU, YOUR HONOR.

15        OUR NEXT WITNESS WILL BE MARKUS PFEIFFER, WHO IS COMET

16   PCT'S VICE PRESIDENT OF CONTROLLING AND STRATEGIC DEVELOPMENT.

17   THAT'S BY VIDEO.  IT'S APPROXIMATELY SIX MINUTES LONG.

18                  THE COURT:  YOU MAY PROCEED.  THANK YOU.

19            (THE VIDEO DEPOSITION OF MARKUS PFEIFFER WAS PLAYED INTO

20   THE RECORD.)

21                  MR. FARRELL:  YOUR HONOR, I WOULD LIKE TO MOVE INTO

22   EVIDENCE DX5096, WHICH WAS EXHIBIT 15; DX5097, WHICH WAS

23   EXHIBIT 16 IN THE VIDEO; AND DX5098, WHICH WAS EXHIBIT 17 IN

24   THE VIDEO.

25                  MR. ALPER:  NO OBJECTION, YOUR HONOR.
```

1        THE COURT:  5096, 5097, AND 5098 ARE EACH ADMITTED.

2        (DEFENDANT'S EXHIBIT 5096, 5097, 5098 WERE ADMITTED INTO

3    EVIDENCE.)

4        THE COURT:  MR. FARRELL, MAYBE YOU HAVE ALREADY DONE

5    THIS, BUT IF YOU COULD ALERT MY DEPUTY TO THE ALLOCATION FOR

6    EACH OF THOSE LAST TWO DEPOSITIONS.

7        MR. FARRELL:  WE WILL DO THAT, YOUR HONOR.

8        THE COURT:  ALL RIGHT.  THANK YOU.

9        AND WHO WILL BE YOUR NEXT WITNESS?

10        MR. FARRELL:  OUR NEXT WITNESS WILL BE IP VALUATION

11    AND DAMAGE EXPERT, CARLYN IRWIN.

12        THE COURT:  THANK YOU.  SHE MAY COME FORWARD.

13    GOOD MORNING.

14        THE WITNESS:  GOOD MORNING.

15        THE COURT:  WE WILL SWEAR YOU IN AND RECEIVE BINDERS.

16    **(DEFENDANT'S WITNESS, CARLYN IRWIN, WAS SWORN.)**

17        THE WITNESS:  I DO.

18        THE CLERK:  PLEASE BE SEATED.  PLEASE STATE YOUR FULL

19    NAME AND SPELL YOUR LAST NAME FOR THE RECORD.

20        THE WITNESS:  CARLYN IRWIN.  I-R-W-I-N.

21                    **DIRECT EXAMINATION**

22    BY MR. MANGAS:

23    Q.   GOOD MORNING, MS. IRWIN.

24    A.   GOOD MORNING, MR. MANGAS.

25    Q.   COULD YOU PLEASE INTRODUCE YOURSELF TO THE JURY.

1      A.    SURE.  I'M CARLYN IRWIN.  I'M A SENIOR ADVISOR WITH

2      CORNERSTONE RESEARCH IN THE LOS ANGELES OFFICE.

3      Q.    AND, MS. IRWIN, HAVE YOU PREPARED SOME SLIDES TO AID IN

4      YOUR TESTIMONY TODAY?

5      A.    I HAVE.

6            MR. MANGAS:  AND, YOUR HONOR, WITH PERMISSION, I

7      WOULD LIKE TO PUBLISH THOSE SLIDES TO THE JURY.

8            THE COURT:  YOU MAY.

9      BY MR. MANGAS:

10     Q.    MS. IRWIN, I'M GOING TO START BY PUTTING A SUMMARY OF YOUR

11     RESUME UP ON THE SCREEN.

12           COULD YOU PLEASE EXPLAIN TO THE JURY THE COLLEGE DEGREES

13     THAT YOU'VE OBTAINED.

14     A.    I HAVE A BACHELOR OF ARTS IN ORGANIZATIONAL PSYCHOLOGY

15     WITH HONORS FROM THE UNIVERSITY OF CALIFORNIA AT SANTA BARBARA.

16           AND I HAVE A MASTER'S IN BUSINESS ADMINISTRATION FROM THE

17     UNIVERSITY OF SOUTHERN CALIFORNIA WHERE I SPECIALIZED IN

18     ACCOUNTING AND FINANCE.

19     Q.    AND, MS. IRWIN, COULD YOU PLEASE DESCRIBE TO THE JURY YOUR

20     PROFESSIONAL EXPERIENCE AFTER GRADUATING FROM USC.

21     A.    I WAS INITIALLY HIRED BY A LOCAL LAW FIRM TO SERVE AS

22     THEIR ASSISTANT CONTROLLER WHERE I WAS RESPONSIBLE FOR THE

23     GENERAL LEDGER MANAGEMENT, OVERSEEING PAYROLL, WORKING WITH THE

24     AUDITORS, AND REPORTING TO THE EXECUTIVE COMMITTEE.

25           AND THEN I WAS HIRED AWAY BY PRICE WATERHOUSE, NOW KNOWN

DIRECT EXAMINATION BY MR. MANGAS

1      AS PRICEWATERHOUSECOOPERS, WHERE I WORKED IN THEIR FINANCIAL

2      ADVISORY SERVICES GROUP WORKING ON CASES LIKE THIS, SUPPORTING

3      OTHER EXPERTS, BUT ALSO FOCUSING ON EARNING MY AUDIT HOURS,

4      DOING SOME TAX ANALYSIS AS WELL AS INVESTIGATIONS.

5           THEN IN 2002, I WAS ASKED TO BE PART OF A SMALL GROUP TO

6      OPEN THE LOS ANGELES OFFICE OF CORNERSTONE RESEARCH.  AND WE

7      HAVE BEEN THERE FOR ALMOST 20 YEARS.

8      Q.   MS. IRWIN, WHAT IS CORNERSTONE RESEARCH?

9      A.   WE ARE AN ECONOMIC AND FINANCIAL -- EXCUSE ME --

10     CONSULTING FIRM.  AND WE FOCUS ON ANALYSIS SUPPORTING EXPERTS

11     AND RESEARCH IN THE CONTEXT OF CIVIL LITIGATION LIKE THIS

12     MATTER.

13     Q.   AND WHAT TYPES OF THINGS DO YOU DO IN YOUR ROLE AS A

14     SENIOR ADVISOR FOR CORNERSTONE RESEARCH?

15     A.   I ANALYZE ECONOMIC ISSUES, ACCOUNTING, FINANCIAL ISSUES,

16     AND PREPARED DAMAGES ANALYSIS, AND IP VALUATION FOR CIVIL

17     LITIGATION.

18     Q.   AND, MS. IRWIN, I'M GOING TO PUT YOUR PROFESSIONAL

19     ACCREDITATIONS UP ON THE SCREEN.

20          CAN YOU PLEASE EXPLAIN THOSE ACCREDITATIONS TO THE JURY.

21     A.   I AM A CERTIFIED PUBLIC ACCOUNTANT, AND THAT IS ISSUED BY

22     THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS.

23     THROUGH THAT ASSOCIATION, I'VE ALSO EARNED A CERTIFICATION IN

24     FINANCIAL FORENSICS, AN ACCREDITATION IN BUSINESS VALUATION,

25     AND A CERTIFICATION IN ENTITY AND INTANGIBLE VALUATION.  I'M

1    ALSO A CERTIFIED FRAUD EXAMINER.

2    Q.   AND, MS. IRWIN, I UNDERSTAND THAT YOU ARE HERE TO TALK

3    ABOUT SOME IP VALUATION ISSUES TODAY.  AND CAN YOU HIGHLIGHT

4    FOR THE JURY WHICH OF YOUR ACCREDITATIONS IS SPECIFICALLY

5    FOCUSED ON VALUATION?

6    A.   YES.  THE TWO ON THE FAR RIGHT-HAND SIDE.  MY

7    ACCREDITATION IN BUSINESS VALUATION AND BEING CERTIFIED IN

8    ENTITY AND INTANGIBLE VALUATIONS.

9    Q.   AND CAN YOU EXPLAIN TO THE JURY, IN YOUR CAREER AT

10   CORNERSTONE OVER THE LAST 20 YEARS, HOW YOU'VE APPLIED THE

11   SKILLS AND EXPERIENCE YOU'VE OBTAINED THROUGH THOSE KINDS OF

12   ACCREDITATIONS IN YOUR PROFESSIONAL WORK?

13   A.   WELL, MOST OF MY CASES INVOLVE SOME SORT OF TRANSACTION,

14   WHETHER IT'S A MERGER OR AN ACQUISITION.  AND SIMILAR IN THIS

15   CASE AS TO THE COMDEL ACQUISITION, THERE ARE REPORTS THAT COME

16   OUT OF THAT TRANSACTION, AND I'M FAMILIAR WITH REVIEWING THOSE

17   REPORTS, UNDERSTANDING THEIR CONTEXT, AND UNDERSTANDING THEIR

18   IMPLICATIONS.

19   Q.   NOW, MS. IRWIN, HAVE YOU TAUGHT ANY COURSES OR SEMINARS

20   RELATED TO THOSE TOPICS?

21   A.   YES, I HAVE.  I'VE GUEST LECTURED AT THE UNIVERSITY OF

22   SOUTHERN CALIFORNIA IN AN ECONOMICS AND LAW CLASS.

23   Q.   AND, MS. IRWIN, HAVE YOU BEEN QUALIFIED AS AN EXPERT

24   WITNESS EITHER BY AN ARBITRATION PANEL OR BY A TRIAL COURT ON

25   ISSUES RELATED TO INTELLECTUAL PROPERTY VALUATION AND DAMAGES?

1      A.    I HAVE.

2      Q.    AND ABOUT HOW MANY TIMES?

3      A.    A DOZEN TO 15 TIMES OVER THE LAST, PROBABLY, 10 YEARS.

4            MR. MANGAS:  YOUR HONOR, AT THIS TIME XP POWER

5      TENDERS CARLYN IRWIN AS AN EXPERT IN IP VALUATION AND DAMAGES.

6            MS. SCHMIDT:  NO OBJECTION, YOUR HONOR.

7            THE COURT:  ALL RIGHT.  I WILL PERMIT TESTIMONY

8      WITHIN THE PARAMETERS OF THE DISCLOSURES MADE BEFORE TRIAL AND

9      SUBJECT TO CROSS-EXAMINATION.

10           YOU MAY PROCEED.

11           MR. MANGAS:  THANK YOU, YOUR HONOR.

12     BY MR. MANGAS:

13     Q.    MS. IRWIN, PLEASE EXPLAIN TO THE JURY WHAT XP POWER ASKED

14     YOU TO DO IN THIS CASE.

15     A.    I WAS ASKED TO DO THREE THINGS:  I WAS ASKED TO REVIEW THE

16     DOCUMENTS AND INFORMATION AVAILABLE IN THIS CASE.  I WAS ASKED

17     TO REVIEW MR. MALACKOWSKI'S REPORT AND DEPOSITION AND TESTIMONY

18     HERE.  AND I WAS ASKED TO ASSESS THE REASONABLENESS OF HIS

19     ASSUMPTIONS AND CONCLUSIONS.

20     Q.    MS. IRWIN, I'VE PUT UP YOUR DEMONSTRATIVE, DX5.4.

21           CAN YOU DESCRIBE TO THE JURY THE INFORMATION THAT YOU

22     REVIEWED IN THE COURSE OF YOUR WORK IN THIS CASE.

23     A.    YES.  I'VE REVIEWED EXPERT REPORTS FOR BOTH PARTIES,

24     DEPOSITION TESTIMONY, DISCOVERY RESPONSES, AND PLEADINGS THAT

25     HAVE GONE BETWEEN THE PARTIES, INCLUDING THEIR OWN FINANCIAL

1    INFORMATION.  I'VE CONSULTED SOME ACADEMIC LITERATURE, AND I'VE

2    SAT THROUGH TRIAL ALONG WITH YOU.

3    Q.   AND, MS. IRWIN, I ALSO WANT TO ASK YOU:  I UNDERSTAND THAT

4    YOU INTERVIEWED A NUMBER OF FOLKS IN THE COURSE OF YOUR WORK,

5    CAN YOU EXPLAIN JUST BRIEFLY WHAT YOU LEARNED FROM EACH OF

6    THOSE INDIVIDUALS?

7    A.   YES.  SO I SPOKE WITH MR. PENNY REGARDING XP'S BUSINESS,

8    THEIR TECHNOLOGY, THE COMDEL ACQUISITION.

9        I SPOKE WITH DR. PHINNEY TO GAIN AN UNDERSTANDING OF THE

10   ALLEGED TRADE SECRETS IN THIS MATTER AND THEIR IMPLICATIONS

11   WITH RESPECT TO DEVELOPMENT OF RF MATCH AND RF GENERATOR

12   PRODUCTS.

13       AND I SPOKE WITH DR. SPENCER, ALONG WITH THE OTHERS, ABOUT

14   WHAT SUSTAINING ENGINEERING IS AND HOW IT DIFFERS FROM R&D

15   DEVELOPMENT.

16   Q.   MS. IRWIN, I'M GOING TO PUT UP YOUR DEMONSTRATIVE, DDX5.5.

17       YOU TALKED ABOUT SEVERAL OF THE DOCUMENTS YOU REVIEWED IN

18   THIS CASE.  WHAT ARE WE LOOKING AT HERE IN DDX5.5?

19   A.   THESE ARE THE RELEVANT DOCUMENTS -- NOT ALL OF THEM, OF

20   COURSE -- THAT I RELIED ON SPECIFICALLY IN MY WORK THAT I'M

21   PRESENTING TODAY.

22   Q.   AND, MS. IRWIN, YOU HAVE A BINDER OF THESE EXHIBITS UP ON

23   THE STAND.  I'M NOT GOING TO ASK YOU TO READ THROUGH THEM ALL

24   RIGHT NOW, BUT DO YOU RECOGNIZE THE EXHIBITS IN THAT BINDER AS

25   THE ONES LISTED HERE IN DDX5.5?

1     A.   YES, I DO.

2     Q.   AND CAN YOU EXPLAIN TO US, AT A HIGH LEVEL, WHAT THOSE

3     DOCUMENTS ARE?

4     A.   THEY ARE COMET AND XP'S BUSINESS RECORDS ALONG WITH MY

5     ANALYSIS AND SUMMARY OF THOSE RECORDS.

6          MR. MANGAS:  AND, YOUR HONOR, WITH YOUR PERMISSION,

7     AND CONSISTENT WITH HOW WE HAVE DONE IT, WE WILL READ THOSE

8     INTO THE RECORD AT THE END OF MS. IRWIN'S EXAMINATION.

9          THE COURT:  APPROVED.  THANK YOU.

10    BY MR. MANGAS:

11    Q.   MS. IRWIN, AS A RESULT OF THE WORK YOU HAVE DONE IN THIS

12    CASE, HAVE YOU FORMED OPINIONS?

13    A.   I HAVE.

14    Q.   AND PLEASE BRIEFLY DESCRIBE THOSE OPINIONS TO THE JURY.

15    A.   WELL, FIRST, I'VE SEEN NO EVIDENCE OF ANY LOSS TO COMET.

16         SECOND, I HAVEN'T SEEN ANY EVIDENCE OF COST SAVINGS BY XP

17    IN THE FORM OF UNJUST ENRICHMENT.  THE ANALYSIS THAT

18    MR. MALACKOWSKI HAS PUT FORWARD, IN MY OPINION, IS INFLATED.

19         AND THEN, FINALLY, NO REASONABLE ROYALTY WOULD BE DUE

20    BASED ON THE FACTS OF THE CASE.

21    Q.   AND I'M GOING TO ASK YOU TO GO THROUGH EACH OF THESE AND

22    PROVIDE SOME MORE DETAILS ABOUT WHY YOU HOLD THESE OPINIONS,

23    BUT FIRST I WANT TO ASK YOU:  WERE YOU REQUIRED TO MAKE ANY

24    ASSUMPTIONS IN THE COURSE OF FORMING THESE OPINIONS?

25    A.   I WAS.

1    Q.   AND WHAT ASSUMPTIONS WERE YOU REQUIRED TO MAKE?

2    A.   WELL, FIRST, THAT THE ALLEGED TRADE SECRETS ARE, IN FACT,

3    TRADE SECRETS AND THAT ALL OF THE TRADE SECRETS HAD BEEN

4    MISAPPROPRIATED.

5    Q.   AND, MS. IRWIN, JUST SO WE ARE CLEAR, YOU ARE NOT ACTUALLY

6    OPINING THAT THE ALLEGED TRADE SECRETS ARE TRADE SECRETS OR

7    THAT THEY WERE MISAPPROPRIATED; IS THAT CORRECT?

8    A.   THAT'S CORRECT.

9    Q.   MS. IRWIN, LET'S TALK ABOUT YOUR FIRST OPINION, THAT

10   THERE'S BEEN NO LOSS TO COMET.

11        WHAT IS YOUR BASIS FOR THAT OPINION?

12   A.   WELL, THE BASIS OF THAT OPINION IS TWO-FOLD.  WE HAVEN'T

13   SEEN ANY NEW PRODUCTS COMING OUT FROM XP SINCE THE ISSUE --

14   SINCE THE ALLEGED MISAPPROPRIATION.

15        AND, NUMBER TWO, AS WE'VE HEARD TESTIMONY, THERE'S BEEN NO

16   IDENTIFIED LOST SALES OR LOST CUSTOMERS OR LOST MARKET SHARE.

17   Q.   AND, MS. IRWIN, YOU MENTIONED THAT YOUR SECOND OPINION

18   RELATES TO UNJUST ENRICHMENT.  IT SAYS UP ON YOUR SLIDE:  "NO

19   COST SAVINGS BY XP."

20        WHY DOES THAT MATTER?

21   A.   WELL, MR. MALACKOWSKI'S METHODOLOGY IN APPROACHING THE

22   CONCEPT OF UNJUST ENRICHMENT IS HE FOCUSED ON WHAT EXPENSES XP

23   AVOIDED THROUGH THE ALLEGED MISAPPROPRIATION.  AND THAT'S

24   CALLED AN AVOIDED COST THEORY.  AND BASICALLY, IN THAT

25   SITUATION YOU WOULD COMPARE WHAT XP ACTUALLY SPENT, ASSUMING

1    ALL LIABILITY AND MISAPPROPRIATION, AND COMPARE IT TO WHAT WE

2    CALL THE BUT-FOR WORLD IN WHICH XP WOULD HAVE DEVELOPED THEIR

3    PRODUCTS WITHOUT ACCESS TO THE ALLEGED TRADE SECRETS.

4    Q.   AND LET ME START BY ASKING THIS:  DID YOU REVIEW THE WORK

5    THAT MR. MALACKOWSKI PERFORMED IN THIS CASE?

6    A.   I DID.

7    Q.   AND DID MR. MALACKOWSKI PERFORM THE COMPARISON THAT YOU

8    ARE DESCRIBING BETWEEN THE ACTUAL AND THE BUT-FOR WORLD?

9    A.   NO, HE DID NOT.

10   Q.   WHAT DID MR. MALACKOWSKI DO?

11   A.   SO MR. MALACKOWSKI LOOKED AT ABOUT 143 PROJECT CODES THAT

12   WERE PROVIDED BY COMET.  HE SUMMED UP THE ENGINEERING TIME

13   CARDS FROM THOSE PROJECT CODES.  HE MADE SOME ADJUSTMENTS,

14   BRINGING THAT NUMBER UP TO 32.5 MILLION.  AND THEN HE SAID THAT

15   THAT WAS A PROXY FOR WHAT XP SAVED; MEANING IN THAT BUT-FOR

16   WORLD, THE DIFFERENCE BETWEEN THE ACTUAL AND THE BUT-FOR WORLD

17   IS XP WOULD HAVE SPENT AN ADDITIONAL $32.5 MILLION IN R&D

18   DEVELOPMENT FOR THEIR MATCH PRODUCTS -- EXCUSE ME -- THEIR RF

19   PRODUCTS.

20   Q.   MS. IRWIN, I'M GOING TO ASK YOU SOME QUESTIONS ABOUT THE

21   RAMIFICATIONS OF MR. MALACKOWSKI'S FAILURE TO PERFORM THAT

22   ANALYSIS.

23        YOU'VE GOT TWO OF THOSE LISTED ON YOUR SLIDE, DDX5.9.  AND

24   LET'S TALK ABOUT THE FIRST ONE, THE DISCONNECT BETWEEN THE

25   CLAIM AND THE EVIDENCE.  WHAT DO YOU MEAN BY THAT?

1    A.   SO IN ORDER TO -- MR. MALACKOWSKI MENTIONED A NEXUS.

2    RIGHT?  THERE'S A NEXUS BETWEEN THE FACTS OF THE CASE AND THE

3    CLAIM THAT -- FOR DAMAGES.

4         AND IN MR. MALACKOWSKI'S OPINION, HE TOTALED UP ALL OF

5    THESE PROJECT CODES, MADE ADJUSTMENTS, AND ASSUMED 100 PERCENT

6    OF EVERY DOLLAR SPENT SINCE 2007 -- MORE THAN A DECADE --

7    CONSTITUTES THIS CLAIM FOR UNJUST ENRICHMENT.

8         THE PROBLEM IS THERE'S BEEN NO EVIDENCE AND ANALYSIS OF

9    HOW XP ACTUALLY WAS ABLE TO SAVE ANY STEPS OR SAVE ANY MONEY OR

10   TIME IN MOVING THEIR PRODUCT FORWARD.

11   Q.   AND LET'S DIVE INTO THAT IN A BIT MORE DETAIL.  WHAT DO

12   YOU MEAN WHAT YOU SAY THERE'S NO EVIDENCE THAT XP SAVED TIME OR

13   MONEY?

14   A.   SO THERE'S NO EXAMPLES OF COST SAVINGS.  IN CASES LIKE

15   THIS YOU WOULD EXPECT TO SEE SOME EVIDENCE THAT XP WOULD HAVE

16   TAKEN A DIFFERENT ROUTE HAD THEY NOT HAD ACCESS TO THE ALLEGED

17   TRADE SECRETS.  AND THERE'S BEEN NO EXAMPLES THAT I'VE SEEN

18   PRESENTED.

19   Q.   LET ME ASK YOU THIS, BECAUSE WE'VE RECENTLY LOOKED AT THE

20   FORENSIC EVIDENCE AND WE'VE SEEN THAT THERE WAS SOME LIMITED

21   AMOUNT OF ACCESS TO SOME POWERPOINT DOCUMENTS BY MR. BEUERMAN

22   AND MR. MASON IN EARLY 2018, AND THEN AGAIN SOME AMOUNT OF

23   ACCESS BY MR. MASON IN 2020.

24        DID MR. MALACKOWSKI DO ANYTHING TO TIE THE DECADE WORTH OF

25   COSTS AND THE $32.5 MILLION TO THOSE POWERPOINTS AND DOCUMENTS

1    THAT WERE ACTUALLY ACCESSED BY MR. BEUERMAN AND MR. MASON?

2    A.   NO, AGAIN, THERE IS NOTHING TO TIE -- THERE'S NO CAUSATION

3    ANALYSIS TO TIE THE 32.5 MILLION TO ANY STEPS THAT XP WAS ABLE

4    TO AVOID OR ANYTIME IT WAS ALLEGED -- ALLOWED TO BE SAVED.

5    Q.   SO LET ME ASK YOU, THE OTHER THING THAT YOU HAVE ON YOUR

6    SLIDE UP HERE, IT SAYS NO LEAPFROGGING, AND WE HEARD

7    MR. MALACKOWSKI TESTIFY THAT XP POWER MAY HAVE USED COMET

8    INFORMATION TO DO SOMETHING CALLED LEAPFROGGING.  LET ME ASK

9    YOU, FIRST, CAN YOU DESCRIBE TO THE JURY OR EXPLAIN WHAT

10   LEAPFROGGING MEANS?

11   A.   IN THIS CONTEXT, LEAPFROGGING IS TAKING INFORMATION AND

12   BEING ABLE TO USE IT IN A WAY THAT YOU ARE LITERALLY JUMPING

13   OVER AND ADVANCING YOURSELF BEYOND, IN THIS CASE COMET, AND

14   ARGUING THAT XP IS FARTHER AHEAD THAN COMET BECAUSE OF THE

15   ALLEGED MISAPPROPRIATION.

16   Q.   AND DID YOU SEE ANY EXAMPLES FROM MR. MALACKOWSKI'S

17   TESTIMONY OR FROM THE TESTIMONY OF COMET'S WITNESSES OF THIS

18   PHENOMENON CALLED LEAPFROGGING ACTUALLY OCCURRING?

19   A.   NO, I DID NOT.

20   Q.   MS. IRWIN, BEFORE WE MOVE ON, I WANT TO ASK YOU A QUESTION

21   ABOUT YOUR OPINION THAT THERE WERE NO EVIDENCE THAT XP SAVED

22   TIME OR MONEY IN THIS CASE.

23        AT ANY POINT DURING THE WORK THAT YOU PERFORMED IN THIS

24   CASE, WERE YOU ASKED TO ASSUME THAT XP HAD USED COMET

25   INFORMATION AND IT HAD AVOIDED COSTS BY VIRTUE OF THAT USE?

1    A.   YES, I WAS.

2    Q.   AND CAN YOU EXPLAIN BRIEFLY WHAT THAT WORK CONSISTED OF?

3    A.   SURE.  SO I RELIED ON ASSERTIONS FROM DR. SHANFIELD,

4    COMET'S EXPERT, REGARDING FILES THAT WERE USED AND SCHEMATICS

5    THAT WERE COPIED OUT OF THESE POWERPOINT SLIDES, AND THEN I

6    CONSULTED DR. PHINNEY TO GET AN ESTIMATE OF HOW MUCH TIME IT

7    WOULD TAKE AN EXPERIENCED OR MAYBE MIDLEVEL ENGINEER TO

8    RECREATE THOSE SCHEMATICS AS AN EXAMPLE OF AN AVOIDED COST.

9         IT WAS ABOUT A DOZEN HOURS IN DR. PHINNEY'S OPINION, AND

10   SO THAT WAS MY RECREATION ANALYSIS THAT I PERFORMED.

11   Q.   AND ARE YOU OPINING TODAY THAT XP AVOIDED ANY COSTS AS A

12   RESULT OF THAT ASSUMPTION?

13   A.   NO.  PRIMARILY BECAUSE EVEN THOUGH THERE WERE THESE

14   SCHEMATICS THAT MAY HAVE BEEN AVOIDED IN RECREATING, IT DIDN'T

15   HELP XP SAVE ANY TIME OR MONEY IN THE DEVELOPMENT OF THEIR RF

16   PRODUCTS.  IT WAS A PRESENTATION OFF TO THE SIDE AND THEN THERE

17   WAS ENGINEERING GOING ON.

18   Q.   AND HOW DO YOU KNOW THAT -- ABOUT THE ENGINEERING WORK

19   THAT XP WAS DOING?

20   A.   OH, I'VE REVIEWED XP'S FILES AND -- WELL, THEIR

21   INFORMATION AND TALKED WITH THEIR EXECUTIVES.  THERE'S BEEN

22   EXTENSIVE INVESTMENT IN THEIR PRODUCTIONS.

23   Q.   WERE YOU HERE IN COURT WHEN MR. RUMMEL TESTIFIED ABOUT THE

24   ENGINEERING WORK THAT HE AND HIS TEAM HAD PERFORMED ON XP'S

25   MATCH AND RF GENERATOR PRODUCTS?

1    A.   YES.

2    Q.   MS. IRWIN, LET ME ASK THIS QUESTION:  WHAT IS THE IMPACT

3    OF THESE FAILURES THAT YOU'VE IDENTIFIED IN MR. MALACKOWSKI'S

4    WORK ON COMET'S CLAIM FOR UNJUST ENRICHMENT?

5    A.   WELL, IF YOU'VE NOT DEMONSTRATED ANY COST SAVINGS, YOU'VE

6    NOT DEMONSTRATED ANY UNJUST ENRICHMENT ON XP'S BEHALF.

7    Q.   MS. IRWIN, LET'S TURN NOW TO YOUR NEXT OPINION THAT

8    MR. MALACKOWSKI, THROUGH HIS CALCULATIONS, INFLATED COMET'S

9    DAMAGES CLAIMS.

10        AND I WANT TO ASK ABOUT YOUR BASES FOR THAT OPINION.

11        AND, FIRST, BEFORE WE GET INTO YOUR SPECIFIC CRITIQUES, I

12   WANT TO TALK A LITTLE BIT ABOUT MR. MALACKOWSKI'S APPROACH TO

13   CALCULATING UNJUST ENRICHMENT.  AND I'M PUTTING UP ON THE

14   SCREEN HERE, DDX5.16.  THIS IS A DEMONSTRATIVE THAT

15   MR. MALACKOWSKI SHOWED DURING HIS TESTIMONY.  AND I WANT TO ASK

16   YOU A FEW QUESTIONS ABOUT THAT.

17        SO FIRST, MR. MALACKOWSKI TESTIFIED THAT AS PART OF HIS

18   WORK, HE PERFORMED BACKGROUND RESEARCH.  IN YOUR REVIEW OF

19   MR. MALACKOWSKI'S WORK, DID HE DO THAT?

20   A.   HE DID.  HE DID BACKGROUND RESEARCH AND CONSIDERED COMET'S

21   BUSINESS AND COMET'S BUSINESS RECORDS.  IN MY OPINION, THERE

22   WAS A LACK OF INVESTIGATION INTO WHAT XP ACTUALLY HAS DONE OVER

23   THE LAST 4 1/2 YEARS.

24   Q.   NEXT, MR. MALACKOWSKI TESTIFIED THAT HE PERFORMED WHAT HE

25   CALLED AN ACCOUNTING ANALYSIS, AND I WANT TO ASK YOU:  DID

1        MR. MALACKOWSKI PERFORM THAT ACCOUNTING -- I'M SORRY, LET ME

2        RE-ASK THAT QUESTION.

3              DID MR. MALACKOWSKI PERFORM THAT ACCOUNTING ANALYSIS FOR

4        ALL OF THE UPWARD ADJUSTMENTS THAT HE INCLUDED IN HIS

5        CALCULATION?

6        A.   NO, HE DIDN'T.

7        Q.   WHAT DID HE DO INSTEAD?

8        A.   HE RELIED ON MR. RUSSELL, WHO SUPPORTED -- SUPPLIED HIM

9        WITH SOME CONTENTIONS, OR ASSUMPTIONS, REGARDING THE ENGINEERS'

10       TIME CARDS, REGARDING THE ALLOCATION OF BUILD-TO-PRINT,

11       BUILD-TO-SPEC, AS WELL AS THE ALLOCATION OF ENGINEERING TIME

12       BACK TO 2007 AND 2010 TIME PERIOD.

13       Q.   NOW, WHAT MR. MALACKOWSKI TOLD US IS THAT HIS RELIANCE ON

14       GARY RUSSELL IS OKAY BECAUSE HIS THIRD STEP WAS TO THEN VERIFY

15       THE THING THAT MR. RUSSELL TOLD HIM.  IS THAT CORRECT; DID

16       MR. MALACKOWSKI VERIFY THINGS MR. RUSSELL TOLD HIM ABOUT THE

17       ADJUSTMENTS YOU ARE DESCRIBING?

18       A.   IN MY OPINION, HE DID NOT.

19       Q.   MS. IRWIN, LET'S LOOK AT SOME OF THE WAYS THAT

20       MR. MALACKOWSKI INFLATED THE NUMBERS REPORTED IN COMET'S

21       FINANCIAL DATA.  AND I WANT TO ASK YOU TO START WITH THE FIRST

22       ISSUE AND DESCRIBE WHAT THE FIRST PROBLEM THAT YOU'VE

23       IDENTIFIED WITH MR. MALACKOWSKI'S CALCULATIONS IS.

24       A.   SO AS MR. MALACKOWSKI TESTIFIED, HE GROSSED UP OR

25       RATCHETED UP THE COMET'S ENGINEERS' TIME CARDS AS ONE OF HIS

1    STEPS IN HIS ANALYSIS.

2    Q.   AND I'M PUTTING UP YOUR SLIDE DDX5.19 ON THE SCREEN.  WHAT

3    ARE WE LOOKING AT HERE?

4    A.   SO THIS IS WHAT THE TIME CARDS FOR THE 143 PROJECT CODES

5    ACTUALLY REFLECT FOR 2011 TO 2017.  AND IT TOTALS UP TO

6    $18.1 MILLION.

7    Q.   AND WHAT DID MR. MALACKOWSKI DO TO THESE RECORDS?

8    A.   WELL, IN RELIANCE ON MR. RUSSELL'S CONTENTION, HE GROSSED

9    THEM UP BY MAKING SOME ASSUMPTIONS, AND THOSE ASSUMPTIONS ADD A

10   SIGNIFICANT AMOUNT OF WHAT HE'S CALLING UNJUST ENRICHMENT TO

11   HIS OPINION.

12   Q.   AND MS. IRWIN, IN YOUR OPINION, WERE THESE ADJUSTMENTS

13   THAT MR. MALACKOWSKI MADE TO THE COMET ENGINEER TIME CARDS,

14   APPROPRIATE?

15   A.   NO, FOR MULTIPLE REASONS.

16   Q.   AND CAN YOU EXPLAIN THOSE REASONS TO THE JURY, PLEASE?

17   A.   WELL, FIRST OF ALL, IF MR. RUSSELL'S ASSUMPTION OR

18   CONTENTION WAS ACCURATE, YOU WOULD EXPECT TO SEE SOMETHING VERY

19   DIFFERENT WITH THE RELATIONSHIP BETWEEN THE RED AND THE BLUE

20   PORTIONS OF THE CHART.

21       FIRST OF ALL, YOU WOULD EXPECT TO SEE A CONSISTENT

22   RELATIONSHIP YEAR OVER YEAR BETWEEN THE UNDERREPORTED TIME AND

23   THE ACTUAL REPORTED TIME, BUT YOU DON'T.  IN FACT, IN 2011,

24   BASED ON SOME OTHER ADJUSTMENTS MR. MALACKOWSKI MAKES, IT

25   ACTUALLY SEEMS AS THOUGH THE ENGINEERS OVERREPORTED THEIR TIME.

1     BUT IN OTHER YEARS, SAY LIKE 2013, THEIR ERROR RATE WAS

2     50 PERCENT.  1.2 MILLION, YOU ADD ANOTHER 1.2, TO 2.4.  BUT IN

3     2014 THE ERROR RATE WAS MUCH, MUCH HIGH AND WE SEE THAT AGAIN

4     IN 2017.

5          THAT PATTERN ISN'T CONSISTENT WITH MR. RUSSELL'S

6     CONTENTION.  AND THIS IS ALSO TRUE WHEN YOU LOOK AT THE PRODUCT

7     LINE, CERTAIN PRODUCT LINES, THE ENGINEERS GOT IT RIGHT, OR

8     THEY WERE MORE ACCURATE.  IN CERTAIN PRODUCT LINES, THEY WERE

9     VERY FAR OFF, AND SPECIFICALLY IN RF GENERATOR, THEY WERE DEAD

10    ON.  SO IT'S JUST INCONSISTENT, THAT PATTERN.

11    Q.   WHEN YOU SAY THE ENGINEERS WERE VERY FAR OFF, ARE YOU

12    SAYING THEY RECORDED THEIR TIME WRONG OR THAT MR. MALACKOWSKI

13    ASSUMED THEY WERE VERY FAR OFF?

14    A.   MR. RUSSELL'S CONTENTION ASSUMES THAT THEY WERE VERY FAR

15    OFF.

16    Q.   AND I WANT TO ASK YOU SOME QUESTIONS ABOUT HOW THOSE

17    ENGINEERS GO ABOUT RECORDING THEIR TIME.  CAN YOU EXPLAIN TO

18    THE JURY HOW ENGINEERS AT COMET REPORT THEIR TIME?

19    A.   BASED UPON MY REVIEW OF THE DATA, THEY REPORT THEIR TIME

20    ON A DAILY BASIS.  THEY RECORD IT ON A DAILY BASIS, AND I THINK

21    IN HALF-HOUR INCREMENTS.

22    Q.   AND DID YOU REVIEW THOSE UNDERLYING TIME CARDS THAT THE

23    ENGINEERS RECORDED?

24    A.   I DID.  I LOOKED AT ALL OF THE 143 TIME CARDS FOR EACH

25    ENGINEER.

1    Q.   AND IF YOU LOOK AT THE ADJUSTMENTS THAT MR. MALACKOWSKI

2    MADE TO THE PRODUCT CODES REFLECTED IN THE ENGINEER TIME CARDS,

3    DO THE AMOUNT OF HOURS HE'S ATTRIBUTING TO THOSE ENGINEERS MAKE

4    SENSE TO YOU?

5    A.   NOT AT ALL.

6    Q.   WHY NOT?

7    A.   SO I SUMMED UP ALL OF THE ENGINEERS' TIME BY -- FOR EACH

8    ENGINEER, FOR EACH OF THE PRODUCT CODES YEAR OVER YEAR, AND

9    THEN APPLIED MR. MALACKOWSKI'S UPWARD ADJUSTMENT, JUST TO TEST

10   WHETHER OR NOT IT WAS REASONABLE.  AND THE RESULTS INDICATE

11   THAT ABOUT A DOZEN ENGINEERS WORKED BETWEEN 8 AND 15 HOURS A

12   DAY, 365 DAYS A YEAR FOR 3 OR 4 YEARS IN A ROW.  AND THAT'S

13   JUST IMPOSSIBLE.

14   Q.   MS. IRWIN, CAN YOU TELL THE JURY HOW MUCH IMPACT THESE

15   UPWARD ADJUSTMENTS TO THE ENGINEER TIME CARDS HAD ON

16   MR. MALACKOWSKI'S UNJUST ENRICHMENT CALCULATION?

17   A.   YES, IT INCREASES IT BY $12.2 MILLION OR IT INCREASES IT

18   BY 40 PERCENT.

19   Q.   MS. IRWIN, YOU WERE HERE FOR MR. MALACKOWSKI'S TESTIMONY

20   LAST WEEK; IS THAT CORRECT?

21   A.   I WAS.

22   Q.   SO I'M GOING TO ADVANCE YOUR SLIDES TO DDX5.21, AND I WANT

23   TO ASK YOU ABOUT -- SO LET ME EXPLAIN WHAT WE'RE LOOKING AT.

24   MR. MALACKOWSKI'S TESTIMONY ON CROSS-EXAMINATION AND THE

25   DOCUMENTS THAT HE WAS LOOKING AT ARE ON THE RIGHT-HAND SIDE OF

1     THE SCREEN.  I'VE RETAINED YOUR SLIDE EXHIBIT OR SLIDE

2     DEMONSTRATIVE ON THE LEFT-HAND SIDE OF THE SCREEN.

3          AND, MS. IRWIN, MR. MALACKOWSKI ADMITTED ON

4     CROSS-EXAMINATION THAT HE HAD INFLATED COMET'S COST CODES BY

5     $11.6 MILLION.

6          DID YOU HEAR THAT TESTIMONY?

7     A.   YEAH, I DID.

8     Q.   AND WHY IS MR. MALACKOWSKI'S NUMBER OF 11.6 MILLION

9     DIFFERENT FROM YOUR NUMBER OF 12.1 MILLION?

10    A.   A COUPLE DIFFERENT REASONS.  FIRST OF ALL, THE ANALYSIS

11    COVERED DIFFERENT TIME PERIODS.  AND MY ANALYSIS INCLUDES SOME

12    OF MR. MALACKOWSKI'S OTHER ADJUSTMENTS, THE RIGHT SIDE DOES

13    NOT.  BUT THE COMPARISON STILL IS IMPORTANT BECAUSE IN BOTH

14    SITUATIONS A SIGNIFICANT AMOUNT OF MONEY WAS ADDED TO THE

15    UNJUST ENRICHMENT CLAIM THROUGH THIS ADJUSTMENT.

16    Q.   MS. IRWIN, LET'S LOOK AT THE SECOND PROBLEM THAT YOU'VE

17    IDENTIFIED WITH MR. MALACKOWSKI'S DAMAGES CALCULATION.  CAN YOU

18    EXPLAIN WHAT THAT ISSUE IS TO THE JURY, PLEASE?

19    A.   YES.  SO WHILE MR. MALACKOWSKI IS TRYING TO LOOK AT WHAT

20    COSTS XP AVOIDED, HE FAILED TO CONSIDER WHAT XP ACTUALLY DID,

21    AND PART OF THAT WAS TO ACQUIRE THE COMDEL TECHNOLOGY.

22    Q.   AND WHY IS MR. MALACKOWSKI'S FAILURE TO CONSIDER THE

23    EXISTING COMDEL TECHNOLOGY A PROBLEM HERE?

24    A.   BECAUSE THAT WAS -- THOSE WERE FUNDS THAT XP ACTUALLY

25    SPENT IN THEIR PURSUIT OF DEVELOPING RF TECHNOLOGY.

1    Q.   MS. IRWIN, I'M GOING TO ASK YOU TO TELL THE JURY HOW MUCH

2    MR. MALACKOWSKI SHOULD HAVE CREDITED XP FOR THE EXISTING

3    TECHNOLOGY, BUT FIRST I WANT TO ASK YOU HOW YOU CALCULATED THAT

4    AMOUNT.

5    A.   SO WHEN AN ACQUISITION IS MADE LIKE THE COMDEL

6    ACQUISITION, A VALUATION FIRM IS HIRED TO PERFORM A PURCHASE

7    PRICE ALLOCATION, BASICALLY HOW TO INFORM THE ACCOUNTANTS WHAT

8    TO RECORD ON THE BALANCE SHEET WHEN YOU ACTUALLY, YOU KNOW,

9    MOVE THEIR NUMBERS IN.

10        SO I CONSULTED THE VALUATION PURCHASE PRICE ALLOCATION

11   THAT WAS DONE ON COMDEL AT THE TIME OF THE ACQUISITION.  AND

12   WHAT IT SHOWS IS, AT THE TIME, THESE PROFESSIONALS VALUED

13   COMDEL'S CURRENT TECHNOLOGY AT THAT MOMENT, TO BE $2.1 MILLION.

14   Q.   AND IN THE WORK THAT YOU'VE PERFORMED ON THIS CASE, DID

15   YOU GAIN AN UNDERSTANDING OF WHETHER COMDEL ACTUALLY HAD

16   EXISTING RF MATCH AND RF GENERATOR TECHNOLOGY AS OF LATE 2017,

17   EARLY 2018 WHEN THE ALLEGED MISAPPROPRIATION OCCURRED IN THIS

18   CASE?

19   A.   YES.

20   Q.   AND CAN YOU EXPLAIN TO THE JURY AT A HIGH LEVEL WHAT THAT

21   TECHNOLOGY WAS?

22   A.   WELL, WE'VE HEARD A LOT ABOUT COMDEL'S RF GENERATOR

23   TECHNOLOGY.  AND MY UNDERSTANDING IS THAT THE MOST RECENT

24   VERSION OF THAT TECHNOLOGY CAME OUT IN 2015, WHEREAS XP'S MOST

25   RECENT RF GENERATOR TECHNOLOGY WAS PREVIOUS -- WAS PART OF THE

1    STOLBERG ACQUISITION THAT TOOK PLACE IN 2011.

2    Q.   AND, MS. IRWIN, I THINK YOU SAID XP ACQUIRED STOLBERG IN

3    2011?

4    A.   OH, SORRY.  COMET ACQUIRED STOLBERG.  MY BAD.  SORRY.

5    Q.   SO UNDERSTANDING THAT THE INDEPENDENT VALUATION FIRM HAD

6    VALUED XP COMDEL'S EXISTING TECHNOLOGY AT 2.1 MILLION AT THE

7    TIME OF THE ALLEGED MISAPPROPRIATION, HOW MUCH DID

8    MR. MALACKOWSKI CREDIT TO XP IN HIS UNJUST ENRICHMENT

9    CALCULATIONS?

10   A.   IN ACKNOWLEDGING THAT 95 PERCENT OF THEIR TECHNOLOGY

11   RELATED TO RF TECHNOLOGY AND 5 PERCENT DIDN'T, I TOOK

12   95 PERCENT, AND THAT COMES OUT TO BE $2 MILLION.

13   Q.   MOVING ON TO THE THIRD PROBLEM THAT YOU IDENTIFIED IN

14   MR. MALACKOWSKI'S CALCULATIONS, PLEASE EXPLAIN THAT PROBLEM TO

15   THE JURY.

16   A.   SO COMDEL ITSELF ACKNOWLEDGES THAT ITS TECHNOLOGY HAS A

17   USEFUL LIFE, MEANING THAT AS TIME GOES ON, THAT TECHNOLOGY

18   BECOMES LESS VALUABLE, EITHER BECAUSE IT BECOMES STALE,

19   OBSOLETE, OR IT BECOMES PUBLIC INFORMATION.

20        AND WHAT COMET ACTUALLY DOES IS THEY DEPRECIATE OR

21   AMORTIZE THAT TECHNOLOGY OVER WHAT THEY'VE FOUND TO BE THE

22   USEFUL LIFE OF IT.

23   Q.   AND LET ME ASK YOU THIS QUESTION FOR US NON-ACCOUNTANTS IN

24   THE ROOM:  WHAT DO YOU MEAN WHEN YOU SAY "DEPRECIATION"?  WHAT

25   DOES THAT CONCEPT MEAN?

1    A.   IT BASICALLY IS THE RECOGNITION ON YOUR FINANCIAL

2    STATEMENTS THAT THE VALUE OF YOUR TECHNOLOGY, OR ANY ASSET,

3    DECLINES OVER TIME.

4    Q.   AND I UNDERSTAND YOUR TESTIMONY THAT COMET, IN ITS

5    FINANCIAL STATEMENTS, ACCOUNTS FOR THE DECLINE IN THE VALUE OF

6    ITS TECHNOLOGY OVER TIME.

7         WHAT I WANT TO DO IS PUT UP COMET'S ANNUAL REPORT AND ASK

8    YOU TO EXPLAIN TO THE JURY WHAT WE ARE LOOKING AT HERE.

9    A.   SO THIS IS COMET'S ANNUAL REPORT FOR 2020 WHERE THEIR

10   FINANCIALS ARE DISCLOSED AND THEIR AUDITED INFORMATION IS.  AND

11   INCLUDED IN THAT, IS A DISCUSSION OF INTANGIBLE ASSETS,

12   INCLUDING THEIR TECHNOLOGY.

13        AND HERE THEY SAY THEY AMORTIZE IT, OR "DEPRECIATE" IT IS

14   ANOTHER WORD, ON A STRAIGHT-LINE BASIS OVER THEIR EXPECTED

15   USEFUL LIFE.  AND DOWN BELOW YOU CAN THAT THE EXPECTED USEFUL

16   LIVES FOR TECHNOLOGY IS FIVE TO TEN YEARS.

17   Q.   AND WHAT RATE OF DEPRECIATION DOES A USEFUL LIFE OF FIVE

18   TO TEN YEARS IMPLY?

19   A.   FIVE YEARS IMPLIES EVERYTHING WOULD LOSE 20 PERCENT OF ITS

20   ORIGINAL VALUE YEAR OVER YEAR, A CONSTANT AMOUNT.

21        A TEN-YEAR USEFUL LIFE IS 10 PERCENT PER YEAR.

22   Q.   AND I JUST WANT TO MAKE SURE THAT THIS IS CLEAR:  ARE YOU

23   TELLING THE JURY THAT THAT CONCEPT OF DEPRECIATION THAT YOU ARE

24   SAYING MR. MALACKOWSKI SHOULD HAVE PERFORMED ON COMET'S

25   INFORMATION IS SOMETHING THAT COMET ITSELF PERFORMS IN THE

1     ORDINARY COURSE OF ITS BUSINESS?

2     A.   YES.

3     Q.   LET ME ASK YOU THIS QUESTION:  WHAT RATE OF DEPRECIATION

4     SHOULD MR. MALACKOWSKI HAVE APPLIED TO THE COMET INFORMATION

5     THAT HE WAS PURPORTING TO VALUE?

6     A.   WELL, HE COULD HAVE CONSIDERED ANYTHING -- FIVE, TEN, OR

7     ANYTHING IN BETWEEN -- BASED ON HIS DISCUSSIONS WITH HIS

8     CLIENT.

9          FOR THE PURPOSES OF MY ADJUSTMENT, I ASSUMED A

10    CONSERVATIVE RATE OF 10 PERCENT, MEANING I ASSUMED A TEN-YEAR

11    USEFUL LIFE COMPARED TO A FIVE-YEAR USEFUL LIFE.

12    Q.   WHAT DO YOU MEAN WHEN YOU SAY THAT YOU WERE "CONSERVATIVE"

13    WHEN YOU CHOSE THE TEN-YEAR USEFUL LIFE OVER THE FIVE-YEAR

14    USEFUL LIFE?

15    A.   MEANING WHEN I MAKE MY ADJUSTMENT TO MR. MALACKOWSKI'S

16    UNJUST ENRICHMENT NUMBER, I ADJUST IT AT A LOWER AMOUNT RATHER

17    THAN A HIGHER AMOUNT, MEANING TO THE BENEFIT OF COMET.

18    Q.   SO I'M GOING TO ADVANCE TO YOUR SLIDE DDX5.28.

19         AND CAN YOU EXPLAIN TO THE JURY WHAT WE ARE LOOKING AT

20    HERE?

21    A.   YES.  SO THE BARS REPRESENT THE R&D INVESTMENT AFTER

22    REMOVING THE INFLATION FOR THE TIME CARDS, AND THE RED PORTIONS

23    REFLECT THAT DEPRECIATION OF THE ASSETS AT A

24    10-PERCENT-PER-YEAR RATE.

25    Q.   AND WHAT I WANT TO ASK YOU IS, FOCUSING ON

1    MR. MALACKOWSKI'S FAILURE TO REMOVE THAT DEPRECIATION, WHAT

2    IMPACT DID THAT HAVE ON COMET'S UNJUST ENRICHMENT CLAIM?

3    A.   $5.5 MILLION.

4    Q.   MS. IRWIN, I'M GOING TO PUT YOUR TABLE OF ISSUES WITH

5    MR. MALACKOWSKI'S CALCULATION BACK UP ON THE SCREEN AT DDX5.30.

6    AND I'M GOING TO ASK YOU TO EXPLAIN TO THE JURY THE FOURTH

7    PROBLEM THAT YOU IDENTIFIED WITH MR. MALACKOWSKI'S

8    CALCULATIONS.

9    A.   WELL, MR. MALACKOWSKI RELIED ON MR. RUSSELL IN ALLOCATING

10   THE ENGINEERING TIME, OR THE R&D EXPENSES, FOR THE 2007-TO-2010

11   PERIOD.  WE KNOW PROJECT CODE ACCOUNTING STARTED IN MID-2010,

12   SO PRIOR TO THAT THERE WAS NO DETAIL AT THAT LEVEL.

13   Q.   AND LET ME ASK YOU THIS, BECAUSE WE HEARD MR. RUSSELL

14   TESTIFY LAST WEEK:  DID MR. RUSSELL WORK AT COMET DURING THE

15   2007-TO-2010 TIME PERIOD?

16   A.   NO.  I BELIEVE HE STARTED IN 2012.

17   Q.   AND IN YOUR REVIEW OF MR. MALACKOWSKI'S WORK, DID

18   MR. MALACKOWSKI REVIEW ANY OF COMET'S ACCOUNTING RECORDS OR ITS

19   FINANCIAL DATA TO SUPPORT THE UPWARD ADJUSTMENT THAT HE MADE TO

20   THE 2007-TO-2010 R&D COSTS?

21   A.   NOT THAT I'M AWARE OF.

22   Q.   AND WHAT I WANT TO ASK YOU -- LET ME ASK YOU THIS:  IN

23   YOUR EXPERIENCE AT CORNERSTONE AND YOUR ROLE AS A CONTROLLER,

24   WOULD THAT TYPE OF FINANCIAL DATA HAVE EXISTED TO ALLOW

25   MR. MALACKOWSKI TO VERIFY IT IF HE HAD CHOSEN TO DO SO?

1      A.   YEAH.  SO FINANCIAL DATA ON AN INCOME STATEMENT OR BALANCE

2      SHEET DOESN'T JUST COME OUT OF THIN AIR.  RIGHT?  IT'S TRACKED

3      THROUGH THE GENERAL LEDGER.  AND A GENERAL LEDGER IS A ROLL-UP

4      OF HUNDREDS OR THOUSANDS OF TRANSACTIONS, AND EACH OF THOSE

5      TRANSACTIONS HAS SUPPORT:  PAYROLL RECORDS, INVOICES, OVERHEAD

6      ALLOCATIONS.  YOU COULD HAVE LOOKED AT INDIVIDUAL PAYROLL

7      RECORDS OR TAX FORMS, W-2S.  ALL OF THAT INFORMATION COULD HAVE

8      BEEN AVAILABLE FOR REVIEW AND JUST TO EVEN TRY TO SUBSTANTIATE

9      MR. RUSSELL'S CONTENTION.

10     Q.   AND DID MR. MALACKOWSKI OBTAIN ANY OF THAT INFORMATION?

11     A.   NOT THAT I'M AWARE OF.

12     Q.   MS. IRWIN, HOW MUCH DID MR. MALACKOWSKI ADD TO THE UNJUST

13     ENRICHMENT CALCULATION BASED ON THESE 2007-TO-2010 COSTS THAT

14     WERE NOT REFLECTED IN COMET'S ACCOUNTING AND FINANCIAL DATA?

15     A.   IT WAS $2.5 MILLION, BUT BECAUSE THOSE ARE AMOUNTS IN 2007

16     TO 2010 AND THEY'RE THE LATEST DATA THAT ARE INCLUDED, THEY

17     HAVE BEEN DEPRECIATED ALREADY THROUGH MY OTHER ADJUSTMENTS.

18     RIGHT?  SO IT ONLY COMES OUT TO BE A HALF-A-MILLION-DOLLAR

19     ADJUSTMENT FOR THIS.

20     Q.   AND JUST TO BE CLEAR, IT'S YOUR OPINION THAT

21     MR. MALACKOWSKI SHOULD HAVE REMOVED ANOTHER HALF A MILLION

22     DOLLARS TO ACCOUNT FOR THESE UNSUPPORTED COSTS IN 2007 TO 2010?

23     A.   WITHOUT SUPPORT, YES.

24     Q.   MS. IRWIN, LET'S LOOK AT THE FIFTH AND FINAL ISSUE THAT

25     YOU'VE IDENTIFIED WITH MR. MALACKOWSKI'S CALCULATIONS.

1            PLEASE EXPLAIN THAT PROBLEM TO THE JURY.

2     A.   SO THIS HAS TO DO WITH THE RECOGNITION THAT NOT ALL OF THE

3     EXPENSES THAT WERE INCLUDED IN THE PROJECT CODES WENT TO THE

4     DEVELOPMENT OF THE TECHNOLOGY.  BASED ON MY DISCUSSIONS WITH

5     MR. PENNY, DR. PHINNEY, AND DR. SPENCER, THE EXPENSES THAT ARE

6     INCURRED AFTER THE LAUNCH OF A PRODUCT ARE PREDOMINANTLY

7     SUSTAINING ENGINEERING, MEANING IT'S CUSTOMER-SPECIFIC

8     ADJUSTMENTS OR SERVICING PRODUCTS THAT HAVE ALREADY BEEN

9     INSTALLED.

10    Q.   AND, MS. IRWIN, IN YOUR OPINION, WOULD THOSE SUSTAINING

11    THOSE CUSTOMER-SPECIFIC SUSTAINING ENGINEERING COSTS, BASED ON

12    WHAT YOU'VE LEARNED IN THIS CASE, WOULD THOSE HAVE ALLOWED XP

13    TO AVOID COSTS OR OTHERWISE BE UNJUSTLY ENRICHED?

14    A.   NO, BECAUSE EVEN IN THAT BUT-FOR WORLD WHERE THEY WOULD

15    HAVE DEVELOPED THEIR TECHNOLOGY WITHOUT THE ALLEGED TRADE

16    SECRETS, AFTER THAT PRODUCT IS LAUNCHED THEY WOULD HAVE THE

17    SAME TYPE OF EXPENSES FOR CUSTOMER-SPECIFIC ADJUSTMENTS OR

18    SERVICING PRODUCTS THAT HAD BEEN INSTALLED.  SO IT'S NOT AT ALL

19    AN AVOIDED COST.

20    Q.   MS. IRWIN, WHAT ARE WE LOOKING AT HERE ON YOUR

21    SLIDE DDX5.33?

22    A.   THIS IS A GRAPHICAL REPRESENTATION OF EACH OF THE PRODUCT

23    LINES.  AND WHAT I'VE DONE IS I'VE INSERTED A GREEN MARKER

24    WHERE THE PRODUCTS HAVE BEEN LAUNCHED.

25    Q.   AND ARE THOSE PRODUCT LINES THE PRODUCT LINES THAT

1    MR. MALACKOWSKI INCLUDED IN HIS UNJUST ENRICHMENT CALCULATIONS?

2    A.   YES.

3    Q.   WELL, LET'S LOOK -- LET'S TAKE AN EXAMPLE.  I WANT TO

4    START WITH THE BAR AT THE VERY BOTTOM THAT SAYS "AMAT GEN-1."

5         COULD YOU WALK THE JURY THROUGH WHAT THE DIFFERENT COLORS

6    ON THAT BAR MEAN?

7    A.   SO THE BLUE PORTIONS REPRESENT THE DEVELOPMENT OF THE

8    PRODUCT IN 2007 AND 2008.  BASED ON COMET'S OWN RECORDS, I

9    DISCOVERED THAT THAT PRODUCT WAS LAUNCHED IN 2008.

10        SO BEGINNING THE NEXT YEAR, 2009, I SUMMED UP OR COUNTED

11   UP ALL OF THE RESEARCH AND DEVELOPMENT -- SORRY -- THE EXPENSES

12   THAT WENT INTO THE PROJECT CODES AFTER LAUNCH.  AND THAT'S THE

13   RED PORTION OF THE BAR.

14   Q.   AND LET ME ASK YOU ABOUT A COUPLE OF THE OTHER PRODUCTS

15   THAT YOU HAVE ON DDX5.33.

16        I SEE -- WELL, NEXTGEN 3, CITO PLUS, AND DA VINCI LOOK

17   LIKE THEY ARE ALL BLUE.

18        WHY ARE THOSE PRODUCTS COLORED ALL BLUE?

19   A.   BECAUSE THEY HAVE NOT BEEN LAUNCHED YET.  SO ALL OF THOSE

20   FUNDS AND THE PROJECT CODE EXPENSES WOULD BE TOWARDS THE

21   DEVELOPMENT OF THOSE PRODUCTS.

22   Q.   AND SO IN YOUR ADJUSTMENTS TO MR. MALACKOWSKI'S

23   CALCULATIONS YOU ARE GIVING COMET FULL CREDIT FOR THOSE

24   DEVELOPMENT COSTS FOR THE UNLAUNCHED PRODUCTS; IS THAT CORRECT?

25   A.   YES.  CONSISTENT WITH MY UNDERSTANDING.

1    Q.   THERE'S ONE THAT'S ALL RED.  IT SAYS "CITO."

2         WHY IS THE CITO PRODUCT CODED ALL RED?

3    A.   BECAUSE THE CITO PRODUCT, I BELIEVE, WAS ACQUIRED THROUGH

4    THE STOLBERG ACQUISITION IN 2011.  THAT PRODUCT HAD ALREADY

5    BEEN LAUNCHED BY STOLBERG.  AND SO, THEREFORE, ALL OF THE

6    EXPENSES WOULD BE CONSIDERED SUSTAINING ENGINEERING.

7    Q.   AND FOCUSING YOU ON JUST THE FIRST THREE PRODUCTS THAT

8    WERE DEVELOPED IN-HOUSE BY COMET AND HAVE BEEN LAUNCHED, IT

9    LOOKS TO ME THAT THE VAST MAJORITY OF THE COSTS COMET IS

10   CLAIMING ARE COSTS IT INCURRED POST-LAUNCH; IS THAT CORRECT?

11   A.   YES.

12   Q.   LET ME ASK YOU THIS BEFORE WE MOVE ON:  BASED ON YOUR

13   DISCUSSIONS WITH MR. PENNY AND WITH DR. PHINNEY AND

14   DR. SPENCER, IS IT POSSIBLE FOR COMET OR FOR A COMPANY TO INCUR

15   REAL R&D COSTS AFTER THE PRODUCT HAS BEEN LAUNCHED?

16   A.   IT'S POSSIBLE, BUT I HAVE NOT SEEN ANY EXAMPLES PUT

17   FORWARD THAT WOULD EXPLAIN THE VAST MAJORITY OF THE FUNDS BEING

18   RELATED TO SUSTAINING ENGINEERING.

19   Q.   AND YOU WERE HERE WHEN THE HEAD OF COMET'S RF GENERATOR

20   PRODUCT, ANDRE GREDE, AND THE HEAD OF ITS RF MATCH PRODUCTS,

21   GARY RUSSELL, TESTIFIED, WERE YOU NOT?

22   A.   I WAS HERE.

23   Q.   AND DID MR. GREDE OR MR. RUSSELL PROVIDE ANY EXAMPLES OF

24   TRUE R&D PROJECTS THAT OCCURRED ON ANY OF THE AMAT GEN-1 OR

25   GEN-2 OR THE KIYO PRODUCTS AFTER THEY HAD BEEN LAUNCHED?

1    A.   NO, I DIDN'T HEAR ANY EXAMPLES.

2    Q.   MS. IRWIN, IF YOU WERE TO REMOVE THE AMOUNT OF SUSTAINING

3    ENGINEERING COSTS THAT MR. MALACKOWSKI INCLUDED IN HIS UNJUST

4    ENRICHMENT CALCULATIONS, HOW MUCH WOULD THAT REMOVE FROM

5    COMET'S UNJUST ENRICHMENT CLAIM?

6    A.   IT'S $8.2 MILLION.

7    Q.   AND, MS. IRWIN, I'M NOT GOING TO MAKE YOU DO THIS IN YOUR

8    HEAD, BUT EXPLAIN TO THE JURY, IF WE REMOVE ALL OF THE

9    INFLATIONS AND UPWARD ADJUSTMENTS THAT MR. MALACKOWSKI INCLUDED

10   IN HIS UNJUST ENRICHMENT CALCULATION, WHAT WOULD THE IMPACT BE

11   ON COMET'S UNJUST ENRICHMENT CLAIM?

12   A.   IT WOULD BE $4.1 MILLION, AT MOST.

13   Q.   MS. IRWIN, IF THE JURY DECIDES THAT XP MISAPPROPRIATED

14   SOME BUT NOT ALL OF COMET'S ALLEGED INFORMATION, IS THERE A WAY

15   FOR THEM TO ALLOCATE THIS 4.1 MILLION AMONG THE TECHNOLOGIES

16   THAT MR. MALACKOWSKI OPINED ABOUT DURING HIS TESTIMONY?

17   A.   YES.  WHEN I MADE THESE ADJUSTMENTS I DID IT BY PRODUCT

18   LINE SO I COULD PROVIDE THE JURY WITH OPTIONS.

19   Q.   AND CAN YOU EXPLAIN TO THE JURY IF YOU REMOVE THE

20   INFLATIONS INCLUDED BY MR. MALACKOWSKI FROM THE CALCULATION AND

21   YOU ASSUME LIABILITY FOR MISAPPROPRIATION FOR THESE PRODUCTS

22   WHAT WOULD BE THE AMOUNT OF UNJUST ENRICHMENT FOR EACH PRODUCT?

23   A.   SO FOR THE AMAT MATCHING NETWORK IT'S 15,000.  FOR KIYO

24   MATCHING NETWORK IT'S 78,000.  FOR THE DA VINCI RF GENERATOR

25   CONTROL, DIGITAL MEASUREMENT, AND SOFTWARE IT'S $1,353,000.

1    AND FOR THE NEXT GENERATION RF MATCHING NETWORK IT'S

2    $2.68 MILLION.

3    Q.   AND LET ME ASK YOU BEFORE WE MOVE ON FROM THESE

4    CALCULATIONS:  ARE YOU OPINING THAT XP POWER WAS UNJUSTLY

5    ENRICHED BY $4.1 MILLION?

6    A.   NO, I'M NOT.

7    Q.   WHY NOT?

8    A.   BECAUSE, AGAIN, I'VE SEEN NO EVIDENCE OF ACTUAL AVOIDED

9    COSTS.  THIS IS SIMPLY -- THIS ANALYSIS IS SIMPLY TAKING ABOUT

10   MALACKOWSKI'S CONTENTION AND REMOVING WHAT I THOUGHT WERE

11   ADJUSTMENTS -- OR MAKING ADJUSTMENTS TO IT TO MAKE IT REFLECT

12   AT LEAST THE INVESTMENTS IN THE TECHNOLOGIES THAT EXIST.

13        AGAIN, I'VE SEEN NO EVIDENCE THAT XP HAS SAVED ANY TIME OR

14   MONEY IN THE PRODUCTION OF THEIR OWN PRODUCT.

15   Q.   LET ME ASK YOU THIS QUESTION:  I KNOW YOU ASSUMED

16   LIABILITY.  IF THE JURY FINDS THAT XP IS NOT LIABLE FOR

17   MISAPPROPRIATION, WHAT'S THE APPROPRIATE AMOUNT OF UNJUST

18   ENRICHMENT?

19   A.   OH, IT WOULD BE ZERO.

20   Q.   AND IF THE JURY FINDS THAT XP IS LIABLE FOR

21   MISAPPROPRIATION BUT DID NOT ACTUALLY AVOID ANY COSTS IN XP'S

22   DESIGN PROCESS, WHAT IS THE APPROPRIATE AMOUNT OF UNJUST

23   ENRICHMENT?

24   A.   AGAIN, IT WOULD BE ZERO.

25   Q.   MS. IRWIN, LET'S MOVE ON TO YOUR FOURTH OPINION CONCERNING

1    A REASONABLE ROYALTY.

2         AND BEFORE WE WALK THROUGH THAT OPINION, I WANT TO ASK:

3    IS A REASONABLE ROYALTY THE APPROPRIATE WAY TO EVALUATE

4    POTENTIAL DAMAGES IN THIS CASE?

5    A.   IN THIS CASE, GIVEN THE CIRCUMSTANCES, I DON'T BELIEVE

6    THIS IS THE BEST WAY TO DETERMINE DAMAGES.

7    Q.   AND WHY NOT?

8    A.   WELL, A ROYALTY IS BEST SUITED WHEN A DEFENDANT IS

9    MANUFACTURING AND SELLING A PRODUCT AND MAKING SALES USING THE

10   PLAINTIFF'S ALLEGED INTELLECTUAL PROPERTY.  THEREFORE, YOU CAN

11   CALCULATE HOW THE DEFENDANT HAS ACTUALLY BENEFITTED SINCE THE

12   MISAPPROPRIATION OR INFRINGEMENT.

13        IN THIS CASE BECAUSE THERE'S BEEN NO SALES OF THE PRODUCTS

14   YET, THERE'S NO ROYALTY BASE, THERE'S NO EXAMPLES OF HOW XP HAS

15   ACTUALLY MADE ANY MONEY OFF OF THIS.

16   Q.   MS. IRWIN, IF THE JURY WERE TO FIND THAT XP WERE LIABLE,

17   AND IF THE JURY WERE TO DECIDE TO AWARD A REASONABLE ROYALTY,

18   CAN THEY COMBINE THAT REASONABLE ROYALTY WITH THE UNJUST

19   ENRICHMENT AMOUNT THAT COMET IS CLAIMING?

20   A.   NO, JUST AS MR. MALACKOWSKI TESTIFIED, THEY'RE NOT -- YOU

21   CAN'T ADD THEM, IT WOULD BE DOUBLE COUNTING.

22   Q.   SO, MS. IRWIN, UNDERSTANDING YOUR OPINION THAT REASONABLE

23   ROYALTY IS NOT THE APPROPRIATE WAY TO MEASURE DAMAGES IN THIS

24   CASE, I DO WANT TO BRIEFLY HAVE YOU EXPLAIN TO THE JURY THE

25   WORK THAT YOU'VE DONE WITH RESPECT TO ANALYZING A REASONABLE

1     ROYALTY AND THE OPINIONS THAT YOU'VE FORMED.

2          AND WHAT I WANT TO HAVE YOU DO FIRST, AND I'M AGAIN

3     PUTTING UP A SLIDE THAT MR. MALACKOWSKI USED DURING HIS

4     TESTIMONY HERE AT DDX5.38, CAN YOU EXPLAIN TO THE JURY HOW ONE

5     WOULD GO ABOUT CALCULATING A REASONABLE ROYALTY?

6     A.   YES.  SO WE PUT OURSELVES IN THIS SITUATION CALLED THE

7     HYPOTHETICAL NEGOTIATION, WHICH IS VERY DIFFERENT THAN A

8     REAL-WORLD NEGOTIATION FOR LICENSES.

9          IN A HYPOTHETICAL NEGOTIATION, EACH PARTY COMES TO THE

10    TABLE AND THEY'RE NOT ALLOWED TO GET UP UNTIL THEY'VE COME TO A

11    DECISION.  AND ANOTHER UNIQUE THING IS WE SIT HERE TODAY

12    IMAGINING WHAT THAT NEGOTIATION WOULD HAVE BEEN LIKE AT THE

13    TIME OR JUST BEFORE THE MISAPPROPRIATION, SO THAT WOULD BE

14    JANUARY OR FEBRUARY OF 2018.

15         ANOTHER UNIQUE THING ABOUT A HYPOTHETICAL NEGOTIATION IS

16    EVERYBODY'S CARDS ARE UP, RIGHT, THERE'S NO SECRETS, EVERYBODY

17    KNOWS HOW YOU ARE GOING TO USE THE INFORMATION, EVERYBODY KNOWS

18    WHAT THE INFORMATION IS, SO IT'S A VERY COMPLICATED WORLD TO

19    PUT YOURSELF IN, BUT THAT'S WHAT WE DO AS DAMAGE EXPERTS.

20    Q.   AND, MS. IRWIN, LET ME ZIP BACK FOR JUST A MOMENT TO THE

21    SLIDE DDX5.36.  AND I MEANT TO ASK YOU BEFORE WE MOVED ON, THE

22    AMAT MATCHING AND THE KIYO MATCHING NETWORK AMOUNTS THAT YOU'VE

23    CALCULATED ARE MUCH LOWER THAN THE AMOUNTS FOR DA VINCI AND THE

24    NEXT GENERATION RF MATCHING NETWORK.  CAN YOU EXPLAIN WHY THAT

25    IS?

1    A.   YES, IT'S ACTUALLY NOT SURPRISING BECAUSE THAT IS THE

2    OLDEST TECHNOLOGY, IT'S BEEN OUT IN THE PUBLIC DOMAIN THE

3    LONGEST, AND SO AFTER YOU DEPRECIATE AND RECOGNIZE THAT THE

4    SUSTAINING ENGINEERING, A LOT OF THAT HAS BEEN SPENT KEEPING

5    THESE PRODUCTS RELEVANT, IT DOESN'T SURPRISE ME AT ALL.

6    Q.   SO I'M GOING TO POP BACK AHEAD TO DDX5.38.  AND YOU WERE

7    EXPLAINING THE CONTOURS OF A HYPOTHETICAL NEGOTIATION.  LET ME

8    ASK YOU THIS:  IS THE GOAL HERE TO FIGURE OUT THE DEAL THAT

9    COMET WOULD HAVE ACCEPTED OR THE DEAL THAT XP WOULD HAVE

10   ACCEPTED OR IS IT SOME COMBINATION OF THOSE THINGS?

11   A.   THE GOAL IS TO DETERMINE WHAT THE MOST LIKELY OUTCOME

12   WOULD BE THAT BOTH PARTIES WOULD AGREE TO.  REMEMBER THEY ARE

13   CHAINED TO THE TABLE, SO TO SPEAK, SO EVEN NO MATTER WHAT THE

14   PLAINTIFF OR DEFENDANT DEMANDED AND THE OTHER SIDE WOULDN'T

15   AGREE, THAT WOULD NOT BE THE OUTCOME.

16   Q.   AND, MS. IRWIN, YOU HEARD MR. MALACKOWSKI TESTIFY THE

17   OTHER DAY ABOUT HOW HE CALCULATED THE REASONABLE ROYALTY THAT

18   HE SAID WOULD RESULT FROM THE HYPOTHETICAL NEGOTIATION,

19   CORRECT?

20   A.   YES.

21   Q.   AND -- WELL, LET ME ASK YOU THIS QUESTION FIRST:  DO YOU

22   AGREE WITH THE WAY MR. MALACKOWSKI DID IT?

23   A.   NO.

24   Q.   SO LET ME ASK YOU FIRST:  AS PART OF THIS ANALYSIS, CAN

25   YOU REMIND THE JURY WHAT COMET IS CLAIMING OCCURRED OR COMET IS

```
 1    CLAIMING XP WAS UNJUSTLY ENRICHED IN THIS CASE?

 2    A.   THEY'RE CLAIMING THAT THEY WERE UNJUSTLY ENRICHED BY

 3    $32.5 MILLION.

 4    Q.   WHAT DOES THAT MEAN?

 5    A.   IT MEANS THAT THEY AVOIDED EXPENSES TO THE TUNE OF

 6    $32.5 MILLION, AND IN THAT BUT-FOR WORLD THEY WOULD HAVE HAD TO

 7    SPEND THAT MONEY.

 8    Q.   AND LET ME ASK THAT QUESTION A SLIGHTLY DIFFERENT WAY.

 9    HOW MUCH IS COMET CLAIMING THAT IT SPENT TO DEVELOP THE ALLEGED

10    TRADE SECRETS IN THIS CASE?

11    A.   $32.5 MILLION.

12    Q.   AND HOW MUCH IS COMET CLAIMING THAT XP SPENT TO OBTAIN

13    THOSE ALLEGED TRADE SECRETS?

14    A.   ZERO.

15    Q.   AND SO TURNING BACK TO MR. MALACKOWSKI'S REASONABLE

16    ROYALTY OPINION, WHAT DOES MR. MALACKOWSKI SAY WOULD BE THE

17    RESULT OF A HYPOTHETICAL NEGOTIATION BETWEEN THOSE TWO PARTIES?

18    A.   THAT XP WOULD PAY COMET $32.5 MILLION.

19    Q.   AND IN YOUR OPINION, IS THAT A PLAUSIBLE RESULT OF A

20    HYPOTHETICAL NEGOTIATION WHERE WE'RE TRYING TO DETERMINE WHAT

21    THE MOST LIKELY OUTCOME THAT THE PARTIES BOTH WOULD AGREE TO

22    IS?

23    A.   NO.

24    Q.   AND WHY NOT?

25    A.   WELL, IF THAT WERE THE CASE, IT WOULD BE -- THE NET RESULT
```

1    FOR COMET WOULD BE THEY WOULDN'T HAVE HAD TO SPEND ANYTHING,

2    THEY WOULD HAVE BEEN REIMBURSED A HUNDRED PERCENT FOR ALL OF

3    THEIR CLAIMED R&D EXPENSES, AND XP POWER WOULD BE IN A POSITION

4    WHERE THEY HAVE NOW HAD TO MAKE THAT REIMBURSEMENT AND THEY

5    WOULD HAVE HAD INCURRED AN ADDITIONAL $32.5 MILLION IN

6    DEVELOPMENT COSTS.

7    Q.   MS. IRWIN, HAVE YOU DEVELOPED AN OPINION ON THE

8    ALTERNATIVE ROYALTY THAT YOU BELIEVE THE PARTIES WOULD HAVE

9    AGREED TO IN A HYPOTHETICAL NEGOTIATION?

10   A.   YES, I HAVE.

11   Q.   AND HOW DID YOU FORM THAT OPINION?

12   A.   WELL, I LOOKED AT COMET'S ACTUAL RECORDS REGARDING

13   LICENSES THAT THEY HAVE ENTERED INTO.

14   Q.   AND WHAT TYPES OF LICENSES HAS COMET ENTERED INTO TO

15   LICENSE ITS RF MATCH TECHNOLOGY?

16   A.   THESE ARE INTERCOMPANY LICENSES, SO THEY'RE BETWEEN

17   COMET-RELATED ENTITIES.

18   Q.   AND IN YOUR REVIEW OF THE MATERIALS PRODUCED IN THIS CASE

19   AND THE RESEARCH YOU PERFORMED, DID YOU FIND ANY OTHER

20   APPLICABLE LICENSES FOR RF MATCH OR RF GENERATOR TECHNOLOGY?

21   A.   NO, I DIDN'T.

22   Q.   AND WHY, IN YOUR VIEW, WAS IT APPROPRIATE TO USE COMET'S

23   INTERCOMPANY LICENSES TO FORMULATE YOUR OPINION HERE?

24   A.   SO EVEN THOUGH THEY'RE BETWEEN RELATED PARTIES, IN ORDER

25   TO MEET, AS WE HEARD MR. PFEIFFER TESTIFY THROUGH HIS VIDEO,

1    THERE ARE CERTAIN STANDARDS THAT HAVE TO BE MET IN THOSE

2    AGREEMENTS.

3         SO ONE OF THOSE STANDARDS IS THAT THE TERMS HAVE TO BE

4    ARM'S LENGTH, THEY HAVE TO BE AS IF THEY ARE NEGOTIATING WITH A

5    THIRD PARTY.  AND THAT'S SO THAT REVENUE CAN BE RECOGNIZED IN

6    THE PROPER -- EITHER REVENUE OR EXPENSES CAN BE RECOGNIZED IN

7    THE PROPER VENUE, MEANING COUNTRY.

8    Q.   AND, MS. IRWIN, AS A RESULT OF THE HYPOTHETICAL

9    NEGOTIATION BETWEEN COMET AND XP, WOULD COMET STILL RETAIN THE

10   ABILITY TO USE THE ALLEGED TRADE SECRETS AT ISSUE HERE?

11   A.   YES, THEY WOULD.

12   Q.   LET ME ASK YOU BEFORE WE MOVE ON, AFTER REVIEWING COMET'S

13   INTERCOMPANY LICENSES, DID YOU COME TO A CONCLUSION AS TO WHAT

14   THE ROYALTY STRUCTURE IS THAT COMET AND XP WOULD MOST LIKELY

15   HAVE AGREED TO?

16   A.   YES.

17   Q.   AND WHAT WOULD THAT STRUCTURE LOOK LIKE?

18   A.   IT WOULD BE WHAT WE CALL A RUNNING ROYALTY, WHICH IS A

19   PERCENTAGE BASED ON REVENUE EARNED BY THE LICENSEE, OR XP IN

20   THIS CASE.

21   Q.   AND WHEN YOU SAY "REVENUE EARNED," ARE YOU REFERRING TO

22   ACTUAL SALES THAT HAVE OCCURRED OR COULD THAT REVENUE INCLUDE

23   PROJECTED SALES INTO THE FUTURE?

24   A.   IT WOULD NOT INCLUDE PROJECTED SALES IN THE FUTURE.

25   Q.   AND WHY NOT?

1      A.   SO A RUNNING ROYALTY IS, IT BALANCES THE RISK AND THE

2      REWARD FOR EACH OF THE PARTIES THAT ARE COMING TO THAT TABLE

3      AND THEY HAVE TO NEGOTIATE.  AND THAT IS IF THE INTELLECTUAL

4      PROPERTY ENDS UP BEING VERY HELPFUL AND VALUABLE, THE LICENSEE

5      MAKES MORE MONEY AND THE MORE ROYALTY GOES TO THE LICENSOR.

6      AND IF IT ENDS UP NOT BEING VERY VALUABLE, THE OPPOSITE IS

7      TRUE.

8          SO THERE'S -- BASICALLY THE OWNER OF THE TECHNOLOGY OR

9      INTELLECTUAL PROPERTY IS REWARDED IN COMMENSURATE VALUE WITH

10     THE VALUE OF THE INFORMATION.  WHEREAS, IF YOU BASE IT ON

11     FUTURE OR EXPECTED SALES, YOU'RE PUSHING ALL OF THE RISK ON THE

12     LICENSEE, BECAUSE THOSE ARE PROJECTIONS.  WE DON'T KNOW WHAT'S

13     REALLY GOING TO HAPPEN IN THE FUTURE, AND LOTS OF DIFFERENT

14     THINGS COULD AFFECT THAT.  SO THAT'S ONE REASON.

15     Q.   ARE THERE ANY OTHERS?

16     A.   YES.  SO AS YOU PROJECT OUT REVENUE, RIGHT, THOSE ARE OVER

17     FIVE TO TEN YEARS, AND WE ALL UNDERSTAND THAT A DOLLAR TODAY IS

18     WORTH MORE THAN A DOLLAR IN FIVE YEARS OR TEN YEARS, SO YOU

19     WOULD HAVE SOME SORT OF DISCOUNT OR TIME VALUE OF MONEY

20     ADJUSTMENT THAT YOU WOULD NEED TO TAKE INTO ACCOUNT IN ADDITION

21     TO SHIFTING ALL THAT RISK ON TO THE LICENSEE.

22     Q.   MS. IRWIN, WERE THERE ANY OTHER THINGS THAT YOU LEARNED IN

23     YOUR REVIEW OF COMET'S RF POWER TECHNOLOGY LICENSES THAT

24     INFORMED YOUR OPINION ON A REASONABLE ROYALTY?

25     A.   YES.

1    Q.   CAN YOU EXPLAIN THOSE BRIEFLY TO THE JURY?

2    A.   YES.  SO NUMBER ONE, THE EFFECTIVE DATE WHICH GIVES YOU A

3    RANGE OF HOW LONG THAT AGREEMENT WAS FOR.  AND THESE THREE

4    LICENSES WERE BETWEEN THREE AND SIX YEARS IN LENGTH.  SECOND,

5    IN TWO OF THE THREE LICENSES, THERE WAS AN EXPIRATION OF

6    CONFIDENTIALITY AFTER THE TERM OF THE AGREEMENT.  AND WHAT THAT

7    IS, IS THERE'S CLAUSES IN THE LICENSE THAT SAYS, FIVE YEARS

8    AFTER THE COMPLETION OF THE LICENSE, THAT INFORMATION IS NO

9    LONGER CONSIDERED CONFIDENTIAL, YOU DON'T HAVE TO KEEP IT

10   CONFIDENTIAL ANYMORE.

11        THE PRODUCTS COVERED, THESE ARE RF PRODUCTS, THEY INCLUDE

12   RF MATCH PRODUCTS, AND I CONFIRMED WITH DR. PHINNEY THAT

13   THESE -- THIS IS THE SAME INFORMATION THAT'S RELATED TO THE

14   ALLEGED TRADE SECRETS IN THIS MATTER.  I CONFIRMED WHO THE

15   LICENSEES AND LICENSORS WERE, AND WHAT THE ROYALTY RATES WOULD

16   BE AND THAT THEY WERE ALL A PERCENTAGE OF SOME FORM OF SALES.

17   Q.   AND, MS. IRWIN, HOW WERE THE ROYALTY RATES AT A PERCENTAGE

18   OF SALES IN THESE LICENSES DETERMINED?

19   A.   AGAIN, THEY WERE DETERMINED BY -- MY UNDERSTANDING IS THEY

20   WERE DETERMINED BY A TAX CONSULTANT THAT COMET HIRED IN ORDER

21   TO INVESTIGATE WHAT THAT ARM'S LENGTH RATE WOULD BE.  SO IT'S

22   AS IF COMET WAS LICENSING IT TO AN OUTSIDE COMPANY.

23   Q.   AND, MS. IRWIN, HOW DID YOU DECIDE THE RATE THAT COMET AND

24   XP WOULD HAVE MOST LIKELY AGREED TO IN A SALES-BASED ROYALTY?

25   A.   SO I FOCUSED ON THAT SECOND LICENSE, BECAUSE IT WAS VERY

1    HELPFUL IN DETERMINING THE INCREMENTAL VALUE OF THE ALLEGED

2    TRADE SECRET.

3         SO WE CAN SEE HERE THAT THIS LICENSE HAS 2 PERCENT FOR

4    BUILD-TO-PRINT, WHICH DOES NOT INCLUDE THE TRADE SECRETS, AND A

5    5 PERCENT RATE FOR THE BUILD-TO-SPEC PRODUCTS, AND THAT DOES

6    INCLUDE THE TRADE SECRET.  SO YOU TAKE THE DIFFERENCE AND THAT

7    GIVES YOU THE PERCENTAGE, OR 3 PERCENT, THAT'S ASSOCIATED WITH

8    THE ALLEGED TRADE SECRETS, IT'S THAT INCREMENTAL AMOUNT.

9    Q.   MS. IRWIN, IN YOUR OPINION, BASED ON YOUR STUDY OF COMET'S

10   RF MATCH LICENSES, RF TECHNOLOGY LICENSES, WHAT WOULD BE THE

11   APPROPRIATE ROYALTY THAT THE PARTIES WOULD HAVE MOST LIKELY

12   AGREED TO IN A HYPOTHETICAL NEGOTIATION?

13   A.   IT WOULD HAVE BEEN AROUND 3 PERCENT FOR ABOUT A FIVE-YEAR

14   PERIOD, STARTING IN 2018.

15   Q.   AND, MS. IRWIN, UNDERSTANDING THAT THERE HAVE BEEN NO

16   SALES OF ANY NEW PRODUCT BY XP SINCE THE DATE OF THE ALLEGED

17   MISAPPROPRIATION, AND THIS IS LIKELY OBVIOUS TO ALL OF US, BUT

18   WHAT WOULD 3 PERCENT OF ZERO BE?

19   A.   ZERO.

20   Q.   WELL, LET ME ASK YOU THIS:  IS THAT SOMETHING THAT YOU

21   THINK COMET LIKELY WOULD HAVE AGREED TO IN A HYPOTHETICAL

22   NEGOTIATION?

23   A.   NO.  GIVEN THE FACTS AND CIRCUMSTANCES AT THE TIME,

24   KNOWING THAT IT WAS GOING TO BE MANY YEARS DOWN THE ROAD TO

25   GENERATE ANY REVENUE IN 2008, I DON'T THINK THAT WOULD HAVE

1    BEEN THE PREFERRED METHOD OF RESOLVING THIS.

2    Q.   AND HOW DOES THAT AFFECT YOUR OPINION AS TO WHETHER A

3    REASONABLE ROYALTY IS THE APPROPRIATE WAY TO EVALUATE DAMAGES,

4    POTENTIAL DAMAGES IN THIS CASE?

5    A.   WELL, CONSISTENT WITH WHAT I SAID BEFORE, IT REALLY KIND

6    OF PROVES UP THAT THE REASONABLE ROYALTY APPROACH IS NOT THE

7    RIGHT APPROACH FOR DAMAGES IN THIS TYPE OF CASE WHERE THE

8    DEFENDANT HASN'T MADE ANY SALES AND IT'S BEEN AN EXTENDED

9    PERIOD OF TIME SINCE WHAT WOULD HAVE BEEN THE HYPOTHETICAL

10   NEGOTIATION.

11   Q.   AND, MS. IRWIN, BEFORE WE GO, CAN I HAVE YOU REMIND THE

12   JURY ONE MORE TIME OF THE OPINIONS THAT YOU FORMED IN THIS

13   CASE?

14   A.   YES.  SO NUMBER ONE, I HAVEN'T SEEN ANY LOSS TO COMET AS A

15   RESULT OF THE ALLEGED MISAPPROPRIATION.

16        SECOND, THERE'S BEEN NO EVIDENCE OF ANY COST SAVINGS TO

17   XP.

18        THREE, MR. MALACKOWSKI'S UNJUST ENRICHMENT ANALYSIS IS

19   GROSSLY INFLATED.

20        AND FOUR, THERE'S NO REASONABLE ROYALTY DUE.

21   Q.   MS. IRWIN, IF COMET HAS NOT PROVEN THAT XP ACTUALLY

22   AVOIDED ANY COSTS AS A RESULT OF THE ALLEGED MISAPPROPRIATION,

23   WHAT WOULD BE THE APPROPRIATE AMOUNT OF UNJUST ENRICHMENT BE?

24   A.   IT WOULD BE ZERO.

25        MR. MANGAS:  THANK YOU, MS. IRWIN.

1        THE COURT:  THANK YOU.

2     CROSS-EXAMINATION?

3        MS. SCHMIDT:  YES, YOUR HONOR, CROSS-EXAMINATION.

4                      **CROSS-EXAMINATION**

5  BY MS. SCHMIDT:

6  Q.  IT'S STILL GOOD MORNING.  GOOD MORNING, MS. IRWIN.

7  A.  GOOD MORNING, MS. SCHMIDT.

8  Q.  IT'S NICE TO SEE YOU AGAIN.

9  A.  NICE TO SEE YOU.

10 Q.  NOW, YOU ARE HERE TESTIFYING AS AN EXPERT ON BEHALF OF XP;

11 IS THAT CORRECT?

12 A.  THAT'S CORRECT.

13 Q.  AND IN THIS CASE, YOU ARE ONLY OFFERING OPINIONS ON

14 DAMAGES, RIGHT?

15 A.  CORRECT.

16 Q.  YOU ARE NOT OFFERING AN OPINION ON WHETHER OR NOT COMET

17 HAS TRADE SECRETS?

18 A.  THAT'S CORRECT.

19 Q.  AND YOU ARE NOT OFFERING AN OPINION ABOUT WHETHER XP

20 MISAPPROPRIATED COMET'S TRADE SECRETS, RIGHT?

21 A.  YES, THAT ALSO IS CORRECT.

22 Q.  NOW, YOU TESTIFIED ON DIRECT ABOUT XP'S USE AND ACCESSING

23 OF SOME OF COMET'S FILES, CORRECT?

24 A.  YES.

25 Q.  BUT YOU DON'T HAVE AN INDEPENDENT OPINION REGARDING WHICH

1    FILES WERE ACCESSED OR USED BY XP, RIGHT?

2    A.   THAT'S CORRECT.  I RELIED ON THE OTHER EXPERTS.

3    Q.   THAT'S RIGHT.  YOU RELIED ON DR. PHINNEY AND MR. COWEN,

4    RIGHT?

5    A.   AS WELL AS DR. SHANFIELD.

6    Q.   BUT YOU DID TESTIFY ABOUT SOME THINGS THAT DR. PHINNEY

7    TOLD YOU ABOUT HOW LONG IT WOULD TAKE TO RECREATE CERTAIN

8    DOCUMENTS, CORRECT?

9    A.   YES.

10   Q.   BUT THAT ISN'T SOMETHING THAT DR. PHINNEY GAVE TESTIMONY

11   TO IN FRONT OF THE JURY, RIGHT?

12   A.   I THINK THAT'S CORRECT.  IT WAS SOMETHING THAT WAS COVERED

13   IN HIS EXPERT REPORTS.

14   Q.   THAT'S RIGHT.  HE DIDN'T TESTIFY UNDER OATH ABOUT THAT IN

15   THIS COURTROOM, RIGHT?

16   A.   I THINK -- WELL, I'M NOT SURE IF IT WAS COVERED UNDER OATH

17   IN HIS DEPOSITION.  BUT THAT'S CORRECT.  FOR TRIAL, THAT'S

18   ABSOLUTELY RIGHT.

19   Q.   AND YOU ALSO TESTIFIED ABOUT WHAT DR. SPENCER TOLD YOU

20   ABOUT SUSTAINING ENGINEERING, CORRECT?

21   A.   YES, THAT'S CORRECT.

22   Q.   BUT DR. SPENCER DID NOT TESTIFY UNDER OATH IN THIS

23   COURTROOM ABOUT SUSTAINING ENGINEERING, CORRECT?

24   A.   I THINK THAT'S CORRECT, YES.

25   Q.   AND YOU AGREE WITH ME THAT IF THE JURY FINDS THAT XP

1     MISAPPROPRIATED COMET'S TRADE SECRETS, IT'S UP TO THEM TO

2     DECIDE THE AMOUNT OF DAMAGES TO AWARD, RIGHT?

3     A.   ABSOLUTELY.

4     Q.   NOW, WE'VE HEARD AT TRIAL THAT XP HAS NOT YET RELEASED ITS

5     NEXT GENERATION RF MATCHING NETWORK AND GENERATION PRODUCTS,

6     RIGHT?

7     A.   YES.

8     Q.   BUT YOU AGREE THAT EVEN IF XP DOES NOT HAVE REVENUES OR

9     PROFITABLES THAT ARE ATTRIBUTED TO THE THEFT COMET ALLEGES,

10    AVOIDED COSTS CAN STILL BE AWARDED IF XP IS FOUND LIABLE,

11    RIGHT?

12    A.   YES, IF THE JURY FINDS THAT THERE ARE AVOIDED COSTS, YES.

13    ABSOLUTELY.

14         MS. SCHMIDT:  NOW, MR. SCHLAIFER, COULD WE PLEASE

15    GET, IF YOU HAVE IT, DDX5.33.

16    BY MS. SCHMIDT:

17    Q.   NOW, MS. IRWIN, THIS WAS A SLIDE THAT YOU JUST SHOWED THE

18    JURY, CORRECT?

19    A.   YES.

20    Q.   AND I JUST WANT TO BE CLEAR ABOUT SOMETHING.  IF WE LOOK

21    AT THE "CITO" LINE, IT'S ALL RED, CORRECT?

22    A.   YES.

23    Q.   AND THAT'S BECAUSE, IN YOUR OPINION, EVERYTHING THAT

24    HAPPENED WITH CITO WAS SUSTAINING ENGINEERING, CORRECT?

25    A.   WELL, IT'S MY UNDERSTANDING BASED ON DISCUSSIONS WITH

1    OTHERS AND ALSO REVIEWING ANALYSIS OF THE ACTUAL EXPENSES, YES.

2    Q.   AND WHAT THAT MEANS IS IF XP TOOK COMET'S R&D WORK RELATED

3    TO CITO, IN YOUR OPINION, THE AMOUNT OF COSTS ASSOCIATED WITH

4    THAT ARE ZERO DOLLARS, CORRECT?

5    A.   I'M SORRY.  COULD YOU REPEAT THE QUESTION.

6    Q.   SURE.

7         AND SO -- AND JUST MAYBE TO MAKE IT SIMPLER, ANYTHING IN

8    RED ON THE SLIDE YOU THINK SHOULD NOT BE INCLUDED AS AN AVOIDED

9    COST BY XP, CORRECT?

10   A.   BECAUSE IT'S SUSTAINING ENGINEERING, THAT IS CORRECT.

11   Q.   ALL RIGHT.  AND SO EVERYTHING WITH RESPECT TO CITO IS RED,

12   CORRECT?

13   A.   YES.

14   Q.   AND SO THAT MEANS THAT IF XP TOOK COMET'S DEVELOPMENT WORK

15   RELATED TO CITO, IN YOUR OPINION, THE AMOUNT OF AVOIDED COSTS

16   FOR THAT IS ZERO, CORRECT?

17   A.   BECAUSE THE METHODOLOGY IS WHAT COMET SPENT DURING THIS

18   TIME PERIOD, YES, THAT'S CORRECT.

19   Q.   NOW, IN THIS CASE MR. MALACKOWSKI CALCULATED XP'S AVOIDED

20   COSTS USING INFORMATION ABOUT COMET'S OWN DEVELOPMENT COSTS

21   RELATED TO THE TRADE SECRETS, RIGHT?

22   A.   YES.

23   Q.   AND YOU HAVE CALCULATED UNJUST ENRICHMENT DAMAGES IN TRADE

24   SECRET CASES USING THE TRADE SECRET OWNER'S DEVELOPMENT COSTS

25   AS A PROXY FOR THE MISAPPROPRIATOR'S AVOIDED COSTS, CORRECT?

1    A.   I HAVE USED THAT METHODOLOGY BEFORE, YES.

2    Q.   BUT IN THIS CASE YOU TESTIFIED ABOUT SOME CRITICISMS YOU

3    HAVE OF MR. MALACKOWSKI, SO I WOULD LIKE TO ASK YOU ABOUT SOME

4    OF THOSE NOW.

5         NOW, YOU TESTIFIED THAT COMET'S R&D COSTS SHOULD BE

6    REDUCED BECAUSE OF SOMETHING CALLED DEPRECIATION, RIGHT?

7    A.   YES.

8    Q.   AND THAT'S BECAUSE, IN YOUR VIEW, COMET'S TRADE SECRETS

9    REACHED THE -- HAVE REACHED THE END OF THEIR USEFUL LIFE AT TEN

10   YEARS, IS WHAT YOU ASSUMED, RIGHT?

11   A.   ACTUALLY, IT WAS NOT MY ASSUMPTION.  THAT'S WHAT COMET

12   DOES ON ITS OWN BOOKS AND RECORDS.

13   Q.   RIGHT.  AND YOU ARE REFERRING TO COMET'S ANNUAL REPORT,

14   CORRECT?

15   A.   YES.

16   Q.   OKAY.  AND NOW THE DEFINITION THAT YOU USED OF EXPECTED

17   USEFUL LIFE IS THE NUMBER OF YEARS BEFORE CASH FLOWS -- YOU

18   AGREE THAT THE EXPECTED USEFUL LIFE OF A TRADE SECRET IS THE

19   NUMBER OF YEARS BEFORE CASH FLOWS RELATED TO THAT TRADE SECRET

20   DECREASE TO AN INSIGNIFICANT LEVEL, RIGHT?

21   A.   YES.  I THINK THAT WAS MY DEPOSITION TESTIMONY, YES.

22   Q.   AND YOU NOTE, DON'T YOU, THAT COMET STILL SELLS THE SAME

23   RF MATCH PRODUCTS TO AMAT THAT IT SOLD IN 2010, RIGHT?

24   A.   THAT IS CORRECT.

25             MS. SCHMIDT:  AND IF WE COULD LOOK AT PDX17.57,

1     PLEASE, MR. SCHLAIFER.

2     BY MS. SCHMIDT:

3     Q.   SO THIS IS SALES DATA YOU REVIEWED IN CONNECTION WITH YOUR

4     REPORT, CORRECT?

5     A.   YES.

6          MS. SCHMIDT:  FOR, THE RECORD, THIS IS PDX2641.

7     BY MS. SCHMIDT:

8     Q.   AND THESE ARE FAIRLY UNWIELDY SPREADSHEETS, WOULD YOU

9     AGREE WITH ME?

10    A.   YES, THEY ARE.

11         MS. SCHMIDT:  SO IF WE'D GO TO PDX17.58, PLEASE,

12    MR. SCHLAIFER.

13    BY MS. SCHMIDT:

14    Q.   THIS HAS TWO EXCERPTS.  AND AS YOU CAN SEE ON THE LEFT,

15    THIS IS SALES DATA FROM 2010, AND THERE'S AN AMAT PART NUMBER

16    HIGHLIGHTED ON THE BOTTOM.

17         YOU SEE THAT, CORRECT?

18    A.   I DO.

19    Q.   OKAY.  AND THAT'S FOR A BUILD-TO-SPEC MATCHING NETWORK,

20    CORRECT?

21    A.   CORRECT.

22    Q.   AND ON THE RIGHT THERE'S SALES DATA IN 2019 FOR THE

23    IDENTICAL BUILD-TO-SPEC AMAT MATCHING NETWORK, CORRECT?

24    A.   YES.

25    Q.   AND SO EVEN TODAY COMET CONTINUES TO RECOGNIZE REVENUES

1     FROM THE SAME PRODUCTS THAT IT WAS SELLING BACK IN 2010,

2     CORRECT?

3     A.   YES.

4     Q.   NOW, ANOTHER CRITICISM THAT YOU HAD OF MR. MALACKOWSKI WAS

5     THAT HE DID NOT CONSIDER THE VALUE OF THE TECHNOLOGY THAT XP

6     ACQUIRED FROM COMDEL, RIGHT?

7     A.   YES.

8     Q.   NOW, YOU ARE AWARE MR. MALACKOWSKI DID DISCUSS THE

9     TECHNOLOGY FROM COMDEL, CORRECT?

10    A.   YES, I BELIEVE HE DID.

11    Q.   BUT HE REACHED A DIFFERENT CONCLUSION THAN YOU AND

12    BELIEVED IT SHOULDN'T BE DEDUCTED, RIGHT?

13    A.   YES.

14    Q.   AND, NOW, YOU WERE HERE FOR MR. RUMMEL'S TESTIMONY ABOUT

15    THE RF POWER PRODUCTS HE WORKED ON AT XP, RIGHT?

16    A.   YES.

17    Q.   AND MR. RUMMEL DIDN'T TESTIFY HE STARTED WITH THE DESIGN

18    WORK FOR THE NEXT GENERATION PRODUCTS WITH THE COMDEL PRODUCTS,

19    RIGHT?

20    A.   NO.  I THINK THEY -- I THINK THE TESTIMONY WAS THEY WANTED

21    TO USE A BLANK SHEET OF PAPER AND START FROM NEW.

22    Q.   THAT'S RIGHT.  MR. RUMMELL SAID, "CLEAR OFF YOUR DESKS.  I

23    WANT TO DO SOMETHING DIFFERENT THAN WHAT COMDEL DID"?

24    A.   I'M NOT SURE OF THE EXACT WORDS; BUT, YES, THAT WAS THE

25    NATURE OF THE TESTIMONY.

1    Q.   AND YOU'VE BEEN HERE FOR THE EVIDENCE THAT XP ITSELF

2    DESCRIBED THE COMDEL PRODUCTS AS OUTDATED, RIGHT?

3    A.   YES.  I MEAN, THE TECHNOLOGY IS BEING -- THAT'S WHY THEY

4    ARE STARTING OVER, THEY WANT TO DO SOMETHING NEW AND DIFFERENT.

5    Q.   NOW, ANOTHER CRITICISM THAT YOU HAD OF MR. MALACKOWSKI WAS

6    RELATED TO HIS RELIANCE ON COMET EMPLOYEES TO IDENTIFY R&D

7    COSTS RELATED TO THE TRADE SECRETS, RIGHT?

8    A.   I'M SORRY.  I THOUGHT YOU SAID "XP."  COULD YOU REPEAT

9    THAT.

10   Q.   I MIGHT HAVE.

11        ANOTHER CRITICISM THAT YOU HAD OF MR. MALACKOWSKI WAS FOR

12   RELYING ON COMET EMPLOYEES TO IDENTIFY WHICH R&D COSTS RELATED

13   TO THE TRADE SECRETS, RIGHT?

14   A.   I DON'T THINK I CRITICIZED HIM FOR RELYING ON HIM TO

15   IDENTIFY THE PROJECT CODES, WHICH WOULD BE WHERE -- THE ALLEGED

16   TRADE SECRETS -- I DON'T HAVE AN ISSUE WITH THAT PER SE.

17   Q.   RIGHT.  BECAUSE YOU YOURSELF HAVE USED THE EXACT SAME

18   METHODOLOGY TO IDENTIFY R&D COSTS ASSOCIATED WITH TRADE SECRET

19   DEVELOPMENT, RIGHT?

20   A.   WELL, IN MY ANALYSIS I'M TAKING MR. MALACKOWSKI'S ANALYSIS

21   AND MAKING ADJUSTMENT, SO I ASSUMED HIS SAME METHODOLOGY.  I

22   DIDN'T HAVE ACCESS TO COMET'S ENGINEERS TO GO OVER THE PROJECT

23   CODES AND DISCUSS THEM AT LENGTH; BUT YES.

24   Q.   RIGHT.  BUT IN OTHER CASES WHERE YOU'VE SERVED AS AN

25   EXPERT YOU HAVE RELIED ON THE TRADE SECRET OWNERS AND EMPLOYEES

1     TO IDENTIFY PROJECT COSTS ASSOCIATED WITH THE TRADE SECRETS,

2     RIGHT?

3     A.   YES.

4     Q.   AND WHEN YOU DID THAT, THE PROJECT TIME ENTRIES THAT YOU

5     RELIED ON IN THAT CASE, YOU ACKNOWLEDGED THAT THE EMPLOYEES MAY

6     NOT HAVE ENTERED ALL THEIR TIME IN THE TRACKING SYSTEM, RIGHT?

7     A.   I MAY HAVE ACKNOWLEDGED IT, BUT WITHOUT BASIS I'VE NEVER

8     MADE AN ADJUSTMENT.

9     Q.   YOU MAY NOT HAVE MADE AN ADJUSTMENT FOR IT, BUT YOU

10    ACKNOWLEDGED THAT BECAUSE THE TIME ENTRIES WERE UNDERBOOKED

11    THAT MEANT THE R&D COSTS WERE UNDERSTATED, RIGHT?

12    A.   THAT'S CORRECT.  IF THAT WAS TRUE AND IF I DIDN'T HAVE

13    SUPPORT THAT SUBSTANTIATED THAT THE TIME ENTRIES WERE

14    UNDERREPORTED, I WOULD NOT HAVE MADE AN ADJUSTMENT AND I WOULD

15    HAVE MAYBE NOTED THAT JUST TO MAKE SURE I CONVEYED THAT I

16    ACTUALLY LOOKED AT THE BACKGROUND.

17    Q.   THAT'S RIGHT.  AND YOU HAVE OFFERED EXPERT OPINIONS THAT

18    WHERE EMPLOYEES UNDERBOOK THEIR TIME, THAT MEANS THAT R&D COSTS

19    ARE UNDERSTATED, CORRECT?

20    A.   TO THE EXTENT THE ASSUMPTION IS TRUE, YES -- OR THE

21    REPRESENTATION IS TRUE, YES, THAT'S CORRECT.

22    Q.   AND THAT'S SOMETHING THAT YOU HAVE NOTED, YOURSELF, AS AN

23    EXPERT, IN YOUR OWN OPINIONS, CORRECT?

24    A.   IN OTHER CASES, THAT'S RIGHT.

25    Q.   OKAY.  AND NOW WE TALKED EARLIER ABOUT HOW YOU'VE RELIED

1    ON A TRADE SECRET OWNER'S DEVELOPMENT COSTS TO ESTABLISH A

2    MISAPPROPRIATOR'S AVOIDED R&D, CORRECT?

3    A.   YES.

4    Q.   AND IN CASES WHERE YOU'VE DONE THAT, YOU HAVE CONCLUDED

5    THAT EVERY PENNY THAT THE TRADE SECRET OWNER SPENT TO DEVELOP

6    THE TRADE SECRETS WAS AN AVOIDED COST OF THE MISAPPROPRIATOR,

7    RIGHT?

8    A.   BASED ON THE FACTS AND CIRCUMSTANCES OF THAT CASE AND THE

9    DOCUMENTATION I REVIEWED, YES, THAT'S CORRECT.

10   Q.   ALL RIGHT.  YOU DIDN'T DEDUCT A PENNY FOR DEPRECIATION,

11   RIGHT?

12   A.   NO, BECAUSE THE INVESTMENT WAS MADE OVER A MUCH SHORTER

13   PERIOD OF TIME, NOT MORE THAN TEN YEARS.

14   Q.   YOU DIDN'T DEDUCT A PENNY FOR DEPRECIATION, RIGHT?

15   A.   THAT'S CORRECT.

16   Q.   OKAY.  YOU DIDN'T DEDUCT A PENNY FOR THE MISAPPROPRIATOR'S

17   OWN R&D, CORRECT?

18   A.   NO, THAT'S NOT CORRECT.

19        MS. SCHMIDT:  WELL, MR. SCHLAIFER, IF WE COULD PLEASE

20   GET --

21   BY MS. SCHMIDT:

22   Q.   SO -- WELL, MS. IRWIN, SO YOU SERVED AS AN EXPERT IN A

23   CASE AGAINST WTRI, CORRECT?

24   A.   YES.

25   Q.   AND IN THAT CASE YOU OFFERED AN EXPERT OPINION RELATED TO

1    THE AMOUNT OF TRADE SECRET DAMAGES BASED ON AVOIDED R&D,

2    CORRECT?

3    A.   YES, THAT'S TRUE.

4    Q.   OKAY.  SO WE HAVE AN EXCERPT OF YOUR REPORT THERE.

5              MS. SCHMIDT:  NOW, MR. SCHLAIFER, IF I COULD GET

6    PDX17.26.

7    BY MS. SCHMIDT:

8    Q.   SO, MS. IRWIN, THIS IS AN EXCERPT OF YOUR REPORT FROM THAT

9    CASE, CORRECT?

10   A.   I HAVEN'T SEEN THE WHOLE DOCUMENT, BUT I WILL TAKE YOUR

11   WORD FOR IT.

12   Q.   OKAY.  AND UP AT THE TOP YOU TOTAL UP THE AMOUNT OF FEES

13   AND EXPENSES THAT THE TRADE SECRET OWNER INCURRED TO DEVELOP

14   THE TRADE SECRETS, CORRECT?

15   A.   YES.

16   Q.   AND THAT'S $1,771,306, RIGHT?

17   A.   YES.

18   Q.   AND THEN IN YOUR CONCLUSIONS, YOU CONCLUDE THAT THE

19   IDENTICAL AMOUNT IS THE AMOUNT OF UNJUST ENRICHMENT, CORRECT?

20   A.   YES.

21   Q.   ALL RIGHT.

22              MS. SCHMIDT:  WE CAN TAKE THAT DOWN, MR. SCHLAIFER.

23   BY MS. SCHMIDT:

24   Q.   SO I'D LIKE TO TURN TO YOUR REASONABLE ROYALTY OPINION.

25        NOW, THE ROYALTY RATE THAT YOU CAME UP WITH IS BASED ON

1    CERTAIN INTERCOMPANY LICENSES THAT COMET HAS, CORRECT?

2    A.   YES.

3    Q.   AND ALL OF THOSE LICENSES ARE BETWEEN ONE COMET ENTITY AND

4    ANOTHER, RIGHT?

5    A.   YES, THAT'S CORRECT.

6    Q.   AND NO LICENSE THAT YOU RELY ON IS BETWEEN A COMET ENTITY

7    AND A THIRD PARTY, RIGHT?

8    A.   THAT'S RIGHT.

9    Q.   AND COMET HAS NEVER LICENSED ITS TRADE SECRETS TO A

10   COMPETITOR, RIGHT?

11   A.   THAT'S MY UNDERSTANDING.

12   Q.   NOW, FOR SALES OF PRODUCTS UNDER THESE LICENSES, ALL OF

13   THE REVENUES ARE ULTIMATELY REVENUES THAT GO INTO COMET, RIGHT?

14   A.   COULD YOU DEFINE WHICH ENTITY OF COMET YOU'RE TALKING

15   ABOUT?

16   Q.   ANY COMET ENTITY.

17   A.   WELL, IT WOULD DEPEND ON -- THERE'S LOTS OF DIFFERENT

18   FACTORS THAT PLAY INTO THAT.  SO IT DEPENDS ON IF THE REVENUE

19   IS GOING TO THE U.S. COMPANY, WHETHER OR NOT THOSE FUNDS

20   ULTIMATELY ARE TRANSFERRED TO A PARENT COMPANY ELSEWHERE, THAT

21   I'M NOT POSITIVE ABOUT, THERE ARE RULES FOR VARIOUS COUNTRIES

22   ABOUT TRANSFERRING PROFITS ACROSS BORDERS.

23        SO IT WOULD DEPEND ON WHICH LICENSEE, LIKE, WHICH LICENSOR

24   WE ARE TALKING ABOUT, AND IT WOULD DEPEND ON THAT GEOGRAPHIC OR

25   THE RULES REGARDING THAT PARTICULAR ENTITY.

1    Q.   BUT JUST TO MAKE IT EVEN MORE SIMPLE, REGARDLESS OF WHICH

2    COMET ENTITY THE REVENUE GOES TO, REVENUE FOR LICENSED PRODUCTS

3    SOLD UNDER THOSE LICENSES GOES INTO COMET, CORRECT?

4    A.   COMET IS A CONGLOMERATE, YES.

5    Q.   IT DOESN'T GO TO A THIRD PARTY?

6    A.   THAT'S CORRECT.

7    Q.   NOW, BUT IF THE LICENSE WERE BETWEEN COMET AND A

8    COMPETITOR, THE REVENUES WOULD GO TO THE COMPETITOR AND THE

9    COMPETITOR WOULD JUST PAY COMET A ROYALTY, RIGHT?

10   A.   YES.

11   Q.   OKAY.  AND YOU MENTIONED ON DIRECT THAT THE LICENSES SAY

12   THAT AT THE END OF THE LICENSE TERM, YOU KNOW, THE INFORMATION

13   UNDER THE LICENSES, YOU KNOW, ISN'T CONFIDENTIAL ANYMORE AND

14   CAN BE MADE PUBLIC; IS THAT RIGHT?

15   A.   ACTUALLY, I THINK I WASN'T VERY PRECISE IN MY LANGUAGE.  I

16   THINK WHAT THE LICENSES SAY IS THAT THE CONFIDENTIALITY

17   PROVISION IN THE LICENSE IS ONLY ENFORCEABLE -- ONLY STAYS IN

18   PLACE FIVE YEARS UNTIL AFTER.  BUT YES, THAT'S CORRECT.

19   Q.   BUT NOTHING IN THAT LICENSE SAYS AT THE END OF THE FIVE

20   YEARS, GO AHEAD AND MAKE THIS INFORMATION PUBLIC, RIGHT?

21   A.   THAT'S CORRECT.

22   Q.   AND IN FACT, YOU KNOW, THE INFORMATION THAT'S EXCHANGED

23   UNDER THIS LICENSE GOES TO ANOTHER COMET COMPANY, RIGHT?

24   A.   YES.

25   Q.   AND AS WE HEARD TESTIMONY, ALL COMET EMPLOYEES SIGN AN

1    AGREEMENT TO KEEP COMET INFORMATION CONFIDENTIAL, RIGHT?

2    A.   YES, THAT'S CORRECT.

3    Q.   AND SO REGARDLESS OF WHAT THIS LICENSE SAYS, EMPLOYEES

4    STILL HAVE AN OBLIGATION TO KEEP ANY COMET CONFIDENTIAL

5    INFORMATION CONFIDENTIAL, RIGHT?

6    A.   I WOULD PRESUME SO, YES.

7    Q.   AND NOW, IN THIS HYPOTHETICAL LICENSE, HOWEVER, YOU AGREE

8    THAT THE REASONABLE ROYALTY AWARD DOES NOT GIVE COMET THE

9    ABILITY TO ENSURE THAT XP KEEPS COMET'S TRADE SECRETS

10   CONFIDENTIAL, RIGHT?

11   A.   YES, I THINK THAT'S RIGHT.

12   Q.   AND IN FACT, XP HAS ARGUED THROUGHOUT THIS TRIAL THAT MANY

13   OF COMET'S TRADE SECRETS ARE ACTUALLY PUBLIC, RIGHT?

14   A.   I THINK IT DEPENDS ON THE INFORMATION, WHETHER IT'S

15   PUBLIC, IT'S WIDELY KNOWN, OR IT WAS DISCLOSED WITHOUT THE

16   PROPER MARKINGS.  I THINK IT VARIES, BUT YES, RIGHT.

17   Q.   AND NOW, MS. IRWIN, JUST SO I HAVE IT RIGHT, YOUR OPINION

18   ON UNJUST ENRICHMENT IS THAT NONE SHOULD BE AWARDED, CORRECT?

19   A.   NO, NOT PRECISELY.  IT'S SHOULD THERE BE NO FINDING OF

20   AVOIDED COSTS, EVEN ASSUMING LIABILITY, IT WOULD BE ZERO, ONLY

21   TO THE EXTENT THE JURY FINDS THAT THERE WERE AVOIDED COSTS,

22   THAT WOULD BE THE AMOUNT OF -- APPROPRIATE AMOUNT OF UNJUST

23   ENRICHMENT.

24   Q.   AND IT'S YOUR OPINION THAT YOU HAVEN'T SEEN EVIDENCE OF

25   AVOIDED COSTS, RIGHT?

1    A.   I HAVE NOT SEEN EVIDENCE OF THAT, CORRECT.

2    Q.   AND YOUR OPINION ON THE ROYALTY IS THAT THAT ALSO SHOULD

3    BE ZERO, CORRECT?

4    A.   UNDER THE CIRCUMSTANCES, THERE IS NO ROYALTY TO BE

5    AWARDED, THAT'S CORRECT.

6    Q.   AND AT THE TIME THAT YOU SUBMITTED YOUR REPORT IN THIS

7    CASE, XP HAD PAID YOU AT LEAST $200,000 TO RENDER YOUR

8    OPINIONS, CORRECT?

9    A.   I DON'T RECALL THAT, BUT I WOULDN'T BE SURPRISED.

10             MS. SCHMIDT:  ALL RIGHT.  THANK YOU.

11        I PASS THE WITNESS, YOUR HONOR.

12             THE COURT:  THANK YOU.

13        MR. MANGAS, ANYTHING FURTHER?

14             MR. MANAGAS:  VERY BRIEFLY, YOUR HONOR.

15                    **REDIRECT EXAMINATION**

16   BY MR. MANGAS:

17   Q.   MS. IRWIN, I'M PUTTING BACK UP YOUR SLIDE DDX5.33, WHICH

18   DEALS WITH SUSTAINING ENGINEERING, BECAUSE MS. SCHMIDT ASKED

19    YOU SOME QUESTIONS ABOUT IT.

20        THE ONLY QUESTION I WANT TO ASK YOU ABOUT THIS SLIDE IS, I

21   UNDERSTAND YOUR UNDERSTANDING OF SUSTAINING VERSUS R&D WAS

22   INFORMED BY DISCUSSIONS YOU HAD WITH MR. PENNY AND DR. PHINNEY

23   AND DR. SPENCER, BUT WHAT I WANT TO ASK YOU IS DID YOU REVIEW

24   THE COMET DOCUMENTS AND COMET TESTIMONY THAT BORE ON THIS

25    ISSUE?

1       A.   I DID.

2       Q.   AND WHAT DID YOU FIND?

3       A.   WELL, SPECIFICALLY RELATED TO THE DA VINCI PRODUCT, WHICH

4    IS THE MOST RECENT, I WAS ABLE TO REVIEW A VERY LARGE EXCEL

5    WORKBOOK THAT WAS PRODUCED IN THIS CASE, AND IN THAT WORKBOOK

6    WAS THE SUMMARY OF EXPECTED EXPENSES ASSOCIATED WITH THE

7    DEVELOPMENT AT VARIOUS STAGES IN THE -- IN THAT PROJECT.

8            AND ONE OF THE PAGES IN THE EXCEL WORKBOOK HAD PROJECTED

9    COSTS PRIOR TO LAUNCH AND THEN EXPECTED REVENUE AS THE PRODUCT

10   WAS LAUNCHED AND THEN GOING FORWARD MANY YEARS.  AND SO I WAS

11   ABLE TO REVIEW THAT.

12      Q.   AND WHAT DID YOU LEARN FROM THAT DOCUMENT?

13      A.   SO WHAT I LEARNED, IN THE CONTEXT OF MR. GREDE'S TESTIMONY

14   AND DEPOSITION TESTIMONY, THAT DA VINCI WAS EXPECTED TO LAUNCH

15   IN 2022, I OBSERVED THAT IN THEIR OWN DOCUMENT, COMET ONLY

16   EXPECTED TO HAVE DEVELOPMENT R&D COSTS UP THROUGH 2021.  AND

17   FOLLOWING 2022, WHEN THE PRODUCT WAS EXPECTED TO LAUNCH, THEY

18   WERE NOT EXPECTING TO HAVE -- THEY WERE ZEROS IN THAT LINE,

19   GOING FROM 2022 FORWARD.  SO IT'S HIGHLY CONSISTENT WITH WHAT

20   I'VE DONE HERE.

21      Q.   AND IS THE WAY COMET TREATS RESEARCH AND DEVELOPMENT

22   VERSUS SUSTAINING ENGINEERING CONSISTENT WITH THE WAY

23   MR. MALACKOWSKI TREATED IT?

24      A.   NO.

25      Q.   MS. IRWIN, I WANT TO ASK YOU JUST A COUPLE OF QUESTIONS

1     ABOUT THE CONCEPT OF DEPRECIATION BECAUSE MS. SCHMIDT TALKED TO

2     YOU ABOUT THAT.

3          AND WHAT I WANT TO ASK YOU IS DO ANY OF THE THINGS THAT

4     MS. SCHMIDT ASKED YOU ABOUT CHANGE YOUR OPINION THAT

5     TECHNOLOGIES DEVELOPED IN 2007 OR 2008 ARE NOT AS VALUABLE 10

6     OR 15 YEARS LATER, TODAY?

7     A.   NO, IT DOESN'T CHANGE MY OPINION.

8     Q.   THE OTHER THING I WANT TO ASK ABOUT IS MS. SCHMIDT BROUGHT

9     UP A PRIOR CASE WHERE YOU RELIED ON THINGS THAT YOUR CLIENT'S

10    EMPLOYEES HAVE TOLD YOU ABOUT THE RESEARCH AND DEVELOPMENT

11    COSTS AT THEIR FIRM BEING UNDERREPORTED.

12         DO YOU RECALL THAT?

13    A.   YES.

14    Q.   AND DID YOU INCREASE THE AMOUNT OF ENGINEERING COSTS,

15    RESEARCH AND DEVELOPMENT COSTS THAT YOU WERE USING IN YOUR

16    DAMAGES CALCULATIONS AS A RESULT OF WHAT THOSE EMPLOYEES TOLD

17    YOU?

18    A.   NO.  DESPITE THE FACT THEY TOLD ME THAT THERE WERE OTHER

19    INDIVIDUALS INVOLVED WITH THIS PARTICULAR PROJECT, BECAUSE I

20    DIDN'T HAVE THE SUPPORT FOR IT AND THOSE EMPLOYEES WERE NO

21    LONGER AVAILABLE BECAUSE THEY HAD MOVED ON, I EXCLUDED THOSE

22    COSTS.

23    Q.   AND, MS. IRWIN, FINALLY I WANT TO ASK YOU ABOUT A CASE

24    THAT MS. SCHMIDT SHOWED YOU, I THINK IT WAS THE WTRI CASE THAT

25    YOU WORKED ON.

1    A.   YES.

2    Q.   AND I JUST WANT TO ASK:  DID THE FACTS IN THAT CASE

3    SUPPORT THE OPINIONS THAT YOU PROVIDED IN THAT CASE?

4    A.   YES.  IN FACT, IF YOU RECALL, ONE THING I REMEMBERED BY

5    LOOKING AT THE EXCERPT FROM MY REPORT IS THE EXPENSES THAT I

6    ADDED TOGETHER WERE ONLY FROM A NINE-MONTH PERIOD IN 2017;

7    THEREFORE, THERE WAS NO REASON -- AND I WAS TESTIFYING ABOUT

8    IT, I THINK, IN, I WANT TO SAY, 2020.  SO THERE WAS NO NEED TO

9    DEPRECIATE SOMETHING THAT HAD BEEN OVER SUCH A SHORT PERIOD OF

10   TIME.

11   Q.   AND, MS. IRWIN, WERE THE FACTS AND CIRCUMSTANCES THAT YOU

12   ANALYZED IN THAT CASE THE SAME AS THE FACTS AND CIRCUMSTANCES

13   THAT YOU'VE ANALYZED IN THIS CASE?

14   A.   NO.

15   Q.   AND, FINALLY, MS. IRWIN, DO THE FACTS AND CIRCUMSTANCES IN

16   THIS PARTICULAR CASE SUPPORT MR. MALACKOWSKI'S DAMAGES

17   CALCULATIONS?

18   A.   IN MY OPINION, NO.

19         MR. MANGAS:  NO FURTHER QUESTIONS.  THANK YOU,

20   MS. IRWIN.

21         THE COURT:  MS. SCHMIDT, ANYTHING FURTHER?

22         MS. SCHMIDT:  JUST TO MOVE AN EXHIBIT INTO EVIDENCE.

23         THE COURT:  GO AHEAD.

24         MS. SCHMIDT:  THAT WOULD BE PDX2641.

25         THE COURT:  MR. MANGAS MAY HAVE A LIST OF HIS OWN

1    THAT ARE GOING TO COME IN.

2             MR. FARRELL:  YES, YOUR HONOR.  I WAS GOING TO

3    ADDRESS THE EXHIBITS.

4        WE HAVE SUBMITTED LISTS FOR THE WITNESSES FROM FRIDAY, SO

5    THAT SHOULD BE IN THE COURT RECORD NOW.  AND OBVIOUSLY THAT'S

6    OUR SUBMISSION.  AND I BELIEVE THAT'S AGREED.

7        AS TO MR. MALACKOWSKI, ALL THE EXHIBITS WERE -- OR SORRY,

8    MR. COWEN, ALL OF THE EXHIBITS WERE ALREADY IN EVIDENCE.  AND

9    AS TO MS. IRWIN, WE DO HAVE A LIST.  AND THAT WOULD BE DX5175,

10   DX5171, DX5160, DX5317, PX2646, DX5158, DX5164, DX5619, DX5618,

11   AND DX5014.

12       LET ME MAKE SURE I DID NOT MISS ANYTHING FROM THIS LIST.

13   DX5149, DX5173, DX5097, DX5098, AND DX5096.  I MAY HAVE ALREADY

14   MOVED THOSE LAST THREE IN WITH MR. PFEIFFER, BUT I'M NOT

15   CERTAIN.

16            THE COURT:  YOU DID.  THEY ARE ALREADY ADMITTED.

17            MR. FARRELL:  ALL RIGHT.  THANK YOU.

18            THE COURT:  ANY OBJECTION?

19            MS. SCHMIDT:  NO, YOUR HONOR.

20            THE COURT:  I WILL REPEAT TO MAKE SURE I WAS TRACKING

21   CORRECTLY.

22       THE STIPULATED EXHIBITS FROM FRIDAY, THOSE WERE ADMITTED.

23   I THINK THERE'S A WRITTEN RECORD OF THOSE.

24       PX2641, ADMITTED.  AND THESE IDENTIFIED BY XP.  5175,

25   5171, 5160, 5317, PX2646.  OUR DX DOCUMENTS, 5158, 5164, 5619,

```
1     5618, 5014, 5317, 5149, AND 5173.

2               MR. FARRELL:  ONE CORRECTION, YOUR HONOR.  IT'S MY

3     FAULT.  THAT WOULD BE PX2640.

4               THE COURT:  2640.

5               MR. FARRELL:  MY OWN HANDWRITING CAUSED ME TO READ IT

6     AS A SIX.

7               THE COURT:  NOT A PROBLEM.  I STAND CORRECTED.

8     PX2640 RATHER THAN 2646 ADMITTED.

9          (EXHIBITS 2640, 2641, 5175, 5171, 5160, 5317, 5158, 5164,

10    5619, 5618, 5014, 5149, AND 5173 WERE ADMITTED INTO EVIDENCE.)

11              MR. FARRELL:  THANK YOU.

12              THE COURT:  ALL RIGHT.  VERY GOOD.  WITH THOSE

13    DOCUMENTS HAVING BEEN ADMITTED, ARE THERE ANY FURTHER WITNESSES

14    OR EVIDENCE FROM THE XP SIDE?

15              MR. FARRELL:  NO FURTHER WITNESSES OR EVIDENCE FROM

16    XP.  WE REST.

17              THE COURT:  ALL RIGHT.  SO LADIES AND GENTLEMEN OF

18    THE JURY, WE HAVE REACHED ANOTHER MILESTONE IN THE CASE WHICH

19    IS THE CLOSURE OF THE EVIDENCE.

20         THERE IS ONE PIECE OF EVIDENCE YOU HAVE NOT SEEN AND

21    THAT'S THE FACTUAL STIPULATIONS.  IT'S A ONE-PAGE DOCUMENT THAT

22    YOU WILL GET IN YOUR EXHIBIT BINDERS FOR DELIBERATIONS.

23         BUT WE'RE ON SCHEDULE HERE.  WE ARE GOING TO TAKE A LUNCH

24    BREAK NOW.  I WILL ASK YOU TO RETURN AT 1:35, AND WHAT WILL

25    HAPPEN NEXT WILL BE THE CLOSING INSTRUCTIONS OF LAW.  I'LL HAVE
```

```
 1    MORE INSTRUCTIONS TO GIVE YOU, AND THEN THE CLOSING ARGUMENTS

 2    BY EACH PARTY, AND THEN IT WILL BE YOUR TURN TO DELIBERATE.  WE

 3    PROBABLY WON'T HAVE TIME TO DELIBERATE TODAY, BUT WE SHOULD GET

 4    THROUGH THE CLOSING ARGUMENT THIS IS AFTERNOON.

 5         SO PLEASE DON'T BEGIN YOUR DELIBERATIONS YET OR DO ANY

 6    FURTHER INVESTIGATION.  WE'LL SEE YOU AT 1:35, PLEASE.  THANK

 7    YOU.

 8         (THE PROCEEDINGS WERE HELD OUT OF THE PRESENCE OF THE JURY

 9    AT 12:28 P.M.)

10         THE COURT:  YOU MAY STEP DOWN.  THANK YOU VERY MUCH.

11         AND JUST GIVE ME TWO MINUTES HERE, AND THEN WE WILL HAVE A

12    CONVERSATION ABOUT WHAT WE ARE DOING.

13         (PAUSE IN PROCEEDINGS.)

14         THE COURT:  ALL RIGHT.  I BELIEVE COMET FORESHADOWED

15    A RULE 50(A) MOTION.

16         IF YOU WOULD LIKE TO PRESENT IT NOW?

17         MR. ALPER:  YES, YOUR HONOR.

18         THE COURT:  AND EVERYONE ELSE MAY BE SEATED.

19         MR. FARRELL:  YOUR HONOR, COULD WE EXCUSE MS. YOUNG?

20         THE COURT:  YES.  THANK YOU.

21         MR. ALPER:  MR. CALHOUN AND SAM BLAKE WILL BE ARGUING

22    RULE 50(A).

23         THE COURT:  VERY GOOD.  GO FORWARD.

24         MR. CALHOUN:  GOOD AFTERNOON, YOUR HONOR.

25    KYLE CALHOUN FOR COMET.
```

1    COMET MOVES FOR SUMMARY JUDGMENT AS A MATTER OF LAW ON ITS

2    CLAIMS.  GIVEN THE OVERWHELMING EVIDENCE PRESENTED OVER THE

3    COURSE OF TRIAL AND XP'S NUMEROUS ADMISSIONS THAT IT ACQUIRED

4    AND USED COMET'S TRADE SECRETS TO DEVELOP ITS NEXT GENERATION

5    PRODUCTS, NO REASONABLE JURY CAN FIND FOR XP.

6    FIRST, YOUR HONOR, I AM GOING TO GO THROUGH HOW COMET

7    PROVED ITS TRADE SECRETS CLAIMS THAT ITS TRADE SECRETS EXIST,

8    THEN I WILL GO THROUGH THE MISAPPROPRIATION AND LIABILITY

9    EVIDENCE ON THE XP SIDE, AND THAT WILL BE FOLLOWED BY

10   MR. BLAKE'S PRESENTATION ON THE DAMAGES ISSUES.

11   SO FIRST, YOUR HONOR, NO REASONABLE JURY COULD FIND FOR XP

12   WITH REGARD TO COMET'S TRADE SECRET PROTECTABILITY AND XP'S

13   MISAPPROPRIATION OF THOSE TRADE SECRETS.

14   THERE ARE FOUR TRADE SECRETS AT ISSUE IN THIS CASE:  TRADE

15   SECRET D, WHICH IS COMET'S DA VINCI RF GENERATOR CONTROL

16   DIGITAL MEASUREMENT AND SOFTWARE; TRADE SECRET E, WHICH IS

17   COMET'S NEXT GENERATOR RF MATCHING NETWORK; TRADE SECRET L,

18   WHICH IS COMET'S KIYO MATCHING NETWORK; AND, TRADE SECRET S,

19   WHICH IS COMET'S AMAT MATCHING NETWORK.

20   AND BASED ON THE EVIDENCE AND TESTIMONY PRESENTED AT

21   TRIAL, NO REASONABLE JURY WOULD FAIL TO FIND THAT COMET OWNS

22   VALID TRADE SECRETS UNDER THE DTSA, AS EACH IS, ONE,

23   SUFFICIENTLY SECRET TO DERIVE INDEPENDENT ECONOMIC VALUE FROM

24   NOT BEING GENERALLY KNOWN; AND, TWO, SUBJECT TO EFFORTS THAT

25   ARE REASONABLE UNDER THE CIRCUMSTANCES TO MAINTAIN THE

1    INFORMATION'S SECRECY.

2         AS AN INITIAL MATTER, COMET SUFFICIENTLY IDENTIFIED AND

3    DESCRIBED THE FOUR ASSERTED TRADE SECRETS.  THIS CAME THROUGH

4    BOTH THE TESTIMONY OF MR. GREDE AND MR. RUSSELL, WHO PRECISELY

5    DELINEATED THE INFORMATION THAT COMPRISED COMET'S TRADE SECRET

6    TECHNOLOGIES, HOW COMET DEVELOPED AND OWNS THOSE TECHNOLOGIES,

7    HOW THOSE TECHNOLOGIES ARE DISTINCT FROM AND AN IMPROVEMENT

8    OVER GENERALLY KNOWN INFORMATION IN THE INDUSTRY, AND WHERE

9    THOSE TECHNOLOGIES ARE FOUND IN COMET'S CONFIDENTIAL

10   DEVELOPMENT MATERIALS.

11        AND THEN AFTER THEY EXPLAINED THOSE TRADE SECRETS,

12   DR. SHANFIELD CONFIRMED THAT ALL FOUR OF THE TRADE SECRETS MEET

13   THE REQUIREMENTS LAID OUT BY THE STATUTE.

14        NOW, WHILE XP DISPUTES THE OWNERSHIP OF JUST ONE OF THE

15   TRADE SECRETS -- THAT'S TRADE SECRET S, YOUR HONOR, THE AMAT

16   TRADE SECRET -- NO REASONABLE JURY COULD FIND IN XP'S FAVOR ON

17   THIS ISSUE.

18        FIRST, AS MR. CROFTON EXPLAINED, COMET OWNS TRADE SECRETS

19   RELATED TO ITS RF TECHNOLOGIES.  XP POINTS TO A GENERAL

20   SERVICES AGREEMENT BETWEEN COMET AND APPLIED MATERIALS, BUT

21   THAT AGREEMENT EXPRESSLY RESERVES COMET'S OWNERSHIP IN ALL

22   TECHNOLOGIES MADE, CONCEIVED, OR DEVELOPED BY COMET.

23        THERE HAS BEEN NO EVIDENCE THAT APPLIED MATERIALS OR ANY

24   EMPLOYEE FOR APPLIED MATERIALS HAD ANY ASSISTANCE,

25   COLLABORATION, INPUT, INVOLVEMENT, OR DEVELOPMENT EFFORTS

1    RELATED TO THE SPECIFIC INFORMATION THAT IS CLAIMED IN COMET'S

2    AMAT TRADE SECRET.

3         AND THIS WAS ALSO CONFIRMED BY COMET ENGINEER

4    GARY RUSSELL.

5         NEXT, THERE IS NO REASONABLE DISPUTE THAT EACH OF THE FOUR

6    ASSERTED TRADE SECRETS ARE, IN FACT, TRADE SECRETS.  COMET'S

7    FACT AND EXPERT WITNESSES EACH EXPLAINED HOW COMET'S TRADE

8    SECRETS ARE DISTINCT FROM WHAT IS GENERALLY KNOWN AND WERE

9    NEVER PUBLICLY DISCLOSED.

10        XP FAILS TO MEANINGFULLY REBUT THIS.  AND INDEED XP'S OWN

11   EXPERT ADMITTED IT, THAT FOR THE VAST MAJORITY OF THE DOCUMENTS

12   THAT COMET IDENTIFIED AS DESCRIBED IN ITS TRADE SECRETS THERE'S

13   NO EVIDENCE THAT COMET MADE THOSE PUBLIC.

14        HE ALSO ADMITTED THERE'S NOT A SINGLE COMET SOLIDWORKS

15   DESIGN, INCLUDING THE HUNDREDS THAT WERE IDENTIFIED IN

16   CONNECTION WITH COMET'S TRADE SECRETS THAT IS FOUND IN THE

17   PUBLIC.  AND THEN HE ALSO ADMITTED THAT THE INFORMATION

18   ACCESSED BY MR. BEUERMAN AND MR. MASON, WHILE AT XP, WAS

19   CONFIDENTIAL COMET INFORMATION.

20        ALTHOUGH XP CONTENDS THAT COMET DISCLOSED CERTAIN ASPECTS

21   OF CERTAIN TRADE SECRETS TO CUSTOMERS AND POTENTIAL CUSTOMERS,

22   THIS IS INCORRECT, AND NO REASONABLE JURY COULD FIND THAT THESE

23   ALLEGED PRESENTATIONS FAILED TO KEEP COMET'S SECRETS SECRET.

24        THE EVIDENCE DEMONSTRATED THAT COMET HAS AN NDA WITH ITS

25   CUSTOMERS LIKE LAM RESEARCH AND AN NDA WITH A DISTRIBUTOR,

1        WPIC, WHO IS RESPONSIBLE FOR ENSURING THAT ANY CUSTOMERS OR

2        POTENTIAL CUSTOMERS AT THOSE PRESENTATIONS HAVE NDA'S.

3               FURTHER, AS COMET'S FACT AND EXPERT WITNESSES TESTIFIED,

4        THIS IS AN INDUSTRY UNDERSTANDING THAT PRESENTATIONS MADE TO

5        THESE TYPES OF CUSTOMERS AND POTENTIAL CUSTOMERS ARE KEPT

6        CONFIDENTIAL.

7               AND, NEXT, YOUR HONOR, INSTEAD OF ADDRESSING THE

8        COLLECTION OF INFORMATION THAT COMET CLAIMS AS ITS FOUR TRADE

9        SECRETS, AS DETAILED ACROSS HUNDREDS OF UNDISPUTEDLY

10       CONFIDENTIAL DOCUMENTS, XP, AT BEST, ONLY CONTENDS THAT A

11       LIMITED PORTION OF CERTAIN TRADE SECRETS ARE WELL KNOWN OR

12       PUBLICLY DISCLOSED.

13              FOR EXAMPLE, XP'S WITNESSES CLAIM THAT INFORMATION LIKE

14       THE USE OF FPGA IN MATCHING NETWORKS OR USE OF A COMMON

15       CONTROLLER FOR A MATCH AND GENERATOR IS WELL KNOWN.

16              BUT EVEN IF YOU TAKE THIS AS TRUE, SUCH TESTIMONY IS

17       INSUFFICIENT FOR A REASONABLE JURY TO FIND THAT, FOR EXAMPLE,

18       COMET'S DA VINCI TRADE SECRET OR NEXT GENERATION MATCHING

19       NETWORK TRADE SECRET ARE WELL KNOWN.  INDEED, IT IS WELL

20       ESTABLISHED THAT THE TRADE SECRETS CAN INCLUDE INFORMATION THAT

21       IS GENERALLY KNOWN OR EVEN BE ENTIRELY COMPRISED OF INFORMATION

22       THAT IS GENERALLY KNOWN SO LONG AS THE COMBINATION OF THAT

23       INFORMATION IS NOT GENERALLY KNOWN.

24              AND, YOUR HONOR, THAT IS HELD BY SEVERAL COURTS IN THIS

25       DISTRICT, INCLUDING THE *02 MICRO* DECISION, THAT'S 420 F. SUPP.

1    2D 1070.

2         HERE, COMET'S TRADE SECRETS INCLUDE A UNIQUE AND

3    CONFIDENTIAL COMBINATION OF TECHNOLOGIES THAT IS NOT WELL

4    KNOWN, AS BOTH MR. GREDE AND MR. RUSSELL TESTIFIED AND AS

5    DR. SHANFIELD CONFIRMED.

6         MOREOVER, XP'S OWN DOCUMENTS AND TESTIMONY CONFIRM THAT

7    COMET'S ASSERTED TRADE SECRETS ARE NOT GENERALLY KNOWN OR

8    PUBLICLY DISCLOSED.  XP'S DOCUMENTS STATE THAT TECHNOLOGIES

9    LIKE A CUSTOM SYSTEM-ON-CHIP, SYSTEM-ON-BOARD ARCHITECTURE WITH

10   A ZYNQ-7015 FPGA, THAT CAN WORK WITH ANY UNDERLYING BASEBOARD,

11   I.E., PRECISELY THE CONTROL ARCHITECTURE THAT COMPRISES COMET'S

12   TRADE SECRETS, IS UNIQUE.

13        AND EVEN XP'S OWN CTO ADMITTED THAT IN HIS FOUR DECADES OF

14   EXPERIENCE IN THIS INDUSTRY HE HAS NEVER SEEN A SYSTEM ON CHIP

15   USED IN AN RF MATCHING NETWORK.

16        RELATEDLY, THERE IS NO REASONABLE DISPUTE THAT COMET'S

17   TRADE SECRETS ARE NOT ASCERTAINABLE THROUGH PROPER MEANS.  THE

18   ONLY EVIDENCE OF RECORD FROM COMET'S WITNESSES, MR. GREDE,

19   MR. RUSSELL, AND DR. SHANFIELD CONFIRMS THAT COMET'S TRADE

20   SECRET INFORMATION IS NOT READILY ASCERTAINABLE FROM LOOKING AT

21   COMET'S PRODUCTS.  AND XP ADDUCED NO EVIDENCE TO THE CONTRARY.

22        FOR EXAMPLE, WHILE XP ATTEMPTED TO SUGGEST THAT THE

23   DESIGNS CONTAINED IN COMET'S SOLIDWORKS FILES COULD BE

24   RECREATED USING PUBLICLY AVAILABLE MATERIALS, MR. RUSSELL

25   EXPLAINED THAT THE INFORMATION CONTAINED IN THOSE STOLEN

1    SOLIDWORKS FILES IS NOT INFORMATION YOU COULD GET FROM OPENING

2    UP A COMET PRODUCT.

3        FURTHER, COMET'S NEXT GENERATION PRODUCTS WHICH FORM TWO

4    OF THE ASSERTED TRADE SECRETS HAVEN'T YET BEEN RELEASED,

5    MEANING THAT NONE OF THE TRADE SECRET INFORMATION RELATED TO

6    THOSE PRODUCTS COULD BE READILY ASCERTAINED.

7        FINALLY, XP'S OWN EXPERT, DR. PHINNEY, CONCEDED THERE WAS

8    NO BASIS TO SAY THAT XP WAS LOOKING AT ANY OF THE PUBLIC

9    INFORMATION WHEN IT WAS DEVELOPING XP'S NEXT GENERATION

10   PRODUCTS.  INSTEAD, XP WAS LOOKING AT CONFIDENTIAL COMET

11   DOCUMENTS AND MATERIALS.

12       AND THE LAST COUPLE POINTS ON THIS, YOUR HONOR:  THERE'S

13   NO REASONABLE DISPUTE THAT EACH OF THE FOUR ASSERTED TRADE

14   SECRETS DERIVE INDEPENDENT ECONOMIC VALUE FROM NOT BEING

15   GENERALLY KNOWN.  THIS WAS TESTIFIED TO BY COMET CEO KEVIN

16   CROFTON.  BOTH MR. GREDE AND MR. RUSSELL WALKED THROUGH THE

17   TRADE SECRET TECHNOLOGY IN DETAIL AND EXPLAINED WHY EACH OF

18   THEM DERIVED VALUE FROM NOT BEING GENERALLY KNOWN.  AND XP HAS

19   NOT INTRODUCED ANY EVIDENCE INDICATING OTHERWISE.

20       TO THE SECOND PRONG OF THE EXISTENCE OF TRADE SECRETS,

21   COMET HAS MADE REASONABLE EFFORTS TO ENSURE THE SECRECY OF ITS

22   SECRETS.  THESE EFFORTS INCLUDE PASSWORD-PROTECTED ACCESS,

23   BADGE-PROTECTED ACCESS, CONFIDENTIALITY AGREEMENTS BOTH WITH

24   EMPLOYEES AND WITH CUSTOMERS, EMPLOYEE ASSIGNMENT AGREEMENTS,

25   AND THEN ALSO INTERNAL R&D AND COLLABORATION SYSTEMS THAT ALLOW

1    COMET TO CONTROL ACCESS TO COMET'S TECHNOLOGY ON A NEED-TO-KNOW

2    BASIS.

3         AND THEN, FINALLY, YOUR HONOR, FOR THE REASONS DISCUSSED

4    EARLIER, NO REASONABLE JURY COULD FIND COMET'S DISCUSSION OF

5    POTENTIAL TRADE SECRETS AT PURPORTED TRADE SHOWS OR DIFFERENT

6    CUSTOMER MEETINGS -- CLOSED-DOOR CUSTOMER MEETINGS THAT WERE

7    INVITE-ONLY EQUATE TO SOME TYPE OF PUBLIC DISCLOSURE OR LACK OF

8    REASONABLE MEASURES TO PROTECT COMET'S TRADE SECRETS.

9         AND, ACCORDINGLY, YOUR HONOR, THERE COULD BE NO REASONABLE

10   DISPUTE THAT COMET'S TRADE SECRET TECHNOLOGY WARRANTS TRADE

11   SECRET PROTECTION.

12        THE COURT:  THANK YOU VERY MUCH.

13        LET ME HEAR FROM MR. BLAKE ON THE DAMAGES PART.

14        MR. CALHOUN:  YOUR HONOR, I HAVE ANOTHER PORTION.  I

15   CAN MOVE THROUGH IT QUICKLY ON MISAPPROPRIATIONS.

16        THE COURT:  AH, ALL RIGHT.  I THOUGHT THAT WAS YOUR

17   GRAND CONCLUSION.  IT WAS JUST A SUBHEADING.

18        MR. CALHOUN:  IT WAS JUST PRONG ONE.  YEAH.

19        THE COURT:  I WAS LOOKING AHEAD TO LUNCH.

20        MR. CALHOUN:  ALL RIGHT.  I WILL SPEED IT UP,

21   YOUR HONOR.

22        THE COURT:  NO.  NO.  DON'T SPEED IT UP.

23        MR. CALHOUN:  OKAY.  SO, YOUR HONOR, MISAPPROPRIATION

24   REQUIRES, IN RELEVANT PART, ACQUISITION OR USE.  COMET HAS

25   UNDISPUTEDLY PROVEN BOTH.  I WILL TOUCH ON THESE BRIEFLY.

1        BUT XP ACTUALLY DOES NOT DISPUTE THAT THE TRADE SECRET

2   FILES WERE IMPROPERLY ACQUIRED FROM COMET AND POSSESSED BY XP

3   EMPLOYEES WHILE THEY DEVELOPED XP'S NEXT GENERATION PRODUCTS.

4   DR. PHINNEY ADMITTED THIS LAST WEEK WHEN HE SAID THAT

5   MR. BEUERMAN AND MR. MASON TOOK COMET TRADE SECRET MATERIALS

6   FROM COMET WHEN THEY LEFT AND IN THAT REGARD STOLE COMET

7   COMET'S TRADE SECRETS.

8        XP'S FORENSIC EXPERT EXPLAINED TODAY THAT A LARGE AMOUNT

9   OF COMET'S CONFIDENTIAL INFORMATION WAS AVAILABLE TO XP THROUGH

10  MR. BEUERMAN AND MR. MASON WHILE THEY WORKED TO DEVELOP XP'S

11  NEXT GENERATION PRODUCTS.  THIS INCLUDED A BACKUP OF

12  MR. MASON'S ENTIRE COMET LAPTOP THAT HE TOOK WITH HIM FROM

13  COMET TO XP.

14       AND THERE'S NO DISPUTE, YOUR HONOR, THAT XP WAS AWARE OF

15  THIS THEFT.  FOR EXAMPLE, MR. BEUERMAN TOLD XP THAT HE HAD

16  SCREWED UP IN BRINGING COMET MATERIAL TO XP.  XP'S BOARD OF

17  DIRECTORS ACKNOWLEDGED THAT MR. BEUERMAN IMPROPERLY TOOK COMET

18  DATA TO XP.  AND NUMEROUS EXHIBITS IN EVIDENCE SHOW

19  COMMUNICATIONS WITH XP EXECUTIVES WHERE THEY WERE INFORMED THAT

20  MR. BEUERMAN AND MR. MASON HAD TAKEN AND WERE USING COMET'S

21  CONFIDENTIAL INFORMATION.

22       ULTIMATELY, MR. FAULKNER AND DR. SHANFIELD SHOW HOW EACH

23  AND EVERY SINGLE FILE THAT MAKES UP THE FOUR ASSERTED TRADE

24  SECRETS WERE TAKEN FROM COMET AND BROUGHT TO XP.

25       TURNING TO XP'S USE.  SO JUST THAT ALONE, YOUR HONOR, IS

1    MISAPPROPRIATION.  ACQUISITION IS ENOUGH TO SHOW

2    MISAPPROPRIATION, BUT WE HAVE ALSO PROVEN USE BEYOND -- ANY

3    REASONABLE JURY COULD FIND HERE.

4         SO NO REASONABLE JURY COULD FIND THAT XP DID NOT USE

5    COMET'S TRADE SECRETS, PARTICULARLY GIVEN THAT XP'S USE IS

6    LARGELY UNDISPUTED.

7         MR. BEUERMAN, AGAIN, ADMITTED HE HAD DOWNLOADED AND

8    ACCESSED COMET DOCUMENTS IN CONNECTION WITH HIS WORK AT XP.

9    AND MR. MASON SIMILARLY ADMITTED THAT HE WAS ACCESSING AND

10   REVIEWING COMET'S TECHNOLOGY -- CONFIDENTIAL TECHNOLOGY WHILE

11   WORKING ON XP'S PRODUCTS.

12        XP'S EXPERTS ALSO ACKNOWLEDGE THIS.  DR. SPENCER

13   ACKNOWLEDGED THAT MR. MASON STILL HAD COMET SOURCE DOCUMENTS ON

14   HIS XP LAPTOP AND CONTINUED TO ACCESS THOSE, INCLUDING AS

15   RECENTLY AS JULY 2021 WHILE HE WAS WORKING AT XP.

16        ULTIMATELY, IT'S UNDISPUTED THAT MR. BEUERMAN AND

17   MR. MASON TOOK THAT INFORMATION WITH THEM AND ACCESSED IT WHILE

18   WORKING ON XP'S NEXT GENERATION PRODUCTS.

19        AND THIS IS ALSO CONFIRMED BY DR. SHANFIELD'S ANALYSIS.

20   HE SPOKE LAST WEEK WITH HOW THE THOUSANDS OF COMET'S

21   CONFIDENTIAL DOCUMENTS WERE EITHER SAVED ON XP LAPTOPS OR USED

22   WHILE THEY WERE WORKING ON XP'S NEXT GENERATION TECHNOLOGY.

23   AND THAT INCLUDES ALL OF THE MATERIALS THAT ARE CITED IN

24   CONNECTION WITH COMET'S TRADE SECRETS D, E, L, AND S.

25        AND I WOULD ALSO NOTE, YOUR HONOR, THAT GIVEN THIS

1    WIDESPREAD AND CONTINUED USE OF COMET'S TRADE SECRET MATERIALS,

2    IT'S UNSURPRISING THAT XP'S OWN TECHNICAL EXPERT, LAST WEEK,

3    FAILED TO REBUT DR. SHANFIELD'S MISAPPROPRIATION ANALYSIS,

4    INCLUDING BY IDENTIFYING ANY DIFFERENCES BETWEEN COMET'S TRADE

5    SECRETS AND XP'S TECHNOLOGY OR EVEN MAKING ANY DISPUTE TO XP'S

6    MISAPPROPRIATION OF AT LEAST TWO OF COMET'S TRADE SECRETS,

7    TRADE SECRET L AND TRADE SECRET S.

8        AND, FINALLY, YOUR HONOR, I WILL CLOSE WITH THAT XP IS

9    LIABLE FOR THIS CONDUCT, IT IS NOT JUST LIMITED TO THE

10   MR. BEUERMAN AND MR. MASON.  XP'S CONTENTION OTHERWISE IS

11   INCORRECT, A CORPORATION IS LIABLE FOR ITS EMPLOYEES' CONDUCT

12   WHENEVER THE EMPLOYEE IS ACTING WITHIN THE SCOPE OF THEIR

13   EMPLOYMENT.  THAT'S THE LANGUAGE LINE.  AND THESE FACTORS, THIS

14   TEST IS CERTAINLY PRESENT HERE.  MR. BEUERMAN, MR. MASON, AND

15   OTHERS WAS WITHIN THE SCOPE OF THEIR JOB RESPONSIBILITIES AT

16   XP.  THEY WERE UNDISPUTEDLY HIRED TO DEVELOP XP'S PRODUCTS,

17   WORKED ON XP'S PRODUCTS, AND TOOK AND USED COMET'S INFORMATION

18   AND CONFIDENTIAL DOCUMENTS FOR THE DEVELOPMENT OF THOSE

19   PRODUCTS.

20       AND DR. PHINNEY LAST WEEK ADMITTED, HE AGREED HIMSELF,

21   THAT IF A JURY FINDS THAT MR. BEUERMAN AND MR. MASON WERE USING

22   COMET TRADE SECRETS FOR THE PURPOSES OF THE TASKS THAT THEY

23   WERE HIRED, WHICH IS UNDISPUTED, XP IS THEN LIABLE FOR TRADE

24   SECRET MISAPPROPRIATION.

25       AND WHILE IT'S NOT REQUIRED FOR PURPOSES OF LIABILITY,

1    THERE'S NO DOUBT THAT OTHERS AT XP WERE AWARE OF THE THEFT AND

2    USE OF COMET'S TRADE SECRET INFORMATION.  WE'VE ALREADY GONE

3    OVER SOME OF THAT EVIDENCE, THAT INCLUDES TESTIMONY FROM XP'S

4    OWN EXECUTIVES AND XP'S INTERNAL DOCUMENTS.

5           AND WITH THAT, YOUR HONOR, I WILL TURN IT OVER TO MY

6    COLLEAGUE, MR. BLAKE.  THANK YOU.

7              THE COURT:  ALL RIGHT.  THANK YOU.

8              MR. BLAKE:  GOOD AFTERNOON, YOUR HONOR.

9    I WILL DO MY BEST TO BE BRIEF.

10             THE COURT:  BUT NOT IN A HURRY.

11             MR. BLAKE:  YOU GOT IT.

12          SO I'LL BE ADDRESSING THE DAMAGES -- COMET'S DAMAGES

13   CLAIMS IN THIS CASE.  AND I'M GOING TO DO THAT IN TWO PARTS.

14   FIRST, I WILL ADDRESS COMET'S COMPENSATORY DAMAGES CLAIM, AND

15   THEN I WILL ADDRESS PUNITIVE DAMAGES.

16          SO STARTING WITH COMPENSATORY DAMAGES, NO REASONABLE JURY

17   COULD FAIL TO AWARD COMET TRADE SECRET MISAPPROPRIATION DAMAGES

18   IN THIS CASE.

19          COMET IS ENTITLED TO RECOVER THE ACTUAL LOSS CAUSED BY THE

20   MISAPPROPRIATION AS WELL AS ANY UNJUST ENRICHMENT NOT TAKING

21   INTO ACCOUNT WHEN COMPUTING ACTUAL LOSS.

22          ALTERNATIVELY, COMET IS ENTITLED TO RECEIVE REASONABLE

23   ROYALTY DAMAGES IN LIEU OF THOSE OTHER COMPENSATORY DAMAGES.

24          ADDITIONALLY, NO REASONABLE JURY COULD FIND THAT XP'S

25   ACTIONS WERE NOT A SUBSTANTIAL FACTOR IN BRINGING ABOUT THOSE

1    DAMAGES IN THIS CASE.

2         NOW, THE EVIDENCE IN THIS CASE SHOWED THAT THE

3    COMPENSATORY DAMAGES THAT ARE APPROPRIATE FOR COMET'S

4    MISAPPROPRIATION CLAIM ARE IN THE FORM OF UNJUST ENRICHMENT

5    DAMAGES.  AND THOSE UNJUST ENRICHMENT DAMAGES ARE APPROPRIATE

6    BECAUSE XP RECEIVED AN UNJUST BENEFIT FROM THE

7    MISAPPROPRIATION.

8         XP ACQUIRED COMDEL TO ENTER THE RF MARKET, SEEING AN

9    OPPORTUNITY AND A LARGE OPPORTUNITY AT THAT.  THE EVIDENCE

10   SHOWS THAT COMDEL'S TECHNOLOGY WAS OUTDATED AND WAS

11   INSUFFICIENT FOR XP TO ADEQUATELY OBTAIN MARKET SHARE IN THAT

12   MARKET, AND THE EVIDENCE ALSO SHOWS THAT XP NEEDED A NEW

13   PRODUCT.

14        ACCORDINGLY, XP ACQUIRED AND USED COMET'S TRADE SECRETS TO

15   JUMP-START ITS NEW PRODUCT DEVELOPMENT.  AND THE EVIDENCE IS

16   CLEAR ON THAT POINT, INCLUDING THE FACT THAT XP HAS NOW

17   DEVELOPED THREE SEPARATE GENERATIONS OF RF MATCH PRODUCTS IN

18   THE LAST FOUR YEARS, DESPITE THE LACK OF R&D AND 30 YEARS OF

19   LOW RELEASES AT COMDEL.

20        NOW, XP'S DECISION TO TAKE AND CONTINUE USING THE TRADE

21   SECRETS ALSO DEMONSTRATES THE VALUE OF THE TRADE SECRETS TO

22   COMET AND TO XP IN ITS UNJUST ENRICHMENT.  AND SO HOW WAS XP

23   UNJUSTLY ENRICHED?  XP WAS UNJUSTLY ENRICHED BECAUSE IT GOT

24   ACCESS TO THESE TRADE SECRETS, USED THEM TO DEVELOP NEW NEXT

25   GENERATION RF MATCH AND GENERATORS WITHOUT HAVING TO INVEST THE

1    TIME OR THE MONEY ITSELF.  AND THE EVIDENCE SHOWS THAT COMET'S

2    RESEARCH AND DEVELOPMENT INVESTMENTS ARE AN APPROPRIATE MEASURE

3    OF THE AMOUNT OF R&D COSTS THAT XP SAVED THROUGH ITS

4    MISAPPROPRIATION.

5         NOW, NO REASONABLE JURY COULD AWARD DAMAGES FOR XP'S

6    UNJUST ENRICHMENT OF LESS THAN $32.5 MILLION.  FIRST, COMET

7    ESTABLISHED THE AMOUNT OF MONEY THAT COMET SPENT TO DEVELOP

8    EACH OF ITS TRADE SECRETS IN THIS CASE.  AND THAT WAS PRESENTED

9    THROUGH MR. MALACKOWSKI'S TESTIMONY AS WELL AS THE EXHIBITS AND

10   EVIDENCE HE PRESENTED.

11        THE COURT:  I MIGHT INTERRUPT WITH A QUESTION.  IS

12   THERE ANYTHING IN MALACKOWSKI'S TESTIMONY ABOUT UNJUST

13   ENRICHMENT AND A REASONABLE ROYALTY THAT WAS NOT REBUTTED

14   THROUGH A COMPETING TESTIMONY IN THE LAST WITNESS, MS. IRWIN?

15        IN OTHER WORDS, WHY DOESN'T HER TESTIMONY CREATE A FACTUAL

16   DISPUTE AS TO ALL THE ISSUES THAT HE TESTIFIED TO?

17        MR. BLAKE:  SURE, YOUR HONOR.  I THINK THERE ARE A

18   COUPLE OF POINTS.

19        SO ONE, I THINK MS. IRWIN'S TESTIMONY ACTUALLY SHOWED THAT

20   SHE DOES NOT CRITICIZE MR. MALACKOWSKI'S USE OF THE PROJECT

21   CODES IN CALCULATING THE R&D SPEND FOR EACH OF THE TRADE

22   SECRETS, AND I DON'T BELIEVE THAT THERE WAS ANY DISPUTE RELATED

23   TO MR. MALACKOWSKI'S OPINION ABOUT THE INTERRELATEDNESS IN THE

24   INTEGRATED NATURE OF THE TRADE SECRETS.  AND WHAT I MEAN BY

25   THAT IS, MR. MALACKOWSKI EXPLAINED THAT LATER-GENERATION TRADE

1    SECRETS BUILD ON EARLIER TRADE SECRETS; AND, THEREFORE, THE

2    UNJUST ENRICHMENT THAT COMES FROM THE MISAPPROPRIATION OF A

3    LATER-GENERATION TRADE SECRET WOULD ALSO INCLUDE ALL OF THE

4    DEVELOPMENT WORK THAT PRECEDED IT.

5         SO THOSE TWO POINTS I BELIEVE ARE UNDISPUTED.

6         AND NOW TURNING -- SO TURNING TO PUNITIVE DAMAGES THEN,

7    YOUR HONOR -- SO ON THE COMPENSATORY DAMAGES, COMET HAS

8    ESTABLISHED THAT NO REASONABLE JURY COULD FIND THAT A

9    REASONABLE ROYALTY IS INAPPROPRIATE AS MS. IRWIN TESTIFIED, AND

10   IN FACT, NO REASONABLE JURY WOULD AWARD A REASONABLE ROYALTY

11   OTHER THAN A LUMP SUM OF THE 32.5 MILLION, AS MR. MALACKOWSKI

12   TESTIFIED.

13        SO NOW TURNING TO THE PUNITIVE DAMAGES IN THIS CASE, NO

14   REASONABLE JURY COULD FIND XP'S ACTIONS WERE NOT WILLFUL AND

15   MALICIOUS.  XP'S CEO, EXECUTIVES, ENGINEERS, AND THE BOARD WERE

16   AWARE OF THE MISAPPROPRIATION OF COMET'S TRADE SECRETS AND TOOK

17   STEPS TO WILLFULLY BLIND THEMSELVES OR TO RATIFY THE

18   MISAPPROPRIATION.

19        AND EVEN IF YOU ACCEPT XP'S CONTENTION THAT IT WAS NOT

20   AWARE OF THE MISAPPROPRIATION UNTIL THE REPEATED ADMISSIONS IN

21   THIS CASE, XP HAS CONTINUED TO USE COMET'S TRADE SECRETS TO

22   DEVELOP RF GENERATORS AND MATCHING NETWORKS, INCLUDING FOR OVER

23   FOUR YEARS SINCE COMET FILED THIS COMPLAINT.

24        NOW, ADDITIONALLY, PUNITIVE DAMAGES AGAINST XP ARE PROPER

25   BECAUSE XP IS VICARIOUSLY LIABLE FOR THE MISAPPROPRIATION OF

1     ITS EMPLOYEES AND ITS AGENTS.

2          CHRIS MASON AND DOUG BEUERMAN WERE EMPLOYED IN MANAGERIAL

3     CAPACITY AND WERE ACTING WITHIN THE SCOPE OF THEIR EMPLOYMENT

4     WHEN THEY USED COMET'S TRADE SECRETS AT XP.

5          XP MADE NO CHANGES TO THE ROLES OR EMPLOYMENT OF

6     MR. CHRIS MASON OR MR. DOUG BEUERMAN OR OTHERS, BUT INSTEAD

7     RETAINED THE BENEFIT OF THE MISAPPROPRIATION AND CONTINUED TO

8     USE COMET'S TRADE SECRETS TO DEVELOP COMPETING RF MATCH AND

9     GENERATOR TECHNOLOGIES.

10          SO FOR THOSE REASONS, NO REASONABLE JURY COULD FAIL TO

11    FIND THAT XP ACTED WILLFULLY AND MALICIOUSLY, AND ADDITIONALLY,

12    NO REASONABLE JURY COULD FAIL TO AWARD PUNITIVE DAMAGES FOR THE

13    AMOUNT OF TWICE THE COMPENSATORY DAMAGES, THE AMOUNT OF

14    $65 MILLION.

15          NOW, MY LAST POINT, YOUR HONOR, I'M GOING TO ADDRESS IS

16    THE AMOUNT OF PUNITIVE DAMAGES.  SO NO REASONABLE JURY COULD

17    AWARD LESS THAN THAT TWO TIMES COMPENSATORY DAMAGES AMOUNT FOR

18    PUNITIVE DAMAGES, AND THAT'S BASED ON ALL OF THE SIX FACTORS

19    SET FORTH IN YOUR HONOR'S JURY INSTRUCTIONS, JURY INSTRUCTION

20    NO. 26.

21          NOW, ALL SIX OF THOSE FACTORS SUPPORT AWARDING THE MAXIMUM

22    STATUTORY AMOUNT OF PUNITIVE DAMAGES.  THE EVIDENCE SHOWS THAT

23    THE HARM TO COMET DUE TO XP'S MISAPPROPRIATION IS OVERWHELMING.

24    YOU HEARD THAT FROM MR. MALACKOWSKI'S TESTIMONY, BUT YOU ALSO

25    HEARD IT FROM COMET'S OWN ENGINEERS WHEN THEY WERE ASKED WHAT

1      THE IMPACT WOULD BE OF XP'S MISAPPROPRIATION.

2           AND THERE'S NO DISPUTE THAT XP WAS COMPETING WITH COMET

3      AND INTENDED TO TAKE ADDITIONAL RF POWER MARKET SHARE FROM

4      COMET.  IN FACT, XP ITSELF, FORECASTS SUBSTANTIAL REVENUE AND

5      PROFIT FROM THE RELEASE OF ITS NEXT GENERATION RF MATCH AND

6      GENERATOR PRODUCTS, INCLUDING UPWARD OF $125 MILLION IN PROFIT

7      OVER THE NEXT EIGHT YEARS.

8           YOU ALSO HEARD EVIDENCE ABOUT XP'S OVERALL REVENUES AND

9      THE SIZE OF XP.  YOU HEARD THAT THROUGH MR. MALACKOWSKI, IT'S

10     VERY LARGE, IT'S OVER A BILLION DOLLARS IN THE LAST FOUR YEARS

11     IN REVENUES.

12          SO AS THE EVIDENCE SHOWS, THOSE SUBSTANTIAL PROFITS THAT

13     XP FORECASTS COMBINED WITH THE TIME AND INVESTMENT IT AVOIDED

14     AND ITS ACCESS TO THE TECHNOLOGY OF A DIRECT COMPETITOR, ALL

15     JUSTIFY THE MAXIMUM PUNITIVE DAMAGES AWARD IN THIS CASE.

16          AND JUST FINALLY, ON A LEGAL POINT HERE, ALTHOUGH THE

17     SUPREME COURT HAS BEEN RELUCTANT TO IDENTIFY CONCRETE

18     CONSTITUTIONAL LIMITS ON THE RATIO FOR COMPENSATORY DAMAGES --

19     OR PUNITIVE DAMAGES -- EXCUSE ME -- IT HAS REPEATEDLY SUGGESTED

20     THAT STATUTORILY AUTHORIZED DOUBLE, TRIPLE, OR QUADRUPOLE

21     PUNITIVE DAMAGES AWARDS WILL RARELY EVER VIOLATE DUE PROCESS.

22          THANK YOU, YOUR HONOR.

23            THE COURT:  THANK YOU VERY MUCH.

24          ALL RIGHT.  ON THE RULE 50(A) MOTION, I'M DEFERRING AND

25     TAKING IT UNDER SUBMISSION.  I WILL LET THE JURY DECIDE EACH OF

1234

```
1     THOSE ISSUES AS TO LIABILITY AND DAMAGES.  BUT THANK YOU FOR

2     YOUR ARGUMENTS.

3          I WANT TO TOUCH BASE -- AND I KNOW WE ARE DUE FOR A BREAK

4     HERE -- ON A FEW ITEMS AND GIVE YOU A CHANCE TO MAKE SURE I

5     DON'T MAKE ANY ERRORS BEFORE WE INSTRUCT THE JURY.  SO LOOKING

6     AT THE VERDICT FORM, I HAVE ONE SELF-CORRECTION TO MAKE TO THAT

7     DOCUMENT.  THIS IS DOCUMENT NO. 383 IS OUR CURRENT VERSION, ON

8     PAGE 2, THERE'S A DUPLICATIVE INSTRUCTION AT LINES 12 AND 13

9     WHICH I WILL DELETE, AND ALSO ADJUST THE PAGINATION SO THAT

10    QUESTION 3 ALL FITS ON ONE PAGE.

11         THIS IS OUR CHARGING CONFERENCE.  ARE THERE ANY OTHER

12    SUGGESTIONS FROM EITHER SIDE AS TO THE VERDICT FORM AS TO THE

13    ISSUES NOT PREVIOUSLY OBJECTED TO IN YOUR WRITINGS?  STARTING

14    ON THE COMET SIDE.

15         AND AS YOU CONTEMPLATE THAT, I'LL JUST SAY FOR OUR

16    RECORD, THERE HAVE BEEN A NUMBER OF REVISIONS TO THE PROPOSED

17    VERDICT FORM FROM EACH SIDE AND BRIEFING ON THOSE AS WELL, AND

18    THE COURT'S VERDICT FORM WAS PROPOSED IN RESPONSE TO THOSE

19    WRITTEN SUGGESTIONS.

20         GO AHEAD WITH YOUR COMMENTS.

21              MR. BLAKE:  THANK YOU, YOUR HONOR.  SAM BLAKE ON

22    BEHALF OF COMET.

23         WITH RESPECT TO THE VERDICT FORM IN THIS CASE, I JUST

24    WANTED TO CONFIRM THAT WE HAVE PRESERVED ALL OF OUR OBJECTIONS

25    TO THE VERDICT FORM AS A WHOLE.  AS WE OBJECTED, IT'S
```

1    UNNECESSARILY LONG, COMPLICATED, AND RISKS A LEGALLY FLAWED

2    VERDICT.

3         BUT SPECIFICALLY, COMET OBJECTS TO QUESTION 4 OF THE

4    VERDICT FORM, WHICH RELATES TO -- WHICH IS A SEPARATE QUESTION

5    ADDRESSING READILY ASCERTAINABLE BY PROPER MEANS.  THAT

6    QUESTION -- THAT QUESTION IS BROKEN OUT FROM QUESTION 3, AND

7    UNDER THE DTSA AND THE STATUTE, THOSE ARE ACTUALLY NOT SEPARATE

8    ISSUES FOR THE JURY TO DECIDE.

9         AND SO INCLUSION OF THIS QUESTION IS ACTUALLY GOING TO BE

10   CONFUSING, AND MOREOVER, THE FORM OF IT WHICH DIFFERS THAN THE

11   REST OF THE LIABILITY QUESTIONS, WOULD REQUIRE AN AFFIRMATIVE

12   ANSWER IF THE JURY IS TO FIND THAT COMET WAS -- IN FAVOR OF

13   COMET, RIGHT?  IT WOULD HAVE TO FIND THE NEGATIVE ANSWER IN

14   FAVOR OF COMET ON THIS ONE QUESTION.

15             THE COURT:  THAT'S CORRECT, THEY WOULD HAVE TO MARK A

16   NO.

17             MR. BLAKE:  RIGHT.  AND SO THAT RISKS AN ISSUE OF A

18   SORT OF DISCONTINUOUS VERDICT BETWEEN THE DIFFERENT QUESTIONS,

19   SO FOR THAT REASON WE REQUEST THAT QUESTION 4 BE REMOVED FROM

20   THE VERDICT FORM.

21             THE COURT:  ALL RIGHT.  THANK YOU.

22        ANY OTHER SUGGESTIONS?

23             MR. BLAKE:  WE UNDERSTAND THAT OUR OBJECTIONS ARE

24   PRESERVED, BUT WE HAVE NOTHING ELSE TO ARGUE.  THANK YOU,

25   YOUR HONOR.

1           THE COURT:  THANK YOU.

2       AND ON THE XP SIDE.

3           MR. FARRELL:  I BELIEVE WE'VE RAISED ALL OUR CONCERNS

4    ALREADY AND THEY'RE PRESERVED AND I WOULD JUST NOTE THAT WE

5    HAVE A PENDING 50(A) AS WELL.

6           THE COURT:  VERY GOOD.  THANK YOU.  THAT YOU WOULD

7    LIKE TO MAKE RIGHT NOW?  YOU'RE SAYING THERE'S MORE YOU WANT TO

8    SAY ABOUT 50(A) OR JUST THAT YOU ALREADY SUBMITTED ONE AND --

9           MR. FARRELL:  WE HAVE SUBMITTED ONE.  I CAN GO ON

10   FURTHER, YOUR HONOR, IF YOU WOULD LIKE.

11          THE COURT:  I WOULD NOT.

12          MR. FARRELL:  OKAY.  I WILL TAKE THAT AS A HINT.

13          THE COURT:  THANK YOU.  IT'S VERY SUBTLE.

14      ALL RIGHT.  AND XP HAS ARGUED -- I'M NOT MAKING XP'S

15   ARGUMENTS FOR IT, BUT IT HAS ARGUED IN FAVOR OF THE READILY

16   ASCERTAINABLE DEFENSE WHICH IS PLED IN THE ANSWER AND HAS

17   ASSERTED THAT IT SHOULD BE INSTRUCTED IN THE CLOSING

18   INSTRUCTION, AND I DO HAVE THAT IN THE CLOSING INSTRUCTION AS

19   WELL AS IN THE VERDICT FORM AS A SEPARATE BREAKOUT.  SO I'M

20   GOING BACK TO YOU JUST TO CONFIRM THAT YOU DO WANT THAT, BOTH

21   INSTRUCTION AND ENTRY IN THE VERDICT FORM.

22          MR. FARRELL:  YES.  WE DO, AND WE BELIEVE IT'S

23   APPROPRIATE UNDER THE DTSA.

24          THE COURT:  YEAH.  ALL RIGHT.  THANK YOU.

25      AND I AGREE, AND I'M GOING TO USE THE VERDICT FORM AS

1        DRAFTED AS TO QUESTION 4 AND IN THE CLOSING INSTRUCTIONS.

2              ALL RIGHT.  SO TURNING TO THE CLOSING INSTRUCTIONS, AGAIN,

3        TWO SELF-EDITS.  IN INSTRUCTION 11, BURDEN OF PROOF, I'M GOING

4        TO ADD A PARALLEL SENTENCE ABOUT THE BURDEN OF PROVING A

5        DEFENSE BY A PREPONDERANCE OF THE EVIDENCE, BECAUSE THERE IS A

6        LATER INSTRUCTION ON THE READILY ASCERTAINABLE DEFENSE THAT

7        NEEDS TO EXPLAIN HERE IN BURDEN, THAT IT GOES AS TO DEFENSES

8        TOO.  SO JUST A PARALLEL SENTENCE THAT WILL TRACK THE SAME

9        LANGUAGE OF WHEN A PARTY HAS A BURDEN OF PROVING A CLAIM TO SAY

10       WHEN A PARTY HAS A BURDEN OF PROVING A DEFENSE AND RESTATES

11       THAT.

12             SO I WILL MAKE THAT CORRECTION.

13             IN INSTRUCTION 21, RESPONDEAT SUPERIOR.  ON PAGE 12 OF

14       DOCKET 382, LINE 1, I'M GOING TO STRIKE THE WORDS "OR

15       EXEMPLARY" BECAUSE I'VE MADE THESE INSTRUCTIONS JUST SAY

16       "PUNITIVE," AND HAVING "PUNITIVE" AND "EXEMPLARY" IS CONFUSING

17       TO THE JURY.

18             SO THAT WILL JUST READ:  "A DIFFERENT RULE APPLIES WITH

19       REGARD TO PUNITIVE DAMAGES."

20             THOSE ARE THE TWO EDITS THAT I PROPOSE.  AND I WILL HEAR

21       IF THERE'S ANY OTHERS, AGAIN, NOT PREVIOUSLY ARGUED IN THE

22       VARIOUS ROUNDS OF MOTIONS AND BRIEFS ON THE CLOSING

23       INSTRUCTIONS.

24             GO AHEAD.

25                   MR. BLAKE:  SO PRESERVING WHAT WE HAVE OBJECTED TO IN

1    THE PREVIOUS ROUNDS, WE HAVE NOTHING FURTHER TO ARGUE HERE,

2    YOUR HONOR.

3            THE COURT:  THANK YOU.

4        AND ON THE XP SIDE?

5            MR. FARRELL:  NOTHING FURTHER, YOUR HONOR.

6            THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

7        SO I WILL GET REVISIONS OUT TO THESE.  WE WILL ISSUE THEM

8    AND MAKE SOME COPIES FOR YOU AND THE JURORS.

9        WE WILL SEE YOU IN 35 MINUTES.  THANK YOU VERY MUCH.

10       I'M SORRY.  ONE OTHER THING.  BACK ON THE RECORD.

11       WILL COMET BE SPLITTING YOUR CLOSING?

12           MR. ALPER:  YES, WE WILL, YOUR HONOR.

13           THE COURT:  AND WHO WILL BE DOING THE CLOSING?

14           MR. ALPER:  OH, I'M SORRY.  I WILL BE DOING THE

15   CLOSING.  AND WE'LL SPLIT IT BETWEEN THE FIRST PART AND THE

16   REBUTTAL.

17           THE COURT:  HOW MUCH WOULD YOU LIKE FOR THE SECOND

18   PART?

19           MR. ALPER:  I WILL HAVE TO SEE HOW IT'S GOING, BUT

20   APPROXIMATELY 15 MINUTES.

21           THE COURT:  VERY GOOD.  THANK YOU.

22       ALL RIGHT.  NOW WE ARE OFF THE RECORD.

23       (RECESS FROM 1:02 P.M. UNTIL 1:41 P.M.)

24           THE COURT:  THANK YOU.  REMAIN COMFORTABLE.  IT WILL

25   BE A FEW MINUTES BEFORE WE GET OUR JURORS.

1          LET'S GO ON THE RECORD.

2          (THE PROCEEDINGS WERE HELD OUT OF THE PRESENCE OF THE JURY

3     AT 1:44 P.M.)

4               THE COURT:  JURORS ARE NOT PRESENT.

5          YES, SIR.

6               MR. FARRELL:  THE PARTIES HAD JOINTLY SUBMITTED A

7     PHYSICAL INSTRUCTION, AND I WASN'T SURE IF THAT WAS AN

8     OVERSIGHT OR YOU INTENTIONALLY OMITTED IT FROM THE

9     INSTRUCTIONS.

10              THE COURT:  IT IS IN INSTRUCTION 29 AT THE END.

11              MR. FARRELL:  OKAY.

12              THE COURT:  MY DEPUTY IS CIRCULATING A COPY OF IT

13    RIGHT NOW.

14         DID YOU SEE THE ONLINE VERSION?

15              MR. FARRELL:  I DID NOT.  I WAS TOLD IT WASN'T THERE.

16    SO I'M JUST BRINGING IT UP.

17              THE COURT:  LET'S TAKE A PROOFREAD RIGHT NOW AND SEE

18    IF I HAVE FAIRLY DONE WHAT THE PARTIES HAVE SUGGESTED.

19         IT'S ON PAGE 17.

20         AND GSA VERY MUCH APPRECIATES THE DIRECTION NOT TO PLUG

21    ELECTRICAL DEVICES DIRECTLY INTO AN ELECTRICAL OUTLET.

22              MR. DEORAS:  YOUR HONOR, NO OBJECTIONS FROM COMET.

23              THE COURT:  THANK YOU.

24              MR. FARRELL:  NO OBJECTION.

25              THE COURT:  VERY GOOD.  THANK YOU BOTH FOR

1    COLLABORATING ON THAT AND THROUGHOUT THE TRIAL.

2         AND WE WILL BRING OUR JURORS IN.  THANK YOU.

3         (JURY IN AT 1:45 P.M.)

4         THE COURT:  CAN'T SAY IT'S POSITIVE, BUT THERE'S BEEN

5    AN INCREASE IN THE STOCK PRICES FOR BINDER MANUFACTURERS.  I

6    APOLOGIZE TO THE ENVIRONMENT.

7         ALL RIGHT.  OUR JURORS HAVE RETURNED.  EVERYONE MAY BE

8    SEATED.

9         I OBSERVE THAT EACH OF OUR JURORS HAS RECEIVED A COPY OF

10   THESE CLOSING JURY INSTRUCTIONS, AND SO I WILL NOW GIVE MY

11   CLOSING INSTRUCTIONS TO THE JURY.

12        DUTY OF THE JURY.

13        NOW THAT YOU HAVE HEARD ALL THE EVIDENCE, IT IS MY DUTY TO

14   INSTRUCT YOU ON THE LAW THAT APPLIES TO THIS CASE.  EACH OF YOU

15   HAS RECEIVED A COPY OF THESE INSTRUCTIONS THAT YOU MAY TAKE

16   WITH YOU TO THE JURY ROOM TO CONSULT DURING YOUR DELIBERATIONS.

17   IT IS YOUR DUTY TO FIND THE FACTS FROM ALL THE EVIDENCE IN THE

18   CASE.  TO THOSE FACTS YOU WILL APPLY THE LAW AS I GIVE IT TO

19   YOU.  YOU MUST FOLLOW THE LAW AS I GIVE IT TO YOU WHETHER YOU

20   AGREE WITH THE LAW OR NOT.

21        AND YOU MUST NOT BE INFLUENCED BY ANY PERSONAL LIKES OR

22   DISLIKES, OPINIONS, PREJUDICES, OR SYMPATHY.  THAT MEANS YOU

23   MUST DECIDE THE CASE SOLELY ON THE EVIDENCE BEFORE YOU.  YOU

24   WILL RECALL THAT YOU TOOK AN OATH TO DO SO.

25        PLEASE DO NOT READ INTO THESE INSTRUCTIONS OR ANYTHING

1       THAT I MAY SAY OR DO OR HAVE SAID OR DONE DURING THE TRIAL THAT

2       I HAVE AN OPINION REGARDING THE EVIDENCE OR WHAT THE JURY'S

3       VERDICT SHOULD BE.

4               WHAT IS EVIDENCE?

5               THE EVIDENCE YOU ARE TO CONSIDER IN DECIDING WHAT THE

6       FACTS OF THE CASE ARE CONSISTS OF, ONE, THE SWORN TESTIMONY OF

7       ANY WITNESS.

8               TWO, THE EXHIBITS THAT ARE ADMITTED INTO EVIDENCE.

9               AND, THREE, ANY FACTS TO WHICH THE LAWYERS HAVE AGREED.

10      AND THESE ARE CALLED STIPULATIONS OR STIPULATIONS OF FACT.

11              THE PARTIES HAVE AGREED TO CERTAIN FACTS TO BE PLACED IN

12      EVIDENCE.  YOU MUST, THEREFORE, TREAT THESE STIPULATED FACTS AS

13      HAVING BEEN PROVED.  A COPY OF THE STIPULATED FACTS WILL BE

14      PROVIDED TO YOU IN THE ADMITTED EXHIBIT BINDER THAT WILL BE

15      PROVIDED TO YOU FOR YOUR DELIBERATIONS.

16              DEPOSITION IN LIEU OF LIVE TESTIMONY.

17              A DEPOSITION IS THE SWORN TESTIMONY OF A WITNESS TAKEN

18      BEFORE TRIAL.  THE WITNESS IS PLACED UNDER OATH TO TELL THE

19      TRUTH, AND LAWYERS FOR EACH PARTY MAY ASK QUESTIONS.  THE

20      QUESTIONS AND ANSWERS ARE RECORDED.

21              INSOFAR AS POSSIBLE, YOU SHOULD CONSIDER DEPOSITION

22      TESTIMONY PRESENTED TO YOU IN COURT IN LIEU OF LIVE TESTIMONY

23      IN THE SAME WAY AS IF THE WITNESS HAD BEEN PRESENT TO TESTIFY.

24              WHAT IS NOT EVIDENCE?

25              IN REACHING YOUR VERDICT, YOU MAY CONSIDER ONLY THE

1    TESTIMONY, FACT STIPULATIONS, AND EXHIBITS RECEIVED INTO

2    EVIDENCE.  CERTAIN THINGS ARE NOT EVIDENCE, AND YOU MAY NOT

3    CONSIDER THEM IN DECIDING WHAT THE FACTS OF THE CASE ARE.

4         I WILL NOW LIST THINGS FOR YOU THAT ARE NOT EVIDENCE:

5         FIRST, THE ARGUMENTS AND STATEMENTS BY LAWYERS ARE NOT

6    EVIDENCE.  THE LAWYERS ARE NOT WITNESSES.  WHAT THEY HAVE SAID

7    IN THEIR OPENING STATEMENTS, WHAT THEY WILL SAY IN THEIR

8    CLOSING ARGUMENTS AND AT OTHER TIMES IS INTENDED TO HELP YOU

9    INTERPRET THE EVIDENCE, BUT IT IS NOT EVIDENCE ITSELF.

10        IF THE FACTS FROM THE TRIAL, AS YOU REMEMBER THEM FROM

11   ADMISSIBLE EVIDENCE, DIFFERS FROM THE WAY THE LAWYERS STATE

12   THEM, YOUR MEMORY OF THE FACTS CONTROLS.

13        NEXT, THE QUESTIONS AND OBJECTIONS BY LAWYERS ARE ALSO NOT

14   EVIDENCE.  THE ATTORNEYS HAVE A DUTY TO THEIR CLIENTS TO OBJECT

15   WHEN THEY BELIEVE A QUESTION IS IMPROPER UNDER THE RULES OF

16   EVIDENCE.  YOU SHOULDN'T BE INFLUENCED BY AN OBJECTION OR BY MY

17   RULING ON AN OBJECTION.

18        NEXT, TESTIMONY THAT IS EXCLUDED OR STRICKEN OR THAT I

19   HAVE INSTRUCTED YOU TO DISREGARD IS NOT EVIDENCE AND MUST NOT

20   BE CONSIDERED.

21        FINALLY, ANYTHING YOU MAY HAVE SEEN OR HEARD WHEN COURT

22   WAS NOT IN SESSION IS ALSO NOT EVIDENCE.  YOU ARE TO DECIDE THE

23   CASE SOLELY ON THE EVIDENCE RECEIVED AT THE TRIAL.

24        DIRECT AND CIRCUMSTANTIAL EVIDENCE.

25        EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL.  DIRECT EVIDENCE

1    IS DIRECT PROOF OF A FACT SUCH AS TESTIMONY BY A WITNESS ABOUT

2    WHAT THAT WITNESS PERSONALLY SAW, HEARD, OR DID.

3         CIRCUMSTANTIAL EVIDENCE IS PROOF OF ONE OR MORE FACTS FROM

4    WHICH YOU COULD FIND ANOTHER FACT.

5         YOU SHOULD CONSIDER BOTH KINDS OF EVIDENCE.  THE LAW MAKES

6    NO DISTINCTION BETWEEN THE WEIGHT TO BE GIVEN TO EITHER DIRECT

7    OR CIRCUMSTANTIAL EVIDENCE.  IT IS FOR YOU, THE JURY, TO DECIDE

8    HOW MUCH WEIGHT TO GIVE TO ANY EVIDENCE.

9         BY WAY OF EXAMPLE, IF YOU WAKE UP IN THE MORNING AND SEE

10   THE SIDEWALK IS WET, YOU MAY FIND FROM THAT FACT THAT IT RAINED

11   DURING THE NIGHT.

12        HOWEVER, OTHER EVIDENCE, SUCH AS A TURNED-ON GARDEN HOSE,

13   MAY PROVIDE A DIFFERENT EXPLANATION FOR THE PRESENCE OF WATER

14   ON A SIDEWALK.  THEREFORE, BEFORE YOU DECIDE THAT A FACT HAS

15   BEEN PROVED BY CIRCUMSTANTIAL EVIDENCE, YOU MUST CONSIDER ALL

16   THE EVIDENCE IN LIGHT OF REASON, EXPERIENCE, AND COMMON SENSE.

17        WITNESS CREDIBILITY.

18        IN DECIDING THE FACTS IN THIS CASE, YOU MAY HAVE TO DECIDE

19   WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO BELIEVE.

20   YOU MAY BELIEVE EVERYTHING A WITNESS SAYS OR PART OF IT OR NONE

21   OF IT.

22        IN CONSIDERING THE TESTIMONY OF ANY WITNESS, YOU MAY TAKE

23   INTO ACCOUNT THE FOLLOWING:

24        ONE, THE OPPORTUNITY AND ABILITY OF THE WITNESS TO SEE OR

25   HEAR OR KNOW THE THINGS TESTIFIED TO.

1       SECOND, THE WITNESS'S MEMORY.

2       THIRD, THE WITNESS'S MANNER WHILE TESTIFYING.

3       FOURTH, THE WITNESS'S INTEREST IN THE OUTCOME OF THE CASE,

4   IF ANY.

5       FIFTH, THE WITNESS'S BIAS OR PREJUDICE, IF ANY.

6       SIX, WHETHER OTHER EVIDENCE CONTRADICTED THE WITNESS'S

7   TESTIMONY.

8       SEVEN, THE REASONABLENESS OF THE WITNESS'S TESTIMONY IN

9   LIGHT OF ALL THE EVIDENCE.

10      AND, EIGHT, ANY OTHER FACTORS THAT BEAR ON BELIEVABILITY.

11      SOMETIMES A WITNESS MAY SAY SOMETHING THAT IS NOT

12  CONSISTENT WITH SOMETHING ELSE HE OR SHE SAID.  SOMETIMES

13  DIFFERENT WITNESSES WILL GIVE DIFFERENT VERSIONS OF WHAT

14  HAPPENED.  PEOPLE OFTEN FORGET THINGS OR MAKE MISTAKES IN WHAT

15  THEY REMEMBER.  ALSO, TWO PEOPLE MAY SEE THE SAME EVENT BUT

16  REMEMBER IT DIFFERENTLY.

17      YOU MAY CONSIDER THESE DIFFERENCES, BUT DO NOT DECIDE THAT

18  TESTIMONY IS UNTRUE JUST BECAUSE IT DIFFERS FROM OTHER

19  TESTIMONY.

20      HOWEVER, IF YOU DECIDE THAT A WITNESS HAS DELIBERATELY

21  TESTIFIED UNTRUTHFULLY ABOUT SOMETHING IMPORTANT, YOU MAY

22  CHOOSE NOT TO BELIEVE ANYTHING THAT WITNESS SAID.

23      ON THE OTHER HAND, IF YOU THINK THE WITNESS TESTIFIED

24  UNTRUTHFULLY ON SOME THINGS BUT TOLD THE TRUTH ABOUT OTHER

25  THINGS, THEN YOU MAY ACCEPT THE PART YOU THINK IS TRUE AND

1    IGNORE THE REST.

2         THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT

3    NECESSARILY DEPEND UPON THE NUMBER OF WITNESSES WHO TESTIFY.

4    WHAT IS IMPORTANT IS HOW BELIEVABLE THE WITNESSES WERE AND HOW

5    MUCH WEIGHT YOU THINK THEIR TESTIMONY DESERVES.

6         BIAS.

7         EACH ONE OF US HAS BIASES ABOUT OR CERTAIN PERCEPTIONS OR

8    STEREOTYPES OF OTHER PEOPLE.  WE MAY BE AWARE OF SOME OF OUR

9    BIASES, ALTHOUGH WE MAY NOT SHARE THEM WITH OTHERS.  WE MAY NOT

10   BE FULLY AWARE OF SOME OF OUR OTHER BIASES.  OUR BIASES OFTEN

11   AFFECT HOW WE ACT, FAVORABLY OR UNFAVORABLY, TOWARDS SOMEONE

12   ELSE.  BIAS CAN AFFECT OUR THOUGHTS, HOW WE REMEMBER, WHAT WE

13   SEE AND HEAR, WHOM WE BELIEVE OR DISBELIEVE, AND HOW WE MAKE

14   IMPORTANT DECISIONS.

15        AS JURORS, YOU ARE BEING ASKED TO MAKE VERY IMPORTANT

16   DECISIONS IN THIS CASE.  YOU MUST NOT LET BIAS, PREJUDICE, OR

17   PROBABLE OPINION INFLUENCE YOUR DECISION; AND MUST NOT BE

18   BIASED IN FAVOR OF OR AGAINST PARTIES OR WITNESSES BECAUSE OF

19   THEIR DISABILITY, GENDER, GENDER IDENTITY, GENDER EXPRESSION,

20   RACE, RELIGION, ETHNICITY, SEXUAL ORIENTATION, AGE, NATIONAL

21   ORIGIN, OR SOCIOECONOMIC STATUS.

22        YOUR VERDICT MUST BE BASED SOLELY ON THE EVIDENCE

23   PRESENTED.  YOU MUST CAREFULLY EVALUATE THE EVIDENCE AND RESIST

24   ANY URGE TO REACH A VERDICT THAT IS INFLUENCED BY BIAS FOR OR

25   AGAINST ANY PARTY OR WITNESS.

1    IMPEACHMENT EVIDENCE.

2    THE EVIDENCE THAT A WITNESS LIED UNDER OATH ON A PRIOR

3    OCCASION MAY BE CONSIDERED, ALONG WITH ALL OTHER EVIDENCE, IN

4    DECIDING WHETHER OR NOT TO BELIEVE THE WITNESS AND HOW MUCH

5    WEIGHT TO GIVE TO THE TESTIMONY OF THE WITNESS AND FOR NO OTHER

6    PURPOSE.

7    EXPERT OPINION TESTIMONY.

8    YOU HAVE HEARD TESTIMONY FROM CERTAIN INDIVIDUALS ON BOTH

9    SIDES OF THE CASE WHO TESTIFIED TO OPINIONS AND THEIR REASONS

10   FOR THEIR OPINIONS.  THIS EXPERT OPINION TESTIMONY IS ALLOWED

11   BECAUSE OF THE EDUCATION OR EXPERIENCE OF THESE WITNESSES.

12   SUCH EXPERT OPINION TESTIMONY SHOULD BE JUDGED LIKE ANY OTHER

13   TESTIMONY.  YOU MAY ACCEPT IT OR REJECT IT AND GIVE IT AS MUCH

14   WEIGHT AS YOU THINK IT DESERVES, CONSIDERING THE WITNESS'S

15   EDUCATION AND EXPERIENCE, THE REASONS GIVEN FOR THE OPINION,

16   AND ALL THE OTHER EVIDENCE IN THE CASE.

17   BURDEN OF PROOF.

18   PREPONDERANCE OF THE EVIDENCE.  WHEN COMET HAS THE BURDEN

19   OF PROVING ANY CLAIM BY A PREPONDERANCE OF THE EVIDENCE, IT

20   MEANS YOU MUST BE PERSUADED BY THE EVIDENCE THAT COMET'S CLAIM

21   IS MORE PROBABLY TRUE THAN NOT TRUE.

22   WHEN XP HAS THE BURDEN OF PROVING ANY DEFENSE BY A

23   PREPONDERANCE OF THE EVIDENCE, IT MEANS YOU MUST BE PERSUADED

24   BY THE EVIDENCE THAT XP'S DEFENSE IS MORE PROBABLY TRUE THAN

25   NOT TRUE.

1          YOU SHOULD BASE YOUR DECISION ON ALL THE EVIDENCE

2     REGARDLESS OF WHICH PARTY PRESENTED IT.

3          MISAPPROPRIATION OF TRADE SECRETS AND INSTRUCTION.

4          NOW I WILL INSTRUCT YOU ON THE ELEMENTS OF COMET'S CLAIMS

5     FOR TRADE SECRET MISAPPROPRIATION.  COMET CLAIMS THAT

6     INFORMATION RELATED TO ITS RADIO-FREQUENCY GENERATORS AND

7     MATCHING NETWORKS ARE ITS TRADE SECRETS AND THAT XP

8     MISAPPROPRIATED THEM.  THE ALLEGED COMET TRADE SECRETS ARE

9     LISTED BELOW:

10         ALLEGED TRADE SECRET D, THE DA VINCI RF GENERATOR CONTROL,

11    DIGITAL MEASUREMENT, AND SOFTWARE.

12         ALLEGED TRADE SECRET E, THE NEXT GENERATION RF MATCHING

13    NETWORK.

14         ALLEGED TRADE SECRET L, THE KIYO MATCHING NETWORK TRADE

15    SECRETS.

16         AND ALLEGED TRADE SECRET S, THE AMAT MATCHING NETWORK.

17         THE LISTING OF THE ALLEGED COMET TRADE SECRETS HAS BEEN

18    DONE FOR YOUR CONVENIENCE.  IT DOES NOT MEAN THAT THEY ARE OR

19    ARE NOT, IN FACT, TRADE SECRETS.  COMET MUST STILL PROVE THAT

20    EACH ONE BOTH QUALIFIES AS A TRADE SECRET AND WAS

21    MISAPPROPRIATED BY XP.

22         THE JURY IS NO LONGER BEING ASKED TO DETERMINE -- EXCUSE

23    ME -- TO EVALUATE ALLEGED COMET TRADE SECRET T.  ALLEGED COMET

24    TRADE SECRET T WILL NOT APPEAR ON THE VERDICT FORM.  YOU SHOULD

25    NOT SPECULATE AS TO THE REASON WHY.

1                MISAPPROPRIATION OF TRADE SECRETS, THE ESSENTIAL FACTUAL

2        ELEMENTS.

3                COMET CLAIMS THAT XP HAS MISAPPROPRIATED CERTAIN OF

4        COMET'S TRADE SECRETS.  TO SUCCEED ON ITS CLAIM, COMET MUST

5        PROVE ALL OF THE FOLLOWING:

6                FIRST, THAT COMET OWNED THE FOLLOWING:  ALLEGED TRADE

7        SECRET D, ALLEGED TRADE SECRET E, ALLEGED TRADE SECRET L, AND

8        ALLEGED TRADE SECRET S.

9                SECOND, THAT THESE WERE TRADE SECRETS AT THE TIME OF THE

10       MISAPPROPRIATION.

11               AND, THIRD, THAT XP IMPROPERLY ACQUIRED OR USED THE TRADE

12       SECRETS.

13               TRADE SECRET INFORMATION GENERALLY.

14               A TRADE SECRET IS INFORMATION INCLUDING BUT NOT LIMITED TO

15       A FORMULA, PATTERN, COMPILATION, PROGRAM, DEVICE, METHOD,

16       TECHNIQUE, DRAWING, PROCESS, FINANCIAL DATA, OR LIST OF ACTUAL

17       OR POTENTIAL CUSTOMERS OR SUPPLIERS THAT, ONE, IS SUFFICIENTLY

18       SECRET TO DERIVE INDEPENDENT ECONOMIC VALUE, ACTUAL OR

19       POTENTIAL, FROM NOT BEING GENERALLY KNOWN TO OTHER PERSONS WHO

20       CAN OBTAIN ECONOMIC VALUE FROM ITS DISCLOSURE OR USE; AND, TWO,

21       IS THE SUBJECT OF EFFORTS THAT ARE REASONABLE UNDER THE

22       CIRCUMSTANCES TO MAINTAIN ITS SECRECY OR CONFIDENTIALITY.

23               THE TERM "TRADE SECRET" CAN INCLUDE COMPILATIONS OF PUBLIC

24       INFORMATION WHEN COMBINED OR COMPILED IN A NOVEL WAY, EVEN IF A

25       PORTION OR EVERY INDIVIDUAL PORTION OF THAT COMPILATION IS

1    GENERALLY KNOWN.  COMBINATIONS OR COMPILATIONS OF PUBLIC

2    INFORMATION FROM A VARIETY OF DIFFERENT SOURCES, WHEN COMBINED

3    OR COMPILED IN A NOVEL WAY, CAN BE A TRADE SECRET.

4         IN SUCH A CASE, IF A PORTION OF THE TRADE SECRET IS

5    GENERALLY KNOWN OR EVEN IF EVERY INDIVIDUAL PORTION OF THE

6    TRADE SECRET IS GENERALLY KNOWN, THE COMPILATION OR COMBINATION

7    OF INFORMATION MAY STILL QUALIFY AS A TRADE SECRET IF IT MEETS

8    THE DEFINITION OF A TRADE SECRET SET FORTH IN THE PRECEDING

9    PARAGRAPH.

10        TRADE SECRET CONCRETENESS.

11        IN ARTICULATING A TRADE SECRET, IT IS NOT ENOUGH FOR COMET

12   TO POINT TO BROAD AREAS OF TECHNOLOGY.  INSTEAD, IT IS COMET'S

13   BURDEN BY A PREPONDERANCE OF THE EVIDENCE TO IDENTIFY CONCRETE

14   INFORMATION THAT IT CONTENDS TO CONSTITUTE ITS ALLEGED TRADE

15   SECRETS.

16        THE SECRECY REQUIREMENT.

17        THE SECRECY REQUIRED TO PROVE THAT SOMETHING IS A TRADE

18   SECRET DOES NOT HAVE TO BE ABSOLUTE IN THE SENSE THAT NO ONE

19   ELSE IN THE WORLD POSSESSES THE INFORMATION.  FOR EXAMPLE, IT

20   MAY BE DISCLOSED TO EMPLOYEES INVOLVED IN COMET'S USE OF THE

21   ALLEGED TRADE SECRET AS LONG AS THEY ARE OBLIGATED TO KEEP THE

22   INFORMATION SECRET.  IT MAY ALSO BE DISCLOSED TO NON-EMPLOYEES

23   IF THEY ARE OBLIGATED TO KEEP THE INFORMATION SECRET.  HOWEVER,

24   IT MUST NOT HAVE BEEN GENERALLY KNOWN TO THE PUBLIC OR TO

25   PEOPLE WHO COULD OBTAIN VALUE FROM KNOWING IT.

1        REASONABLE EFFORTS TO PROTECT TRADE SECRETS.

2        TO ESTABLISH THAT THE INFORMATION IS A TRADE SECRET, COMET

3    MUST PROVE THAT IT MADE REASONABLE EFFORTS UNDER THE

4    CIRCUMSTANCES TO KEEP IT SECRET.

5        "REASONABLE EFFORTS" ARE THE EFFORTS THAT WOULD BE MADE BY

6    A REASONABLE BUSINESS IN THE SAME SITUATION AND HAVING THE SAME

7    KNOWLEDGE AND RESOURCES AS COMET, EXERCISING DUE CARE TO

8    PROTECT IMPORTANT INFORMATION OF THE SAME KIND.  THIS

9    REQUIREMENT APPLIES SEPARATELY TO EACH ITEM THAT COMET CLAIMS

10   TO BE A TRADE SECRET.

11       IN DETERMINING WHETHER OR NOT COMET MADE REASONABLE

12   EFFORTS TO KEEP THE ALLEGED TRADE SECRETS SECRET, YOU SHOULD

13   CONSIDER ALL THE FACTS AND CIRCUMSTANCES.  AMONG THE FACTORS

14   YOU MAY CONSIDER ARE THE FOLLOWING:

15       ONE, WHETHER DOCUMENTS OR COMPUTER FILES CONTAINING THE

16   INFORMATION WERE MARKED WITH CONFIDENTIALITY WARNINGS.

17       TWO, WHETHER COMET INSTRUCTED ITS EMPLOYEES TO TREAT THE

18   INFORMATION AS CONFIDENTIAL.

19       THREE, WHETHER COMET RESTRICTED ACCESS TO THE INFORMATION

20   TO PERSONS WHO HAD A BUSINESS REASON TO KNOW THE INFORMATION.

21       FOUR, WHETHER COMET KEPT THE INFORMATION IN A RESTRICTED

22   OR SECURED AREA.

23       FIVE, WHETHER COMET REQUIRED EMPLOYEES OR OTHERS WITH

24   ACCESS TO THE INFORMATION TO SIGN CONFIDENTIALITY OR

25   NON-DISCLOSURE AGREEMENTS.

1    SIX, WHETHER COMET TOOK ANY ACTION TO PROTECT THE SPECIFIC

2    INFORMATION, OR WHETHER IT RELIED ON GENERAL MEASURES TAKEN TO

3    PROTECT ITS BUSINESS INFORMATION OR ASSETS.

4    SEVEN, THE EXTENT TO WHICH ANY GENERAL MEASURES TAKEN BY

5    COMET WOULD PREVENT THE UNAUTHORIZED DISCLOSURE OF THE

6    INFORMATION.

7    AND, EIGHT, WHETHER THERE WERE OTHER REASONABLE MEASURES

8    AVAILABLE TO COMET THAT IT DID NOT TAKE.

9    THE PRESENCE OR ABSENCE OF ANY ONE OR MORE OF THESE

10   FACTORS IS NOT NECESSARILY DETERMINATIVE.

11   INDEPENDENT ECONOMIC VALUE.

12   A TRADE SECRET HAS INDEPENDENT ECONOMIC VALUE IF IT WOULD

13   HAVE GIVEN THE OWNER AN ACTUAL OR POTENTIAL BUSINESS ADVANTAGE

14   OVER OTHERS WHO DID NOT KNOW THE INFORMATION AND WHO COULD HAVE

15   OBTAINED ECONOMIC VALUE FROM ITS DISCLOSURE OR USE.  IN

16   DETERMINING WHETHER INFORMATION HAD ACTUAL OR POTENTIAL

17   INDEPENDENT ECONOMIC VALUE BECAUSE IT WAS SECRET, YOU MAY

18   CONSIDER THE FOLLOWING:

19   ONE, THE EXTENT TO WHICH THE OWNER OBTAINED OR COULD HAVE

20   OBTAINED ECONOMIC VALUE FROM THE INFORMATION IN KEEPING IT

21   SECRET.

22   TWO, THE EXTENT TO WHICH OTHERS COULD HAVE OBTAINED

23   ECONOMIC VALUE FROM THE INFORMATION IF IT WERE NOT SECRET.

24   THREE, THE AMOUNT OF TIME, MONEY, OR LABOR THAT THE OWNER

25   EXPENDED IN DEVELOPING THE INFORMATION.

1       AND, FOUR, THE AMOUNT OF TIME, MONEY, OR LABOR THAT

2   DEFENDANT SAVED BY USING THE INFORMATION.

3       THE PRESENCE OR ABSENCE OF ANY ONE OR MORE OF THESE

4   FACTORS IS NOT NECESSARILY DETERMINATIVE.  THIS REQUIREMENT

5   APPLIES SEPARATELY TO EACH ITEM THAT IS ALLEGED TO BE A TRADE

6   SECRET.

7       THE DEFINITION OF MISAPPROPRIATION.

8       IF YOU FIND THAT COMET HAS PROVEN BY A PREPONDERANCE OF

9   THE EVIDENCE THAT A TRADE SECRET EXISTED, THEN YOU MUST DECIDE

10  WHETHER THAT TRADE SECRET INFORMATION WAS MISAPPROPRIATED BY

11  XP.  TO PROVE THAT A MISAPPROPRIATION OCCURRED, COMET MUST

12  PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT:

13      ONE, XP ACQUIRED COMET'S TRADE SECRET KNOWING OR HAVING

14  REASON TO KNOW THAT THE TRADE SECRET WAS ACQUIRED BY IMPROPER

15  MEANS; OR, TWO, XP DISCLOSED OR USED COMET'S TRADE SECRET

16  WITHOUT COMET'S EXCESS OR IMPLIED CONSENT, AND XP, A, USED

17  IMPROPER MEANS TO ACQUIRE KNOWLEDGE OF THE TRADE SECRET; OR, B,

18  AT THE TIME OF THE DISCLOSURE OR USE OF THE TRADE SECRET, KNEW

19  OR HAD REASON TO KNOW THAT KNOWLEDGE OF THE TRADE SECRET WAS,

20  ONE, DERIVED FROM OR THROUGH A PERSON WHO USED IMPROPER MEANS

21  TO ACQUIRE IT; OR, TWO, ACQUIRED UNDER CIRCUMSTANCES GIVING

22  RISE TO A DUTY TO MAINTAIN ITS SECRECY OR LIMIT ITS USE; OR,

23  THREE, DERIVED FROM OR THROUGH A PERSON WHO OWED A DUTY TO

24  COMET TO MAINTAIN ITS SECRECY OR LIMIT ITS USE.

25      THE PHRASE "IMPROPER MEANS," INCLUDES THEFT, BRIBERY,

1    MISREPRESENTATION, BREACH OR INDUCEMENT OF A BREACH OF A

2    CONFIDENTIAL RELATIONSHIP OR OTHER DUTY TO MAINTAIN SECRECY OR

3    LIMIT USE OR ESPIONAGE THROUGH ELECTRONIC OR OTHER MEANS, OR

4    DOWNLOADING COPIES OF CONFIDENTIAL INFORMATION FOR PURPOSES

5    OTHER THAN SERVING THE INTEREST OF AN EMPLOYER.

6         ON THE OTHER HAND, THE PHRASE "IMPROPER MEANS" DOES NOT

7    INCLUDE ACQUIRING INFORMATION THROUGH REVERSE ENGINEERING,

8    INDEPENDENT DEVELOPMENT, OR OBTAINING THE INFORMATION FROM

9    PUBLIC SOURCES.

10        AFFIRMATIVE DEFENSE.  INFORMATION READILY ASCERTAINABLE BY

11   PROPER MEANS.

12        XP DID NOT MISAPPROPRIATE A COMET TRADE SECRET IF XP

13   PROVES BY A PREPONDERANCE OF EVIDENCE THAT THE TRADE SECRET

14   INFORMATION ALLEGEDLY USED OR DISCLOSED BY XP WAS READILY

15   ASCERTAINABLE BY PROPER MEANS AT THE TIME OF THE ALLEGED

16   MISAPPROPRIATION.

17        INFORMATION THAT IS GENERALLY KNOWN IN THE FIELD OR IS

18   READILY ASCERTAINABLE BY PROPER MEANS BY THOSE SKILLED IN THE

19   ART AT THE TIME OF THE ALLEGED MISAPPROPRIATION CANNOT QUALIFY

20   AS A TRADE SECRET.  THERE IS NO FIXED STANDARD FOR DETERMINING

21   WHAT IS "READILY ASCERTAINABLE BY PROPER MEANS."

22        IN GENERAL, INFORMATION IS READILY ASCERTAINABLE IF IT CAN

23   BE OBTAINED, DISCOVERED, DEVELOPED, REVERSE-ENGINEERED, OR

24   COMPILED WITHOUT SIGNIFICANT DIFFICULTY, EFFORT, OR EXPENSE.

25   FOR EXAMPLE, INFORMATION IS READILY ASCERTAINABLE IF IT IS

1    AVAILABLE IN TRADE JOURNALS, REFERENCE BOOKS OR PUBLISHED

2    MATERIALS, OR IF IT COULD BE READILY DETERMINED BY THOSE

3    SKILLED IN THE ART.

4        ON THE OTHER HAND, THE MORE DIFFICULT INFORMATION IS TO

5    OBTAIN AND THE MORE TIME AND RESOURCES THAT MUST BE EXTENDED IN

6    GATHERING IT, THE LESS LIKELY IT IS READILY ASCERTAINABLE BY

7    PROPER MEANS.

8        NEXT, RESPONDEAT SUPERIOR.

9        YOU HAVE HEARD TESTIMONY ABOUT WHETHER CERTAIN INDIVIDUALS

10   WERE EMPLOYED BY COMET OR XP THROUGHOUT THE COURSE OF THIS

11   TRIAL.  XP CAN BE HELD LIABLE FOR HARM RESULTING TO COMET FROM

12   THE CONDUCT OF ANOTHER IF XP KNOWS THAT THE OTHER'S CONDUCT

13   CONSTITUTED A BREACH OF DUTY AND GIVES SUBSTANTIAL ASSISTANCE

14   OR ENCOURAGEMENT TO THE OTHER.

15       AS A CORPORATION, XP CAN ONLY ACT THROUGH ITS EMPLOYEES,

16   AGENTS, DIRECTORS, OR OFFICERS.  THEREFORE, XP IS RESPONSIBLE

17   FOR THE ACTS OF ITS EMPLOYEES, AGENTS, DIRECTORS, AND OFFICERS

18   PERFORMED WITHIN THE SCOPE OF EMPLOYMENT.  AN EMPLOYEE IS

19   ACTING WITHIN THE SCOPE OF HIS OR HER EMPLOYMENT IF, ONE, HIS

20   OR HER CONDUCT IS REASONABLY RELATED TO THE KINDS OF TASKS THAT

21   THE EMPLOYEE WAS EMPLOYED TO PERFORM; OR, TWO, HIS OR HER

22   CONDUCT IS REASONABLY FORESEEABLE IN LIGHT OF THE EMPLOYER'S

23   BUSINESS OF THE EMPLOYEE'S JOB RESPONSIBILITIES.

24       CONDUCT IS WITHIN THE SCOPE OF EMPLOYMENT WHEN ACTUATED,

25   AT LEAST IN PART, BY A PURPOSE TO SERVE THE EMPLOYER.  A

1    CORPORATION KNOWS WHEN ITS EMPLOYEES KNOW ABOUT SUBJECTS THAT

2    ARE WITHIN THE SCOPE OF THE EMPLOYEE'S DUTIES AND

3    RESPONSIBILITIES.  AN ILLEGAL ACT MAY STILL BE WITHIN THE SCOPE

4    OF EMPLOYMENT, SO AS TO IMPOSE LIABILITY ON THE CORPORATION.  A

5    DIFFERENT RULE APPLIES WITH REGARD TO PUNITIVE DAMAGES.  I WILL

6    INSTRUCT YOU ON THAT LATER IN THE INSTRUCTIONS.

7         DAMAGES, AN INTRODUCTION.

8         IT'S NOW MY DUTY TO INSTRUCT THE JURY ABOUT THE MEASURE OF

9    DAMAGES.  BY INSTRUCTING YOU ON DAMAGES, I DON'T MEAN TO

10   SUGGEST FOR WHICH PARTY YOUR VERDICT SHOULD BE RENDERED.  IF

11   YOU DECIDE THAT COMET HAS PROVED ONE OR MORE OF ITS TRADE

12   SECRET MISAPPROPRIATION CLAIMS AGAINST XP, THEN YOU ALSO MUST

13   DECIDE HOW MUCH MONEY WILL REASONABLY COMPENSATE COMET FOR THE

14   HARM.

15        IT IS FOR YOU TO DETERMINE WHAT DAMAGES, IF ANY, HAVE BEEN

16   PROVEN.  YOUR AWARD, IF ANY, MUST BE BASED UPON EVIDENCE AND

17   NOT UPON SPECULATION, GUESSWORK, OR CONJECTURE.

18        YOU CAN FIND THAT COMET SHOULD BE AWARDED DAMAGES ONLY IF

19   XP'S ACTIONS WERE A SUBSTANTIAL FACTOR IN BRINGING ABOUT THE

20   DAMAGES.  A SUBSTANTIAL FACTOR IN CAUSING HARM IS A FACTOR THAT

21   A REASONABLE PERSON WOULD CONSIDER TO HAVE CONTRIBUTED TO THE

22   HARM.  IT MUST BE MORE THAN A REMOTE OR TRIVIAL FACTOR.

23        UNJUST ENRICHMENT.

24        COMET IS SEEKING COMPENSATORY DAMAGES UNDER TWO

25   ALTERNATIVE THEORIES.  THE FIRST THEORY, COMET IS SEEKING

1    DAMAGES BASED ON UNJUST ENRICHMENT.  XP WAS UNJUSTLY ENRICHED

2    IF ITS MISAPPROPRIATION OF COMET'S TRADE SECRETS CAUSED XP TO

3    RECEIVE A BENEFIT THAT THEY OTHERWISE WOULD NOT HAVE ACHIEVED.

4    UNJUST ENRICHMENT DOES NOT OCCUR, HOWEVER, WHERE THE BENEFIT

5    WOULD HAVE BEEN REALIZED ANYWAY.

6         IF YOU FIND XP MISAPPROPRIATED AN ALLEGED TRADE SECRET AND

7    WAS THEREBY UNJUSTLY ENRICHED, THEN YOU MUST DECIDE WHETHER

8    COMET HAS PROVEN, BY A PREPONDERANCE OF THE EVIDENCE, A

9    CALCULABLE DOLLAR VALUE FOR THE UNJUST ENRICHMENT BY XP OF THAT

10   ALLEGED TRADE SECRET.  COMET MUST PROVE THE AMOUNT OF DAMAGES

11   WITH REASONABLE CERTAINTY, BUT NEED NOT PROVE THE AMOUNT OF

12   DAMAGES WITH MATHEMATICAL PRECISION.

13        TO DECIDE THE AMOUNT OF ANY UNJUST ENRICHMENT, FIRST

14   DETERMINE THE VALUE OF XP'S BENEFIT THAT WOULD NOT HAVE BEEN

15   ACHIEVED, EXCEPT FOR THEIR MISAPPROPRIATION.  THEN SUBTRACT

16   FROM THAT AMOUNT XP'S REASONABLE EXPENSES, INCLUDING THE VALUE

17   OF THE SPECIFIC CATEGORIES OF EXPENSES IN EVIDENCE, SUCH AS

18   LABOR, MATERIALS, RENTS, OR INTEREST ON INVESTED CAPITAL.

19        MOREOVER, COMET HAD A DUTY TO USE REASONABLE EFFORTS TO

20   MITIGATE DAMAGES.  TO MITIGATE MEANS TO AVOID OR REDUCE

21   DAMAGES.  XP HAS THE BURDEN OF PROVING BY A PREPONDERANCE OF

22   THE EVIDENCE, ONE, THAT COMET FAILED TO USE REASONABLE EFFORTS

23   TO MITIGATE DAMAGES; AND, TWO, THE AMOUNT BY WHICH DAMAGES

24   WOULD HAVE BEEN MITIGATED.

25        REASONABLE ROYALTY.

1           AS AN ALTERNATIVE TO UNJUST ENRICHMENT, YOU MAY AWARD

2      COMET COMPENSATORY DAMAGES FOR TRADE SECRET MISAPPROPRIATION IN

3      THE FORM OF A REASONABLE ROYALTY.  IF YOU FIND THAT A

4      REASONABLE ROYALTY SHOULD BE AWARDED TO COMET FOR TRADE SECRET

5      MISAPPROPRIATION BY XP, YOU MAY DETERMINE THE AMOUNT OF THAT

6      ROYALTY.

7           GENERALLY SPEAKING, A REASONABLE ROYALTY IS DEFINED AS THE

8      REASONABLE AMOUNT THAT SOMEONE WANTING TO USE A TRADE SECRET OR

9      OTHER PROTECTED INTELLECTUAL PROPERTY SHOULD EXPECT TO PAY THE

10     OWNER AND THE OWNER SHOULD EXPECT TO RECEIVE FOR ITS USE,

11     CALCULATED FROM THE TIME OF THE MISAPPROPRIATION TO THE DATE OF

12     YOUR VERDICT.

13          SAID ANOTHER WAY, A REASONABLE ROYALTY AIMS TO CALCULATE

14     WHAT THE PARTIES WOULD HAVE AGREED TO AS A FAIR LICENSING PRICE

15     AT A TIME JUST BEFORE THE ALLEGED MISAPPROPRIATION OCCURRED.

16          IN THIS CASE, THE REASONABLE ROYALTY IS THE PAYMENT THAT

17     WOULD HAVE RESULTED FROM A HYPOTHETICAL NEGOTIATION BETWEEN

18     COMET AND XP.  YOU SHOULD FOCUS ON WHAT THE EXPECTATIONS OF THE

19     PARTIES WOULD HAVE BEEN HAD THEY ENTERED INTO AN AGREEMENT AT

20     THAT TIME AND HAD THEY ACTED REASONABLY IN THEIR NEGOTIATIONS.

21          YOU MUST ALSO ASSUME THAT BOTH PARTIES BELIEVED THE

22     INFORMATION ALLEGEDLY MISAPPROPRIATED WAS LAWFULLY PROTECTED

23     AND THAT IT WAS IMPROPERLY ACQUIRED, USED, OR DISCLOSED BY XP.

24          IN ADDITION, YOU MUST ASSUME THAT THE PARTIES WERE WILLING

25     TO ENTER INTO AN AGREEMENT.

1        THE MEASURE OF DAMAGES IS A ROYALTY THAT WOULD HAVE

2   RESULTED FROM THIS HYPOTHETICAL NEGOTIATION AND NOT SIMPLY WHAT

3   ROYALTY EITHER PARTY WOULD HAVE PREFERRED.  YOU SHOULD ASSUME

4   THAT COMET AND XP KNEW AT THE TIME SUCH THINGS AS THE LEVEL OF

5   SALES AND PROFITS THAT XP WOULD MAKE USING THE INTELLECTUAL

6   PROPERTY, THE RESEARCH AND DEVELOPMENT COST SAVINGS XP WOULD

7   AVOID USING THE INTELLECTUAL PROPERTY, AND THE SALES AND

8   PROFITS THAT COMET WOULD LOSE AS A RESULT OF XP'S USE OF

9   COMET'S INTELLECTUAL PROPERTY.

10       YOU SHOULD ALSO ASSUME THAT COMET WAS WILLING TO GRANT XP

11  A LICENSE TO USE ITS PROTECTED INTELLECTUAL PROPERTY AND THAT

12  XP WAS WILLING TO PAY FOR THAT LICENSE.

13       IN DECIDING WHAT IS A REASONABLE ROYALTY, YOU MAY CONSIDER

14  THE FACTORS THAT COMET WOULD CONSIDER IN SETTING THE AMOUNT XP

15  WOULD PAY.

16       I WILL LIST FOR YOU A NUMBER OF FACTORS WHICH YOU MAY

17  CONSIDER.  THIS IS NOT INTENDED AS AN EXCLUSIVE LIST OF THE

18  FACTORS WHICH YOU MAY CONSIDER, ALTHOUGH IT WILL GIVE YOU AN

19  IDEA OF THE KINDS OF THINGS TO CONSIDER IN SETTING A REASONABLE

20  ROYALTY.

21       AMONG THE FACTORS WHICH YOU MAY FIND RELEVANT ARE ALL THE

22  FOLLOWING:

23       ONE, THE RESULTING AND FORESEEABLE CHANGE IN THE PARTY'S

24  COMPETITIVE POSTURE.

25       TWO, THE PRICES PAST PURCHASERS OR LICENSEES OF THE TRADE

1    SECRETS MAY HAVE PAID.

2         THIRD, THE TOTAL VALUE OF THE SECRET TO THE PLAINTIFF,

3    INCLUDING THE PLAINTIFF'S DEVELOPMENT COSTS AND THE IMPORTANCE

4    OF THE SECRET TO THE PLAINTIFF'S BUSINESS.

5         FOUR, THE NATURE AND EXTENT OF THE USE THE DEFENDANT

6    INTENDED FOR THE SECRET.

7         AND, FINALLY, WHATEVER OTHER UNIQUE FACTORS IN A

8    PARTICULAR CASE WHICH MIGHT HAVE AFFECTED THE PARTY'S AGREEMENT

9    SUCH AS THE AVAILABILITY OR ABSENCE OF ALTERNATIVE PROCESSES.

10        REASONABLE ROYALTY CALCULATION.

11        A REASONABLE ROYALTY CAN BE IN THE FORM OF EITHER A

12   PERCENTAGE OF A ROYALTY BASE SUCH AS, FOR EXAMPLE, SALES OR

13   PROFITS, OR, ALTERNATIVELY, BASED UPON A FIXED PRICE.

14        ANOTHER WAY TO CALCULATE A ROYALTY IS TO DETERMINE A

15   ONE-TIME LUMP-SUM PAYMENT THAT XP WOULD HAVE PAID AT THE TIME

16   OF THE HYPOTHETICAL NEGOTIATION FOR A LICENSE COVERING USE OF

17   THE TRADE SECRETS THROUGH THE DATE OF TRIAL.

18        YOU MAY DECIDE TO ADOPT EITHER OF THESE APPROACHES

19   PROVIDED THAT IT CORRESPONDS TO WHAT YOU BELIEVE WOULD HAVE

20   RESULTED FROM THE HYPOTHETICAL NEGOTIATION PREVIOUSLY

21   DESCRIBED.

22        YOU MAY CONSIDER OPINION TESTIMONY RECEIVED IN THE TRIAL

23   IN DETERMINING WHICH METHOD OF CALCULATING A ROYALTY IS MORE

24   APPROPRIATE.

25        PUNITIVE DAMAGES.

1      IF YOU FIND FOR COMET ON ONE OR MORE OF ITS TRADE SECRET

2  MISAPPROPRIATION CLAIMS, YOU MAY, BUT ARE NOT REQUIRED TO,

3  ACCESS THE ADDITIONAL PUNITIVE DAMAGES AGAINST XP.

4      THE PURPOSES OF PUNITIVE DAMAGES ARE TO PUNISH XP FOR ITS

5  CONDUCT AND TO DETER XP AND OTHERS FROM ENGAGING IN SIMILAR

6  CONDUCT IN THE FUTURE.

7      IN ORDER FOR COMET TO RECOVER PUNITIVE DAMAGES YOU MUST

8  FIND THAT COMET HAS PROVED, BY A PREPONDERANCE OF THE EVIDENCE,

9  THAT XP'S ACTS OF TRADE SECRET MISAPPROPRIATION WERE WILLFUL

10  AND MALICIOUS.

11      "WILLFUL" MEANS THAT XP ACTED WITH A PURPOSE OR

12  WILLINGNESS TO COMMIT THE ACT OR ENGAGE IN THE CONDUCT IN

13  QUESTION AND THE CONDUCT WAS NOT REASONABLE UNDER THE

14  CIRCUMSTANCES AT THE TIME AND WAS NOT UNDERTAKEN IN GOOD FAITH.

15      CONDUCT IS MALICIOUS IF IT IS ACCOMPANIED BY ILL WILL OR

16  SPITE OR IF IT IS DONE FOR THE PURPOSE OF INJURING COMET.

17      PUNITIVE DAMAGES MAY BE AWARDED AGAINST AN EMPLOYER

18  BECAUSE OF AN ACT OF AN EMPLOYEE BUT ONLY IF YOU FIND, ONE, THE

19  EMPLOYER AUTHORIZED THE DOING IN THE MANNER OF THE ACT.

20      TWO, THE EMPLOYEE WAS UNFIT AND THE EMPLOYER WAS RECKLESS

21  IN EMPLOYING HIM OR HER.

22      THIRD, THE EMPLOYEE WAS EMPLOYED IN A MANAGERIAL CAPACITY

23  AND WAS ACTING IN THE SCOPE OF HIS OR HER EMPLOYMENT.

24      OR, FOURTH, THAT THE EMPLOYER OR A MANAGER OF THE EMPLOYER

25  RATIFIED OR APPROVED OF THE ACT.

1          IN DETERMINING WHETHER AN EMPLOYEE IS ACTING IN A

2     MANAGERIAL CAPACITY YOU SHOULD CONSIDER THE EMPLOYEE'S

3     AUTHORITY AND DISCRETION TO MAKE DECISIONS AND NOT ONLY THE

4     EMPLOYEE'S TITLE.

5          IF THE JURY FINDS THAT PUNITIVE DAMAGES ARE APPROPRIATE,

6     THEN YOU MUST USE SOUND REASON IN SETTING THE AMOUNT OF THOSE

7     DAMAGES.

8          PUNITIVE DAMAGES, IF ANY, SHOULD BE IN AN AMOUNT

9     SUFFICIENT TO FULFILL THE PURPOSES I'VE DESCRIBED TO YOU, BUT

10    THEY SHOULD NOT REFLECT BIAS, PREJUDICE, OR SYMPATHY TOWARD

11    EITHER PARTY.

12         IN DETERMINING THE AMOUNT OF PUNITIVE DAMAGES, IF ANY, YOU

13    SHOULD CONSIDER THE FOLLOWING FACTORS:

14         FIRST, THE REPREHENSIBILITY OF THE CONDUCT.

15         SECOND, THE IMPACT OF THE CONDUCT ON COMET.

16         THIRD, THE RELATIONSHIP BETWEEN COMET AND XP.

17         FOURTH, XP'S FINANCIAL CONDITION.

18         FIFTH, THE LIKELIHOOD THAT SUCH CONDUCT WOULD BE REPEATED

19    BY XP OR OTHERS IF AN AWARD OF PUNITIVE DAMAGES IS NOT MADE.

20         AND, SIX, THE RELATIONSHIP OF ANY AWARD OF PUNITIVE

21    DAMAGES TO THE AMOUNT OF ACTUAL HARM COMET SUFFERED.

22         IF YOU FIND THAT XP ACTED WILLFULLY AND MALICIOUSLY, YOU

23    MAY AWARD COMET AN AMOUNT OF EXEMPLARY -- AND I'M STRIKING THAT

24    WORD "EXEMPLARY."  IT SHOULD BE "PUNITIVE DAMAGE" IN PLACE OF

25    "EXEMPLARY" -- PUNITIVE DAMAGE UP TO TWO TIMES THE TOTAL AMOUNT

1    OF COMPENSATORY DAMAGES YOU AWARD COMET FOR TRADE SECRET

2    MISAPPROPRIATION.

3         ARGUMENTS OF COUNSEL ARE NOT EVIDENCE OF DAMAGES.  THE

4    ARGUMENTS OF THE ATTORNEYS ARE NOT EVIDENCE OF DAMAGES.  YOUR

5    AWARD MUST BE BASED ON YOUR REASONED JUDGMENT APPLIED TO THE

6    TESTIMONY OF THE WITNESSES AND THE OTHER EVIDENCE ADMITTED

7    DURING THE TRIAL.

8         DO NOT CONSIDER ATTORNEYS' FEES AND COURT COSTS.  YOU MUST

9    NOT CONSIDER OR INCLUDE, AS PART OF ANY AWARD, ATTORNEYS' FEES

10   OR EXPENSES THE PARTIES INCURRED BRINGING OR DEFENDING THIS AND

11   A PRIOR LAWSUIT BETWEEN THE PARTIES.

12        EVIDENCE IN ELECTRONIC FORMAT.

13        THOSE EXHIBITS RECEIVED IN EVIDENCE THAT ARE CAPABLE OF

14   BEING DISPLAYED ELECTRONICALLY WILL BE PROVIDED TO YOU IN THAT

15   FORM, AND YOU WILL BE ABLE TO VIEW THEM IN THE JURY ROOM.  A

16   COMPUTER WILL BE AVAILABLE TO YOU IN THE JURY ROOM.

17        A COURT TECHNICIAN WILL BE AVAILABLE TO SHOW YOU HOW TO

18   OPERATE THE COMPUTER AND OTHER EQUIPMENT AND HOW TO LOCATE AND

19   VIEW EXHIBITS ON THE COMPUTER.  YOU WILL ALSO BE PROVIDED WITH

20   A PAPER LIST OF ALL EXHIBITS AND THE FACT STIPULATIONS RECEIVED

21   IN EVIDENCE.

22        IF YOU NEED ADDITIONAL SUPPLIES OR EQUIPMENT OR IF YOU

23   HAVE A QUESTION ABOUT HOW TO OPERATE THE COMPUTER AND

24   EQUIPMENT, YOU MAY SEND A NOTE TO MY DEPUTY, SIGNED BY YOUR

25   FOREPERSON, WHO IS YOUR PRESIDING JUROR, OR BY ONE OR MORE

1    MEMBERS OF THE JURY.

2         DO NOT REFER TO OR DISCUSS THE PARTICULAR EXHIBIT YOU ARE

3    ATTEMPTING TO VIEW IN YOUR NOTE TO MY DEPUTY.

4         IF A TECHNICAL PROBLEM OR QUESTION REQUIRES HANDS-ON

5    MAINTENANCE OR INSTRUCTION, THEN A COURT TECHNICIAN MAY ENTER

6    THE JURY ROOM WITH THE DEPUTY PRESENT FOR THE PURPOSE OF

7    ASSURING THAT THE ONLY MATTER DISCUSSED IS THE TECHNICAL

8    PROBLEM.

9         WHEN THE COURT TECHNICIAN OR ANY NON-JUROR IS IN THE JURY

10   DELIBERATION ROOM, THEN THE JURY SHALL NOT DELIBERATE.  NO

11   JUROR MAY SEND ANYTHING TO THE COURT TECHNICIAN OR ANY

12   NON-JUROR OTHER THAN TO DESCRIBE THE TECHNICAL PROBLEM OR TO

13   SEEK INFORMATION ABOUT THE OPERATION OF THE EQUIPMENT.  DO NOT

14   DISCUSS ANY EXHIBIT OR ANY ASPECT OF THE CASE.

15        THE SOLE PURPOSE OF PROVIDING THE COMPUTER IN THE JURY

16   ROOM IS TO ENABLE JURORS TO VIEW THE EXHIBITS RECEIVED IN

17   EVIDENCE IN THE CASE.  YOU MAY NOT USE THE COMPUTER FOR ANY

18   OTHER PURPOSE.

19        AT MY DIRECTION AND WITH THE AGREEMENT OF THE PARTIES, THE

20   TECHNICIANS HAVE TAKEN STEPS TO ENSURE THAT COMPUTER DOES NOT

21   PERMIT ACCESS TO THE INTERNET OR TO ANY OUTSIDE WEBSITE,

22   DATABASE, DIRECTORY, GAME, OR OTHER MATERIAL.  PLEASE DO NOT

23   ATTEMPT TO ALTER THE COMPUTER TO OBTAIN ACCESS TO SUCH

24   MATERIALS.

25        IF YOU DISCOVER THAT THE COMPUTER PROVIDES OR ALLOWS

1    ACCESS TO MATERIALS THAT ARE NOT IN EVIDENCE, YOU MUST INFORM

2    THE COURT IMMEDIATELY AND ALSO REFRAIN FROM VIEWING THOSE

3    MATERIALS.

4         ALSO, DON'T REMOVE THE COMPUTER OR ANY ELECTRONIC DATA

5    FROM THE JURY ROOM.  AND DO NOT COPY ON ANY DATA.

6         THE PHYSICAL DEVICES YOU RECEIVED ARE EVIDENCE IN THIS

7    TRIAL.  YOU MAY INSPECT THEM IN YOUR DELIBERATIONS AS THEY WERE

8    PRESENTED IN TRIAL, BUT YOU MUST NOT ALTER OR MODIFY THE

9    DEVICES IN ANY WAY, INCLUDING BY OPENING THE DEVICES OR BY

10   REMOVING DEVICE COMPONENTS.

11        FINALLY, YOU MUST NOT PLUG THE DEVICES INTO AN ELECTRICAL

12   OUTLET.

13        DUTY TO DELIBERATE.

14        BEFORE YOU BEGIN YOUR DELIBERATIONS, ELECT ONE MEMBER OF

15   THE JURY AS YOUR PRESIDING JUROR.  THE PRESIDING JUROR WILL

16   PRESIDE OVER THE DELIBERATIONS AND SERVE AS A SPOKESPERSON FOR

17   THE JURY IN COURT.

18        YOU SHALL DILIGENTLY STRIVE TO REACH AGREEMENT WITH ALL

19   THE OTHER JURORS IF YOU CAN DO SO.  YOUR VERDICT MUST BE

20   UNANIMOUS, MEANING YOU MUST ALL AGREE.

21        EACH OF YOU MUST DECIDE THE CASE FOR YOURSELF, BUT YOU

22   SHOULD DO SO ONLY AFTER YOU'VE CONSIDERED ALL THE EVIDENCE,

23   DISCUSSED IT FULLY WITH THE OTHER JURORS, AND LISTENED TO THEIR

24   VIEWS.  IT IS IMPORTANT THAT YOU ATTEMPT TO REACH A UNANIMOUS

25   VERDICT, BUT, OF COURSE, ONLY IF EACH OF YOU CAN DO SO AFTER

1    HAVING MADE YOUR OWN CONSCIENTIOUS DECISION.

2         DO NOT BE UNWILLING TO CHANGE YOUR OPINION IF THE

3    DISCUSSION PERSUADES YOU THAT YOU SHOULD.  BUT DO NOT COME TO A

4    DECISION SIMPLY BECAUSE OTHER JURORS THINK IT IS RIGHT OR

5    CHANGE AN HONEST BELIEF ABOUT THE WEIGHT AND THE EFFECT OF THE

6    EVIDENCE SIMPLY TO REACH A VERDICT.

7         COMMUNICATION WITH THE COURT.

8         IF IT BECOMES NECESSARY DURING YOUR DELIBERATIONS TO

9    COMMUNICATE WITH ME, YOU MAY SEND A NOTE THROUGH MY COURTROOM

10   DEPUTY SIGNED BY ANY ONE OR MORE OF YOU.  NO MEMBER OF THE JURY

11   SHOULD EVER ATTEMPT TO COMMUNICATE WITH ME EXCEPT BY A SIGNED

12   WRITING.  I WILL NOT COMMUNICATE WITH ANY MEMBER OF THE JURY ON

13   ANYTHING CONCERNING THE CASE EXCEPT IN WRITING OR HERE IN OPEN

14   COURT.

15        IF YOU SEND OUT A QUESTION, I WILL CONSULT WITH THE

16   LAWYERS BEFORE ANSWERING IT, WHICH MAY TAKE SOME TIME.  YOU MAY

17   CONTINUE YOUR DELIBERATIONS WHILE WAITING FOR AN ANSWER TO A

18   QUESTION.

19        REMEMBER THAT YOU ARE NOT TO TELL ANYONE, INCLUDING ME,

20   HOW THE JURY STANDS, WHETHER IN TERMS OF VOTE COUNT OR

21   OTHERWISE, UNTIL AFTER YOU HAVE REACHED A UNANIMOUS VERDICT OR

22   HAVE BEEN DISCHARGED BY ME.

23        VERDICT FORM.

24        A VERDICT FORM HAS BEEN PREPARED FOR YOU.  MY COURTROOM

25   DEPUTY WILL PROVIDE IT TO YOU.

1        AFTER YOU HAVE REACHED A UNANIMOUS AGREEMENT ON A VERDICT,

2   YOUR PRESIDING JUROR SHOULD COMPLETE THE VERDICT FORM ACCORDING

3   TO YOUR DELIBERATIONS, SIGN AND DATE IT, AND ADVISE MY DEPUTY

4   THAT YOU ARE READY TO RETURN TO THE COURTROOM.

5        THAT CONCLUDES THE CLOSING JURY INSTRUCTIONS.  THANK YOU

6   FOR LISTENING AND FOR YOUR PATIENCE.

7        LET'S TAKE A STRETCH BREAK NOW.

8        DOES ANY JUROR NEED TO USE THE RESTROOM BEFORE WE HAVE THE

9   CLOSING ARGUMENTS?

10        ALL RIGHT.  EVERYBODY CAN TAKE A STAND-UP STRETCH BREAK,

11   AND THEN IT WILL BE -- COMET WILL GO FIRST FOLLOWED BY XP AND

12   THEN COMET WILL GET THE FINAL REBUTTAL WORD BEFORE THE

13   DELIBERATIONS.

14        (PAUSE IN PROCEEDINGS.)

15        THE COURT:  ALL RIGHT.  MR. ALPER, YOU MAY PROCEED.

16   THANK YOU EVERYONE FOR YOUR ATTENTION.

17            **CLOSING ARGUMENTS BY MR. ALPER**

18   THANK YOU, YOUR HONOR.

19        GOOD AFTERNOON, EVERYONE.  I WANT TO START WHERE I STARTED

20   TWO WEEKS AGO, AND THAT IS TO THANK YOU, REALLY THANK YOU FOR

21   YOUR TIME AND ATTENTION OVER THIS LAST WEEK.  WE KNOW THAT YOU

22   HAVE IMPORTANT THINGS IN YOUR LIVES, AND YOUR ATTENTION TO OUR

23   MATTER HAS BEEN UNPRECEDENTED AND WE ARE GRATEFUL FOR IT.

24        LET ME GIVE YOU A LITTLE BIT OF A ROAD MAP OF WHAT I'M

25   GOING TO DO OVER THE COURSE OF MY CLOSING PRESENTATION.  I'M

1    GOING TO GET BACK INTO THE STORY OF WHAT HAPPENED.  I'M GOING

2    TO FOLD IN THE EVIDENCE THAT WE'VE SEEN OVER THE COURSE OF THE

3    TRIAL, INCLUDING TESTIMONY THAT WAS PROVIDED ON THE STAND, AND

4    SOME OF THE EXHIBITS, AND THEN I'LL GET INTO THOSE BEDROCK

5    FACTS THAT I TOLD YOU ABOUT AND I'LL SHOW YOU HOW WE PROVE

6    THEM.  AND THEN I WILL WRAP THINGS UP AND THEN XP WILL HAVE AN

7    OPPORTUNITY.

8         BUT BEFORE I BEGIN THAT, I WANT TO START WITH ONE VERY KEY

9    POINT.  I RAISED IT AS THE FIRST KEY POINT THAT I TOLD YOU

10   ABOUT A WEEK AGO, AND THAT IS, THERE IS NO QUESTION THAT A

11   THEFT OCCURRED HERE AND XP IS LIABLE.  AND I JUST WANT TO START

12   BY SHOWING YOU JUST A LITTLE BIT OF THE EVIDENCE BEFORE I GET

13   BACK INTO THE BROADER STORY OF WHAT HAPPENED.

14        YOU HEARD IT FROM THEIR WITNESSES WHO ADMITTED IT.

15   THERE'S MR. MASON, WE ASKED HIM, "YOU WERE ACCESSING COMET

16   CONFIDENTIAL DOCUMENTS WHILE AT XP, EVEN AFTER COMET HAD SUED

17   YOU AND XP FOR MISUSING ITS CONFIDENTIAL INFORMATION?"

18        HE ANSWERED, FLAT "YES."

19        WHAT ABOUT MR. BEUERMAN?  THE EXECUTIVES AT XP REPEATEDLY

20   ADMITTED THAT THEY KNEW THAT MR. BEUERMAN HAD BROUGHT COMET

21   DATA INTO XP POWER.  YOU HEARD IT FROM THEIR CEO, MR. PENNY, HE

22   ADMITTED IT STRAIGHT UP.  WE ASKED HIM, "YOUR EMPLOYEES DID

23   TAKE THE CONFIDENTIAL INFORMATION AND HAD IT ON THEIR XP

24   LAPTOPS?"

25        AND HE SAID, "YES."

1        AND WAS THAT WRONG?  WAS THAT WILLFUL?

2        LOOK AT THE NEXT QUESTION AND ANSWER FROM THE CEO OF A

3   BILLION DOLLAR COMPANY.  HE SAYS, WE ASKED HIM, THE -- OF THE

4   FOUR ENGINEERS INDICATED AS WORKING ON XP'S RF MATCH TECHNOLOGY

5   HERE, THAT WAS IN REFERENCE TO THAT ORGANIZATIONAL CHART WHERE

6   THE XP -- THE COMET FOLKS WHO HAD COME OVER FROM COMET WERE THE

7   LEADERS OF THE RF MATCH GROUP AT XP, WE ASKED HIM, "THE COMPANY

8   HAS CONCLUDED THAT THREE OF THE FOUR HAVE ENGAGED IN WRONGFUL

9   CONDUCT WITH RESPECT TO MY CLIENT'S INFORMATION?"

10       HIS ANSWER WAS, "WILLFUL CONDUCT, YES."

11       AND IT WASN'T JUST THEIR WITNESSES WHO ADMITTED IT, THEIR

12  EXPERT ADMITTED IT.  THEIR LIABILITY EXPERT ADMITTED TO IT.  WE

13  ASKED HIM, "MR. BEUERMAN AND MR. MASON TOOK COMET TRADE SECRET

14  MATERIALS FROM COMET WHEN THEY LEFT, AND IN THAT REGARD THEY

15  STOLE COMET'S TRADE SECRETS?"

16       HE SAID, "I THINK THAT'S RIGHT."

17       "AND WERE THEY ACCESSING COMET CONFIDENTIAL INFORMATION

18  WHILE THEY WERE WORKING AT XP?"

19       HE SAYS, "I DON'T THINK THERE'S A DISPUTE ABOUT IT."

20       AND IS XP LIABLE FOR THE ACTS OF ITS OWN SENIOR EMPLOYEES?

21  OF COURSE IT IS.  AND DR. PHINNEY, HE ADMITTED IT STRAIGHT UP

22  ON THE STAND ON CROSS-EXAMINATION WHEN I ASKED HIM, "XP IS

23  LIABLE, CORRECT?"

24       HE SAID, "I IMAGINE SO."

25       AND WHY IS THAT?  YOU HEARD MR. PENNY SAY IT, HE SAID,

1    "THE WAY THAT XP ACTS IS THROUGH ITS EMPLOYEES."

2         OF COURSE XP IS LIABLE FOR THE CONDUCT OF ITS EMPLOYEES

3    HERE.

4         SO WHAT DID XP HAVE TO SAY ABOUT THAT AT TRIAL?  WELL, WE

5    HEARD THEM IN THEIR OPENING STATEMENT, THEY SAID, "THIS CASE

6    ISN'T ABOUT THE THEFT OF COMET'S DOCUMENTS, WHAT IT'S REALLY

7    ABOUT IS THE ABILITY OF EMPLOYEES TO MOVE FROM COMPANY TO

8    COMPANY."

9         THAT'S FROM THEIR OPENING STATEMENT, THAT'S WHAT THEY TOLD

10   YOU THIS CASE WAS ABOUT.  AND THEY SAID THERE'S NOTHING WRONG

11   WITH THAT, AND THAT'S NORMAL.

12        BUT WE ALL KNOW WHAT THIS CASE IS ABOUT.  WE ALL KNOW

13   THERE WAS A MASSIVE THEFT.  AND THERE IS SOMETHING WRONG WITH

14   THAT.  AND THAT IS NOT NORMAL.  AND THEY MADE COMET LITIGATE

15   THIS CASE FOR FOUR YEARS, THEY MADE US ALL SIT IN THIS TRIAL

16   FOR A FULL WEEK, WHEN THEY HEARD IT, WHEN COMET HAD TOLD THEM

17   WHAT THEY HAD DONE WRONG, THEIR ENGINEERS TOLD THEM WHAT THEY

18   HAD DONE WRONG, THEIR EXECUTIVES ACKNOWLEDGED WHAT THEY HAD

19   DONE WRONG.  THEIR EXPERT, THEIR LIABILITY, BOTH -- DR. SPENCER

20   DID IT TOO, THEY ADMITTED WHAT THEY HAD DONE WAS WRONG, BUT

21   THEY JUST WON'T LISTEN.

22        BUT HERE'S THE THING, THEY HAVE TO LISTEN TO YOU.  AND FOR

23   THAT REASON, WE ARE ASKING YOU TO RENDER A VERDICT THAT XP

24   COMMITTED WILLFUL AND MALICIOUS TRADE SECRET MISAPPROPRIATION.

25        OKAY.  LET ME GET BACK INTO THE STORY, AS I SAID I WOULD.

1    ALL RIGHT.  THE STORY, AS I STARTED OFF, STARTS WITH COMET.

2         DID COMET INVEST IN THIS MATERIAL?  OF COURSE THEY DID.

3    OVER $100 MILLION OF RESEARCH AND DEVELOPMENT INVESTMENT IN THE

4    TRADE SECRETS.  OVER 100 ENGINEERS WORKED ON IT.  DID THEY CARE

5    ABOUT THIS?  YOU HEARD FROM MR. CROFTON, YOU HEARD FROM

6    MR. GREDE, YOU HEARD FROM MR. RUSSELL; THIS IS SOMETHING THEY

7    PUT THEIR BLOOD, SWEAT, AND TEARS INTO WITH THEIR ENGINEERS AND

8    THEY CARED GREATLY ABOUT IT.

9         IS IT IMPORTANT?  OF COURSE IT IS.

10        IS IT UNIQUE?  IT IS, AND YOU'LL SEE THAT IN XP'S OWN

11   DOCUMENTS.

12        WHAT HAPPENED WITH XP?  XP WANTED IN ON THE MARKET,

13   BECAUSE AS WE HAVE SHOWN FROM THE EVIDENCE, IT'S VERY

14   LUCRATIVE.

15        XP THEN -- YOU HEARD THIS PART OF THE STORY, SO I'M GOING

16   TO GO SOMEWHAT QUICKLY THROUGH IT -- XP PURCHASED COMDEL, THERE

17   IS NO DENYING IT.  COMDEL DID NOT WORK OUT THE WAY THAT THEY

18   HAD HOPED.  THE PRODUCT WAS OUTDATED.  THEY NEEDED A NEW

19   PRODUCT.  AND WHY WAS THAT?  MR. PENNY ADMITTED IT ON THE

20   STAND.  WE ASKED HIM, "WHAT WAS COMDEL'S APPROACH TO R&D?"

21        HE SAID, "THEY WEREN'T FOCUSED ON R&D."

22        AS I SAID IN MY OPENING, THAT WAS THE BIG DIFFERENCE.

23   COMET INVESTED IN R&D; COMDEL DID NOT.

24        AND SO WHAT HAPPENED NEXT?  XP, THEY STILL WANTED TO GET

25   INTO THE MARKET, SO THEY WENT OUT AND THEY TOOK THE COMET

1    ENGINEERS AND WITH THEM BROUGHT OVER ALL OF THOSE CONFIDENTIAL

2    MATERIALS.  AND IT STARTED WITH MR. WARNER, WHO REACHED OUT TO

3    MR. MASON.

4        AND I WANT TO NOTE SOMETHING HERE BECAUSE YOU HADN'T HEARD

5    THIS WHEN I RAISED THIS IN THE OPENING, YOU HADN'T HEARD THE

6    CONVERSATION YET.  BUT YOU GOT TO HEAR A PIECE OF IT HERE AT

7    THE TRIAL.  AND DID YOU HEAR MR. WARNER SOMBERLY TELL

8    MR. MASON, "HEY, WHATEVER YOU DO, WE GOT TO PLAY THIS

9    ABOVEBOARD AND YOU CANNOT BRING OVER COMET TRADE SECRET

10   INFORMATION TO US."

11       IT WAS THE OPPOSITE.  THEY WERE LAUGHING IT UP.  AS

12   MR. MASON SAID, "IF YOU WANT A TURNKEY MATCH DESIGN, WE'VE GOT

13   A CREW THAT'LL DO IT."

14       AND WHAT DID MR. WARNER SAY THAT MEANT?  TURNKEY MEANS

15   IT'S FULLY READY TO GO, THERE'S NOTHING ELSE THAT NEEDS TO

16   CHANGE; AND THAT'S BECAUSE THE COMET DESIGN WAS FULLY DEVELOPED

17   AT THE TIME.

18       THE CONVERSATION WENT ON, YOU HEARD IT, MR. WARNER, HE

19   DIDN'T SAY, "NO, DON'T DO IT."  HE CALLED IT AMAZING, HE

20   THOUGHT THIS PLAN WAS AMAZING.

21       SO WHAT HAPPENED NEXT?  YOU'VE SEEN THIS EXHIBIT A FEW

22   TIMES OVER THE COURSE OF THIS TRIAL.  MR. WARNER FORWARDS THAT

23   AUDIO FILE TO THE CEO, MR. PENNY, AND ALSO THE DIRECTOR OF

24   PRODUCT DEVELOPMENT, NOT SOMEONE IN HR TO FILL OUT FORMS OR

25   ANYTHING LIKE THAT, THE DIRECTOR OF PRODUCT DEVELOPMENT AT XP.

```
 1    HE SAYS, "PLEASE KEEP THIS STRICTLY CONFIDENTIAL, YOU WILL SEE
 2    WHY."
 3            WAS THAT A RED FLAG?  OF COURSE IT WAS A RED FLAG TO THEM.
 4    OF COURSE IT WAS A RED FLAG.
 5            NOW, MR. PENNY -- I'M SHOWING SOME SIDE-BY-SIDE TESTIMONY
 6    HERE ON THIS NEXT SLIDE.  ON THE STAND, MR. PENNY SAID, WHEN HE
 7    WAS ASKED, "EVEN KNOWING WHAT YOU KNOW NOW, THERE ARE NO RED
 8    FLAGS?"
 9            HE SAID, "THAT'S CORRECT."
10            BUT AT HIS DEPOSITION WHEN WE ASKED HIM, "SHOULDN'T THAT
11    HAVE BEEN A RED FLAG TO YOU?"
12            HE SAID, "YEAH, MAYBE IT SHOULD HAVE."
13            THERE ARE TWO IMPORTANT TAKEAWAYS HERE THAT ARE GOING TO
14    BE THEMATIC THROUGH THIS CASE.  ONE IS, OF COURSE THERE ARE RED
15    FLAGS HERE.  OF COURSE THERE ARE RED FLAGS HERE.
16            NUMBER TWO, THEY ARE CHANGING THEIR TESTIMONY ON THE STAND
17    BECAUSE THEY WILL SAY ANYTHING TO GET AWAY WITH IT.  AND THE
18    JUDGE HAS INSTRUCTED YOU, YOU'RE ALLOWED TO TAKE THAT INTO
19    CONSIDERATION.
20            WHAT HAPPENS NEXT?  MR. BEUERMAN AND MR. MASON, THEY GIVE
21    THEIR NOTICES, THEY WRITE TO MR. WARNER A FEW WEEKS LATER AND
22    THEY SAY, "PEOPLE ARE ASKING QUESTIONS."  AND THAT GETS
23    FORWARDED TO THE EXECUTIVES AT XP.  AND WHAT DID THE EXECUTIVES
24    AT XP DO?  WHAT DO THEY SAY?  WELL, THEY SAY A COUPLE OF
25    THINGS.  THEY DEFINITELY DON'T PLAY THIS ABOVEBOARD, OKAY, THIS
```

1    IS A PUBLICLY TRADED BILLION DOLLAR COMPANY.  THIS IS THE CHIEF

2    EXECUTIVE OFFICER OF A PUBLICLY TRADED BILLION DOLLAR COMPANY,

3    THAT WE ARE ALL SUPPOSED TO BE ABLE TO TRUST WILL DO THE RIGHT

4    THING.

5         WHAT DOES THE CEO SAY?  HE SAYS, "YOU KNOW WHAT?  I THINK

6    OUR" -- INSTEAD OF ABSOLUTELY, MAKE SURE THAT THEY DON'T BRING

7    OVER COMET CONFIDENTIAL INFORMATION, HE SAYS, "YOU KNOW WHAT?

8    I THINK OUR CURRENT BOILERPLATE EMPLOYEE AGREEMENT COVERS US,

9    AND I DON'T SEE A NEED FOR THEM TO DO ANYTHING EXTRA TO ENSURE

10   THAT THEY WON'T BRING ANY COMET IP INTO XP POWER."

11        THAT'S NOT TRYING TO PREVENT THEM FROM BRINGING COMET DATA

12   INTO XP.  THAT'S THEM CREATING PLAUSIBLE DENIABILITY SO THAT IF

13   THEY EVER SHOW UP IN FRONT OF A JURY, THEY HAVE SOMETHING TO

14   POINT TO, AND THAT IS EXACTLY WHAT THEY DID HERE DURING THIS

15   TRIAL, OVER AND OVER AND OVER AGAIN, WAS POINT TO THE EMPLOYEE

16   AGREEMENTS.

17        AND WHEN IT CAME TO TELLING BEUERMAN AND MASON WHAT TO SAY

18   TO COMET, LOOK AT WHAT THE CEO SAID REGARDING TELLING COMET

19   WHERE THEY ARE GOING, "THEY DON'T NEED TO OFFER THIS UP

20   UNPROMPTED."  MR. PENNY ON THE STAND SAID THAT WAS HIS WAY OF

21   SAYING THEY SHOULD TELL COMET THAT THEY'RE GOING TO XP.  THAT'S

22   WHAT HE SAID AFTER HE WAS SUED, AT THE TRIAL, BUT YOU GOT TO GO

23   BACK TO THE DOCUMENTS BEFORE THEY WERE SUED AND LOOK AT WHAT

24   THEY SAID BACK THEN, BECAUSE THAT IS NOT AT ALL WHAT HE SAID.

25        OKAY.  DID MR. MASON AND MR. BEUERMAN FOLLOW THOSE

1    DIRECTIONS?  OF COURSE THEY DID.  YOU SAW THE EVIDENCE FROM THE

2    XP -- I MEAN THE COMET EXIT INTERVIEW DOCUMENTS.  THEY DIDN'T

3    TELL COMET WHERE THEY WERE GOING.

4         THEN WHAT HAPPENS?  NOW, THIS IS TWO DAYS BEFORE -- WE SAW

5    THIS DURING THE TRIAL.  THIS IS TWO DAYS BEFORE MR. BEUERMAN

6    AND MR. MASON JOIN XP, MR. BEUERMAN WRITES TO MR. WARNER, AND

7    HE SAYS -- HE'S ALREADY LEFT COMET, AND HE SAYS, "SOMEONE FROM

8    A LAW FIRM IN PALO ALTO LOOKED AT MY LINKEDIN PROFILE TODAY,

9    HYMN, WONDER WHY THAT I COULD BE," WINKY FACE.

10        YOU GOT TO ASK YOURSELF, WHO, IN JOINING A NEW COMPANY,

11   TWO DAYS BEFORE THEY JOIN, SAYS, "THERE ARE LAWYERS TRACKING

12   ME, I WONDER WHO THAT COULD BE," WINKY FACE.  AND WHERE IS THE

13   RESPONSE TO THIS?  WHERE IS ANYONE AT XP TURNING AROUND AND

14   SAYING, "THAT IS HIGHLY IMPROPER, WE NEED TO TAKE THIS

15   SERIOUSLY AND DO SOMETHING ABOUT IT"?  WHERE'S EVEN AN INTERNAL

16   DISCUSSION ABOUT MR. BEUERMAN SAYING LAWYERS ARE LOOKING AT

17   HIM, WINKY FACE?  THIS IS A HUGE RED FLAG, IF NOT MORE THAN

18   THAT.

19        OKAY.  SO THEY COME OVER.  THE TESTIMONY WAS THEY BROUGHT

20   OVER 10,000 CONFIDENTIAL DOCUMENTS AND FILES.  HOW DID THEY DO

21   IT?  WELL, MR. BEUERMAN, YOU HEARD EXTENSIVE EVIDENCE, HE HAD

22   OVER 14, AT LEAST 14 EXTERNAL DEVICES, HE WAS PLUGGING THEM

23   INTO COMET COMPUTERS, HE WAS THEN BRINGING THEM OVER, PLUGGING

24   THEM INTO PERSONAL COMPUTERS AND THEN ULTIMATELY TRANSFERRING

25   THAT INFORMATION TO XP LAPTOPS.

1          MR. MASON, HE TOOK A DIFFERENT APPROACH, HE JUST COPIED

2     HIS ENTIRE COMET LAPTOP, PUT IT ON A COUPLE OF HARD DRIVES, AND

3     WE HEARD THE EVIDENCE OF THAT.

4          NOW, WHAT DID XP SAY ABOUT THE ACQUISITION AND USE OF THE

5     COMET MATERIALS?  WELL, DURING JURY SELECTION YOU HEARD IT,

6     THEY SAID XP IS NOT RELYING ON ANY INFORMATION FROM COMET.  BUT

7     THE EVIDENCE SHOWED ABSOLUTELY OTHERWISE.  AND LET ME SHOW YOU

8     SOME OF THAT HERE.  I WON'T BE ABLE TO SHOW YOU ALL OF IT IN

9     THE TIME THAT I HAVE, BUT I WOULD LIKE TO SHOW YOU SOME OF IT.

10          SO HERE'S -- I'M GOING TO SHOW YOU THE TECHNICAL EVIDENCE,

11     BUT LET'S JUST START WITH THIS.  THIS IS MARCH 19, 2019, A YEAR

12     AFTER COMET ORIGINALLY SUED, AND MR. MASON IS WRITING TO

13     MR. BEUERMAN, AND HE SAYS, "WHAT ARE WE GOING TO DO WHEN THE

14     EXPERT WITNESS LOOKS AT WHAT WE ARE DOING AND WE ARE USING WHAT

15     COMET IS USING?"

16          THIS IS IN THE THICK OF IT, THIS IS A YEAR LATER.

17     DR. PHINNEY TRIED TO ADDRESS THIS, HE SAID, "OH, WHAT THEY WERE

18     TALKING ABOUT WAS STUFF THAT EVERYONE IS USING."  BUT HERE'S

19     WHERE YOU GOT TO COMPARE WHAT THEY ARE SAYING AT TRIAL TO WHAT

20     THEY SAID BACK WHEN THE ACTUAL FACTS WERE HAPPENING.  THEY

21     DON'T SAY WE ARE USING WHAT EVERYONE IS USING, THEY SAY WE ARE

22     USING WHAT COMET IS USING.  AND THE EXPERT WILL SOMEDAY CATCH

23     US.

24          MR. MASON, YOU SAW IT -- I'M NOT GOING TO BELABOR THIS --

25     IN 2018, RIGHT WHEN HE JOINED, HE STARTS ACCESSING HIS PORTABLE

1    DRIVE, BRINGING THOSE FILES OVER AND MODIFYING THEM, CREATING

2    THEM OVER ON HIS XP LAPTOP.  HE DOES IT AGAIN IN 2020.  HE

3    TAKES THE COMET SENSOR FILE.

4         BY THE WAY, THIS IS THE NEXT GENERATION MATCH TRADE

5    SECRET.  THIS RELATES TO TRADE SECRET E.

6         HE TAKES THE COMET MATCH SENSOR FILE, AND HE BRINGS IT

7    OVER TO HIS XP LAPTOP.  THE ONLY THING HE DOES, HE TAKES THE

8    WORD "COMET" OFF.  WHEN WE LOOK AT THE ACTUAL DOCUMENTS, THE

9    COMET VERSION VERSUS THE XP, THEY ARE IDENTICAL.

10        WERE THEY USED THROUGHOUT THE YEARS?  OF COURSE THEY WERE.

11   YOU GO LOOK AT THE NEMO SPECIFICATION THAT MR. RUMMEL SAID, HE

12   SAID THEY STARTED FROM A CLEAN SHEET OF PAPER.  JUST LOOK AT

13   THIS, WHEN YOU CONSIDER THAT TESTIMONY.  THAT'S NOT A CLEAN

14   SHEET OF PAPER, THAT CAME FROM COMET.

15        AND MR. RUMMEL, HE SAID IT RIGHT HOW IT HAPPENED, WHERE HE

16   GOT IT FROM, HE GOT IT FROM MR. MASON, MR. MASON SENT HIM THAT.

17   AND HE MODIFIED A FEW BLOCKS, AND THEN USED IT FOR NEMO.  IS

18   THE FACT THAT HE MODIFIED A FEW THINGS MEANINGFUL?  DR. PHINNEY

19   ADMITTED IT, IT IS NOT.  USING A TRADE SECRET DOES NOT REQUIRE

20   MAKING AN EXACT COPY OF IT.  HE ADMITTED YES.

21        WHY IS THAT?  BECAUSE OTHERWISE YOU COULD JUST MAKE A FEW

22   TWEAKS AND GET AWAY SCOT-FREE.  AND THEY CANNOT GET AWAY

23   SCOT-FREE HERE.

24        IT GOES ON FROM THERE, XP SAYS OR TRIED TO SAY TODAY THAT

25   IT WAS LIMITED TO A LIMITED TIME FRAME, BUT WHAT THEY DIDN'T

1    TELL YOU WHEN THEIR EXPERT WAS ON THE STAND TODAY WAS MR. MASON

2    KEPT DOING IT OVER AND OVER.  HERE'S SEPTEMBER 2020, AND HE'S

3    STILL GOING TO THOSE DESIGN FILES, AND THEN RIGHT THERE IN THAT

4    SAME HOUR HE'S CREATING NEMO SENSOR DESIGN FILE, AFTER DESIGN

5    FILE, AFTER DESIGN FILE, WHILE REVIEWING THE COMET CONFIDENTIAL

6    TRADE SECRET INFORMATION.

7         AND IT'S NOT JUST THIS DIAGRAM, XP SAYS, "OH, IT'S JUST A

8    DIAGRAM, NO BIG DEAL."  FIRST OF ALL, IF IT'S JUST A DIAGRAM,

9    NO BIG DEAL, WHY DO THEY KEEP GOING BACK TO IT?  OBVIOUSLY IT'S

10   VALUABLE.

11        BUT IT'S NOT JUST THE DIAGRAM, IT'S THE CODE.  WE SHOWED

12   YOU IN THE EVIDENCE, DR. SHANFIELD, HE PRESENTED THIS TO YOU.

13   IN MARCH 2020, MR. MASON, HE IS ACCESSING THE ENTIRE CODE FOR

14   THAT SENSOR.  AND HERE'S THE THING ABOUT IT, DR. PHINNEY TOOK

15   THE STAND, HE DIDN'T EVEN RESPOND.  HE DID NOT RESPOND TO THAT

16   TRADE SECRET.  IT IS UNDISPUTED THAT THEY USED NOT JUST

17   ANYTHING, THE CROWN JEWELS.

18        LET'S GO ON TO ANOTHER TRADE SECRET.  THIS IS THE KIYO LAM

19   TRADE SECRET, TRADE SECRET L.

20        MR. BEUERMAN, HE COMES RIGHT IN THE DOOR, HE TAKES AN

21   ENTIRE COMET FOLDER, OPENS IT UP, AND HE ACCESSES THIS

22   SOLIDWORKS FILE.  YOU SAW THAT, THOSE WERE THE FILES THAT WERE

23   THE CAD FILES.  THEY HAVE ALL THE DETAILS IN THEM.  THEY'VE GOT

24   THE DIMENSIONS, THE TOLERANCES, THE MATERIALS, AND SO FORTH.

25   HE ACCESSES THAT FILE.

1          WHERE DID IT COME FROM?  IT CAME FROM COMET.  YOU SEE THAT

2     IN THE E-MAIL WE PRESENTED YOU BELOW.  THIS IS A COMET E-MAIL

3     WHERE MR. JACK GILMORE, A COMET EMPLOYEE, IS SENDING THAT VERY

4     FILE TO MR. MASON, MR. BEUERMAN, AND MR. MORI.

5          AND WHAT DOES MR. BEUERMAN DO WITH IT?  HE TAKES OUT THE

6     DETAILS, PUTS THEM INTO AN XP DOCUMENT, WHICH HE LABELS "RF

7     MATCH VIP."  AND THIS IS KEY.  YOU WANT TO TALK ABOUT RED

8     FLAGS?  HE SENDS THAT OFF TO MR. LAVER, THE PRESIDENT AT XP.

9     AND HE SAYS, "THE SENSOR SPECIFICATION FOR THIS SENSOR WILL BE

10    THE SAME AS THE ONE PRESENTED TO ME AT A DIFFERENT SETTING

11    EARLIER EARLY THIS YEAR."

12         I'D LIKE TO SAY THAT WAS CODE.  IT'S NOT CODE.  EARLIER

13    THIS YEAR, JUST TWO WEEKS BEFORE THAT, HE WAS AT COMET.

14    "EARLIER THIS YEAR" MEANS THIS WAS PRESENTED TO ME AT COMET.

15    AND MR. LAVER KNEW IT.

16         AND YOU ARE NOT GOING TO SEE A SINGLE E-MAIL, ANY OF THE

17    TESTIMONY PLAYED BY MR. LAVER, OR ANYTHING WHERE ANYONE SAID

18    THAT IS A PROBLEM.

19         BUT IT IS A HUGE PROBLEM.  WHAT KIND OF A CORPORATION

20    LOOKS THE OTHER WAY LIKE THIS?

21         OKAY.  IS THAT IT FOR MR. -- THEY SAY MR. BEUERMAN KIND

22    OF STOPPED ACCESSING THINGS.  HE PUT THE COMET CONFIDENTIAL

23    INFORMATION INTO XP DOCUMENTS.  AND THEN KEPT ACCESSING THOSE.

24    AND SO DID THE OTHER ENGINEERS AT XP.

25         HERE'S MR. BEUERMAN ACCESSING THAT SAME FILE OVER AND OVER

1    AGAIN.  NOW THIS IS IN DECEMBER 2018.  AND, AGAIN, IN

2    JANUARY 2019 HE'S GOING BACK TO THE COMET WELL.

3         WHAT ABOUT THE CONTROLLER TRADE SECRETS, THE DA VINCI

4    CONTROLLER?  THIS IS TRADE SECRET D.  DR. SHANFIELD, HE SHOWED

5    YOU HOW THE CENTRALIZED CONTROL AND ALL THE OTHER KEY FEATURES,

6    THE ARCHITECTURE THAT MR. GREDE TESTIFIED ABOUT, HOW THAT IS IN

7    COMET'S MATERIALS.

8         WE SHOWED YOU HOW THAT TOOK SO LONG TO DEVELOP AND HOW XP

9    IS USING THE SAME THING WITH THE SYSTEM-ON-CHIP CONTROLLER

10   ATTACHED TO THE MOTHERBOARD, THE MODULAR INTERFACES, AND HOW IT

11   ALL FITS TOGETHER.

12        AND WE ASKED XP -- IT'S UNDISPUTED, REALLY -- IS XP USING

13   IT?  ABSOLUTELY.

14        THIS IS TESTIMONY FROM MR. RUMMEL.  ON THE RIGHT, WE ASKED

15   HIM, IN REDFIN, BLUEFIN, AND NEMO, THE SYSTEM-ON-CHIP BOARD,

16   JUST LIKE IN COMET, BY THE WAY, IT'S THE BRAIN OF THE PRODUCT.

17   IT'S IN THERE.

18        AND IS IT THE BRAIN OF THE PRODUCT?  HE SAID, "CORRECT."

19        NOW, WHAT DID COMDEL HAVE?  COMDEL HAD HUNDREDS OF

20   COMPONENTS AND NOT ONE BRAIN CONTROLLING IT.  A COMPLETELY

21   DIFFERENT SYSTEM.  AND THAT'S SIGNIFICANT.

22        MS. IRWIN SUGGESTED THAT XP WAS USING COMDEL TECHNOLOGY IN

23   THEIR NEMO PRODUCT.  WE PROVED IT TO YOU.  THE COMDEL

24   TECHNOLOGY WAS THE OPPOSITE OF WHAT THEY ARE DOING FROM AN

25   ARCHITECTURAL PERSPECTIVE.

1    HUNDREDS OF CHIPS, NOT ONE BRAIN CONTROLLING IT.  NOT THE

2    VALUABLE THING THAT MR. GREDE AND HIS COLLEAGUES INVENTED.

3    AND WHAT ABOUT:  WHERE DID IT COME FROM?  HERE'S THE

4    EXHIBIT.  IT CAME FROM A 2018 DESIGN DOCUMENT THAT MR. MORI

5    CREATED WHEN HE FIRST JOINED XP.

6    AND WAS THIS SOMETHING THAT ALL THE OTHER XP ENGINEERS

7    WERE USING?  OF COURSE IT WAS.

8    THIS IS NOW TWO YEARS LATER.  YOU SAW THIS.  I QUESTIONED

9    MR. RUMMEL ON THE STAND ABOUT IT.  TWO YEARS LATER, MR. RUMMEL

10   AND MR. IRVINE, THEY ARE REFERENCING THIS AND THE OTHER RELATED

11   COMET DOCUMENTS -- OR XP DOCUMENTS WITH COMET TECHNOLOGY, TO

12   PUT INTO THE SPECS.

13   AND I ASKED HIM, "WHICH SPECS ARE THOSE?"  AND HE ADMITTED

14   IT.  THOSE ARE THE NEMO SPECS.  THAT'S THEIR PRODUCT.  THAT'S

15   THE PRODUCT HE SAID, BY THE WAY, THAT WAS TO BE LAUNCHED IN

16   DECEMBER OF LAST YEAR AND MARCH OF THIS YEAR.

17   THEY TRY TO SAY THAT THIS STUFF IS ALL STUFF EVERYONE

18   KNOWS.  THEY SAY THIS IS JUST COMMONPLACE TECHNOLOGY.  BUT

19   HERE'S WHERE YOU GOT TO COMPARE THAT STORY TO WHAT THEY WERE

20   SAYING BEFOREHAND.  BECAUSE LOOK AT IT, LOOK AT MR. MORI'S

21   DOCUMENT.  WHAT DOES HE SAY?  HE SAYS IT'S UNIQUE.  THE

22   ARCHITECTURE IS UNIQUE.  AND HE GIVES A BUNCH OF BULLET POINTS.

23   LOOK AT ANOTHER XP DOCUMENT.  THEY TALK ABOUT THIS IN

24   TERMS OF A CUSTOM CPU MODULE.  NOT AN OFF-THE-SHELF ONE, NOT

25   ONE THAT YOU CAN BUY FROM ANYWHERE.  IT'S THEIR CUSTOM CPU

1    MODULE.

2         AND WE ASKED MR. RUMMEL.  HE HAS 30 YEARS OF EXPERIENCE IN

3    THIS INDUSTRY.  HE'S BEEN AROUND IN THE INDUSTRY FOR A LONG

4    TIME.  "YOU ARE NOT AWARE OF ANYONE ELSE THAT USES A SYSTEM ON

5    CHIP FOR PURPOSES OF RF POWER PRODUCTS?"

6         HE SAID, "THAT'S CORRECT."

7         WE ASKED HIM ON RECROSS.  I SAID, "THERE WERE MILLIONS OF

8    WAYS TO BUILD A CONTROLLER?"

9         HE SAID, "YEAH."

10        I SAID, "MR. MORI SAID THE ONE HE WAS PROPOSING IS UNIQUE,

11   THAT'S THE COMET ONE?"

12        HE SAID, "YEAH."

13        "AND THAT'S THE ONE YOU CHOSE?"

14        AND HE SAID, "THAT'S RIGHT.

15        "IS THIS UNIQUE?  IS THIS VALUABLE?

16        "YES.

17        "DID THEY TAKE IT?

18        "ABSOLUTELY."

19        OKAY.  AND THAT'S -- OF COURSE, YOU HEARD FROM MR. GREDE.

20   YOU HEARD FROM DR. SHANFIELD WHO SAID THE EXACT SAME THING.

21   CONFIRMED THE SAME THING.

22        WHAT ABOUT MR. BEUERMAN'S DOCUMENTS AT XP?  YOU SAW THE

23   EVIDENCE FROM HIS XP LAPTOP.  HE WAS PORTING THEM ALL OVER

24   SEVEN DAYS AFTER HE GOT TO THE COMPANY.  AND THEN LOOKING AT

25   THEM, LOOKING AT THEM, LOOKING AT THEM, LOOKING AT THEM ONE

1    AFTER THE NEXT, AFTER THE NEXT.

2         MS. IRWIN SAID THAT THIS REFLECTS ONLY 12 DAYS OF RESEARCH

3    AND DEVELOPMENT.  LOOK AT ALL OF THOSE TECHNICAL DOCUMENTS.

4    YOU HEARD IT FROM MR. GREDE.  YOU HEARD IT FROM MR. RUSSELL.

5    THAT REFLECTS YEARS OF RESEARCH AND DEVELOPMENT.

6         IT'S EASY TO LOOK AT IT.  IT MIGHT HAVE TAKEN 12 DAYS TO

7    LOOK AT IT, IT TOOK YEARS TO CREATE.

8         AND WHAT DID HE DO WITH IT?  MR. BEUERMAN?  HE TOOK IT.

9    HE PUT IT IN A PRESENTATION NINE DAYS AFTER HE GOT TO THE

10   COMPANY, AND HE SENT IT TO ALL THE EXECUTIVES.

11        AND WAS THIS DETAILED?  WAS THAT -- COULD ANYONE BELIEVE

12   THAT HE COULD HAVE DONE THAT IN NINE DAYS?  WAS THAT A RED

13   FLAG?  MR. RUMMEL -- ABSOLUTELY IT WAS.

14        MR. RUMMEL, HE ADMITTED IT.  I ASKED HIM.  AT HIS

15   DEPOSITION.  I PUT THIS VERY PRESENTATION IN FRONT OF HIM, AND

16   I ASKED HIM IF MR. BEUERMAN SHOWED UP AT XP AND A FEW DAYS

17   AFTER HE ARRIVED SHOWED ALL OF THESE BOARD LAYOUTS, THE ONE IN

18   THAT DOCUMENT FOR NEXT GENERATION SENSORS AND NEXT GENERATION

19   CONTROL BOARDS AND SO FORTH, WOULD THAT RAISE ANY QUESTIONS.

20        HE SAYS, "IT WOULD RAISE FLAGS.  I WOULDN'T BE COMFORTABLE

21   WITH IT."

22        I SAID, "THOSE ARE RED FLAGS?"

23        HE SAID, "YEAH, I WOULD BRING IT TO THE ATTENTION OF

24   OTHERS."

25        THAT'S THEIR WITNESS ADMITTING IT.  THEIR WITNESS

1    ADMITTING THAT THIS WAS THE TECHNICAL -- THIS WAS THE TECHNICAL

2    DETAILS AND HE WOULD HAVE SAID SOMETHING ABOUT IT.

3         HERE IS THE PROBLEM:  NONE OF THEM DID.

4         YOU SAW THIS E-MAIL.  I WON'T BELABOR IT.  THIS IS TWO

5    YEARS LATER.

6         HE AND MR. IRVINE, THE SENIOR-MOST ENGINEERS, GO OUT, AND

7    WHAT DO THEY DO?  DO THEY COLLECT UP MR. BEUERMAN'S DOCUMENTS

8    AND THROW THEM AWAY BECAUSE THEY KNOW AT THIS POINT -- EVERYONE

9    KNOWS AT THIS POINT THAT HE HAD BROUGHT COMET CONFIDENTIAL

10   INFORMATION TO COMPANY.

11        WHAT IS THE RESPONSIBLE THING TO DO AT THIS POINT?  WHAT

12   DID -- AND COMPARE THAT WITH WHAT THEY DID.  COLLECTED IT UP,

13   STUDIED IT, AND TOOK THE BEST PARTS.

14        THIS IS A BILLION DOLLAR COMPANY, AND HE'S THE CHIEF

15   TECHNICAL OFFICER.  AND HE STOOD UP THERE AND FACED YOU AND HE

16   SAID THIS IS ALL OKAY.

17        AND IT IS DEFINITELY NOT OKAY.

18        ALL RIGHT.  WHAT IS THEIR MAIN EXCUSE FOR ALL OF THIS?

19   THEY SAY -- THEY HAVE A BUNCH OF THEM.  THEY SAY, "LOOK, THIS

20   WAS THEM, IT'S NOT US, AND WE AREN'T LIABLE."

21        BUT HERE'S THE THING:  AS THE JUDGE INSTRUCTED YOU, THAT

22   IS NOT THE LAW.  BECAUSE WHEN SOMEONE DOES SOMETHING AS PART OF

23   THEIR JOB IN FURTHERANCE OF THE SCOPE OF THEIR EMPLOYMENT, FOR

24   INSTANCE, IN CONNECTION WITH CREATING RF MATCH PRODUCTS LIKE

25   THESE INDIVIDUALS WERE HIRED TO DO, THE COMPANY IS LIABLE EVEN,

1    AS THE INSTRUCTION EXPLICITLY SAYS, IF WHAT THEY ARE DOING IS

2    ILLEGAL.  EVEN IF IT'S ILLEGAL.  AND IT IS THAT SIMPLE, AND THE

3    EVIDENCE SHOWED IT.

4         I'VE GOT THE ORG CHART ON THE LEFT.  WERE THESE

5    INDIVIDUALS WORKING IN THEIR JOBS?  NOT ONLY IN THEIR JOBS,

6    THEY WERE THE ENTIRE RF MATCH GROUP FOR THE FIRST YEAR AND A

7    HALF THEY WERE THERE.

8         AND EVERYONE ADMITTED IT, INCLUDING MR. PENNY.

9    MR. WARNER -- I DON'T KNOW IF YOU GOT THIS DURING THE VIDEO

10   THAT WE PLAYED OF HIM.  HE ADMITTED XP IS EVEN PAYING FOR

11   MR. BEUERMAN AND MR. MASON'S LAWYERS; AND MR. PENNY ADMITTED

12   WHY.  IT'S BECAUSE THAT'S WHAT YOU HAVE TO DO IF THEY ARE

13   ACCUSED OF DOING SOMETHING THAT'S AS PART OF THEIR JOB.

14        THEY ADMIT IT.

15        DR. PHINNEY, HE STRAIGHT UP ADMITTED IT TOO.  WE WALKED

16   HIM THROUGH.  HE ADMITTED THEY DID IT.

17        "AND IS XP LIABLE?

18        "I IMAGINE SO."

19        OF COURSE XP IS LIABLE.  AND IT'S BECAUSE XP ACTS ON

20   BEHALF OF THEIR EMPLOYEES, AND THAT'S WHAT RIGHT.  AND THAT'S

21   IT.  THAT'S GAME OVER AT THAT POINT.  THEY ARE MISAPPROPRIATES.

22   THE COMPANY IS MISAPPROPRIATOR'S.

23        BUT WERE THERE REDS FLAGS?  DID THEY KNOW WHAT WAS GOING

24   ON?  THEY KNEW FROM DAY ONE.  THE TESTIMONY, YOU SEE IT HERE.

25   THEY KNEW IN MARCH OF 2018 THAT MR. BEUERMAN HAS COMMITTED A

1    WRONGDOING OVER COMET CONFIDENTIAL INFORMATION.  THIS WAS

2    ADMITTED REPEATEDLY THROUGHOUT THE TRIAL.  THEY LEARNED THAT IN

3    2018.  THEY ALSO LEARNED IT FROM COMET, BY THE WAY, WHEN COMET

4    FILED A LAWSUIT.

5         AND THEN THERE'S THIS:  IT'S NOT JUST A COUPLE OF THEM, IT

6    WAS THE ENTIRE BOARD OF DIRECTORS.  THIS IS -- I WANT TO WALK

7    YOU THROUGH THIS.  SO THIS IS OCTOBER 2019.  THE BOARD OF

8    DIRECTORS CONCLUDES THAT MR. BEUERMAN IS TO RECEIVE A WRITTEN

9    WARNING REGARDING BRINGING THIRD-PARTY DATA INTO XP POWER.

10        AND THE TESTIMONY WAS, THAT'S COMET DATA.  THAT WAS THE

11   COMET CONFIDENTIAL DATA.

12        SO THEY'RE -- THE ENTIRE BOARD'S ACKNOWLEDGING THAT HE DID

13   SOMETHING WRONG, PUT ASIDE THEY ARE ONLY GOING TO GIVE A

14   WRITTEN WARNING.  PUT ASIDE THAT THEY'RE ONLY GOING TO GIVE A

15   WRITTEN WARNING.  THAT'S WAY NOT THE RIGHT THING TO DO.  THEY

16   SHOULD HAVE TERMINATED HIM A LONG TIME BEFORE THIS.

17        BUT HERE'S THE THING:  LOOK AT WHAT IT SAYS THAT I PUT IN

18   RED.  "FOLLOWING THE CONCLUSION."  THEY ARE NOT GOING TO DO IT

19   RIGHT AWAY.  THEY ARE GOING TO LET HIM KEEP USING THE COMET

20   CONFIDENTIAL INFORMATION AND ROLL IT INTO XP.  AND THEY ARE NOT

21   GOING TO EVEN WARN HIM ABOUT IT UNTIL FOLLOWING THE CONCLUSION

22   OF THE COMET LEGAL CASE.

23        AND MY COLLEAGUE ASKED MR. PENNY ON THE STAND WHY THAT

24   WAS, AND LOOK AT HIS ANSWER.  HE WAS ASKED:  "YOU WERE" -- HE

25   WAS CONCERNED -- "YOU WERE CONCERNED THAT MR. BEUERMAN MIGHT

```
 1      TURN STATE'S EVIDENCE AND TELL COMET THAT HE HAD BROUGHT A LOT

 2      OF COMET MATERIALS OVER TO XP?"

 3            AND THE ANSWER WAS, "YES, OR EVEN WORSE."

 4            THEY LET MR. BEUERMAN AND MR. MASON CONTINUE WHAT -- DOING

 5      WHAT THEY WERE DOING BECAUSE THEY WERE AFRAID THAT THEY

 6      WOULD -- AND NOT EVEN GIVE THEM A WARNING BECAUSE THEY WERE

 7      AFRAID THEY WOULD GO TELL COMET EXACTLY WHAT WAS GOING ON.

 8            AND IT DOESN'T GET MORE IRRESPONSIBLE THAN THAT.

 9            WHAT DID THEY DO?  DID THEY DO ANYTHING ABOUT IT?  NO.

10      DID THEY MOVE MR. BEUERMAN OR MR. MASON INTO A DIFFERENT

11      POSITION?  DID THEY DEMOTE THEM?

12            THE OPPOSITE.  THEY GAVE MR. BEUERMAN A RAISE TO KEEP HIM

13      QUIET.  MR. MASON, FOR YEARS -- THIS IS NOW WHEN NEMO WAS BEING

14      DEVELOPED IN 2020 -- HE'S THE PRINCIPAL DESIGNER OF THE WHOLE

15      PROJECT.

16            AND WHEN IT COMES TO DOING THE RIGHT THING -- OH, AND THEN

17      DO THEY CHANGE THEIR PRODUCT?  MR. RUMMEL, HE SAID, "WE HAVEN'T

18      MADE ANY CHANGES."  TO THIS DAY THEY HAVEN'T DONE ANYTHING TO

19      CHANGE THE PRODUCT.

20            LOOK AT THE EVIDENCE.  THEY'RE ALL ADMITTING THAT THEY

21      USED COMET'S TRADE SECRET INFORMATION.  THEIR EXPERT IS TELLING

22      THEM THAT, AND THEY STILL HAVEN'T CHANGED THE PRODUCT.

23            AND WE ASKED ALL OF THEM WHAT THEY DID IN RESPONSE TO

24      COMET'S ALLEGATIONS.  AND WHAT DID THEY SAY?  YOU HEARD IT.

25      THEY DIDN'T PAY ANY ATTENTION TO IT.
```

1       AND WHEN IT CAME TO MR. WARNER, HE SAID IT'S NOT HIS JOB,

2    NOT HIS RESPONSIBILITY.

3       AND WHAT DID MR. PENNY SAY?  WE ASKED HIM, "XP POWER DID

4    NOT CHANGE ANY OF ITS BEHAVIOR IN RESPONSE TO BEING SUED BY

5    COMET FOR TRADE SECRET THEFT?"

6       HE SAID -- THE CEO OF THE COMPANY, HE SAID, "CORRECT."

7       CORRECT.

8       I TOLD YOU WHEN WE STARTED THIS THAT THIS CASE WAS GOING

9    TO -- ONE OF THE ISSUES IN THIS CASE WAS GOING TO BE CORPORATE

10   RESPONSIBILITY AND WHAT THE RIGHT THING TO DO IS WHEN YOU ARE A

11   COMPANY AND WHAT THE WRONG THING TO DO IS, AND THAT IS

12   DEFINITELY NOT THE RIGHT THING TO DO.

13      ESPECIALLY FOR A COMPANY THAT'S MADE A BILLION DOLLARS

14   OVER THE LAST COUPLE OF YEARS.  IT'S JUST NOT THE RIGHT WAY TO

15   DO BUSINESS.

16      OKAY.  BEDROCK FACTS.  I'M GOING TO FLIP THROUGH SOME

17   THINGS HERE.  YOU'VE SEEN A LOT OF THE EVIDENCE, IT'S JUST BEEN

18   OVER THE LAST FEW DAYS, SO I'M GOING TO GO A LITTLE BIT QUICKLY

19   BUT I'M GOING TO SPEAK SLOWLY SO THAT WAY WE CAN STAY ON TRACK.

20      SO FIRST BEDROCK FACT, XP STOLE COMET'S TRADE SECRETS AND

21   USED THEM.  LET'S LOOK AT THE JURY INSTRUCTION ON

22   MISAPPROPRIATION.  TWO WAYS FOR YOU TO FIND MISAPPROPRIATION.

23   THEY ACQUIRED THE TRADE SECRETS OR THEY USED THE TRADE SECRETS.

24   BOTH ARE PRESENT HERE; YOU DON'T HAVE TO FIND BOTH, BOTH ARE

25   PRESENT HERE.  THEY BROUGHT THEM OVER, THAT'S ACQUISITION, AND

1    OF COURSE WE JUST SAW, AND YOU'VE SEEN MUCH MORE EVIDENCE OF

2    THE USE.

3         IT'S GOT TO BE WITHIN PROPER MEANS.  WHAT IS IMPROPER

4    MEANS?  THEFT.  EXACTLY WHAT WE HAVE SEEN HERE.  THEFT, BREACH

5    OF A CONFIDENTIALITY AGREEMENT WITH YOUR EMPLOYER.  DOWNLOADING

6    COPIES OF THINGS FROM YOUR EMPLOYER BUT NOT FOR YOUR ACTUAL USE

7    WITH YOUR EMPLOYER.  ALL OF THAT IS PRESENT HERE.  WAS IT

8    IMPROPER?  ABSOLUTELY.

9         AS THE JUDGE INSTRUCTED YOU, WE ARE FOCUSING ON FOUR OF

10   THE TRADE SECRETS.  I ALREADY TALKED ABOUT THREE OF THEM IN MY

11   STORY PART OF MY REMARKS.  D, E, AND L.  SO LET ME KIND OF FLIP

12   PAST THOSE FOR NOW.  I DO WANT TO SAY SOMETHING.  THERE'S MORE

13   EVIDENCE OF ALL OF THIS.  DR. SHANFIELD WAS ON THE STAND FOR

14   QUITE A WHILE, SO YOU'LL HAVE TO RELY ON YOUR MEMORIES AND YOUR

15   NOTES FOR THAT.

16        I DO WANT TO SAY SOMETHING ABOUT KIYO.  DR. PHINNEY, HE

17   HAD NO RESPONSE TO THAT, NO RESPONSE.  NOTHING.  IT'S

18   UNDISPUTED THAT THEY USED THE KIYO MATCHING NETWORK TRADE

19   SECRET.  SAME THING WHEN IT COMES TO THE AMAT TRADE SECRET,

20   TRADE SECRET S, THAT HAS TO DO WITH SOLIDWORKS SENSOR FILES AND

21   IMPEDANCE DATA.  DR. PHINNEY, WE ASKED HIM, "YOU DIDN'T OFFER

22   ANY OPINION THAT APPLIED MATERIALS, THE APPLIED MATERIALS

23   MATCHING NETWORK WAS NOT USED BY XP?"

24        HE SAID, "YEAH, THAT'S NOT MY OPINION."  HE DIDN'T EVEN

25   RESPOND.

1          OKAY.  SO HERE'S THE VERDICT FORM.  YOU ARE GOING TO BE

2    ASKED WHETHER XP ACQUIRED OR USED THE INFORMATION BY IMPROPER

3    MEANS FOR THE FOUR TRADE SECRETS.  OF COURSE THEY DID.  AND WE

4    WILL ASK YOU TO CHECK "YES" FOR EACH ONE OF THOSE TRADE

5    SECRETS.

6          ALL RIGHT.  WHAT ABOUT OWNERSHIP?  OWNERSHIP IS ANOTHER

7    ONE OF THE ISSUES IN THE CASE.  IT IS NOT CHALLENGED FOR THREE

8    OF THE FOUR TRADE SECRETS.  IT IS UNDISPUTED EXCEPT FOR THE

9    AMAT TRADE SECRET S, BUT HERE IT'S NOT EVEN AN ISSUE.

10         SO THERE'S A SUPPLY AGREEMENT WITH APPLIED MATERIALS.  THE

11    FIRST THING THAT YOU'LL SEE IN THAT SUPPLY AGREEMENT IS THE

12    SUPPLIER COMET OWNS ITS TRADE SECRETS.

13         THERE IS AN EXCEPTION TO THAT, WHICH SAYS THAT APPLIED HAS

14    RIGHTS TO ANY WORKS -- THOSE ARE THE TRADE SECRETS -- TO ANY

15    TRADE SECRETS THAT IT PROVIDES COLLABORATION OR INPUT INTO, AND

16    HERE'S WHERE YOU GOT TO THINK ABOUT THE EVIDENCE IN THIS CASE.

17    WHAT IS TRADE SECRET S?  IT'S THE SOLIDWORKS FILES AND THE

18    IMPEDANCE DATA.  DID THEY PRESENT ANY EVIDENCE THAT APPLIED

19    MATERIALS PROVIDED INPUT INTO ANY OF THAT?  ABSOLUTELY NOT.

20    NOT A SHRED OF IT.  NOT A SHRED OF IT.  THAT WAS ALL DEVELOPED

21    BY COMET AND IT'S COMET'S PROPERTY AND YOU HEARD OUR WITNESSES

22    SAY IT.

23         OKAY.  SO LET ME -- I'M SORRY.  WHAT DID THE OTHER

24    EVIDENCE SHOW?  WHAT DID APPLIED MATERIALS DO?  APPLIED

25    MATERIALS DID WHAT ANY PURCHASER DOES, THEY SAID HERE'S WHAT WE

1    WANT; BUT WHEN IT COMES TO THE DESIGN AND THE DEVELOPMENT OF

2    THE TRADE SECRETS, THERE IS ZERO INPUT FROM APPLIED MATERIALS.

3    THEY ARE THE CUSTOMER, OF COURSE.  MAKES SENSE, THEY'RE THE

4    CUSTOMER.  COMET IS THE SUPPLIER.  COMET IS THE DEVELOPER.  AND

5    IT WAS CONFIRMED BY ALL OF THE WITNESSES.

6         OKAY.  SO WHEN IT COMES TO WHETHER COMET WAS THE OWNER,

7    THERE'S NO DISPUTE FOR D, E, AND L, TRADE SECRETS D, E, AND L;

8    AND ON S, CLEARLY, COMET IS THE OWNER.  THIS IS JUST AN EXCUSE.

9    IT'S SOMETHING THAT THEY ARE MAKING UP AFTER THE FACT.  THEY

10   NEVER CONSIDERED THIS WHEN THEY WERE STEALING COMET'S TRADE

11   SECRETS.

12        WHAT'S THE NEXT SET OF THINGS?  OKAY.  SO WE HAVE TO SHOW

13   THAT THE TRADE SECRETS WERE VALUABLE.  OF COURSE THEY WERE

14   VALUABLE.  YOU HEARD EXTENSIVE TESTIMONY FROM MR. CROFTON, FROM

15   MR. GREDE, FROM MR. RUSSELL, EXPLAINING ABOUT THE YEARS OF

16   EFFORT.  AND YOU CAN READ THE JURY INSTRUCTION, THAT'S WHAT YOU

17   LOOK AT, HOW MUCH EFFORT WENT INTO IT, HOW MUCH DEVELOPMENT.

18   THESE WERE REAL ENGINEERS DEVELOPING REAL TECHNOLOGIES THAT

19   WERE EXTENSIVE AND MARKET-LEADING.  THEY ADMITTED IT,

20   MARKET-LEADING.  COMET IS THE MARKET LEADER IN THESE

21   TECHNOLOGIES.

22        THEN, DID COMET ENGAGE IN REASONABLE EFFORTS TO KEEP THEM

23   SECRET?  OF COURSE COMET DID.  YOU HEARD ABOUT EMPLOYEE

24   CONFIDENTIALITY AGREEMENTS, ACCESS CONTROL, PASSWORDS, PHYSICAL

25   SECURITY MEASURES, CORPORATE POLICIES.  ALL OF THAT COUNTS AS

1    REASONABLE MEASURES.  THERE'S ZERO EVIDENCE THAT COMET SHOULD

2    HAVE DONE ANYTHING MORE, AND WHEN IT COMES TO THESE ASPECTS OF

3    THE VERDICT FORM, ON VALUE, OF COURSE IT'S YES, ACROSS THE

4    TRADE SECRETS.  IT'S ESSENTIALLY UNDISPUTED, AND WHEN IT COMES

5    TO, DID COMET ACTUALLY MAKE REASONABLE EFFORTS TO KEEP THE

6    INFORMATION SECRET, THE ANSWER IS OF COURSE YES FOR ALL THE

7    TRADE SECRETS.

8         ALL RIGHT.  NOW, SO LET'S TALK A LITTLE BIT ABOUT ONE OF

9    THE ARGUMENTS THAT THEY MAKE, WHICH IS, THIS IS INFORMATION

10   THAT COMET PUBLICLY DISCLOSED ITS TRADE SECRETS.

11        YOU HEARD ABOUT THINGS THAT ARE BEING REFERRED TO AS TRADE

12   SHOWS BUT THEY'RE NOT TRADE SHOWS, THEY'RE PRIVATE MEETINGS,

13   AND WE WILL TALK ABOUT THAT.  SO WHAT IS THAT ISSUE ABOUT?  SO

14   LET'S LEVEL SET, OKAY.  AND I DID THIS WITH DR. PHINNEY, I

15   SAID, LET'S LEVEL SET ON THIS ISSUE.

16        I ASKED HIM, "OF THE VAST MAJORITY OF DOCUMENTS THAT COMET

17   IDENTIFIED AS DESCRIBING ITS TRADE SECRETS, THERE IS NO

18   EVIDENCE THAT COMET ACTUALLY MADE THOSE PUBLIC?"

19        HE SAID, "I THINK THAT'S FAIR."

20        AND THEN I POINTED HIM TO THE THOUSANDS OF SOLIDWORKS

21   FILES THAT WERE STOLEN, AND I SAID, "IS THERE EVIDENCE THAT

22   COMET MADE A SINGLE ONE OF THOSE PUBLIC?"

23        HE SAYS, "THERE ISN'T."

24        I ASKED HIM, HE'S NOT AWARE OF A SINGLE ONE OF THOSE BEING

25   MADE PUBLIC?

1          AND HE SAID, "THAT'S CORRECT."

2          AND THEN WHEN IT COMES TO THE INFORMATION THAT WAS STOLEN

3     AND USED AT XP, IT WAS THE CONFIDENTIAL INFORMATION.  I ASKED

4     HIM, "YOU WOULD AGREE THAT MR. BEUERMAN AND MR. MASON WERE

5     ACCESSING COMET CONFIDENTIAL INFORMATION WHILE THEY WERE

6     WORKING AT XP?"

7          HE SAYS, "YEAH."

8          NOT STUFF THAT HAD BEEN DISCLOSED PUBLICLY, NOT STUFF THAT

9     WAS PRESENTED TO SOMEONE IN THE MEETING, IT WAS THE

10    CONFIDENTIAL INFORMATION THEY WERE USING.  THIS IS A

11    MISDIRECTION, IT IS SOMETHING THAT IT IS BEEN -- IT IS EXCUSE,

12    AND YOU SHOULD COMPLETELY DISREGARD IT WHEN IT COMES TO WHETHER

13    THE TRADE SECRET INFORMATION THAT THEY TOOK AND USED WAS MADE

14    PUBLIC.

15         SO LET'S TALK ABOUT A FEW OF THOSE THINGS VERY BRIEFLY.

16    THEY HAVE A FEW OF THEM.  THE FIRST ONE, THEY SAY THERE'S A

17    POWERPOINT PRESENTATION THAT WAS PROVIDED TO LAM THAT WAS GIVEN

18    TO LAM.  A COUPLE OF THINGS HERE.  LET'S LEVEL SET.

19         THERE IS A CONFIDENTIALITY AGREEMENT WITH LAM.  THERE IS

20    AN AGREEMENT WITH LAM THAT PROTECT COMET'S INFORMATION.  THE

21    AGREEMENT SAYS -- DOES NOT SAY ANYWHERE THAT IF YOU PRESENT

22    INFORMATION TO LAM, IT AUTOMATICALLY BECOMES PUBLIC OR IT

23    AUTOMATICALLY BECOMES PUBLIC AFTER 30 DAYS.  IT DOESN'T SAY

24    THAT.

25         LAM MAY HAVE THE RIGHT IN CERTAIN CIRCUMSTANCES TO MAKE

1    INFORMATION PUBLIC, BUT IT DOESN'T AUTOMATICALLY BECOME PUBLIC.

2    AND HERE'S WHAT THE UNIFORM TESTIMONY WAS, THERE IS NO EVIDENCE

3    THAT AT ANY POINT IN TIME EVER IN THE RELATIONSHIP BETWEEN LAM

4    AND COMET, THAT LAM EVER MADE ANY OF COMET'S INFORMATION

5    PUBLIC, LET ALONE THE HANDFUL OF SLIDES THAT THEY POINT TO TO

6    TRY TO GET AWAY WITH IT.

7         THIS IS AN EXCUSE, PLAIN AND SIMPLE, IT IS AN

8    AFTER-THE-FACT ARGUMENT THAT THEY'RE MAKING UP IN ORDER TO GET

9    AWAY WITH IT.

10        AND WHAT ABOUT DR. RAFINEJAD?  I GOT TO POINT THIS OUT,

11   YOU DIDN'T HEAR THEM BRING ANYONE FROM LAM AND SAY, "HEY, YEAH,

12   THIS IS OUR INFORMATION AND WE MADE IT PUBLIC."  YOU DID HEAR

13   SOMEONE WHO DID WORK AT LAM FOR 14 YEARS, DR. RAFINEJAD, AND HE

14   SAID, "WE NEVER MADE THIS KIND OF THING PUBLIC.  THIS IS ALWAYS

15   UNDERSTOOD TO BE CONFIDENTIAL WITH OUR SUPPLIERS."

16        OKAY.  WHAT ABOUT THOSE, THEY CALL THEM TRADE SHOWS.

17   AGAIN, THIS IS A MISNOMER.  THESE ARE PRIVATE MEETINGS BETWEEN

18   COMET AND ITS CUSTOMERS.  SO LET'S LEVEL SET ON THIS JUST A

19   LITTLE BIT.

20        SO WE ARE TALKING ABOUT SLIDES THAT WERE PRESENTED AT

21   THESE MEETINGS, AND THEY WERE FROM THE COMET ROAD MAP

22   PRESENTATION, SO COMET ROAD MAP PRESENTATION THAT YOU SAW A

23   NUMBER OF TIMES, AND IT WAS A SUBSET OF THOSE SLIDES FROM THAT

24   ROAD MAP PRESENTATION, I'M SHOWING IT THERE ON THE LEFT.  AND

25   HERE'S THE THING, THE VAST MAJORITY OF THE SLIDES IN THAT COMET

1       ROAD MAP PRESENTATION WERE NOT SHOWN IN ANY OF THESE MEETINGS.

2           THAT INCLUDED BOARD LAYOUTS, INCLUDED THE ENTIRETY OF THE

3       GEN-2.5 AND GEN-3.0 TECHNOLOGY.  ALL OF THE STUFF THAT

4       MR. GREDE TESTIFIED ABOUT AND WALKED YOU THROUGH FOR QUITE A

5       WHILE TO SHOW THE KEY CONTROLLER TECHNOLOGY AND OTHER

6       TECHNOLOGIES.  NONE OF THAT WAS PRESENTED IN ANY OF THE

7       MEETINGS THEY POINTED TO, NONE OF IT.

8           THEY WANT YOU TO THINK THAT IT WAS.  BUT NONE OF IT WAS

9       ACTUALLY PRESENTED.

10          AND WHAT HAPPENED?  SO WE HAVE TSMC.  THIS WAS A PRIVATE

11      MEETING WITH A POTENTIAL CUSTOMER, THERE WAS AN UNDERSTANDING

12      BY COMET THAT TSMC WOULD KEEP THIS INFORMATION CONFIDENTIAL.

13      IT DOESN'T -- YOU LOOK AT THE JURY INSTRUCTION, IT DOESN'T

14      REQUIRE THAT COMET DO EVERYTHING IT POSSIBLY CAN, BEYOND A

15      REASONABLE DOUBT, TO MAKE SURE ITS INFORMATION IS CONFIDENTIAL.

16      THEY JUST NEED TO BELIEVE, THEY JUST NEED TO BELIEVE, TAKE

17      REASONABLE MEASURES.  THEY BELIEVE THAT THIS WOULD BE HELD

18      CONFIDENTIAL WITH A RESPECTIVE CUSTOMER WHO WANTED A

19      RELATIONSHIP WITH COMET.

20          AND IT WAS -- BY THE WAY, ALL OF THESE WERE SET UP BY THIS

21      WPIC ENTITY WITH WHICH COMET HAD AN NDA AND WHO HAD AN

22      OBLIGATION TO ENSURE THAT THE OTHER PEOPLE IN THESE MEETINGS

23      WOULD AGREE TO CONFIDENTIALITY.

24          AND SO WE SEE THAT IN THE TESTIMONY.  SO MR. PAUL SMITH,

25      WHEN IT CAME TO THE PCT SEMINAR, HE SAID -- HE WAS ASKED, WOULD

```
1    THE PROSPECTIVE CUSTOMERS -- THE CUSTOMERS WERE THERE, THEY HAD

2    NDA'S WITH COMET; BECAUSE THEY'RE CUSTOMERS, SO THEY HAVE TO

3    SIGN UP WITH NDA'S.  THAT'S THE TESTIMONY.  WOULD THE

4    PROSPECTIVE CUSTOMERS BE UNDER NDA WHEN THEY ATTENDED THE PCT

5    SEMINAR?

6         HE SAID, "I WOULD THINK SO."

7         HE WAS ASKED, "TO GET INTO A PCT SEMINAR QUESTION, WOULD

8    YOU NEED TO BE UNDER NDA?"

9         AND THE ANSWER WAS, "THE CUSTOMER AND THE COMPANIES WOULD

10   HAVE AN NDA."

11        OKAY.  LET ME GO ON NOW TO -- SO WHEN YOU GET TO THE

12   VERDICT FORM ON, WAS THE INFORMATION SECRET AT THE TIME OF THE

13   ALLEGED MISAPPROPRIATION?  ABSOLUTELY, ABSOLUTELY IT WAS

14   SECRET.  YOU HEARD DR. PHINNEY, HE ADMITTED IT, ALL OF IT, THE

15   VAST MAJORITY OF IT.  IT WAS ONLY A HANDFUL OF SLIDES WE'RE

16   TALKING ABOUT PRESENTING THESE MEETINGS.  THE VAST MAJORITY OF

17   IT WAS ABSOLUTELY SECRET.  THERE'S NO EVIDENCE TO THE CONTRARY.

18   AND WHEN IT CAME TO THOSE SLIDES, THOSE WERE MEETINGS WHERE

19   THERE'S AN EXPECTATION OF CONFIDENTIALITY.

20        WHETHER -- WAS THIS INFORMATION READILY ASCERTAINABLE BY

21   PROPER MEANS AT THE TIME OF THE ALLEGED ACQUISITION OR USE BY

22   XP?  OF COURSE THERE WASN'T.  YOU SAW XP KEPT GOING BACK TO THE

23   COMET DOCUMENTS.  THERE'S NO EVIDENCE THAT XP WENT OUT AND

24   LOOKED PUBLICLY FOR THIS STUFF.  IT'S COMMON SENSE STUFF.  THEY

25   WENT BACK TO THE COMET MATERIALS OVER AND OVER AGAIN.
```

1        ALL RIGHT.  LET ME TALK ABOUT THE LAST TWO BEDROCK FACTS

2    TOGETHER.  THESE HAVE TO DO WITH DAMAGES AND PUNITIVE DAMAGES.

3    SO --

4            THE COURT:  MR. ALPER, SORRY TO INTERRUPT.  YOU'VE

5    GONE 45 MINUTES, SO YOU'RE NOW MOVING INTO YOUR REPLY TIME.

6    YOU CAN KEEP GOING, BUT I'M LETTING YOU KNOW.

7            MR. ALPER:  THANK YOU VERY MUCH.  I'M JUST GOING TO

8    TAKE A COUPLE OF MINUTES ON THIS.

9        SO UNJUST ENRICHMENT THAT HAS TO DO WITH WHAT COSTS XP

10   AVOIDED.  YOU SAW IT, WE QUANTIFIED IT AS $32.5 MILLION.

11   MS. IRWIN, SHE MADE A NUMBER OF DEDUCTIONS FROM THAT.  BUT

12   LET'S JUST TALK ABOUT THOSE.  YOU HAVE TO USE COMMON SENSE

13   HERE.

14       SHE ADMITTED THAT THE HOURS THAT THE ENGINEERS REPORTED

15   WERE UNDERREPORTED.  SHE ADMITTED THAT'S -- EVERYONE KNOWS

16   THAT, THEY ARE PAYING THE ENGINEERS FOR A FULL DAY OF WORK, BUT

17   THE ENGINEERS, THEY'RE NOT BILLING EVERY HOUR OF WORK, THEY'RE

18   NOT BILLING WHEN THEY GO TO LUNCH OR OTHER THINGS OR MAYBE DO

19   SO OTHER PROJECTS.  SO THOSE ARE UNDERREPORTED HOURS.  THAT IS

20   AN ADMITTED FACT, AND SO THAT DEDUCTION IS APPROPRIATE.

21       WHAT ABOUT SHE SAID THAT YOU SHOULD -- DEPRECIATION, SHE

22   SAID THAT WE HAVE TO DEDUCT FOR DEPRECIATION.  BUT YOU SAW THE

23   EVIDENCE.  THESE PRODUCTS, THEY'RE BEING SOLD FOR YEARS,

24   THEY'RE STILL IN USE, THEY ARE STILL BEING SOLD.  SO

25   DEPRECIATION IS INAPPROPRIATE TO DEDUCT.

1        AND WHAT ABOUT COMDEL?  SHE MADE A DEDUCTION FOR COMDEL.

2    THERE IS ZERO EVIDENCE, ZERO EVIDENCE THAT ANYTHING AT COMDEL

3    WAS USED IN THE PRODUCTS, THE NEMO PRODUCTS OR ANYTHING THAT XP

4    IS PLANNING TO SELL.  ZERO EVIDENCE.  WHY IS SHE MAKING A

5    DEDUCTION FOR COMDEL?  THERE'S NO EVIDENCE OF THAT, IT'S MADE

6    UP.

7        OKAY.  YOU COULD ALSO -- YOU SHOULD AWARD AN UNJUST

8    ENRICHMENT.  BUT IF YOU DON'T, YOU CAN EVALUATE A REASONABLE

9    ROYALTY.  THAT'S WHERE YOU LOOK AT WHAT XP, IF IT WAS

10   WILLING -- YOU HAVE TO ASSUME THEY ARE WILLING -- THEY WANT THE

11   TECHNOLOGY AND THEY WANT TO MAKE A DEAL, THAT'S WHAT YOU HAVE

12   TO ASSUME GOING INTO REASONABLE ROYALTY, HOW EAGER WOULD THEY

13   HAVE BEEN TO DO THIS?  YOU SAW THE EVIDENCE, VERY EAGER.  THEY

14   SAW AN $800 MILLION A YEAR MARKET BACK IN 2017, GROW TO

15   $1.2 BILLION AND THEY SAW A HUGE OPPORTUNITY THERE.  OF COURSE

16   THEY WOULD HAVE PAID TO GET IN ON IT.

17       LASTLY, LET ME TURN TO PUNITIVE DAMAGES.  SO ON -- ARE

18   DAMAGES, COMPENSATORY DAMAGES, APPROPRIATE?  THE ANSWER IS YES

19   ON QUESTION 7.

20       LET'S GO TO THAT 32.5 MILLION.

21       LET'S GO TO PUNITIVE DAMAGE.  HERE IT IS -- I'M SORRY,

22   FLIPPING AHEAD.

23       WHAT IS THE PURPOSE OF PUNITIVE DAMAGES?  IT'S TO PUNISH

24   XP AND DETER XP AND OTHERS FROM ENGAGING IN THIS TYPE OF

25   CONDUCT, AND YOU CAN FIND IT IF THEIR CONDUCT WAS WILLFUL AND

1    MALICIOUS.  I SHOWED YOU A LOT OF THAT EARLIER.

2         I WILL LEAVE YOU WITH THIS.  THIS IS MR. PENNY'S

3    TESTIMONY.  AND WE ASKED HIM, "WAS IT WRONGFUL?"

4         HE SAID, "YEAH, IT WAS WILLFUL."  HE ADMITTED IT WAS

5    WILLFUL.  AND YOU KNOW THAT FROM SEEING THE EVIDENCE.

6         AND AT THE CONCLUSION OF THIS CASE WE ARE GOING TO ASK YOU

7    TO AWARD PUNITIVE DAMAGES AND WE ARE GOING TO ASK YOU TO AWARD

8    THE MAXIMUM AMOUNT TO DETER XP, A BILLION DOLLAR COMPANY, AND

9    EVERYONE ELSE WATCHING THIS CASE WHO MIGHT THINK ABOUT DOING

10   THE SAME THING.

11        THANK YOU.  I WILL COME BACK AT THE CONCLUSION OF XP'S

12   REMARKS.

13            THE COURT:  THANK YOU, MR. ALPER.

14        LET'S TAKE A TEN-MINUTE BREAK, AND WE WILL RETURN FOR XP'S

15   CLOSING ARGUMENT.

16        (RECESS FROM 3:16 P.M. UNTIL 3:25 P.M.)

17            THE COURT:  ALL RIGHT.  WELCOME BACK.  NOW ITS XP'S

18   OPPORTUNITY FOR A CLOSING.  AND I JUST WARN THE JURY, WE MAY GO

19   A FEW MINUTES PAST 4:30.  I APOLOGIZE FOR THAT, BUT I DO WANT

20   TO FINISH THIS SO YOU CAN GET A FRESH START TOMORROW.

21        YOU MAY PROCEED.

22            **CLOSING ARGUMENTS BY MS. YOUNG**

23        GOOD AFTERNOON, GENTLEMEN AND LADY OF THE JURY.  I WANT TO

24   START BY ASKING A FEW SIMPLE QUESTIONS.

25        WHY ARE WE HERE?  AND WHAT IS THIS CASE REALLY ABOUT?

1          NOW, IT MAY SEEM LIKE THERE ARE A LOT OF COMPLEX ISSUES,

2     HUMAN ISSUES, AND LEGAL ISSUES, BUT THE FACTS ARE REALLY SIMPLE

3     AND REALLY LOGICAL.

4          SO HOW DO YOU GET THERE?  IT'S YOUR JOB TO SORT THROUGH

5     THE FACTS AND TO APPLY YOUR COMMON SENSE.  I DON'T ENVY YOUR

6     TASK, BUT THAT'S WHY IN THIS COUNTRY WE HAVE A RIGHT TO A JURY

7     TRIAL.  SO THAT A GROUP OF PEOPLE LIKE YOURSELVES HAVE ALL THE

8     EVIDENCE FROM BOTH SIDES, AND YOU CAN ASSESS THE FACTS WITH

9     COMMON SENSE AND THE JUDGE'S INSTRUCTIONS THAT WE JUST GAVE YOU

10    ON WHAT THE LAW REQUIRES COMET TO PROVE.

11         AND ONCE YOU DO THAT, THEN YOU CAN SEE WHAT THIS CASE IS

12    REALLY ABOUT.

13         AND WHAT IS IT REALLY ABOUT?  IT'S ABOUT EMPLOYEE

14    MOBILITY, ABOUT THE ABILITY OF A COMPANY, AND ABOUT THE ABILITY

15    OF EMPLOYEES TO MOVE FROM COMPANY TO COMPANY AND TO APPLY THEIR

16    SKILLS, KNOWLEDGE, AND EXPERIENCE WHEN THEY DO SO.

17         IT'S ABOUT COMPETITION; THE RIVALRY BETWEEN COMPANIES

18    SELLING SIMILAR PRODUCTS AND SERVICES.

19         NOW, HEALTHY COMPETITION BETWEEN TWO COMPANIES MEANS THAT

20    BOTH HAVE COMMON GOALS OF SERVING THEIR CUSTOMERS TO ACHIEVE

21    REVENUE, PROFIT, AND INCREASED MARKET SHARE.

22         NOW HERE, YES, XP RECRUITED EXPERIENCED ENGINEERS, BUT NOT

23    JUST FROM COMET AND CERTAINLY NOT FOR ANY ALLEGED TRADE SECRET.

24         THE CASE IS ALSO ABOUT RESPONSIBILITY.  THE CASE IS ABOUT

25    TAKING RESPONSIBILITY FOR WHAT HAS HAPPENED.  XP DID TAKE

1    RESPONSIBILITY FOR WHAT IT RIGHTFULLY SHOULD HAVE TAKEN

2    RESPONSIBILITY FOR.

3         DUNCAN PENNY, AS THE CEO OF XP AT THE TIME, HE HAS TAKEN

4    THAT RESPONSIBILITY.  HE'S BEEN INVOLVED WITH THIS CASE SINCE

5    DAY ONE, AND HE CAME HERE TO TALK TO YOU ABOUT THAT.  AND THAT

6    IS THE TRUTH.

7         NOW, WE ALL AGREE THAT MR. BEUERMAN AND MR. MASON KEPT

8    INFORMATION FROM COMET THAT THEY SHOULD NOT HAVE KEPT WHEN THEY

9    LEFT.  LET ME BE CLEAR:  THEY WERE WRONG.  AND COMET HAS EVERY

10   RIGHT TO BE ANGRY ABOUT WHAT MR. BEUERMAN DID AND WHAT

11   MR. MASON DID.

12        BUT YOU KNOW WHO ELSE IS TROUBLED BY WHAT THEY DID?  XP,

13   MR. PENNY, MR. RUMMEL.  THEY CAME HERE AND TALKED TO YOU ABOUT

14   THEIR DISAPPOINTMENT.

15        BUT AS THE EVIDENCE SHOWED, THAT DOES NOT MEAN THAT THOSE

16   FILES MADE IT TO XP.  THAT DOESN'T MEAN THOSE FILES WERE

17   ACCESSED BY XP.  IT DOESN'T MEAN THOSE FILES WERE USED BY XP.

18   AND IT CERTAINLY DOES NOT MEAN THAT ANY LEGALLY PROTECTABLE

19   TRADE SECRET WILL BE USED IN ANY XP PRODUCT.  NOT NOW, NOT

20   EVER.

21        SO WHAT COMET IS LEFT WITH IS TRYING TO FIT THE FACTS INTO

22   A PRECONCEIVED AND FALSE NARRATIVE THAT DEFIES COMMON SENSE.

23        IN FACT, ON THE ONE HAND, COMET HAS ALLEGED THE CASE IS

24   ABOUT SOME GRAND CONSPIRACY PUPPETEERED BY XP.

25        ON THE OTHER, COMET ALSO SEEMS TO ALLEGE THE CASE IS ABOUT

1    XP'S FAILURE TO RECOGNIZE FLAGS.  NOT ANY FLAG, BUT RED FLAGS.

2    BUT IT CANNOT BE BOTH.

3         WHY?  BECAUSE IF THERE WAS SOME GRAND CONSPIRACY, WHY

4    WOULD ANYBODY BE LOOKING FOR RED FLAGS?

5         BUT WHAT THE EVIDENCE HAS ACTUALLY SHOWN IS THAT IT'S

6    NEITHER OF THEM.  THERE'S NO CONSPIRACY, AND THERE WERE NO RED

7    FLAGS.

8         SO TO UNDERSTAND HOW WE GOT HERE LET'S GO BACK IN TIME AND

9    LOOK AT THE TIMELINE.  AND TIMING IS EVERYTHING.

10        SO THIS IS THE BASIC TIMELINE.  IN JANUARY 2018,

11   MR. BEUERMAN DOWNLOADED FILES BEFORE HE LEFT COMET.  TO BE

12   CLEAR, THOSE ACTS WERE PERFORMED BY MR. BEUERMAN AT COMET WHILE

13   HE WAS STILL A COMET EMPLOYEE.

14        HE THEN DELETED ALL HIS FILES BEFORE HE STARTED WORKING

15   FOR XP.  WHY WOULD HE DO THAT IF XP AND HE WERE CONSPIRING TO

16   BRING OVER A TURNKEY DESIGN?

17        HE THEN JOINED XP.  BUT THEN AFTER HE GOT TO XP, COMET

18   SUED HIM.  THEN TWO MONTHS LATER, COMET ALSO SUED MR. MASON AND

19   MR. MORI.

20        NOW, AT THAT POINT XP WASN'T SUED.  XP WASN'T SUED UNTIL

21   NOVEMBER 2018.  BUT THEN IN JANUARY, COMET DISMISSED THE CASE

22   AGAINST MR. BEUERMAN, MR. MASON, MR. MORI, AND XP.

23        SO DESPITE THIS HISTORY, AS YOU HEARD, MR. CROFTON IS THE

24   ONE WHO MADE THE DECISION THAT COMET WAS GOING TO FILE SUIT

25   AGAIN IN SEPTEMBER OF 2020.  THAT IS OVER A YEAR AND A HALF

1    AFTER THE FIRST SUIT WAS DISMISSED AND 11 DAYS AFTER HE JOINED

2    COMET.

3         AND HE MADE THE DECISION TO ONLY SUE XP.  WHY?  WELL, I

4    WILL LET YOU CONSIDER THAT YOURSELF.

5         SO COMET ATTEMPTS TO TELL YOU THIS SALACIOUS STORY OF A

6    COMPLEX CONSPIRACY, BUT SUCH A STORY NEEDS A MOTIVE, A VILLAIN,

7    AND A PLOT.  BUT WHEN YOU STRIP THIS CASE DOWN TO THE EVIDENCE,

8    THIS STORY JUST DOES NOT MAKE ANY SENSE.  COMET IS FITTING

9    FACTS TO THE STORY RATHER THAN TELLING A STORY WITH FACTS.

10        FIRST, THERE IS NO MOTIVE.  COMET ALLEGES THAT THE MOTIVE

11   IS THAT COMDEL WAS A FAILURE.  BUT CONTRARY TO COMET'S

12   ALLEGATIONS, XP HAD NO NEED FOR COMET'S INFORMATION.  COMDEL IS

13   THRIVING.  AND, GRANTED, COMDEL WASN'T THE COMPLETE ANSWER FOR

14   XP AND RF, BUT XP, THEREFORE, SET OUT TO BUILD A NEXT

15   GENERATION PRODUCT THAT IS DIFFERENT FROM ITS COMPETITORS BASED

16   ON THE SKILLS, THE TALENTS, AND THE EXPERIENCE OF ITS

17   ENGINEERS.

18        SO LET ME TAKE THOSE IN TURN.

19        SO, FIRST, AS MR. PENNY EXPLAINED, XP STARTED OFF AS A

20   U.K. DISTRIBUTOR OF POWER SUPPLIES AND THEN GREW ORGANICALLY

21   OVER TIME TO BE A DESIGNER, A MANUFACTURER, AND THEN EVENTUALLY

22   THEY EXPANDED INTO HIGHER POWER, HIGHER VOLTAGE, AND INCREASED

23   COMPLEXITY.

24        XP FURTHER EXPANDED BY ADDING SMALL NICHE PLAYERS INTO ITS

25   FAMILY.  AND NOW, AS MR. PENNY TESTIFIED, XP IS ONE OF TWO

1    COMPANIES, THE OTHER ONE BEING AE, WHICH HAS A VERY BROAD POWER

2    PRODUCT PORTFOLIO THAT CAN GIVE CUSTOMERS A COMPLETE POWER

3    SOLUTION.

4          SO LET'S TALK ABOUT COMDEL.  AGAIN, TIMING IS EVERYTHING.

5    SO COMET POINTS TO POST-ACQUISITION INTERNAL E-MAIL

6    DISCUSSIONS, WHICH ACTUALLY OCCURRED AFTER MR. BEUERMAN AND

7    MR. MASON HAD ALREADY BEEN HIRED AS EVIDENCE OF COMDEL'S

8    ALLEGED FAILURE, BUT COMET IGNORES THE EVIDENCE OF XP'S

9    PRE-ACQUISITION FINDINGS.  COMDEL'S ACTUAL REVENUES, THE MARKET

10   DEMAND FOR COMDEL'S PRE-EXISTING PRODUCTS, AND COMDEL'S LOYAL

11   CUSTOMERS FOR COMDEL'S PRE-EXISTING PRODUCTS.

12         SO WHAT REALLY HAPPENED?  IF YOU RECALL, IT WAS APPLIED

13   MATERIALS THAT ACTUALLY REFERRED COMDEL TO XP.  APPLIED

14   MATERIALS WAS A LONGTIME CUSTOMER OF COMDEL, AND THEY SUGGESTED

15   THAT XP REACH OUT TO COMDEL.

16         AND WHAT XP DID WAS THEY DID A PRE-ACQUISITION REVIEW, AND

17   THEY PERFORMED DUE DILIGENCE.  IN FACT, XP KNEW WHAT THEY WERE

18   GETTING FOR THE $23 MILLION THAT THEY PAID.

19         SO WHAT HAPPENED AFTER THAT?  MR. PENNY TESTIFIED XP

20   ACHIEVED ITS EXPECTED RETURN ON INVESTMENT IN A FEW YEARS.

21   THEY DOUBLED THE REVENUE OF COMDEL BASED ON COMDEL'S

22   PRE-EXISTING PRODUCTS IN A FEW YEARS.

23         SO CONTRARY TO COMET'S ALLEGATIONS, XP DID DO TECHNICAL

24   DILIGENCE.  AND, YES, WHILE SOME OF COMDEL'S PRODUCTS WERE OLD,

25   IT'S IMPORTANT TO REMEMBER THAT COMDEL HAD INCREDIBLY LOYAL

1    CUSTOMERS.

2         AND, MORE IMPORTANTLY, WHAT XP FOUND WAS OPPORTUNITY AND

3    SYNERGIES.  THEY FOUND WAYS TO CONTRIBUTE TO AND TO IMPROVE THE

4    SALES OF COMDEL'S EXISTING PRODUCTS.

5         FINALLY, XP GOT SEVEN ENGINEERS IN THE ACQUISITION.  AND

6    OTHER THAN THE TWO THAT RETIRED, FIVE OF THEM ARE STILL THERE.

7         IN FACT, MR. RUMMEL, WHO YOU HEARD FROM EARLIER, HE CAME

8    BACK TO COMDEL AND STAYED AT XP BECAUSE HE ENJOYED WORKING

9    THERE.

10        SO WHILE COMET TRIED TO ALLEGE THAT COMDEL WAS A FAILURE,

11   AGAIN POINTING TO POST-ACQUISITION DOCUMENTS, THEY WERE

12   INCORRECT.

13        AS YOU RECALL, MR. PENNY TESTIFIED THAT THE ISSUES THAT

14   COMDEL NEEDED TO IMPROVE WAS THE DEMAND, ESPECIALLY THE HIGH

15   DEMAND FOR EXISTING COMDEL PRODUCTS.  THEIR ISSUES WERE THAT

16   THEY NEEDED A LARGER BUILDING, THEY HAD PRODUCT ISSUES, THEY --

17   NOT THAT THEY NEEDED TO STEAL ANY ALLEGED TRADE SECRETS.  THE

18   REAL ISSUE WAS TRYING TO FIGURE OUT HOW TO MEET THE DEMAND FOR

19   EXISTING COMDEL PRODUCTS.  SO COMDEL WAS NOT A FAILURE.

20        SO, NEVERTHELESS, XP SET OUT TO BUILD NEXT GENERATION

21   PRODUCTS THAT WERE DIFFERENT FROM ITS COMPETITORS.

22        IF YOU RECALL, MR. PENNY TESTIFIED THAT WHAT XP WANTED WAS

23   GROUND-UP DEVELOPMENT AND TO USE NOVEL IDEAS TO BUILD NOVEL

24   PRODUCTS.  AND IN FACT, XP FILED PATENTS ON THOSE NOVEL IDEAS.

25        SO HOW DID XP DO THAT?  WITH ENGINEERS WITH THE RIGHT

1    EXPERIENCE, THE RIGHT TALENT, AND THE RIGHT SKILLS.  THEY DID

2    NOT TARGET COMET.  THEY DID NOT WANT FORMER COMET EMPLOYEES TO

3    BRING COMET INFORMATION.  THEY DID NOT ASK FORMER COMET

4    EMPLOYEES TO BRING COMET INFORMATION, AND I WILL GO BACK TO

5    THAT.  THEY WERE LOOKING FOR TALENTED ENGINEERS.  AND IN FACT,

6    XP FOUND MANY TALENTED ENGINEERS.

7         THE RF ENGINEERING TEAM AT XP HAS GROWN FROM 7 TO 29,

8    WHERE ONLY THREE OF THEM WERE COMET EMPLOYEES THAT CAME

9    DIRECTLY FROM COMET; AND MR. MA, WHO HAD DONE SOME WORK AS A

10   COMET CONTRACTOR.  THE OTHERS, ALL OF THEM, CAME FROM OTHER

11   COMPANIES:  QUINTEL, LAM, NOKIA, NOT COMET.

12        SO BASED ON THE ACTUAL FACTS AND THE ACTUAL TIMELINE,

13   COMET'S MOTIVE STORY FALLS APART.

14        SO, NEXT, LET'S TURN TO THE NEXT PART OF COMET'S STORY.

15        AS I SAID, COMET'S STORY NEEDS A VILLAIN, BUT COMET HAS

16   IDENTIFIED THE WRONG VILLAINS HERE.  THE VILLAIN IS NOT XP, ITS

17   EXECUTIVES, AND THE XP FOLKS YOU HEARD FROM DURING THE TRIAL,

18   MR. PENNY AND MR. RUMMEL.

19        COMET WANTS YOU TO BELIEVE THAT XP ACTED WILLFULLY AND

20   MALICIOUSLY.  MALICIOUSLY.  YOU HEARD FROM MR. PENNY AND

21   MR. RUMMEL, XP WAS NOT WILLFUL, XP WAS NOT MALICIOUS.

22        SO WHY DID COMET MAKE XP THE VILLAINS?  BECAUSE THEY SUED

23   XP.

24        SINCE THEY SUED XP, THEY, AGAIN, HAVE TO CONTORT THE FACTS

25   TO FIT THE STORY AGAIN.  AND, AGAIN, TIMING IS EVERYTHING.

1    COMET FIRST IDENTIFIED THE VILLAINS IN THE ORIGINAL CASE

2    AS MR. BEUERMAN AND MR. MASON, BUT THEY ARE NOT HERE.  THEY ARE

3    NO LONGER DEFENDANTS.  COMET DISMISSED THEM FROM THE PRIOR

4    CASE.  COMET DIDN'T SUE THEM.  COMET DIDN'T HAVE THEM COME TO

5    TRIAL.  AND WHY NOT?  BECAUSE THEY DON'T REALLY FIT COMET'S

6    STORY.

7    YOU NEVER HEARD MR. BEUERMAN OR MR. MASON SAY THERE WAS

8    SOME CONSPIRACY OR THAT XP KNEW ABOUT WHAT THEY WERE DOING, LET

9    ALONE APPROVE IT OR THEIR ACTIONS.

10    IN FACT, XP DID THE OPPOSITE AND FORBID THEM FROM TAKING

11    INFORMATION FROM COMET AND MADE IT CLEAR THAT DOING SO WAS

12    INCONSISTENT WITH WHAT XP WAS PAYING THEM TO DO, WHICH WAS TO

13    BUILD A NEW PRODUCT FROM THE GROUND UP.

14    MOREOVER, IF YOU REMEMBER, MR. BEUERMAN ADMITTED IT WAS

15    HIS FAULT, NOT XP'S.  HE WAS FIRED BY XP.  BY THE TIME HE WAS

16    DEPOSED, HE DID NOT HAVE TO, BUT HE TOOK RESPONSIBILITY.

17    SO WHY ARE MR. PENNY, MR. RUMMEL, AND XP NOT THE VILLAIN?

18    AS AN INITIAL MATTER, AS THE EVIDENCE HAS SHOWN, MR. PENNY HAS

19    TAKEN RESPONSIBILITY.  WHEN ASKED THE TOUGH QUESTIONS BY

20    COMET'S LAWYERS, YOU HEARD HIM, YOU SAW HIM.  HE WAS

21    FORTHRIGHT, HE WAS HONEST, AND HE TOLD THE TRUTH.

22    AND AS SOON AS XP LEARNED OF ANY ALLEGATIONS, THEY DID THE

23    RIGHT THING.  THEY ACTED PROMPTLY, REASONABLY, AND RESPONSIBLY.

24    AGAIN, TIMING IS EVERYTHING.

25    SO, FIRST, BEFORE THE COMET EMPLOYEES EVEN JOINED XP, AS

1    PART OF XP'S ONBOARDING PROCEDURE, XP HAD THEM SIGN AGREEMENTS.

2    XP ALSO HAD THEM ACKNOWLEDGE AN EMPLOYEE HANDBOOK AND A CODE OF

3    CONDUCT, WHICH EXPLICITLY SAID THAT THEY SHOULD NOT USE THE

4    CONFIDENTIAL TRADE SECRET OR PROPRIETARY INFORMATION OF ANY

5    OTHER COMPANIES.

6        FURTHER, MR. LAVER AND MR. WARNER EXPLICITLY TOLD THEM NOT

7    TO BRING ANYTHING, NOT TO USE ANYTHING.  THERE'S NO DISPUTE

8    ABOUT THIS.

9        NOW, THIS WAS ALL BEFORE THE FORMER COMET EMPLOYEES JOINED

10   XP, BEFORE THERE WERE ANY ALLEGATIONS BY COMET, AND BEFORE ANY

11   KNOWLEDGE BY XP OF ANY COMET ALLEGATIONS.  THIS IS XP BEING

12   RESPONSIBLE.

13       BECAUSE COMET CANNOT DISPUTE XP'S ACTS, IT CREATES AN

14   ALTERNATE VERSION OF THE STORY IN WHICH XP MISSED RED FLAGS.

15   THE EVIDENCE ALSO SHOWS THIS IS NOT TRUE.  COMET KEEPS POINTING

16   TO A -- THE WARNER INTERVIEW, BUT THAT'S NOT A RED FLAG.  AS

17   YOU'VE HEARD, XP DID NOT WANT A TURNKEY MATCH, NOR DID THEY GET

18   ONE.  WE SHOWED YOU THE FULL TRANSCRIPT OF THE INTERVIEW ON

19   THIS ISSUE.  WE HEARD MR. WARNER TESTIFY, XP WANTED SOMETHING

20   NEW, AND THEY NEVER ONCE ASKED MR. MASON FOR A TURNKEY MATCH.

21       NOW, WHILE COMET MAKES A BIG DEAL ABOUT THE ENGINEERS NOT

22   WANTING TO DISCLOSE WHERE THEY WERE GOING, MR. PENNY EXPLAINED

23   THAT NOT OFFERING UP UNPROMPTED MEANT WHAT HE WROTE.  LOGICALLY

24   THE CONVERSE OF THAT IS TO TELL THE TRUTH, IF PROMPTED.  AND

25   THE TRUTH IS THE ENGINEERS WERE ACTUALLY CONCERNED ABOUT

1       ANTI-SOLICITATION ISSUES, NOT THAT THEY WERE GOING TO TAKE

2       ALLEGED TRADE SECRETS.

3            SO THEN EVEN AFTER MR. BEUERMAN AND MR. MASON SHOW UP AT

4       XP, COMET ALLEGES THAT A BEUERMAN PRESENTATION SHOULD HAVE

5       PRESENTED RED FLAGS, A SENSOR DIAGRAM SHOULD HAVE BEEN A RED

6       FLAG, AND MR. MASON'S ACCESS TO A FEW FILES SHOULD HAVE BEEN

7       RED FLAGS.  BUT AS DR. PHINNEY TESTIFIED, THIS IS NOT TRUE,

8       THERE WERE NO COMPLETE DESIGNS.  AND AT THIS TIME, XP STILL DID

9       NOT KNOW OF ANY ALLEGATIONS.

10           THESE HIGH-LEVEL DOCUMENTS WOULDN'T HAVE RAISED ANY RED

11      FLAGS.  WE WILL GO INTO THAT IN A LITTLE MORE DETAIL LATER.

12      AND AT THIS POINT IN TIME, COMET STILL DID NOT PROVIDE XP WITH

13      ANY ALLEGATIONS, LET ALONE ANY SPECIFIC INFORMATION REGARDING

14      WHAT THE ALLEGED TRADE SECRETS WERE.

15           SO WHAT DID XP ACTUALLY KNOW AND WHEN?  IF YOU RECALL,

16      MR. PENNY TESTIFIED THAT XP HEARD ABOUT THE LAWSUIT ON MARCH 7,

17      2018, FROM ANOTHER LAW FIRM.  DUNCAN PENNY, THEN CEO, TOOK

18      RESPONSIBILITY FOR INVESTIGATING THE ISSUE, AND HE'S THE HEAD

19      OF THE COMPANY.  MR. PENNY ALSO ASKED MR. BEUERMAN TO TURN OVER

20      HIS DRIVES ON MARCH 7TH AND TOLD HIM THAT XP DIDN'T WANT ANY

21      COMET INFORMATION IN XP'S BUILDINGS.

22           AT THIS POINT COMET DIDN'T EVEN TELL XP ABOUT THE LAWSUIT

23      UNTIL MARCH 12.  AND IN THAT NOTICE, THE ALLEGATIONS WERE

24      VAGUE.  XP DID NOT KNOW THEN WHAT WE ALL KNOW NOW.  XP HAD NOT

25      SEEN WHAT YOU HAVE SEEN THROUGHOUT THIS TRIAL.

1        BY MARCH 15TH XP TAKES POSSESSION OF MR. BEUERMAN'S XP

2   LAPTOP, AND BY MARCH 17TH XP COMPLETED ITS INVESTIGATION.  THEY

3   SEARCHED MR. BEUERMAN'S XP LAPTOP, THEY HAD SEARCHED XP'S

4   SYSTEM, AND TO BE FAIR, THEY HAD TROUBLE SEARCHING.  THE ONLY

5   THING THEY COULD SEARCH FOR WAS THE WORD "COMET."  BUT THEY

6   ALSO MADE MR. BEUERMAN TURN OVER ALL OF HIS EXTERNAL DEVICES TO

7   A THIRD-PARTY FORENSICS COMPANY.  AND IN ITS SEARCHES, ALL XP

8   FOUND WERE SOME PUBLIC LOGOS AND LINKS TO FILES THAT DIDN'T

9   EXIST ON THE LAPTOP BECAUSE THEY WERE ON THE DRIVES THAT HAD

10  BEEN TURNED OVER AND QUARANTINED.

11       AND IN FACT, THIS INVESTIGATION WORKED.  THERE IS NO

12  EVIDENCE THAT MR. BEUERMAN ACCESSED ANY COMET DOCUMENTS AFTER

13  MARCH 2018, WHICH WAS FOUR YEARS AGO.  AGAIN, XP ACTED

14  DILIGENTLY, REASONABLY, AND TOOK RESPONSIBILITY.

15       SO WHAT HAPPENED NEXT?  AS I MENTIONED, MR. MASON AND

16  MR. MORI WERE ADDED TO THE SUIT IN MAY 2018.  MR. MORI AND

17  MR. MASON ALSO TURNED THEIR DRIVES OVER IN JUNE 2018, AND XP

18  HAD PREVIOUSLY ALREADY TOLD THEM NOT TO BRING ANYTHING AND HAD

19  ALREADY SEARCHED THEIR SYSTEMS.  AGAIN, XP ACTED DILIGENTLY,

20  PROMPTLY, REASONABLY, AND TOOK RESPONSIBILITY IN RESPONSE TO

21  VAGUE ALLEGATIONS BEING MADE AGAINST ITS THREE EMPLOYEES.

22       SO THEN IN THE FIRST CASE, XP WASN'T EVEN FORMALLY BROUGHT

23  INTO THE SUIT UNTIL NOVEMBER 2018.  BUT THEN BY JANUARY 2018

24  THE FIRST SUIT -- 2019 -- THE FIRST SUIT WAS ALREADY DISMISSED.

25       NOW, AT THIS POINT IN TIME, XP STILL DID NOT KNOW ABOUT

1    ANY SPECIFIC ALLEGATIONS.  SO WHAT HAPPENED NEXT?  AS MR. PENNY

2    TESTIFIED, THE PARTIES WENT INTO A MEDIATION PROCESS WHICH TOOK

3    THE REST OF THE YEAR.  AND IT WAS IN THAT MEDIATION THAT XP

4    FINALLY OBTAINED SOME ADDITIONAL INFORMATION ABOUT COMET'S

5    ALLEGATIONS.  XP LEARNED ABOUT COMET'S ALLEGATIONS REGARDING

6    FOUR IMAGES, FOUR IMAGES IN THE BEUERMAN PRESENTATION, THAT'S

7    IT, NOTHING ELSE.  BUT WHAT DID XP DO?  THEY IMMEDIATELY

8    CONFRONTED MR. BEUERMAN, AND WHAT HE SAID WAS THE RESULT OF

9    PUBLIC MARKETING INFORMATION AND NOT SECRET.

10         NOW, THIS IS CONSISTENT WITH WHAT XP HAD SEEN AND WITH

11   WHAT MR. PENNY HAD SEEN.  THE INFORMATION IN THERE WAS

12   MARKETING INFORMATION, IT WAS HIGH-LEVEL DIAGRAMS, INFORMATION

13   THAT CUSTOMERS PROVIDE TO SUPPLIERS ALL THE TIME.  AND THE

14   EVIDENCE HAS SHOWN THAT THAT IS NOT SECRET.  AND IN FACT, COMET

15   DID NOT CONSIDER THAT INFORMATION AS A TRADE SECRET, WHICH I'LL

16   DISCUSS FURTHER LATER.

17         SO BY EARLY 2020, MR. BEUERMAN AND HIS TEAM HAD NO PRODUCT

18   AND HAD NOT MADE ANY PROGRESS.  SO MR. BEUERMAN WAS TERMINATED

19   FOR LACK OF PERFORMANCE.  WHILE COMET ATTEMPTS TO MAKE A BIG

20   DEAL ABOUT XP NOT REPRIMANDING MR. BEUERMAN IN 2019 WHEN THERE

21   WAS NO LAWSUIT, AGAIN, THERE WAS NO LAWSUIT AT THAT TIME, ALL

22   XP KNEW AT THAT TIME WAS AN ALLEGATION OF FOUR IMAGES THAT IT

23   BELIEVED WAS PUBLIC AND THAT WAS HIGH LEVEL AND MARKETING

24   MATERIALS.  XP THEREFORE HAD MANY INPUTS TO CONSIDER AND WERE

25   CONCERNED THAT MR. BEUERMAN, AS MR. PENNY TESTIFIED, MAY

1    ACTUALLY DO SOMETHING VINDICTIVE AND UNTRUE IF THEY REPRIMANDED

2    HIM.  AND THEN ULTIMATELY THEY DIDN'T REPRIMAND HIM BECAUSE

3    THEY FIRED HIM SOON AFTER FOR LACK OF PERFORMANCE.

4         SO WHAT HAPPENS NEXT?  COMET RE-FILED IN SEPTEMBER 2020.

5    BUT COMET DID NOT FILE THE CASE AGAINST MR. BEUERMAN OR

6    MR. MASON, COMET ONLY SUED XP.  AND EVEN AT THIS TIME THERE

7    WERE NO NEW ALLEGATIONS AND NO SPECIFIC ALLEGATIONS THAT XP

8    KNEW ABOUT.

9         SO WHEN DID XP FINALLY LEARN ANY NEW ALLEGATIONS?

10   CHRIS MASON'S DEPOSITION IN JUNE OF 2021.  AND WHAT DID THEY

11   LEARN?  THAT MR. MASON HAD ACCESSED SOME COMET SOURCE DOCUMENTS

12   FROM OTHER EXTERNAL HARD DRIVES.  XP DID NOT EVEN KNOW IF THEY

13   WERE ALLEGED TRADE SECRETS OR IF THEY WERE CONFIDENTIAL.  BUT

14   AGAIN, XP ACTED SWIFTLY.  THEY IMMEDIATELY QUARANTINED

15   MR. MASON'S COMPUTER.  THEY DEMANDED THAT HE IMMEDIATELY TURN

16   OVER THE DEVICES, THAT HE PREVIOUSLY DENIED HAVING, AND FIRED

17   HIM.

18        SO WHY DID HE GET FIRED?  BECAUSE MR. MASON LIED TO XP.

19   XP UNDERSTOOD THAT BY JUNE 2018, MR. MASON SHOULDN'T HAVE HAD

20   ANY MORE COMET INFORMATION.  HE HAD TURNED EVERYTHING OVER.

21   BUT IN HIS TERMINATION NOTE, DESPITE REPEATED ASSURANCES, AS XP

22   POINTED OUT, HE LIED.

23        SO WAS XP DISAPPOINTED WITH WHAT HAPPENED?  SURE.  BUT DID

24   XP ACT REASONABLY, RESPONSIBLY?  ABSOLUTELY.  AND MORE

25   IMPORTANTLY, WHAT MR. BEUERMAN AND MR. MASON DID WAS WRONG.

1    THEY WERE TOLD NOT TO DO IT, THEY WERE NOT AUTHORIZED TO DO IT,

2    IT WAS NOT PART OF THEIR JOBS TO DO IT, AND XP HAD MADE THAT

3    CLEAR.

4        MR. PENNY, MR. RUMMEL AND XP, THEY ARE NOT THE VILLAINS,

5    THEY DID NOT ACT WILLFULLY AND THEY CERTAINLY DID NOT ACT

6    MALICIOUSLY.

7        SO AGAIN, I ASK YOU TO LOOK AT THE FACTS.  COMET'S STORY

8    FALLS APART BECAUSE THEY ARE FITTING FACTS INTO A PRECONCEIVED

9    STORY.  THE FACTS SHOW THAT XP ACTED REASONABLY AT EVERY

10   JUNCTURE BASED ON WHAT IT KNEW.

11       SO WHAT'S NEXT?  COMET IS LEFT WITH THE ALLEGATIONS ABOUT

12   10,000 DOCUMENTS, BUT EVEN THAT'S A SLEIGHT OF HAND, AND WHAT

13   DO I MEAN BY THAT?  SO, LET'S TURN TO THE PLOT.  NOW, COMET

14   ALLEGES XP TOOK 10,000 DOCUMENTS, AND THAT AMOUNTS TO FOUR

15   ALLEGED TRADE SECRETS.  BUT COMET MUST PROVE IT OWNED THOSE

16   TRADE SECRETS, THAT THOSE TRADE SECRETS WERE SECRET, THAT THEY

17   HAD VALUE TO THEIR SECRECY, THAT THEY TOOK REASONABLE MEASURES

18   TO PROTECT THE SECRECY OF THOSE ALLEGED TRADE SECRETS, AND THAT

19   XP ACQUIRED OR USED THOSE TRADE SECRETS VIA IMPROPER MEANS AND

20   A NUMBER OF OTHER ELEMENTS.

21       BUT TO GET THERE, COMET ALSO TWISTS THE FACTS.  NOW, WHY

22   DOES THAT MATTER?  SO THIS IS THE SLIDE THAT COMET'S LAWYERS

23   USED IN OPENING.  10,000 CONFIDENTIAL DOCUMENTS.  BUT LET'S

24   TAKE A LOOK AT WHAT ACTUALLY HAPPENED TO THESE 10,000

25   DOCUMENTS.

1    AS YOU HEARD FROM MR. COWEN, MR. BEUERMAN DELETED AN

2    ENTIRE HARD DRIVE BEFORE EVER GETTING TO XP, WHICH WAS

3    UNRECOVERABLE.  THOSE FILES WERE GONE.  THEY NEVER MADE IT TO

4    XP'S DOOR.  EVERYTHING ELSE MR. BEUERMAN HAD WAS QUARANTINED BY

5    MARCH 2018, WHICH WAS FOUR YEARS AGO.  LOCKED AWAY IN A

6    THIRD-PARTY FORENSIC COMPANY, AS SOON AS COMET MADE ITS

7    ALLEGATIONS AGAINST MR. BEUERMAN.

8    MR. MASON'S DEVICES WERE ALSO TURNED IN TO THE FORENSICS

9    COMPANY, AND MR. MORI'S DEVICES WERE ALSO TURNED IN, EVEN

10   THOUGH THERE'S BEEN NO EVIDENCE THAT MR. MORI EVER TOOK

11   ANYTHING.

12   AND XP LOCKED AWAY MR. MASON'S DEVICES THAT HE HANDED OVER

13   AND FOR WHICH HE CLAIMED THAT WAS ALL THAT HE HAD.  SO WHERE

14   DOES THAT LEAVE US?  WELL, WHAT IS COMET'S CASE ABOUT?  AS

15   MR. ALPER CLAIMS, COMET TOLD YOU THAT XP STOLE COMET'S TRADE

16   SECRETS AND CONTINUOUSLY USED THEM TO DEVELOP COMPETING

17   TECHNOLOGIES.  THAT WAS ONE OF THE ALLEGED BEDROCK FACTS THAT

18   MR. ALPER CLAIMED COMET WOULD PROVE.

19   BUT IF YOU RECALL, MR. RUMMEL TESTIFIED AT LENGTH.  HE

20   CAME HERE AND TOLD HIM YOURSELF [SIC] ABOUT HOW XP DEVELOPED

21   THE TECHNOLOGY, HOW HE WAS INVOLVED IN DEVELOPING THE

22   SCHEMATICS AND LAYOUTS SHOWN ON THE LEFT HERE.  ON THE OTHER

23   HAND, COMET'S EXPERT, DR. SHANFIELD, DID NOT POINT TO ANY OF

24   THESE SCHEMATICS OR CIRCUIT DIAGRAMS, HE POINTED MAINLY TO

25   POWERPOINTS AND WELL-KNOWN TECHNICAL PHRASES AND SAID HE DIDN'T

1        HAVE TIME TO EXPLAIN THE DETAILS.

2            MR. RUMMEL CAME HERE AND HE SHOWED YOU COMDEL'S GENERATOR

3        AND XP'S NEMO MATCH, WHICH IS IN DEVELOPMENT, WHICH HAS NOT YET

4        BEEN RELEASED.  HE OPENED IT UP FOR YOU TO SEE.  IN FACT,

5        MR. RUMMEL IS VERY PROUD OF HIS WORK, BECAUSE IT WAS BUILT ON

6        INDEPENDENT DEVELOPMENT.

7            XP DID INDEPENDENT DEVELOPMENT THE WAY XP ALWAYS WANTED TO

8        DO AND HOW THEY PLANNED TO DO.  THIS IS THE SAME INDEPENDENT

9        DEVELOPMENT THAT MR. PENNY DESCRIBED.

10           NOW, CONTRARY TO COMET'S ALLEGATIONS, WHILE COMET ARGUES

11       XP WANTED A TURNKEY MATCH, THAT EVIDENCE SHOWS THAT IT'S NOT

12       TRUE, NOR DID IT EVER HAPPEN.  YOU HEARD THE SAME FROM

13       MR. RUMMEL, MR. PENNY, AND DR. PHINNEY.

14           NOW, COMET'S EXPERT, DR. SHANFIELD, ALSO TOLD YOU THAT BY

15       MARCH 2018 XP HAD A COMPLETE DEVELOPMENT PLAN AND A COMPLETE 4X

16       SENSOR DESIGN NINE DAYS AFTER THE FORMER COMET EMPLOYEES JOINED

17       XP.  HE TOLD YOU THAT XP HAD A COMPLETE MECHANICAL HOUSING

18       DESIGN FOR RF SENSORS ONE WEEK LATER, AND THEN HE TOLD YOU THE

19       ENGINEERS PROVIDED A COMPLETE CONTROL ARCHITECTURE FOR NEXTGEN

20       RF PRODUCTS IN ABOUT A MONTH.  BUT NONE OF THIS IS SUPPORTED BY

21       THE EVIDENCE.  THERE WERE NO COMPLETE PLANS, THERE WERE NO

22       COMPLETE DESIGNS, THERE'S NO COMPLETE ARCHITECTURE.  THERE'S

23       JUST NO TURNKEY DESIGN.

24           POWERPOINTS AND BLOCK DIAGRAMS ARE NOT A TURNKEY DESIGN.

25           YOU MAY ALSO RECALL THAT DR. SPENCER SEEMED CONFUSED BY

1    SOME OF THE TESTIMONY OF DR. PHINNEY.  THAT'S BECAUSE COMET'S

2    LAWYER MISREPRESENTED WHAT DR. PHINNEY HAD ACTUALLY SAID.

3    HERE'S THE FULL TRANSCRIPT.  DR. PHINNEY WAS ASKED TO ASSUME

4    LIABILITY.  SO WHAT IS LEFT?  CONCEPTS.

5        CONCEPTS ARE NOT TRADE SECRETS.  FOR EXAMPLE,

6    DR. SHANFIELD CLAIMED THAT A CONTROLLER THAT CAN BE USED FOR

7    BOTH THE GENERATOR AND THE MATCH, THAT IS MODULAR, IS A COMET

8    CONCEPT.  BUT APPLIED MATERIALS WAS ALREADY DISCLOSING THIS TO

9    THE WORLD YEARS EARLIER.  AS ANOTHER EXAMPLE, YOU HEARD FROM

10   MR. BONNER, ANOTHER COMET EMPLOYEE, WHO SAID MARKETING FLIERS

11   ARE ALSO NOT TRADE SECRETS.

12       SO THEN WE TURN TO THE ONE THING THAT COMET'S LAWYERS SAID

13   WAS SIMILAR BETWEEN COMET AND XP.  WELL, FIRST, AS I MENTIONED,

14   YOU HEARD MR. RUMMEL'S TESTIMONY OF HOW THE VARIOUS ASPECTS OF

15   XP'S TECHNOLOGY WAS DEVELOPED AND THAT HOW HE WAS PROUD OF HIS

16   WORK.  BUT AFTER MR. RUMMEL FINISHED, THE ONE ASPECT MR. ALPER

17   QUESTIONED HIM ABOUT WAS THE USE OF THE FPGA OR SOC,

18   SYSTEM-ON-CHIP BOARD TO CONTROL THE MATCH.

19       SO HERE'S THE PRESENTATION THAT MR. ALPER REALLY WANTED TO

20   GET MR. RUMMEL TO SAY DEMONSTRATED THE UNIQUENESS OF THE FPGA

21   OR SOC.  BUT YOU KNOW WHO THE AUTHOR OF THAT DOCUMENT IS?

22   MR. MORI.  IT IS UNDISPUTED THAT MR. MORI WORKED ON THE XP

23   CONTROLLER IN THE NEMO PRODUCT.  BUT DO YOU KNOW HOW MANY

24   DOCUMENTS MR. MORI IS ACCUSED OF TAKING?  ZERO.  COMET DIDN'T

25   PLAY HIS VIDEO, THEY DIDN'T CALL HIM TO TESTIFY.  HE DID

1    NOTHING WRONG EXCEPT APPLY HIS EXTENSIVE EXPERIENCE RELATING TO

2    FPGA'S AS A CONTROLLER.  IT'S UNDISPUTED THAT MR. MORI IS AN

3    EXPERT IN THIS AREA AND THAT HE HAD EXPERIENCE USING FPGA'S FOR

4    DECADES.  IT'S ALSO UNDISPUTED THAT THE CONTROLLER BOARD

5    MR. MORI IS WORKING ON WAS PURCHASED FROM MYIR WITH MINOR

6    CUSTOMIZATIONS.

7         WHAT COMET IS REALLY TRYING TO DO HERE IS TO SAY THAT

8    MR. MORI SHOULD NOT BE PERMITTED TO USE AN FPGA AT HIS NEW

9    EMPLOYER, AT XP.

10        NOW, ALTHOUGH COMET CALLS THE USE OF AN FPGA TO CONTROL A

11   MATCH A CONCEPT THAT COMET OWNS, THEY ARE WRONG.  IT'S KNOWN TO

12   USE FPGA'S.  IT'S KNOWN TO THE MARKET.  YOU EVEN HEARD THAT

13   FROM MR. PENNY AND MR. RUMMEL.  AND EVEN MR. CROFTON ADMITS

14   THAT WITH RESPECT TO THE FPGA, IT'S ABOUT THE HOW AND ABOUT THE

15   DETAILS, NOT SIMPLY THE FPGA.

16        IT'S ALSO KNOWN ON HOW TO USE A MODULAR DESIGN.  AND THE

17   MODULAR FPGA ARCHITECTURE COMET IS USING IS SOMETHING THAT'S

18   AVAILABLE OFF THE SHELF.

19        XILINX IS A MAJOR MANUFACTURER OF FPGA'S, TELLS ITS

20   CUSTOMERS TO USE PREDESIGNED BOARDS FROM ITS PARTNERS LIKE

21   MYIR, WHICH IS WHAT XP DID.  AND IN FACT, COMET DID THAT TOO,

22   BUT WITH ANOTHER COMPANY.  XILINX -- THAT XILINX RECOMMENDED,

23   TRENZ.  IF YOU RECALL, MR. GREDE TESTIFIED TO THIS AND YOU SAW

24   E-MAILS OF HIM SAYING THAT THE COMET CONTROLLER WAS LARGELY

25   IDENTICAL TO AN OFF-THE-SHELF BOARD FROM TRENZ.

1          ALTHOUGH COMET CLAIMS THEY MADE MODIFICATIONS SUCH AS THE

2     AMOUNT OF MEMORY OR INTERFACES ON THE BOARD, BUT THE GENERAL

3     ARCHITECTURE OF HAVING AN FPGA CONTROLLER IS NOT A COMET

4     CONCEPT, AS THEY CLAIM.

5          SO FAILING TO FIND ANY SIMILARITIES BETWEEN NEMO AND

6     COMET'S ALLEGED TRADE SECRETS, WHAT DOES COMET DO?  COMET IS

7     THE ONE THAT DOES MISDIRECTION.

8          SO IF YOU RECALL, COMET'S EXPERT SPOKE TO YOU FOR OVER

9     THREE HOURS, BUT DID HE POINT TO A SINGLE SIMILARITY IN AN XP

10    CIRCUIT DIAGRAM, SCHEMATIC, LAYOUT BOARD, OR ANY OTHER

11    ENGINEERING DOCUMENT TO AN ALLEGED TRADE SECRET?  NO.  HE

12    POINTED TO WORDS AND DIAGRAMS AND POWERPOINTS AND COMPARED

13    THEM.  NOW, YOU DON'T NEED A PH.D. IN ENGINEERING TO DO THAT.

14         YOU MIGHT HAVE EXPECTED TO SEE EXACTLY WHAT COMET IS

15    CLAIMING AS ITS TRADE SECRETS, BUT WHAT'S STRIKING IS THAT ALL

16    OF XP'S SCHEMATICS, CIRCUIT DIAGRAMS, AND ALL THOSE DOCUMENTS

17    WERE AVAILABLE TO DR. SHANFIELD, BUT HE DIDN'T POINT TO THEM A

18    SINGLE TIME DURING HIS TESTIMONY.  THERE'S ONLY ONE REASONABLE

19    CONCLUSION, XP'S PRODUCTS DO NOT USE ANY ALLEGED COMET TRADE

20    SECRETS.

21         IN FACT, DR. SHANFIELD WAS GIVEN AN OPPORTUNITY TO INSPECT

22    NEMO, AND YOU PROBABLY WOULD HAVE EXPECTED TO SEE A COMPARISON

23    OF COMET'S ALLEGED TRADE SECRETS IN XP'S RF MATCH TECHNOLOGY.

24    BUT DESPITE COMET HAVING THE BURDEN OF PROOF, HE DIDN'T SHOW

25    ANY ALLEGED TRADE SECRETS IN XP'S NEMO PROTOTYPE.  HE DIDN'T

1318

1    SHOW YOU COMET'S NEXTGEN PRODUCT.  HE DIDN'T COMPARE NEMO TO

2    COMET'S PRODUCT.

3         SO WHAT DOES COMET RELY ON INSTEAD TO PROVE

4    MISAPPROPRIATION?  SLEIGHT OF HAND.

5         SO LET'S TURN TO THE FOUR ALLEGED TRADE SECRETS.  LET'S

6    TALK ABOUT THE AMAT MATCHING NETWORK TRADE SECRET.  SO COMET

7    MADE A BIG DEAL ABOUT HOW DR. PHINNEY DID NOT TALK ABOUT THESE

8    DOCUMENTS, INCLUDING DURING HIS TESTIMONY, BUT LET'S LOOK AT

9    WHY.

10        HERE ARE THE THREE DOCUMENTS, PX3665, PX3666, AND PX1336,

11   THAT COMPRISE, ALLEGEDLY, THE AMAT MATCHING NETWORK TRADE

12   SECRET.  MR. RUSSELL TESTIFIED ABOUT THIS, AND DR. SHANFIELD

13   TESTIFIED ABOUT THIS.

14        BUT, CURIOUSLY, COMET HAS PRESENTED ZERO EVIDENCE THAT

15   THESE THREE DOCUMENTS WERE EVER ACCESSED BY ANYONE, INCLUDING

16   MR. BEUERMAN OR MR. MASON, AFTER THEY LEFT COMET.

17        INSTEAD, WHEN TALKING TO YOU ABOUT THE ALLEGED TRADE

18   SECRETS IN RELATION TO THE AMAT MATCHING NETWORK, DR. SHANFIELD

19   TESTIFIED ABOUT TWO OTHER DOCUMENTS THAT HE CLAIMED MR. MASON

20   ALLEGEDLY ACCESSED.  ONE OF THEM IS THIS INSULATOR SLEEVE

21   DOCUMENT, WHICH JUST SIMPLY DISCLOSES A SHAPE AND DIMENSIONS.

22   AND THAT'S WHAT COMET FOCUSED ON WITH MR. COWEN, TOO,

23   SUGGESTING IT WAS A TRADE SECRET.

24        BUT THE TWO DOCUMENTS ON THE RIGHT, THOSE ARE IRRELEVANT.

25   THEY ARE NOT PART OF COMET'S ALLEGED TRADE SECRETS.

1           AND WHY NOT?  BECAUSE COMET KNOWS THESE AREN'T TRADE

2     SECRETS.

3           AS DR. SHANFIELD TESTIFIED AND RECOGNIZED, NOT ALL

4     CONFIDENTIAL DOCUMENTS AND NOT ALL CONFIDENTIAL INFORMATION IS

5     A TRADE SECRET.

6           NOW, COMET COULDN'T PROVE THE DOCUMENTS MR. MASON

7     ALLEGEDLY ACCESSED ARE TRADE SECRETS, SO THEY JUST RELIED ON

8     MISDIRECTION AND SLEIGHT OF HAND.  THERE IS ZERO EVIDENCE OF

9     MISAPPROPRIATION AS TO THE THREE EXHIBITS THAT MAKE UP THE

10    ALLEGED AMAT MATCHING NETWORK TRADE SECRET.  THAT IS CONCLUSIVE

11    AS TO THE ALLEGED AMAT MATCHING NETWORK TRADE SECRET.  BUT THAT

12    ALLEGED TRADE SECRET ISN'T EVEN A TRADE SECRET BY THE TIME OF

13    THE ALLEGED MISAPPROPRIATION.

14          NOW, IF YOU RECALL, YOU HEARD FROM MR. RUSSELL.  AND HE

15    SAID THAT AMAT MATCHES HAVE ALREADY BEEN SOLD.  AND YOU ALSO

16    HEARD FROM MR. KAMMERER THAT ANYONE THAT BUYS A PRODUCT CAN

17    OPEN IT UP AND DO WHATEVER THEY WANT WITH IT, EVEN BURN IT

18    DOWN.

19          THEREFORE, ONE CAN OPEN UP AN AMAT MATCH AND LOOK AT THE

20    COMPONENTS, INCLUDING THINGS LIKE THE SENSOR AND THE OTHER

21    COMPONENTS ON THE INSIDE.

22          SO WHAT DOES IT MEAN?  IT MEANS COMET'S ALLEGED TRADE

23    SECRETS ARE ALSO READILY ASCERTAINABLE.  AND YOU HEARD THAT

24    TERM FROM THE JUDGE, ONE CAN SEE THE PARTS.

25          THIS IS CONTRARY TO DR. SHANFIELD'S ASSUMPTION THAT THIS

1320

```
1    ALLEGED TRADE SECRET IS SECRET.  IT'S NOT.
2         BUT IT'S EVEN SIMPLER THAN THAT.  COMET DOESN'T EVEN OWN
3    THE ALLEGED AMAT TRADE SECRET.  HERE'S THE COMET AMAT
4    AGREEMENT, IT IS UNDISPUTED THAT THE COMET AMAT AGREEMENT
5    RELATES TO AND COVERS THE ALLEGED AMAT TRADE SECRET.
6         MR. RUSSELL AND DR. RAFINEJAD AGREE WITH THAT.
7         AND THE AGREEMENT SAYS THAT OWNERSHIP OF IP BELONGS TO
8    AMAT IF THERE'S INPUT OR COLLABORATION.
9         NOW, CONTRARY TO MR. ALPER'S CLAIM THAT THERE IS NO
10   EVIDENCE THAT AMAT PROVIDES INPUT, THE EVIDENCE HAS SHOWN THAT
11   AMAT DOES PROVIDE INPUT.
12        AND IF YOU RECALL, DR. RAFINEJAD ALSO TESTIFIED THAT THE
13   AMAT MATCH WAS DEVELOPED IN CLOSE COLLABORATION WITH AMAT.  SO
14   COMET DOESN'T EVEN OWN THE ALLEGED AMAT MATCHING TRADE SECRET.
15        SO WHAT ABOUT THE OTHER THREE ALLEGED TRADE SECRETS?
16   COMET DOES THE SAME TRICK IT USES FOR THE AMAT MATCHING NETWORK
17   TRADE SECRET.  COMET SHOWS YOU ONE SET OF DOCUMENTS AS ITS
18   ALLEGED TRADE SECRETS BUT CANNOT SHOW ALL OF THESE WERE EVEN
19   ACCESSED BY MR. MASON OR MR. BEUERMAN AT XP, LET ALONE USED.
20        LET'S LOOK AT THE DA VINCI RF GENERATOR CONTROL DIGITAL
21   MEASUREMENT AND SOFTWARE ALLEGED TRADE SECRET.
22        SO ONE OF THE ALLEGED TRADE SECRET DOCUMENTS, IF YOU SEE
23   HERE, IS THE ANALOG INPUT CONCEPT.
24        SO WHAT IS THAT?  IT'S A PUBLIC DATA SHEET FROM ANALOG
25   DEVICES, A THIRD-PARTY CHIP MANUFACTURER.  DATA SHEETS ARE
```

1    AVAILABLE ONLINE.  THEY ARE NOT COMET'S CONCEPTS.  THEY ARE NOT

2    COMET'S TRADE SECRET.

3         AGAIN, DR. SHANFIELD SKIPPED OVER THIS DETAIL.

4         ONCE YOU GET PAST THIS, COMET'S ALLEGATIONS BOIL DOWN TO

5    THE INFORMATION CONTAINED IN THREE COMET DOCUMENTS, PX0002,

6    PX3078, AND PX3657.

7         THESE DOCUMENTS CONTAIN THE ALLEGED TRADE SECRETS THAT

8    DR. SHANFIELD ULTIMATELY COMPARES TO XP'S POWERPOINTS.  BUT

9    NONE OF THESE ARE TRADE SECRETS, AND NONE OF THEM WERE

10   MISAPPROPRIATED.

11        FIRST, LET'S LOOK AT PX0002.  IT'S A POWERPOINT

12   PRESENTATION.  THIS IS IT.

13        SO PX0002 IS A POWERPOINT PRESENTATION THAT MR. BEUERMAN

14   USED IMAGES FROM TO CREATE A PRESENTATION FOR XP.  AND COMET

15   HAS SHOWN THESE SLIDES OVER AND OVER AGAIN IN THIS CASE.  BUT

16   BEFORE THE LITIGATION, COMET TREATED THE INFORMATION CONTAINED

17   IN THIS ROAD MAP POWERPOINT AS PUBLIC MARKETING MATERIALS.

18        THERE'S ONLY ONE SLIDE IN THIS ENTIRE PRESENTATION THAT

19   WAS MARKED CONFIDENTIAL, BUT THAT SLIDE IS NOT ONE THAT COMET

20   ALLEGES MR. BEUERMAN COPIED.

21        IN FACT, THE ONLY FOUR THAT WERE ALLEGED AS COPIED WERE

22   PRESENTED WITHOUT CONFIDENTIALITY MARKINGS.  AND THOSE WERE

23   PRESENTED IN ANOTHER PRESENTATION AROUND THE WORLD IN TAIWAN AT

24   CONFERENCES AND TO POTENTIAL CUSTOMERS.

25        AND YOU HEARD MR. SMITH AND MR. KAMMERER TESTIFY THAT

1    COMET DID NOT TAKE STEPS TO PROTECT THE INFORMATION IN THIS

2    PRESENTATION.  YOU HEARD COMET TESTIFY THAT THE ROAD MAP WAS

3    GIVEN TO LAM AND NOT MARKED CONFIDENTIAL AS REQUIRED UNDER

4    COMET'S AGREEMENT WITH LAM.

5         COMET DID NOT TREAT THIS AS A TRADE SECRET BECAUSE IT'S

6    NOT.  COMET ONLY CLAIMED IT WAS A TRADE SECRET AFTER LEARNING

7    THAT MR. BEUERMAN KEPT A COPY.  AND COMET EVEN HIRED AN EXPERT

8    TO TELL YOU THAT THERE'S AN IMPLIED NDA IN THE INDUSTRY WHERE

9    AN UNSPOKEN AGREEMENT EXISTS WHEREBY EVERYONE HELPS KEEP

10   EVERYONE'S INFORMATION SECRET FOREVER.  FOREVER.

11        NOW, IF YOU FIND THAT THE COMET MATCH ROAD MAP IS NOT A

12   TRADE SECRET, THERE CAN BE NO FINDING OF MISAPPROPRIATION OF

13   THE KIYO AND DA VINCI RF GENERATOR CONTROL ALLEGED TRADE

14   SECRET.

15        YES, COMET AND DR. SHANFIELD CITED TO OTHER DOCUMENTS AND

16   CLAIMED THEM TO BE PART OF THESE ALLEGED TRADE SECRETS, BUT

17   THOSE DOCUMENTS WERE NEVER USED BY XP.  AND AS I SHOWED YOU,

18   SOME AREN'T EVEN COMET DOCUMENTS.

19        SO THE NEXT DOCUMENT, PX3078.  THAT'S THIS PRESENTATION, A

20   HANDFUL OF PAGES.  AND PX3078 CONTAINS A BLOCK DIAGRAM THAT

21   COMET HAS ALSO SHOWN REPEATEDLY THROUGHOUT THIS CASE.

22        IF YOU RECALL, MR. RUMMEL TESTIFIED THIS DESIGN IS SIMPLY

23   NOT USED IN XP.  FULL STOP.

24        AND WHEN MR. RUMMEL SAW IT, HE RECOGNIZED IT AS SOMETHING

25   HE HAD KNOWN ABOUT FOR YEARS.  THIS BLOCK DIAGRAM REFLECTS

1    MATH.  COMET CANNOT CLAIM MATH AS A TRADE SECRET, CERTAINLY NOT

2    ITS TRADE SECRET, EVEN IF DR. SHANFIELD CLAIMS IT IS A COMPLETE

3    DESIGN.

4        NOW, COMET'S EXPERT EVEN SAYS THAT THE INFORMATION IN HERE

5    ARE THINGS YOU MIGHT FIND IN A TEXTBOOK.  THAT'S THE OPPOSITE

6    OF A TRADE SECRET.

7        THIS IS ONE WHERE THEY QUESTION MR. COWEN ABOUT, TOO, BUT

8    IT'S JUST SIMPLY NOT A TRADE SECRET.

9        SO WHERE DOES THAT LEAVE US?  ONE LAST DOCUMENT.  THE

10   SENSOR DOCUMENT.

11       SO, NOW, DURING COMET'S CASE, COMET REPEATEDLY COMPARED

12   THIS SENSOR IN PX3657 TO A SENSOR DRAWING IN A PRESENTATION

13   THAT MR. BEUERMAN HAD CREATED AND CLAIMED IT WAS A TELLTALE

14   SIGN THAT XP KNEW MR. BEUERMAN WAS USING COMET INFORMATION.

15       BUT COMET NEVER SHOWED YOU WHAT WAS ALREADY KNOWN IN THE

16   INDUSTRY, DR. PHINNEY DID THAT.  HE SHOWED YOU THIS IS A WIDELY

17   KNOWN SENSOR DESIGN FOUND IN PUBLICLY AVAILABLE ADVANCED ENERGY

18   MATCHES THAT ANYONE CAN TAKE APART AND LOOK AT.

19       IN FACT, EVEN MR. PENNY RECOGNIZED IT AS AN AE SENSOR.

20       AND, MOST IMPORTANTLY, XP IS NOT USING THIS SENSOR AT ALL.

21   AS MR. RUMMEL TESTIFIED, NEMO USES A SIMPLE VP DETECTOR THAT

22   MR. RUMMEL DESIGNED AND THAT YOU CAN SEE FROM LOOKING AT NEMO.

23       SO WHERE DOES THIS LEAVE US?  AS THE JUDGE HAS INSTRUCTED

24   YOU, IT IS COMET'S BURDEN TO PROVE ITS ALLEGED TRADE SECRETS

25   WERE ACTUALLY SECRET AND THAT IT TOOK REASONABLE MEASURES TO

1     PROTECT THEM AS SECRET.

2          COMET ALSO BEARS THE BURDEN OF PROOF ON ALL THE OTHER

3     ELEMENTS FOR TRADE SECRET MISAPPROPRIATION FOR EACH OF THE

4     ALLEGED TRADE SECRETS.  THEY MUST DO SO BY A PREPONDERANCE OF

5     THE EVIDENCE.  IF YOU ARE CONFUSED AS TO ABOUT WHAT THE ALLEGED

6     TRADE SECRETS EVEN ARE, ABOUT WHETHER COMET ACTUALLY OWNS THEM,

7     OR ABOUT WHAT EVIDENCE COMET WANTS YOU TO BELIEVE SHOWS PARTS

8     THAT WERE ALLEGEDLY USED BY XP, COMET HAS SIMPLY NOT MET ITS

9     BURDEN TO PROVE MISAPPROPRIATION.

10          SO WHAT ARE WE LEFT WITH?  MORE FACTS THAT DON'T FIT WITH

11    COMET'S VERSION OF THE PLOT.  ALLEGED TRADE SECRETS THAT WERE

12    NOT CONSIDERED TRADE SECRET BY ANYONE PRIOR TO THE LAWSUIT, NOT

13    COMET, NOT MR. BEUERMAN, NOT MR. MASON.

14          BUT DESPITE ALL THAT, XP TOOK THE ALLEGATIONS SERIOUSLY

15    AND, AS ALREADY EXPLAINED, INVESTIGATED AND ACTED SWIFTLY AND

16    PROMPTLY.

17          SO WHAT DO I MEAN BY NO ONE TREATED THESE SO-CALLED TRADE

18    SECRETS AS TRADE SECRET?  WELL, MR. CROFTON CLAIMED WHEN HE

19    CHOSE TO FILE SUIT THAT THE RF MATCH WERE THE FAMILY JEWELS.

20    BUT THE FACTS DON'T BEAR THAT OUT.

21          BEFORE THERE WAS A LAWSUIT, COMET DID NOT TREAT THE

22    DOCUMENTS AND INFORMATION IT NOW CLAIMS AS TRADE SECRET AS

23    SECRET.  COMET DID NOT PROTECT THE INFORMATION AS SECRET.

24          FIRST, AS YOU'VE SEEN, MR. SMITH TESTIFIED THAT NO STEPS

25    WERE TAKEN TO PREVENT TSMC FROM DISCLOSING THE INFORMATION THEY

1    LEARNED AND THAT COMET DID NOT DO ANYTHING TO ENSURE THAT

2    EVERYONE AT THE PCT PRODUCT SEMINAR HAD SIGNED AN NDA.

3          MR. KAMMERER CONFIRMED THE SAME THING.

4          AND, NOW, COMET DIDN'T BRING MR. KAMMERER OR MR. SMITH,

5    WHO WERE TWO EXECUTIVES AT COMET; MR. KAMMERER, THE HEAD OF

6    PCT; AND MR. SMITH, THE HEAD OF PCT U.S., THE RELEVANT COMET

7    DIVISION.  PERHAPS IT'S BECAUSE THEIR TESTIMONY DOESN'T FIT

8    COMET'S STORY.

9          SECOND, COMET KNEW HOW TO MARK INFORMATION CONFIDENTIAL.

10   IN THE COMET ROAD MAP PRESENTATION, AS I MENTIONED, THEY MARKED

11   ONE SLIDE CONFIDENTIAL.  BUT COMET DID NOT MARK PROPRIETARY OR

12   CONFIDENTIAL ANYTHING ELSE IN THE PRESENTATION IN ACCORDANCE

13   WITH ITS AGREEMENTS WITH LAM.

14         SO, FINALLY, ALL THAT ASIDE, COMET'S ALLEGED AMAT AND KIYO

15   TRADE SECRETS HAVE ALREADY BEEN SOLD.  AND THEY HAVEN'T TAKEN

16   ANY STEPS TO ENSURE THAT NO ONE CAN LOOK INSIDE OF THEM -- TO

17   PREVENT ANYONE FROM LOOKING INSIDE OF THEM.

18         DESPITE CLAIMING THESE ARE FAMILY JEWELS, COMET DID NOT

19   CHANGE A THING.

20         WHY?  BECAUSE THE FEW DOCUMENTS THAT REMAIN AT ISSUE IN

21   THIS CASE, NO ONE REALLY CONSIDERED THEM A TRADE SECRET,

22   CERTAINLY NOT COMET.

23         SO WHERE DOES THIS LEAVE US WITH COMET'S STORY?  THE REAL

24   FACTS AND EVIDENCE DO NOT SUPPORT COMET'S MOTIVE, ITS VILLAIN,

25   OR ITS PLOT.

1    USING YOUR COMMON SENSE, YOU WILL FIND AND YOU WILL REACH

2    THAT THERE IS NO LIABILITY.  COMET CANNOT PROVE ITS CASE.

3    AND IF COMET CANNOT PROVE EACH AND EVERY ELEMENT OF ITS

4    CLAIMS, THERE CAN BE NO DAMAGES.

5    THERE HAVE BEEN NO LOST SALES BY COMET.  AND, IN FACT, AS

6    MR. KAMMERER TESTIFIED, THERE HAS BEEN NO HARM TO COMET.

7    MR. MALACKOWSKI ALSO CONFIRMED THIS.  YET YOU HEARD COMET

8    RATCHET UP NUMBERS TO FIT ITS STORY AGAIN.  COMET, IN ITS

9    OPENING AND AGAIN IN ITS CLOSING AND THROUGH WITNESSES, TRIED

10   TO ARGUE THAT THEY SPENT $100 MILLION ON R&D DEVELOPING THESE

11   ALLEGED TRADE SECRETS.  BUT EVEN ITS OWN EXPERT COULD ONLY SAY

12   THAT ANY UNJUST ENRICHMENT WAS NO MORE THAN 32.5 MILLION.

13   BUT AS MS. IRWIN EXPLAINED, EVEN THAT 32.5 MILLION IS AN

14   OVERREACH.  MR. MALACKOWSKI IS WRONG.  MR. MALACKOWSKI INFLATED

15   HIS UNJUST ENRICHMENT CALCULATIONS.  MR. MALACKOWSKI DID NOT

16   SHOW ANY ACTUAL AVOIDED COSTS AS A RESULT OF THE ALLEGED USE,

17   AND BECAUSE OF THAT THERE SHOULD BE NO DAMAGES.

18   NOW, AS AN ALTERNATIVE, MR. MALACKOWSKI PRESENTED A

19   REASONABLE ROYALTY ANALYSIS.  BUT MR. MALACKOWSKI'S WAY OF

20   REASONABLE ROYALTY ASSUMED THAT XP WOULD PAY FOR ALL OF COMET'S

21   R&D AND THAT COMET WOULD PAY ZERO.  THAT'S NOT THE RIGHT WAY TO

22   EVALUATE DAMAGES.  THERE ARE NO NEW PRODUCTS, AND THERE ARE NO

23   NEW SALES.

24   SO HAS COMET PROVEN ITS CASE?  NO.

25   IN THE JURY ROOM WHEN YOU DELIBERATE, YOU WILL NEED TO

1      FILL OUT A VERDICT FORM.  MR. ALPER ACTUALLY WENT THROUGH IT

2      FAIRLY IN DETAIL, BUT I'M GOING TO TALK ABOUT THE HIGHLIGHTS.

3           SO AS YOU JUST HEARD IN THE JUDGE'S INSTRUCTIONS AND

4      YOU'VE HEARD ME SAY, COMET MUST PROVE EACH ELEMENT.  IF COMET

5      FAILS TO PROVE THAT IT OWNED THE ALLEGED TRADE SECRETS, THE

6      ANSWER IS NO, AND YOUR VERDICT IS COMPLETE.

7           IF COMET FAILS TO PROVE THAT THE INFORMATION WAS SECRET,

8      THE ANSWER IS NO, AND YOUR VERDICT IS COMPLETE.

9           IF COMET FAILS TO PROVE THAT THE ALLEGED TRADE SECRETS HAD

10     ACTUAL OR POTENTIAL INDEPENDENT ECONOMIC VALUE BECAUSE IT WAS

11     SECRET, AGAIN, THE ANSWER IS NO, AND YOUR VERDICT IS COMPLETE.

12          IF COMET FAILS TO PROVE THAT IT MADE REASONABLE EFFORTS

13     UNDER THE CIRCUMSTANCES TO KEEP THE ALLEGED TRADE SECRETS

14     SECRET, THE ANSWER IS NO, AND YOUR VERDICT IS COMPLETE.

15          AND IF COMET FAILED TO PROVE THAT XP USED OR DISCLOSED THE

16     INFORMATION BY IMPROPER MEANS, THE ANSWER IS NO, AND YOUR

17     VERDICT IS COMPLETE.

18          NOW, YOU WILL SEE IN THE INSTRUCTIONS THAT IF YOU ANSWER

19     NO TO ANY OF THESE QUESTIONS, YOUR VERDICT IS COMPLETE ON THAT

20     ALLEGED TRADE SECRET.  THERE IS ONE QUESTION THAT WE BELIEVE IF

21     YOU REACH IT, THE ANSWER IS ACTUALLY YES.  AND IF THE ALLEGED

22     TRADE SECRETS WERE READILY ASCERTAINABLE BY PROPER MEANS AT THE

23     TIME OF THE ALLEGED USE OR DISCLOSURE, YOUR VERDICT FORM IS

24     COMPLETE ON THAT ALLEGED TRADE SECRET.

25          SO WE STRONGLY BELIEVE THAT COMET HAS NOT MET ITS BURDEN

1    OF PROOF AND THAT THE EVIDENCE DOESN'T SUPPORT THEIR STORY AND

2    THAT YOU WILL NOT GET TO THE QUESTION OF DAMAGES.

3         SO I STARTED WITH WHY ARE WE HERE AND WHAT IS THIS CASE

4    REALLY ABOUT.  IT'S COMET'S ATTEMPT TO TWIST THE FACTS AND TO

5    USE SMOKE AND MIRRORS TO TELL A SALACIOUS STORY, BUT ONE THAT

6    DOESN'T HOLD UP.  IN FACT, COMET IS THE ONE WHO HAS NOT BEEN

7    TRANSPARENT.  THERE ARE KEY PIECES OF EVIDENCE THAT THEY IGNORE

8    OR OBSCURE.

9         ONE EXAMPLE, WHEN THE FACTS DON'T SUPPORT COMET, THEY SAY

10   THINGS THAT DEFY COMMON SENSE TO SUPPORT THEIR STORY.  AS YOU

11   RECALL, SINCE COMET DIDN'T FOLLOW THEIR NDA'S, DR. RAFINEJAD,

12   COMET'S EXPERT WHOSE TESTIMONY YOU HEARD, CLAIMS THERE IS A

13   SO-CALLED INDUSTRY STANDARD OF IMPLIED NDA'S WHERE DOCUMENTS

14   ARE CONFIDENTIAL FOREVER.  AND HE HAS NO IDEA HOW TO ENFORCE

15   SUCH AN NDA.  IS HE CREDIBLE?  WELL, HE ADMITTED THAT HE FORMED

16   OPINIONS ON DOCUMENTS THAT HE DIDN'T LOOK AT.

17        AND THEN THERE'S MR. RUSSELL, WHERE WHEN THE FINANCIAL

18   DATA DIDN'T SUPPORT COMET'S THEORIES, HE CLAIMED THAT ALL

19   ENGINEERS HAD BEEN UNDERREPORTING THEIR TIME FOR SEVEN YEARS.

20        AS ANOTHER EXAMPLE, COMET'S EXPERT DISAGREED WITH COMET'S

21   VIEW OF SOME OF THE INFORMATION IT NOW CLAIMS AS ITS ALLEGED

22   TRADE SECRETS.  SPECIFICALLY, MR. SMITH, WHO MANAGED

23   MR. BEUERMAN AS HEAD OF PCT, TESTIFIED THAT COMET DID NOT EVEN

24   CONSIDER EVERY SLIDE IN THE PRESENTATION AS COMET CONFIDENTIAL

25   INFORMATION.  BUT IF YOU RECALL, DR. RAFINEJAD SAID THAT'S

1    MR. SMITH'S OPINION, BUT DR. RAFINEJAD HAS HIS OWN OPINION,

2    WHICH IS DIFFERENT.

3         SO INSTEAD, XP IS HERE, AND YOU ARE HERE, AND WHY?

4    BECAUSE MR. CROFTON, WHO WASN'T AROUND WHEN THE EVENTS

5    HAPPENED, MADE A DECISION TO RE-FILE THIS CASE AGAINST XP.

6    BECAUSE MR. CROFTON IS BETTING ON WINNING.  AND HAVING MADE

7    THAT BET, COMET HAD TO CONJURE UP A MOTIVE, A VILLAIN, AND A

8    PLOT ON A STORY THAT DEFIES COMMON SENSE.

9         IF XP WAS USING COMET'S TECHNOLOGY, IF XP WAS USING A

10   TURNKEY DESIGN FROM COMET, WHY WOULDN'T DR. SHANFIELD IDENTIFY

11   ANY EVIDENCE OF THAT IN THE SCHEMATICS, THE BOARD LAYOUTS, THE

12   ACTUAL ENGINEERING DOCUMENTS?  WHY DID HE RELY ON POWERPOINTS

13   AND MARKETING BUZZ WORDS?  AND THEN, WHY DID COMET'S LAWYERS

14   THINK IT WOULD BE A BAD IDEA FOR DR. SHANFIELD TO POINT OUT

15   CERTAIN PARTS OF NEMO WHICH HE INSPECTED AND SHOWED YOU WHERE

16   COMET'S ALLEGED TRADE SECRETS ARE IN THE PRODUCT THAT

17   MR. RUMMEL AND HIS TEAM BUILT?

18        SO SOON I WILL BE SITTING DOWN, AND MR. ALPER WILL BE ABLE

19   TO ADDRESS YOU AGAIN.  IT IS HIS RIGHT AS A PLAINTIFF WITH THE

20   BURDEN OF PROOF.  I WILL NOT BE ABLE TO SPEAK TO YOU AGAIN ON

21   BEHALF OF XP.  BUT I WOULD ASK YOU TO THINK ABOUT WHAT I SAID

22   AND WHAT XP WOULD SAY IN RESPONSE TO HIS COMMENTS AS YOU

23   CONSIDER ALL OF THE EVIDENCE.

24        REMEMBER THE REAL STORY.  SO WHAT IS THE REAL STORY?

25   THERE IS NO CONSPIRACY.  MR. BEUERMAN ADMITTED THAT EVERYTHING

1    HE DID WAS HIS FAULT.   MR. LAVER AND MR. WARNER AND XP TOLD

2    MR. BEUERMAN AND MR. MASON NOT TO BRING ANYTHING.   THERE ARE NO

3    SO-CALLED RED FLAGS.   MR. BEUERMAN AND MR. MASON DID SCREW UP.

4    MR. BEUERMAN SCREWED UP BEFORE HE EVEN LEFT COMET, BUT HE

5    DELETED THOSE FILES AND THEN ONLY ACCESSED A FEW IMAGES THAT NO

6    ONE, NO ONE, NOT EVEN COMET TREATED AS CONFIDENTIAL.

7         MR. MASON SIMPLY LIED.   I MEAN, HE LIED TO EVERYONE.

8    DESPITE EVERYTHING XP DID, MR. MASON DISAPPOINTED EVERYONE, BUT

9    HE SHOULD BE THE VILLAIN, NOT XP.   SO COMET IS SUING THE WRONG

10   PARTY.   MR. BEUERMAN AND MR. MASON ARE NOT BEING SUED.

11        THE SIMPLE FACT IS, IF YOU REMEMBER, XP HAS BEEN TOTALLY

12   TRANSPARENT TO YOU AND TO COMET.   THIS DISPUTE COULD HAVE BEEN

13   RESOLVED A LONG TIME AGO.   COMET COULD HAVE BEEN MORE

14   TRANSPARENT.   AS MR. PENNY TESTIFIED, COMET COULD HAVE REACHED

15   OUT BEFORE MR. MASON AND MR. BEUERMAN EVEN STARTED.   COMET

16   COULD HAVE TOLD XP ABOUT THEIR SPECIFIC ALLEGATIONS.   IN THAT

17   CASE, MAYBE NONE OF THIS WOULD HAVE HAPPENED.

18        AND AS MR. ALPER ASKS YOU TO FIND THAT XP AND MR. PENNY

19   AND MR. RUMMEL IS GUILTY OF ACTING WILLFULLY AND MALICIOUSLY,

20   REMEMBER MR. PENNY'S TESTIMONY.   HE INVITED MR. KAMMERER TO GO

21   TO XP AND LOOK AT WHAT XP WAS DOING.   HE INVITED COMET TO BRING

22   COMET'S ENGINEERS AND SEE WHAT XP WAS DOING.   BECAUSE XP DID

23   NOT KNOW WHAT THE ALLEGED TRADE SECRETS WERE, COMET DID.

24   BECAUSE XP WAS CONFIDENT IT WAS NOT USING COMET'S TRADE

25   SECRETS.   XP MADE THIS OFFER, TRUSTED COMET TO GO TO XP TO

1    ALLOW COMET TO DETERMINE WHETHER XP WAS USING ANY OF ITS

2    ALLEGED TRADE SECRETS BECAUSE XP BELIEVED XP WAS DOING THINGS

3    FROM THE GROUND UP.

4         XP WAS NOT ACTING WILLFULLY; IT WAS NOT ACTING

5    MALICIOUSLY.  IT WAS ACTING REASONABLY.

6         I ASK YOU, THEREFORE, AS I DID WHEN I STARTED, TO SORT

7    THROUGH THE FACTS AND TO APPLY YOUR COMMON SENSE AND THE

8    JUDGE'S INSTRUCTIONS ON WHAT THE LAW REQUIRES COMET TO PROVE.

9    AND ONCE YOU DO THAT, YOU CAN SEE THROUGH THE SMOKE AND THE

10   MIRRORS AND FIND THE TRUTH AND THE SIMPLE FACTS IN EVIDENCE

11   THAT THIS CASE IS REALLY ABOUT.

12        ON BEHALF OF XP, WE ALSO THANK YOU FOR YOUR SERVICE.

13        THE COURT:  THANK YOU, MS. YOUNG.  LET'S TAKE A

14   STRETCH BREAK, AND THEN MR. ALPER WILL HAVE THE FINAL SHORT

15   REPLY.

16        (PAUSE IN PROCEEDINGS.)

17        THE COURT:  READY?  ALL RIGHT.  MR. ALPER, YOU MAY

18   PROCEED.

19        MR. ALPER:  THANK YOU.

20        OKAY.  THANK YOU, YOUR HONOR.

21        **FURTHING CLOSING ARGUMENT BY MR. ALPER**

22        MR. ALPER:  ALL RIGHT.  THIS IS IT, YOU'RE ALMOST

23   THERE, THE CASE IS ALMOST YOURS, I ONLY HAVE A FEW MINUTES

24   LEFT, I WILL KEEP MY REMARKS BRIEF.

25        YOU HEARD A LOT OVER THE COURSE OF THIS TRIAL.  YOU

1332

1     CERTAINLY HEARD A LOT FROM XP.  YOU'VE HEARD ABOUT PUBLIC

2     MEETINGS WHERE SLIDES WERE DISCLOSED; YOU'VE HEARD ABOUT

3     CONFIDENTIALITY MARKINGS; YOU'VE HEARD ABOUT HOW THERE ARE NO

4     RED FLAGS; YOU'VE HEARD ABOUT HOW THERE ARE OWNERSHIP

5     AGREEMENTS; AND YOU'VE HEARD ABOUT HOW THERE WERE THINGS THAT

6     WERE PUT IN PATENTS AND THINGS THAT WERE BOUGHT FROM PEOPLE WHO

7     MAKE FPGA'S.

8          MR. SCHLAIFER, IF YOU COULD CALL UP PDX18.4, PLEASE.

9          BUT WHAT YOU HAVEN'T HEARD IS XP SAY, "WE WERE WRONG, WE

10    ARE GOING TO MAKE THIS RIGHT, AND WE ARE GOING TO TAKE

11    RESPONSIBILITY FOR OUR ACTIONS."  YOU HAVEN'T HEARD THEM SAY,

12    "WE ARE GOING TO TAKE ALL THOSE DOCUMENTS THAT WE SHOWED

13    YOU" -- THAT I JUST SHOWED YOU, THAT THEY ARE STILL PASSING

14    AROUND IN THEIR COMPANY -- "AND GET RID OF THEM, AND ENSURE

15    THAT ANY OF THE TECHNOLOGY THAT WE HAVE USED THAT IS COMET'S,

16    IS NOT IN OUR PRODUCTS."

17         AND THAT IS ABSOLUTELY THE WRONG THING FOR THEM TO DO.

18         AND INSTEAD, WHAT WE'VE HEARD IS THAT ALL OF THIS IS

19    COMET'S FAULT.  AND THAT IS BLAMING THE VICTIM, PLAIN AND

20    SIMPLE.  IT DOESN'T GET MORE CLEAR THAN THAT.

21         THIS IS A COMPANY WHERE EVERY EXECUTIVE ADMITS THAT THEFT

22    OCCURRED WITH THEIR -- BY THEIR SENIOR EMPLOYEES, THAT THEY

23    HAVE KNOWN ABOUT IT FOR YEARS, AND THEY SIMPLY WILL NOT TAKE

24    RESPONSIBILITY AND MAKE IT RIGHT.

25         AND IT FALLS ON YOU TO TELL THEM TO DO IT RIGHT, THE RIGHT

1    WAY.

2         OKAY.  I WOULD LIKE TO ADDRESS JUST A COUPLE OF POINTS

3    HERE.  HOW ABOUT THE POINT THAT WE MADE UP THE STORY, WE MADE

4    UP THE PLOT.

5         IF YOU COULD, MR. SCHLAIFER, TO PDX7.19.

6         THEY SAY THAT WE CAME UP -- WE CONCOCTED THE IDEA THAT XP

7    WAS ATTEMPTING TO TARGET COMET EMPLOYEES.  IT COULDN'T BE

8    FARTHER FROM THE TRUTH.  YOU SAW THIS, THIS IS PX3208, IT'S AN

9    E-MAIL FROM MIKE LAVER TO DUNCAN PENNY AND THE CURRENT CEO,

10   MR. GRIGGS, WHO NEVER TOOK THE STAND.  HE NEVER TOOK THE STAND.

11   HE'S THE CURRENT CEO, AND HE WOULDN'T FACE YOU AND TESTIFY

12   BEFORE YOU.

13        AND WHAT DO THEY SAY?  COMET HAS SOME OF THE BEST

14   TECHNOLOGY IN THE BUSINESS AND THEY ARE TALKING ABOUT THE

15   EMPLOYEES THEY ARE GOING TO TAKE AWAY FROM COMET, AND THEY SAY,

16   "I SEE THIS GROUP AS" -- "NOT ONLY AS A WAY TO MAKE A SPLASH IN

17   THE MATCH ARENA BUT ALSO A WAY TO SELL MORE GENERATORS."

18        THEY CAME UP WITH THE PLAN, THEY WROTE THE PLOT TO THE

19   STORY, AND THEY FOLLOWED THROUGH ON IT.  AND I SHOWED YOU IN

20   THE EVIDENCE.

21        WHAT ABOUT NO RED FLAGS?  WHAT ABOUT THEY DID THE RIGHT

22   THING?  WE HEARD THEY DID THE RIGHT THING ALL ALONG.  IT IS

23   UNDISPUTED THAT XP KNEW ABOUT ALL OF THIS SINCE MID-2018, AND

24   YET THEY KEPT MR. BEUERMAN AND MR. MASON EMPLOYED IN THEIR

25   POSITIONS, ALL OF THAT TIME.  AND THEN WE SAW THAT BOARD

1       MEETING THAT HAPPENED AT THE END OF 2019 --

2               AND BY THE WAY, WHILE THEY ARE CONTINUING TO USE COMET

3       INFORMATION, I SHOWED YOU THE EXPERT E-MAIL, THE E-MAIL ABOUT

4       THE EXPERT IS GOING TO FIND THIS.  THAT'S WHILE THEY ARE

5       WORKING AT XP.  THAT'S NOT AT COMET, THAT'S NOT BEFORE ALL OF

6       THIS CAME OUT, THAT'S WHILE THEY ARE WORKING AT XP, THEY ARE

7       USING COMET INFORMATION, WITH A TEAM.

8               AND THEN THE BOARD MEETS IN 2019, AND THEY DECIDE TO GIVE

9       MR. BEUERMAN A WRITTEN WARNING.  I'M NOT MAKING THIS UP.  THIS

10      IS IN THE DOCUMENTS, I DIDN'T WRITE THIS STORY, THEY WROTE THIS

11      STORY.  AND THEY SAY THEY ARE GOING TO GIVE HIM A WRITTEN

12      WARNING, BUT NOT YET, LET'S WAIT UNTIL THE COMET LEGAL CASE IS

13      GONE AND THE COAST IS CLEAR.  THEY WROTE THAT.  THAT'S --

14              IF YOU GO TO PDX18.52.

15              AND THEN WHAT DID MR. PENNY SAY ABOUT THAT?  WHAT WAS THE

16      REASON?  WE GO TO THE NEXT SLIDE.  HE WAS CONCERNED THAT

17      MR. BEUERMAN MIGHT TURN STATE'S EVIDENCE AND TELL COMET WHAT

18      REALLY HAPPENED.

19              AND SO THEY DECIDED NOT TO EVEN WARN HIM, JUST LET HIM

20      KEEP ON DOING WHAT HE WAS DOING.  AND THE SAME WITH MASON.  WE

21      ARE NOT WRITING THIS STORY, THEY WROTE THE STORY, AND THEY ARE

22      TRYING TO CHANGE IT HERE AT THE TRIAL.  IS THAT THE RIGHT THING

23      TO DO?  IS THAT THE WAY THAT YOU WANT CORPORATIONS TO BEHAVE IN

24      THE UNITED STATES, ESPECIALLY BIG ONES THAT HAVE THE MONEY TO

25      DO WHATEVER THEY WANT?  TO BUY OTHER COMPANIES, TO BUY

1    TECHNOLOGY.

2         THE ANSWER FOR US IS CLEAR.

3         WHAT ABOUT USING THE TECHNOLOGY?

4         IF WE COULD GO TO SLIDE PDX18.41.

5         THIS IS STILL THEIR ANSWER.  THE TECHNOLOGY WAS ALL KNOWN,

6    IT'S JUST A BASIC FPGA, IT'S STUFF YOU CAN BUY FROM ANYONE.

7         I HAD TO CROSS-EXAMINE MR. RUMMEL, I HAD TO GET HIM ON THE

8    STAND AND CROSS-EXAMINE HIM, BUT HE ADMITTED IT.  THERE ARE

9    MILLIONS OF WAYS TO DO THIS, THERE WAS ONE THAT MR. MORI WAS

10   PROPOSING AND THAT WAS UNIQUE, AND THAT'S THE ONE THEY CHOSE.

11   AND THAT'S THE ONE THAT CAME FROM COMET.  THAT'S THE

12   ARCHITECTURE.  IT'S NOT JUST AN FPGA, IT'S AN ARCHITECTURE.

13        AND BY THE WAY, COUNSEL SAID THAT WE DIDN'T BRING

14   MR. BEUERMAN, MR. MASON, AND MR. MORI TO TESTIFY TO YOU --

15   BEFORE YOU.  THOSE ARE THEIR EMPLOYEES.  MR. MORI WORKS AT

16   THEIR COMPANY CURRENTLY.  HE'S SITTING AT A DESK RIGHT NOW AT

17   XP EARNING A PAYCHECK FOR THIS.  MR. WARNER IS SITTING AT A

18   DESK RIGHT NOW, HE'S THE TURNKEY GUY, LAUGHING IT UP WITH

19   MR. MASON ON THAT AUDIO RECORDING ABOUT HOW THEY'RE GOING TO

20   TAKE COMET'S TECHNOLOGY.  HE'S SITTING AT A DESK AS EXECUTIVE

21   VICE PRESIDENT DESK AT XP RIGHT NOW.

22        WHERE WERE THEY?  IT'S OUR RESPONSIBILITY TO BRING THEIR

23   WITNESSES TO THE TRIAL?  THEY WERE AFRAID IF THEY BROUGHT THOSE

24   WITNESSES TO THE TRIAL, BECAUSE THEY KNEW THAT MORE OF THESE

25   TYPE OF ADMISSIONS WOULD HAPPEN.

1          OKAY.  WHAT ABOUT THE PUBLIC DISCLOSURES?

2          IF WE GO TO PDX18.78, PLEASE.

3          THIS IS, AS I SAID, IT'S MISDIRECTION, THE VAST MAJORITY

4     OF THE TRADE SECRET DOCUMENTS THAT WE SPENT ALL OF THAT TIME

5     INTRODUCING INTO EVIDENCE WERE NEVER DISCLOSED TO ANYONE.

6     THERE WERE OVER 10,000 SOLIDWORKS FILES ON MR. MASON'S PORTABLE

7     DRIVES THAT HE HAD WITH HIM IN 2021, AND THEY WERE NEVER

8     DISCLOSED PUBLICLY.

9          COUNSEL DREW X'S THROUGH ALL THE TRADE SECRETS SAYING THAT

10    BECAUSE A FEW SLIDES WERE PRESENTED AT A TRADE SHOW THAT DIDN'T

11    EVEN INCLUDE THE KEY SLIDES, AS I SHOWED YOU FROM THE COMET

12    ROAD MAP PRESENTATION, THAT MEANS COMET HAS NO TRADE SECRETS?

13    IT ABSOLUTELY DOESN'T MAKE ANY SENSE, BUT IT SHOWS YOU THE

14    LENGTHS THEY WILL GO TO TO GET AWAY WITH IT AND THEIR ABSOLUTE

15    DESIRE TO TELL A STORY THAT IS NOT SUPPORTED BY THE FACTS.

16         AND YOU SHOULD CONSIDER THAT WHEN YOU ARE CONSIDERING THE

17    WHOLE PICTURE AND WHAT TO DO WITH THIS CASE.

18         LET'S TALK ABOUT DAMAGES FOR A MINUTE.

19         BY THE WAY, ACTUALLY, IF YOU COULD GO TO PDX18.110.

20         DR. SPENCER, WERE THESE -- DID THESE PRESENTATIONS INCLUDE

21    THE TRADE SECRETS?  HE SAID NO, THE TRADE SECRETS WERE MUCH

22    MORE GENERAL THAN THE VERY SPECIFIC TRADE SECRETS AT ISSUE

23    HERE.

24         THE TRADE SECRETS ARE SPECIFIC HERE.  THEY ARE COVERED BY

25    ALL THESE DOCUMENTS THAT ARE IN EVIDENCE, AND THE PRESENTATIONS

1        DID NOT DISCLOSE THEM.

2             OKAY.  LET'S GO TO DAMAGES.

3             IF I COULD GO TO SLIDE 18.95.

4             YOU ARE GOING TO BE REQUIRED TO PUT DOWN A NUMBER IN

5        QUESTION 8 FOR EACH OF THE TRADE SECRETS.  THOSE ARE THE

6        NUMBERS; 4.9 MILLION FOR D, 6 MILLION FOR E, 11.1 MILLION FOR

7        L, 10.5 MILLION FOR S.

8             NOW, IF YOU DECIDE THAT NOT ALL THE TRADE SECRETS SHOULD

9        BE -- INVOLVE A MONETARY DAMAGES AMOUNT, BECAUSE OF THE WAY

10       THAT THE TRADE SECRETS -- YOU HEARD MR. MALACKOWSKI, HE

11       PRESENTED THE TESTIMONY ON THE RIGHT.  IF YOU DECIDE, FOR

12       INSTANCE, THE NEXT GENERATION MATCH TRADE SECRET WAS

13       MISAPPROPRIATED, THAT IS BASED ON ALL THE OTHER NUMBERS AND YOU

14       CAN AWARD THE FULL AMOUNT FOR THAT SINGLE TRADE SECRET.  THAT

15       IS THE EVIDENCE OF RECORD, THAT WOULD BE 32.5 MILLION.  THEY

16       ARE BUILT THAT WAY ON TOP OF EACH OTHER BECAUSE EACH GENERATION

17       IS BUILT ON THE LAST.

18             IF WE GO TO -- YOU SHOULDN'T DOUBLE COUNT, BUT THAT'S THE

19       WAY IT WORKS.

20             IF YOU GO TO THE NEXT SLIDE, 96, THAT'S A TOTAL OF

21       32.5 MILLION.

22             LET'S TALK ABOUT PUNITIVE DAMAGES FOR A MINUTE.

23                  THE COURT:  BECAUSE THAT'S ALL YOU HAVE REMAINING.

24                  MR. ALPER:  ONE MINUTE REMAINING?

25                  THE COURT:  YES.

1          MR. ALPER:  PUNITIVE DAMAGES ARE ABSOLUTELY

2    APPROPRIATE IN THIS CASE.  THINK ABOUT IT.

3          WHAT HAVE THEY SAID?

4          CAN YOU GO TO SLIDE 103, PLEASE.

5          WHAT HAVE THEY SAID?  WHAT IS THEIR PRIMARY RESPONSE?  "IT

6    IS THEM, IT IS NOT US."

7          JUST THINK WHAT KIND OF A WORLD WOULD IT BE IF

8    COMPANIES -- IF CORPORATIONS ARE ALLOWED TO GET AWAY WITH IT

9    AND NOT TAKE RESPONSIBILITY FOR THEIR OWN EMPLOYEES?  THINK

10   ABOUT IT.

11         WHEN SOMEONE GOES OUT AND IN THE COURSE OF THEIR JOB THEY

12   GO OUT AND HURT YOU OR SOMEONE YOU CARE ABOUT, OF COURSE THEY

13   ARE RESPONSIBLE.  OF COURSE THEY ARE RESPONSIBLE.  THAT'S

14   WHAT'S RIGHT.  THAT IS THE LAW.  THAT IS WHAT THE JUDGE

15   INSTRUCTED YOU ON.

16         AND THEY ARE TRYING TO GET AWAY WITH IT, AND YOU NEED TO

17   SEND A MESSAGE TO THEM AND TO ALL THE OTHER BAD COMPANIES IN

18   THE WORLD WHO ARE WATCHING THIS TRIAL AND TELL THEM THAT IS NOT

19   ALL RIGHT, THAT IS NOT OKAY, AND YOU NEED TO TAKE

20   RESPONSIBILITY.  WE ARE NOT GOING TO STAND FOR IT.

21         I WANT TO THANK YOU VERY MUCH FOR YOUR TIME AND ATTENTION.

22   IT'S BEEN A LONG TRIAL.  THERE'S A LOT OF EVIDENCE.  AND I WISH

23   YOU VERY GOOD LUCK IN YOUR DELIBERATIONS.

24         THE COURT:  THANK YOU, MR. ALPER.

25         THAT CONCLUDES THE CLOSING ARGUMENTS, AND WE WILL EXCUSE

1339

1    THE JURORS FOR THE DAY, ASKING YOU TO RETURN TOMORROW MORNING

2    AT 9:30 TO BEGIN YOUR DELIBERATION.  IT WILL TAKE US UNTIL THEN

3    TO GET THE COMPUTERS SET UP AND THE DIFFERENT THINGS FOR YOU TO

4    VIEW TO SET UP.

5         SO PLEASE DON'T START YOUR DELIBERATIONS NOW, START IN THE

6    MORNING.  AND YOU DO ALL NEED TO BE IN THE ROOM FOR THE

7    DELIBERATIONS.  SO IT'S INCENTIVE FOR EVERYBODY TO GET HERE ON

8    TIME AND START FRESH AT 9:30, AND WE WILL BE HERE WAITING FOR

9    YOUR VERDICT.

10        THANK YOU VERY MUCH.  SEE YOU IN THE MORNING.

11        (THE PROCEEDINGS WERE HELD OUT OF THE PRESENCE OF THE JURY

12   AT 4:37 P.M.)

13        THE COURT:  ALL RIGHT.  THANK YOU, EVERYONE.  MUCH

14   APPRECIATED.  OUR JURORS ARE ABSENT NOW.  I'M GOING TO GIVE

15   THEM A MOMENT TO EXIT THE BUILDING.

16        SO A FEW COMMENTS.  THANK YOU VERY MUCH FOR YOUR

17   PRESENTATIONS.  BOTH PARTIES WERE ABLE TO GET ALL THE EVIDENCE

18   AND ARGUMENT IN UNDER THE DEADLINE, AND THAT WAS THROUGH A LOT

19   OF PREPARATION ON BOTH SIDES AND COLLABORATION AND

20   COMMUNICATION.

21        AND I JUST WANTED TO SAY I ADMIRED THAT BOTH SIDES WERE

22   ABLE TO USE MANY DIFFERENT ATTORNEYS, BUT THAT DID NOT DIMINISH

23   THE PRESENTATION.  AND THAT TAKES EXTRA WORK TO PLAN YOUR

24   PRESENTATION SO YOU DON'T OVERLAP WITH EACH OTHER AND SPEAK

25   WITH DIFFERENT VOICES, AND I THOUGHT BOTH VOICES WERE VERY

1      SUCCESSFUL THROUGH HARD WORK AND PREPARATION FOR MAKING YOUR

2      ARGUMENTS.  SO THANK YOU FOR THAT ADVANCE WORK.

3           AND AT THIS POINT IN THE PROCEEDINGS SOMETIMES WE LOSE THE

4      EXPERT WITNESSES IN THE AUDIENCE AND ATTORNEYS, SO IF THIS IS

5      OUR LAST DISCUSSION, THANK YOU FOR BEING HERE FOR THE TRIAL.

6      WE HOPE YOU WILL RETURN AGAIN FOR ANOTHER TRIAL IN THE FUTURE,

7      AND IT'S BEEN A PLEASURE WORKING WITH YOU.

8           FOR THE ATTORNEYS WHO ARE STICKING HERE THROUGH OUR

9      VERDICT, WE WON'T COMMENCE AT 9:30 ALL TOGETHER, WE WILL JUST

10     LET YOU KNOW IF THERE'S ANY QUESTIONS FROM THE JURY.  AND I

11     WILL ASK AT LEAST ONE REPRESENTATIVE TO BE WITHIN FIVE MINUTES

12     IF THERE ARE ANY QUESTIONS, AND LET MY DEPUTY KNOW HOW TO REACH

13     YOU SO WE CAN CONTACT YOU QUICKLY IF THERE IS A QUESTION OR

14     VERDICT FROM THE JURY.

15          AND I'M SURE YOU ARE ALREADY WORKING ON GETTING ALL THE

16     EXHIBITS AND MATERIALS TOGETHER.

17          MS. LI IS NODDING HER HEAD.

18          SO IF YOU WILL COORDINATE WITH MY DEPUTY TO GET THOSE SET

19     UP IN THE MORNING SO THAT THEY ARE READY TO GO AT 9:30, THAT

20     WOULD BE GREATLY APPRECIATED.

21          LOOKING AHEAD, WHEN WE GET TO A VERDICT -- I WILL ALERT

22     THE JURORS TO THIS, THAT ONCE WE HAVE A VERDICT, I WILL

23     COMMUNICATE TO THE JURORS THAT THEY ARE WELCOME TO RETURN TO

24     THE COURTROOM AFTER THE VERDICT TO SPEAK WITH THE PARTIES AND

25     COUNSEL, IF THEY WISH TO.

1      THEIR FIRST AMENDMENT RIGHTS WILL BE RETURNED TO THEM

2      FULLY, SO IF THEY WANT TO TALK WITH YOU THEY CAN.  IF THEY

3      DON'T WANT TO TALK WITH YOU, I WILL SUGGEST TO THEM THAT THEY

4      EXIT NOT THROUGH THE COURTROOM BUT GO OUT ANOTHER DOOR.  AND IF

5      THAT'S THE CHOICE THEY MAKE, THEN I ASK YOU NOT TO PURSUE THEM

6      BECAUSE THEY ARE COMMUNICATING THAT THEY DON'T WANT TO COME

7      BACK TO TALK TO YOU RIGHT AWAY.

8          AND FOR OUR LAST FEW TRIALS, THE JURORS HAVE BEEN VERY

9      ENTHUSIASTIC ABOUT COMING BACK, BUT EACH TRIAL IS DIFFERENT.

10     IT WILL DEPEND ON, I WILL EXPECT, ON THE TIME OF DAY AND THEIR

11     MOTIVATION TO SPEND MORE TIME WORKING ON THIS PROJECT WITH YOU.

12         BUT IT'S AN INDIVIDUAL OPPORTUNITY TO GET FEEDBACK FOR THE

13     INDIVIDUAL ATTORNEYS ABOUT YOUR PRESENTATION STYLES, IF THE

14     JURORS ARE WILLING TO TALK WITH YOU FURTHER.

15         ANY QUESTIONS ABOUT OUR NEXT PHASES?

16         MR. ALPER:  NOTHING FROM US, YOUR HONOR.

17     THANK YOU VERY MUCH.

18         MR. FARRELL:  NOTHING FROM OUR SIDE EITHER.

19         THE COURT:  I THINK I'VE EXHAUSTED MY NOTES AND

20     EXHAUSTED US AS WELL.

21         THANK YOU VERY MUCH AGAIN.  AND WE WILL BE HERE AND

22     KEEPING OUR FINGERS CROSSED FOR A VERDICT.

23         THANK YOU VERY MUCH.  WE ARE IN RECESS.

24         (PROCEEDINGS WERE CONCLUDED.)

25

1

2

3

4                    **<u>CERTIFICATE OF REPORTER</u>**

5

6

7

8              I, THE UNDERSIGNED OFFICIAL COURT

9    REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10   THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11   FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12   CERTIFY:

13              THAT THE FOREGOING TRANSCRIPT,

14   CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16   SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18   TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21

22

23

24   _____

25   SUMMER A. FISHER, CSR, CRR
     CERTIFICATE NUMBER 13185          DATED: 3/21/22