UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COMET TECHNOLOGIES USA INC., and others,<br><br>           Plaintiffs,<br><br>     v.<br><br>XP POWER LLC,<br><br>           Defendant. | Case No. 20-cv-06408-NC<br><br>**ORDER GRANTING PERMANENT INJUNCTION WITH RESPECT TO TRADE SECRETS D, E, AND L**<br><br>Hon. Nathanael M. Cousins<br><br>Re: ECF 409 |

    Following a jury trial on trade secret misappropriation, a jury found that XP misappropriated three of Comet's trade secrets under the Defend Trade Secrets Act. 18 U.S.C. § 1836(b)(3)(A). Further, the jury found that the misappropriation was willful and malicious, awarding significant punitive damages. ECF 406 (Verdict).

    In light of the jury's findings, Comet seeks an order from the Court to permanently enjoin XP from using Comet's trade secrets in the development of their products. Comet's proposed injunction seeks: (1) a permanent injunction on sales, distribution, and disclosure of the trade secrets; (2) removal and quarantine of trade secret information; and (3) the ability to ensure compliance through auditing procedures.

    The injunction is GRANTED with respect to Trade Secrets D, E, and L and is DENIED with respect to Trade Secret S.

**I.     BACKGROUND**

    A detailed history of this case has been recounted in other orders, and so the court

1

summarizes here only those facts necessary required to assess the propriety of an injunction. At issue at trial were four alleged Comet trade secrets: (1) Trade Secret D: Da Vinci RF Generator Control, Digital Measurement, and Software; (2) Trade Secret E: Next Generation RF Matching Network; (3) Trade Secret L: Kiyo Matching Network; and (4) Trade Secret S: AMAT Matching Network.

The jury found that all four alleged trade secrets were, in fact, trade secrets. It found that Trade Secrets D and E were misappropriated, causing damage to Comet. With respect to Trade Secret L, the Jury found that it was used or acquired through improper means but that that use was not a substantial factor in causing damages. ECF 406.

However, with respect to Trade Secret S, the jury found that it was not used or acquired by improper means. ECF 406. This suggests either that the jury credited XP's argument that a competitor company, Applied Material, had some intellectual property rights to Trade Secret S under the Global Supply Agreement between AMAT and Comet. Def. Ex. 5234, or that the jury believed that the information contained within it was otherwise available to XP in non-secret forums.

For the reasons elaborated below, the Court will issue an injunction tracking that verdict. The future use of Trade Secrets D and E will be enjoined. Although the jury found that the improper use or acquisition of Trade Secret L had not caused damages at the time of verdict, that finding does not preclude future damages. It also suggests that Comet has not been monetarily compensated for the improper use or acquisition. Accordingly, the future use of Trade Secret L will be enjoined as well.

However, the jury found differently with Trade Secret S, finding that that trade Secret was not acquired or used through improper means. In so finding, it appears to have credited XP's argument that that the information was available in non-secret forums or had previously been disclosed outside Comet. Accordingly, the Court will not enjoin the future use of Trade Secret S.

## II. DISCUSSION

### A. Legal Standard

The Defend Trade Secrets Act (DTSA) authorizes federal courts to grant permanent injunctions to prevent actual or threatened trade secret misappropriation. 18 U.S.C. § 1836(b)(3)(A). "Injunctions in the area of trade secrets are governed by the principles applicable to injunctions in general." *Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1449 (2002).

To determine whether a permanent injunction should issue, courts consider whether a prevailing plaintiff has demonstrated: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 879 (9th Cir. 2014) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

The Court concludes that the balancing of those factors supports the issuance of a permanent injunction subject to the parameters noted above.

### B. Analysis

#### 1) Irreparable Injury

The first issue is whether Comet will suffer irreparable injury in the absence of an injunction. A finding of misappropriation is generally adequate for a finding of irreparable injury in trade secret cases. *Carl Zeiss Meditec, Inc. v. Topcon Med. Sys., Inc.*, No. 19-cv-4162 SBA, 2021 WL 1186335, at *10 (N.D. Cal. Mar. 1, 2021). Although the "Ninth Circuit has not reached the question of whether a court may presume irreparable harm in trade secrets cases[,] . . . courts within this District have consistently reached the conclusion that a plaintiff 'will suffer irreparable harm if its proprietary information is misappropriated.'" *Id.*

A trade secret plaintiff may also demonstrate irreparable injury through a loss in market share. *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, No. 10-cv-3428 PSG, 2013 WL 890126, at *9 (N.D. Cal. Jan. 23, 2013) ("[c]ommercial advantage is grounds for finding irreparable harm"); *Complex Sys., Inc. v. ABN AMRO Bank N.V.*, No. 08-cv-7497 KBF, 2014

WL 1883474, at *12-13 (S.D.N.Y. May 9, 2014) ("[I]t is well-established that a movant's loss of current or future market share may constitute irreparable harm.") (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 67 (2d Cir. 2007)).

Given the jury's finding that XP willfully and maliciously misappropriated Trade Secrets D, E, and L, the Court finds irreparable injury to Comet. In addition, the record contains myriad evidence, credited by the jury, that XP made use of the trade secret information in developing its future products, leaving Comet vulnerable to further future market share loss.

Because the jury did not find that Trade Secret S was used or acquired through improper means, the Court does not conclude irreparable injury from its past use, or potential future use.

2) Monetary Damages are Inadequate

Next, the Court must consider the adequacy of monetary damages awarded by the jury. "An injunction may be used to eliminate any unfair head start a defendant may have gained by improper use of confidential information, and is appropriate if it 'place[s the defendant] in the position it would have occupied if the breach' had not occurred." *Netlist Inc. v. Diablo Techs. Inc.*, No. 13-cv-05962 YGR, 2015 WL 153724, at *7 (N.D. Cal. Jan. 12, 2015); s*ee also Brocade Commc'ns Sys.*, 2013 WL 890126, at *9 (entering injunction where defendant failed to provide evidence of inevitable discovery "through proper means" or "evidence about how long those proper means would take"). Injunctions can also issue to remedy the loss of secrecy of a trade secret, which is not compensable in monetary terms. *Id.*

Here, the damages awarded by the jury compensated for past harm, but they did not address ongoing or future harm from the future development of XP products based on Comet trade secrets. What's more, the Court does not understand either damages expert to have urged the jury to consider future harm in awarding unjust enrichment damages.

Therefore, the Court concludes that even the significant monetary award given by the jury does not adequately compensate and is not sufficient to prevent future harm against Comet.

3) Balance of Hardships

The Court concludes that the balance of the hardships favors Comet. While an injunction would place restrictions on XP, those restrictions are necessary to ensure that XP follows the

law. Additionally, the Court is persuaded that regulation and oversight of XP's activities is especially appropriate in light of the jury's finding that the misappropriation was "willful and malicious." Comet's theory of the case, which was apparently credited by the jury, implicates much of XP's leadership team, not just a few bad apples, making a company-wide injunction appropriate and not unduly harmful.

With respect to the relative hardships of the parties, the record at trial amply demonstrates that Comet has faced and will continue to face significant hardship from the disclosure of their trade secrets, including the loss of market shares, reputational harm, and loss of customers. By contrast, nothing in this order prohibits XP from doing its own research and development to make its own products.

Additionally, the Court finds that Comet's proposed audit does not unduly burden XP and is necessary to prevent dissemination or further use of the Trade Secrets D, E, or L.

Accordingly, the balance of hardships weighs in favor of Comet.

4) Public Interest

The Court concludes that the public interest favors the issuance of an injunction. Courts in trade secret cases have consistently held that the public interest favors the vindication of intellectual property rights. *See Lam Rsch. Corp. v. Deshmukh*, 2005 WL 8173156, at *3 (W.D. Wash. Jan. 3, 2005) (quoting *PepsiCo Inc. v. Redmond*, 54 F.3d 1262, 1268 (7th Cir. 1995)); *Intertek Testing Servs. v. Pennisi*, 443 F. Supp. 3d 303, 347 (E.D.N.Y. 2020) ("injunctive relief would serve the public interest by ensuring that . . . protecting plaintiff's . . . secrecy of its trade secrets and confidential information."). As a result, "[c]ourts often find that the public has a strong interest in protecting intellectual property rights," *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 854 (N.D. Cal. 2019) ("an injunction would also promote fair and lawsuit competition in an emerging market.").

Although the jury did find that Trade Secret S, the AMAT Matching Network was a trade secret, the jury found that it was not used or acquired through improper means. As a result, the public interest in protecting intellectual property and promoting fair competition does not apply with equal force regarding that trade secret.

Accordingly, the public interest favors an injunction on Trade Secrets D, E, and L subject to the provisions below.

### III. CONCLUSION

The Court concludes that Comet has shown that (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

### IV. TERMS OF INJUNCTION

#### I. Terms

For purposes of this injunction, the term "Comet's Trade Secret Information" means any confidential information copied or derived from, in whole or in part from those Comet trade secrets which the jury found were used or acquired through improper means, which are listed here by name:

- Trade Secret D: Da Vinci RF Generator Control, Digital Measurement, and Software
- Trade Secret E: Next Generation RF Matching Network
- Trade Secret L: Kiyo Matching Network

XP, their officers, agents, servants, employees, distributors, and resellers of any type, and all those persons in active concert or participation with any of them who receive actual notice of the order by personal service or otherwise, are permanently enjoined from performing any of the following actions:

(1) possessing, accessing, reviewing, using, or disclosing Comet's Trade Secret Information, in whole or in part, anywhere in the world;

(2) making, offering to sell, selling, or otherwise distributing anywhere in the world any product derived from Comet's Trade Secret Information; and

    (3)    advertising, promoting, offering to sell, selling, or otherwise providing services anywhere in the world using or claiming the benefit of Comet's Trade Secret Information.

**II.  Removal and Quarantine of Comet Trade Secret Information.**

XP, their officers, agents, servants, employees, distributors and resellers of any type, and attorneys, and all those persons in active concert or participation with any of them who receive actual notice of the order by personal service or otherwise, shall undertake the following steps to remove from their possession and quarantine any information associated with trade Secrets D, E and L, *see* 18 U.S.C. § 1836(3)(A)(ii):

    (1)    XP will engage an e-discovery vendor to assist with the identification, collection, and removal of any Comet Trade Secret Information, while also preserving all data in connection with XP's obligations in pending litigations in the U.S. and other countries.

    (2)    XP will inspect the following data sources in its possession:

        a.    Any database or document management systems in use at XP;

        b.    The mailboxes contained in XP's corporate email servers for all current custodians in this litigation, as well as each XP employee who is currently designing, developing, researching, advertising, marketing, or selling RF Power products;

        c.    XP computers, laptops, hard drives, and other storage media (including USB drives, network-based storage drives) belonging to all current custodians in this litigation, as well as each each XP employee who is currently designing, developing, researching, advertising, marketing, or selling RF Power products; and

        d.    Paper files belonging to all current custodians in this litigation, as well as each XP employee who is currently designing, developing, researching, advertising, marketing, or selling RF Power products.

    (3)    Prior to inspection and removal of any Comet Trade Secret Information, and in order to satisfy XP's discovery obligations and the litigation holds in place in this and other litigations, the e-discovery vendor will create and preserve a copy of each of the data sources listed above (hereinafter "Preserved Files"). The Preserved Files shall be maintained by the e-discovery vendor, and any Comet Trade Secret Information contained therein shall only be accessible by XP's outside counsel (including experts, vendors, etc.) in connection with pending or future litigation between Comet and XP without express written permission by the Court, obtained after providing notice to Comet. In addition, notwithstanding any other aspect of this Order, XP's outside counsel (including experts, vendors, and other permitted entities or individuals retained thereby solely for purpose of litigation) in any pending litigation may retain the files they have until those litigations are concluded,

consistent with the protective orders and other law and regulations applicable in those cases.

(4) XP will remove from its possession and quarantine the following:

a. Comet's Trade Secret Information (including source code libraries) that Comet contends were improperly acquired by XP. XP will provide to Comet a copy of all such documents and source code.

b. All other documents or source code (including source code libraries) in XP's possession that contain, in whole or in part, information copied from Comet's Trade Secret Information, or that XP's counsel, in connection with XP's technical experts, can reasonably determine, based on the evidence submitted at trial, was derived from Comet's Trade Secret Information.

(5) The documents and source code identified and removed pursuant to Section II(4) above shall be quarantined by the e-discovery vendor, consistent with Section II(3) above.

(6) XP shall complete the identification, collection, and quarantine of Comet Trade Secret Information within sixty (60) days of the date of this Order. In the event XP is unable to comply in that time frame, XP may make application to the Court for a modification of this Order, or for other relief.

### III. Comet Audit Rights.

Comet may conduct audits of XP, their officers, agents, servants, employees, distributors and resellers of any type, and attorneys, and all those persons in active concert or participation with any of them who receive actual notice of the order by personal service or otherwise, to ensure compliance with this Order, as follows:

(1) Comet may audit, through audits conducted by an independent third party chosen by Comet, and in compliance the Protective Order in this case, the following data sources in XP's possession:

a. Any database or document management systems in use at XP, including but not limited to databases containing XP's source code;

b. The mailboxes contained in XP's corporate email servers for all current custodians in this litigation, as well as each XP employee who is currently designing, developing, researching, advertising, marketing, or selling RF Power products;

c. XP computers, laptops, hard drives, and other storage media (including USB drives, network-based storage drives) belonging to all current custodians in this litigation, as well as each XP employee who is currently designing, developing, researching, advertising, marketing, or selling RF Power products; and

        d.    Paper files belonging to all current custodians in this litigation, as well as each XP employee who is currently designing, developing, researching, advertising, marketing, or selling RF Power products.

(2)    The findings of such audits will be available only to Comet's outside attorneys, the independent third-party auditor, the Court, and XP and its attorneys.

(3)    If the auditor finds that XP may not be in compliance with the terms of this Order, the auditor shall provide written notice and a copy of his findings to XP and one of Comet's in-house attorneys to permit Comet to understand the reason(s) and extent of XP's non-compliance.

(4)    The audits may be conducted a maximum of twice per calendar year, during the course of normal business hours, and upon electronic or written notice of at least five business days to XP. The parties will use good faith efforts to conduct the audit in a manner least disruptive to XP's normal business activities.

The Court retains jurisdiction to enforce this injunction.

**IT IS SO ORDERED.**

Dated: September 30, 2022

Honorable Nathanael M. Cousins
United States Magistrate Judge
Northern District of California