Adam Alper (SBN: 196834)
*adam.alper@kirkland.com*
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone:    (415) 439-1400
Facsimile:    (415) 439-1500

Michael W. De Vries (SBN: 211001)
*michael.devries@kirkland.com*
KIRKLAND & ELLIS LLP
555 South Flower Street
Los Angeles, CA 90071
Telephone:    (213) 680-8400
Facsimile:    (213) 680-8500

Sharre Lotfollahi (SBN: 258913)
*sharre.lotfollahi@kirkland.com*
KIRKLAND & ELLIS LLP
2049 Century Park East, Suite 3700
Los Angeles, CA 90067
Telephone:    (310) 552-4200
Facsimile:    (310) 552-5900

Leslie M. Schmidt (*pro hac vice*)
*leslie.schmidt@kirkland.com*
KIRKLAND & ELLIS LLP
601 Lexington Ave.
New York, NY 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Attorneys for Plaintiffs
COMET TECHNOLOGIES USA INC.,
COMET AG AND YXLON
INTERNATIONAL GMBH

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COMET TECHNOLOGIES USA INC., a Delaware corporation, COMET AG, a Swiss corporation, and YXLON INTERNATIONAL GMBH, a German corporation,<br><br>        Plaintiffs,<br><br>     v.<br><br>XP POWER LLC, a California Limited Liability Company,<br><br>        Defendants. | CASE NO. 5:20-cv-6408<br><br>**PLAINTIFFS' OPPOSITION TO XP POWER LLC'S MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF JAMES MALACKOWSKI**<br><br>**PUBLIC REDACTED VERSION**<br><br>Date:     January 19, 2022<br>Time:     1:00 p.m.<br>Courtroom:  5 (4th floor)<br>Judge:    Hon. Nathanael Cousins |

**TABLE OF CONTENTS**

I.      INTRODUCTION .................................................................................. 1

II.     STATEMENT OF FACTS .................................................................... 2

        A.      Comet's Industry Leading Technology ..................................... 2

        B.      XP Acquired and Used Comet's Technology to Develop Competing Technology ................................................................ 3

        C.      Mr. Malackowski's Opinions .................................................... 4

                1.      Unjust Enrichment............................................................ 4

                2.      Reasonable Royalty.......................................................... 7

                3.      Injunctive Relief .............................................................. 8

III.    LEGAL STANDARD........................................................................... 8

IV.     ARGUMENT ........................................................................................ 9

        A.      Mr. Malackowski's Avoided Cost Analysis, Which Supports His Unjust Enrichment and Royalty Opinions, Is Reliable ........................................ 9

                1.      The Avoided Costs Mr. Malackowski Calculates Are Causally Linked to XP's Misappropriation (Mot. § V.A) ............................... 9

                2.      Mr. Malackowski Properly Apportioned between the Trade Secrets (Mot. § V.B) ...................................................... 12

                3.      Mr. Malackowski's Reference to the Option Value Is Not a New Opinion................................................................ 15

        B.      Mr. Malackowski's Reasonable Royalty Analysis Also Was Proper ... 16

                1.      Mr. Malackowski's Reasonable Royalty Is Apportioned and Ms. Irwin's Disagreement with His Analysis Is Not Grounds for Exclusion (Mot. § V.C.) ................................................ 16

                2.      Mr. Malackowski Reliably Concluded Comet's Intercompany Licenses Were Not Relevant (Mot. § V.D)................................... 19

        C.      Comet Disclosed Substantial Documentary and Testimonal Evidence Supporting Mr. Malackowski's Opinions (Mot. § V.E) ........................ 20

        D.      Mr. Malackowski's Opinions Related to Injunctive Relief Are Permissible and Based on the Facts (Mot. § V.F).................................... 24

V.      CONCLUSION .................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Atlantic Inertial Sys., Inc. v. Condor Pac. Indus. of California, Inc.*,
 2015 WL 3825318 (C.D. Cal. June 18, 2015).................................................................... 18

*Bio-Rad Lab'ys., Inc. v. 10X Genomics, Inc.*,
 2018 WL4691047 (D. Del. Sept. 28, 2018) ........................................................... 13, 16, 25

*Bracco Diagnostics Inc. v. Amersham Health, Inc.*,
 627 F. Supp. 2d 384 (D.N.J. 2009) ..................................................................................... 13

*Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*,
 2012 WL 13170064............................................................................................................ 12, 27

*Carbo Ceramics, Inc. v. Keefe*,
 166 F. App'x. 714 (5th Cir. 2006)....................................................................................... 10

*CareDxInc. v. Natera, Inc.*,
 2021 WL 1840646 (D. Del. May 7, 2021) ...................................................................... 25, 26

*Cheever v. Huawei Device USA, Inc.*,
 2019 WL 8883942 (N.D. Cal. Dec. 4, 2019) ...................................................................... 20

*City of Pomona v. SQM N. Am. Corp.*,
 750 F.3d 1036 (9th Cir. 2014)......................................................................................... 9, 26

*Daubert v. Merrell Dow Pharms., Inc.*,
 509 U.S. 579 (1993) .................................................................................................... passim

*DiscoverOrg Data LLC v. Bitnine Glob., Inc.*,
 2020 WL 6562333 (N.D. Cal. Nov. 9, 2020)...................................................................... 18

*Doe by & through Pike v. Pike*,
 405 F. Supp. 3d 243 (D. Mass. 2019) ................................................................................. 23

*Dynetix Design Sols., Inc. v. Synopsys, Inc.*,
 2013 WL 4537838 (N.D. Cal. Aug. 22, 2013)..................................................................... 20

*Dyson v. United States*,
 2021 WL 291284 (E.D. La. Jan. 28, 2021) ......................................................................... 13

*Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*,
 980 F.3d 1117 (7th Cir. 2020)...................................................................................... 10, 13

*Fed. Trade Comm'n v. Qualcomm Inc.*,
 2018 WL 6615050 (N.D. Cal. Dec. 17, 2018) ...................................................................... 2

*Finmeccanica S.p.A. v. Gen. Motors Corp.*,
 2008 WL 11336141 (C.D. Cal. Dec. 17, 2008) .................................................................. 10

*Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*,
 2006 WL 1390416 (N.D. Cal. May 18, 2006) ..................................................................... 21

*Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp.*,
   593 F. Supp. 2d 1088 (N.D. Cal. 2009) ............................................................................... 27

*GlobeRanger Corp. v. Software AG United States of Am., Inc.*,
   836 F.3d 477 (5th Cir. 2016) .......................................................................................... 10, 12

*Hilderman v. Enea Teksci, Inc.*,
   2010 WL 546140 (S.D. Cal. Feb. 10, 2010) ....................................................................... 14

*Huawei Techs. Co., Ltd. v. Yiren Huang*,
   2019 WL2395276 (E.D. Tex. June 6, 2019) ........................................................................ 11

*I-Flow Corp. v. Apex Med. Techs., Inc.*,
   2010 WL 141402 (S.D. Cal. Jan. 8, 2010) .......................................................................... 27

*Juicy Couture, Inc. v. L'Oreal USA, Inc.*,
   2006 WL 1359955 (S.D.N.Y. May 18, 2006) ...................................................................... 13

*Language Line Servs., Inc. v. Language Servs. Assocs. Inc.*,
   944 F. Supp. 2d 775 (N.D. Cal. 2013) ................................................................................ 16

*LivePerson, Inc. v. [24]7.AI, Inc.*,
   2018 WL 6257460 (N.D. Cal. Nov. 30, 2018) ..................................................................... 15

*Looksmart Grp., Inc. v. Microsoft Corp.*,
   2019 WL 4009263 (N.D. Cal. Aug. 5, 2019) ................................................................. 19, 20

*Mars, Inc. v. Coin Acceptors, Inc.*,
   527 F.3d 1359 (Fed. Cir. 2008) .......................................................................................... 21

*Prism Techs. LLC v. AT&T Mobility, LLC*,
   2014 WL 4705403 (D. Neb. Sept. 22, 2014) ................................................................. 13, 14

*Rembrandt Soc. Media, LP v. Facebook, Inc.*,
   22 F. Supp. 3d 585 (E.D. Va. 2013) ......................................................................... 13, 14, 25

*SPS Techs., LLC v. Briles Aerospace, Inc.*,
   2021 WL 4913509 (C.D. Cal. Sept. 8, 2021) ...................................................................... 19

*Steves and Sons, Inc. v. JELD-WEN, Inc.*,
   2018 WL 2172502 (E.D. Va. May 10, 2018) ....................................................................... 14

*Synopsys, Inc. v. AzurEngine Techs., Inc.*,
   401 F. Supp. 3d 1068 (S.D. Cal. 2019) ............................................................................... 27

*Therasense, Inc. v. Becton, Dickinson and Co.*,
   2008 WL 2323856 (N.D. Cal. May 22, 2008) ..................................................................... 25

*Trustees of Bos. Univ. v. Everlight Elecs. Co.*,
   141 F. Supp. 3d 147 (D. Mass. 2015) ................................................................................. 23

*United Energy Trading, LLC v. Pac. Gas & Elec. Co.*,
   2018 WL 5013580 (N.D. Cal. Oct. 16, 2018) ............................................................. 9, 22, 26

*Univ. Computing Co. v. Lykes-Youngtown Corp.*,
   504 F.2d 518 (5th Cir. 1974) ................................................................. 8, 18, 19, 22

*Waymo LLC v. Uber Tech. Inc.*,
   2017 WL 5148390 (N.D. Cal. Nov. 6, 2017) .................................................. 23

*Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*,
   2014 WL 4312021 (N.D. Cal. Aug. 28, 2014) ................................................ 27

**Statutes**

18 U.S.C. § 1836 ....................................................................................... 4, 17

California Uniform Trade Secrets Act ("CUTSA") .............................................. 4

**Other Authorities**

Cal. Civ. Proc. Code § 3426 ........................................................................ 4, 17

Defend Trade Secrets Act ................................................................................ 4

## I.    INTRODUCTION

XP Power LLC ("XP") saw a billion-dollar opportunity to enter the radio-frequency ("RF") power market.  XP first tried to do so by acquiring another company, Comdel, which had RF power products.  But XP soon realized it would not be able to tap into that billion-dollar market with Comdel's out-of-date technology, so it moved to Plan B: instead of developing RF power technology on its own, XP chose to misappropriate Comet's RF technology.  Comets' technical experts Stanley Shanfield, Kevin Faulkner, and Dariush Rafinejad set forth the significant evidence demonstrating XP's unauthorized acquisition and use of Comet's trade secrets in the development of XP's forthcoming next generation RF matching networks ("RF matches") and RF generators.  Comet's damages expert, James Malackowski, analyzed the financial and economic harm XP's misappropriation of Comet's 20 asserted trade secrets caused Comet and the financial and economic benefit that XP obtained through its misappropriation, and he issued detailed expert reports disclosing his opinions.  In those reports, Mr. Malackowski explained that XP's misappropriation significantly harmed Comet and unjustly enriched XP immensely by allowing it to leapfrog the years and tens of millions of dollars Comet spent developing the trade secret technologies XP misappropriated, which relate to confidential aspects of Comet's RF matches and RF generators.

Faced with overwhelming evidence of its theft, through this motion XP seeks to deny Comet *any* compensation for its willful and malicious misappropriation.  XP takes a throw-it-at-the-wall-and-see-what sticks approach, raising seven separate issues (which largely track its own damages expert's report)—including an amorphous catch-all described as "Mr. Malackowski's damages opinions are not based on sufficient evidence," and what appear to be eleven separate criticisms in XP's "Statement of Facts"—that XP claims require the Court to exclude Mr. Malackowski's testimony in its entirety.  None of XP's indiscriminate critiques demonstrates anything unreliable about Mr. Malackowski's opinions, let alone meets the exacting bar required for exclusion.  Rather, XP criticizes Mr. Malackowski for not accepting its theory of the case, repeatedly mischaracterizes his analysis and testimony, and disregards the fact discovery Comet provided, while asking the Court to adopt its own damages expert's heavily disputed views of the case, in which Comet would be entitled to less than $8,074 for XP's misappropriation.

At bottom, XP wants the Court to transform factual disputes and disagreements with Mr.

Malackowski's opinions into grounds for excluding his testimony.  That is not close to the proper purpose of *Daubert*.  At this stage, "'[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful' to the trier of fact." *Fed. Trade Comm'n v. Qualcomm Inc.*, 2018 WL 6615050, at *5 (N.D. Cal. Dec. 17, 2018).  Accordingly, Comet respectfully requests that the Court reject the multitude of arguments indiscriminately raised by XP and deny XP's motion to exclude in its entirety.

## II.     STATEMENT OF FACTS

### A.     Comet's Industry Leading Technology

Comet's Plasma Control Technologies (PCT) have led the industry for over 50 years.  Comet expanded its offerings to RF matches in the early 2000s, and RF generators a decade ago.  By 2011, Comet's RF power technologies were competing with the leading suppliers in the semiconductor fabrication industry, and led the market of RF matching networks. Ex. 1 at 7.  Comet's technological development is the backbone of its success, which has seen revenues increase from ███████████ █████████████████████ Ex. 2 at Fig. 2.  In support of its PCT business in particular, Comet's continued focus on R&D efforts creates industry-leading innovative technologies that are far more efficient and last much longer.  Comet largely relies on trade secrets to protect those innovations, which are developed through the significant R&D investments over many years.  *See* Ex. 3 at 219:14-222:15.

In this case, Comet's Asserted Trade Secrets are described in its Trade Secret Disclosure as follows: Trade Secrets A-D ████████████████████████████ Trade Secrets E-K ████ ████████████████████████████ Trade Secrets L-Q ████████████████ ████████████ Trade Secret R ████████████ Trade Secret S ████████████████████ and Trade Secret T ████████████████████████ Comet's witnesses and interrogatory responses explained that its RF matching network and generator technology was an evolutionary process, with each successive generation building on the prior research and development that Comet had performed on the earlier generation.  Ex. 4 at 15-16; *see, e.g.*, Ex. 5 at 12:1-13, 35:13-36:8, 56:1-20, 70:18-71:12.  Comet also explained that due to the iterative nature of the development process for RF power products, the development work for Comet's overall matching or generator trade secrets (trade secrets A, E, and L) is attributable to their respective components, which Comet's technical expert, Stanley Shanfield,

likewise confirmed.  Ex. 2 at 21, 25-26, 30-31; Ex. 6 ¶¶ 56, 111, 196.  Finally, ███████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████

████ that related to the Asserted Trade Secrets.  *Compare* Ex. 7 at 23-27, 35, *with* Exs. 8 & 9.  Comet provided a 30(b)(6) witness on this topic (Andre Grede, Comet's V.P. of Global R&D, PCT), but XP declined to ask him any questions about Comet's expenditures or the interrogatory response.

**B.    XP Acquired and Used Comet's Technology to Develop Competing Technology**

In stark contrast to Comet, XP did not offer RF matching networks or RF generator products until it acquired Comdel just a few years ago, in late 2017.  But XP certainly recognized—and touted— the extensive benefits it wanted to achieve by entering the RF market.  *See* Ex. 26 at 8 (2017 XP Annual Report estimating the RF Power market at $800 million).  XP's acquisition of Comdel was a purposeful step in XP's plan to enter the billion-dollar RF match and generator market.  But XP soon realized the Comdel acquisition was not its ticket into that lucrative market.  Ex. 10 at 29 ████████████ █████████████████████████████████████████████████████████████████████████  To try to get its RF power development back on track, XP changed its playbook. Instead of paying for the RF power technology it needed to get into the market, XP decided to steal it from Comet.  XP recognized that Comet was the best in the business, and encouraged its engineers to bring a ███████████ from Comet over to XP.  Ex. 11 at 12:19-13:6.  XP's "Plan B" worked, and for nearly four years, XP has been using Comet's trade secrets to develop its next generation RF power products, ███████████ ██████████████████  Ex. 2 at 35 (citing Laver Dep. at 67, 69, 73).  Comet's technical experts describe XP's acquisition and use of each of Comet's trade secrets in detail.  Indeed, Dr. Shanfield analyzes XP's use of Comet's Trade Secrets A–T over 350 pages of his report.  Ex. 6; Ex. 25.[1]  With Comet's technology in-hand, XP planned to reap the benefits, projecting that it would make ███ ███████████████████ with RF matching networks and another ████████████████████ with RF generators, totaling over ███████████████ in aggregate.  Ex. 12 at ████████████████

---

[1] To avoid providing the Court with 350+ pages of exhibits for an expert opinion that is not being challenged, Comet has provided the Court with only the tables of contents from Dr. Shanfield's reports.  However, should the Court wish to review any portions of Dr. Shanfield's report, Comet will provide it.

████ Ex. 13 at Tab: ████████████████

### C.   Mr. Malackowski's Opinions

Mr. Malackowski analyzed the economic impact of XP's misappropriation and specifically assessed the harm it caused Comet, including the appropriate measure of damages.  As background for his opinions, Mr. Malackowski first analyzed the parties, their financial information, and their market positions before the misappropriation through the time of his report.  Ex. 2 at 5-20.  He also analyzed the RF Power market generally.  *Id.* at 11-20.  After laying out the economic background, Mr. Malackowski spent 14 pages of his opening report describing his understanding of Comet's trade secrets.  *Id.* at 20-34.  Contrary to XP's assertion that Mr. Malackowski did not calculate damages based on information in Comet's trade secret disclosure, he reviewed and in fact repeatedly cited to Comet's disclosure and interrogatory responses, in addition to information he discussed with Comet's technical expert, Dr. Shanfield.  *Id.*  Indeed, Mr. Malackowski categorized the trade secrets according to Comet's trade secret identification—he did not "create" the categories as XP incorrectly posits.  *See* Ex. 15.  Mr. Malackowski applied his understandings of the market, Comet's trade secrets, XP's misappropriation, and the documentary and testimonial evidence cited in his reports, to determine Comet's actual losses, XP's unjust enrichment, and alternatively, a reasonable royalty.  Mr. Malackowski also analyzed the harm XP's misappropriation caused Comet for which a monetary remedy is inadequate.

#### 1.   Unjust Enrichment

Mr. Malackowski applied the damages framework set forth in the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b)(3)(B), and the California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Proc. Code § 3426.3(a).  At the outset of his analysis, Mr. Malackowski determined that "XP Power's misappropriation resulted in actual losses to Comet including both lost development time and devaluation (and loss) of Comet's trade secrets."  Ex. 2 at 35.  He further explained that XP entered the RF power seeking to take market share away from competitors, including Comet, and although it has not yet released competing products, ████████████████████████████████████

---

[2] Although Comet had set forth in detail the types of damages it would seek and the factual basis for those damages in its interrogatory responses, XP provided no indication what its own damages theory would be (other than disputing Comet was entitled to a penny for XP's misappropriation) until its rebuttal expert report.  *See generally* Ex. 14.

███████████████████████████. *Id.* (citing Laver Dep. at 67, 69, 73). Mr. Malackowski explained, however, that because Comet's actual losses are not fully quantifiable and are ongoing, losses related to XP's R&D cost savings would be captured in his unjust enrichment calculation. *See* Ex. 2 at 4. Accordingly, he calculated XP's unjust enrichment by determining the R&D costs XP saved as a result of its misappropriation.

To evaluate XP's unjust enrichment from the misappropriation, Mr. Malackowski calculated XP's R&D cost savings that results from taking and using Comet's trade secrets in lieu of developing the technologies itself. He determined that in this matter, Comet's R&D costs spent on its trade secrets are a reasonable proxy for the costs XP saved through its misappropriation. *Id.* at 35, 37; Ex. 16 at 5.

Mr. Malackowski analyzed Comet's financial information to determine Comet's R&D investment into its trade secrets. Development of Comet's trade secrets began in 2005, but Comet did not begin tracking its R&D expenditures on a project-by-project basis until 2010. To determine Comet's R&D expenditures during the time before Comet began tracking its R&D by project code, Mr. Malackowski reviewed Comet PCT's income statements. Consistent with Comet's interrogatory response, and confirmed by discussions with Comet engineer, Gary Russell, Mr. Malackowski explained his understanding that nearly all of Comet's expenditures prior to 2010 were related to Comet's first generation trade secret RF match. *See* Ex. 2 at 38-39. He nonetheless reduced Comet's R&D expenditures during that time by 50 percent to ensure his calculation was not overstated and fairly accounted for expenditures unrelated to the trade secrets. *See* Ex. 2 at Appx. 5.6.3; Ex. 16 at 8. Starting in 2010, Comet began recording its R&D expenditures in spreadsheets broken out by project code. Mr. Malackowski analyzed those spreadsheets, and corroborated the allocation of those codes to the Asserted Trade Secrets in Comet's interrogatory response with Mr. Russell and Mr. Grede, who served as Comet's corporate witness on this subject. Ex. 2 at 38. Mr. Malackowski was then able to use that information to calculate R&D costs for Asserted Trade Secrets A-S. Ex. 2 at 39-45. For Trade Secret T, Mr. Malackowski explained "the value of Comet's proprietary knowledgebase of its customers' manufacturing processes is at least equal to the value of Comdel's customer relationships," which was attributed more than $6.5 million when XP acquired Comdel. *Id.* at 45.

Additionally, based on differences between Comet's R&D project spreadsheets and Comet PCT

R&D expenditure totals, and as disclosed in Comet's interrogatory response and deposition testimony, Mr. Malackowski recognized that Comet's R&D spreadsheets did not capture the entirety of Comet's development costs including because all employee hours are not booked to individual projects.  *See* Ex. 2 at 39-45.  Accordingly, after confirming his understanding of the documents with Mr. Russell and Comet's Vice President of Controlling, Markus Pfeiffer, Mr. Malackowski determined that "all of the costs Comet's Plasma Control Technologies Division ("PCT Division") records to its R&D function support or otherwise contribute to Comet's R&D efforts."  Ex. 16 at 6 (citing COMET_00003990 and COMET_00004018 in support of his understanding that "[t]he types of costs the PCT Division records to its R&D function include personnel charges (such as wages and salaries), depreciation and amortization, materials and supplies, and consulting fees.").  Mr. Malackowski therefore adjusted his calculation of Comet's R&D expenditures to capture this underreporting by applying the adjustment equally across all of the trade secret-related project codes.  *See* Ex. 16 at 7 ("Mr. Russell confirmed that these non-project-specific R&D costs generally contribute to all of Comet's PCT Division R&D projects" and the pro-rata distribution of those costs is consistent with standard cost accounting).

Mr. Malackowski also made *downward* adjustments to his R&D calculation to avoid capturing R&D that was not specifically attributable to the trade secrets.  For example, Comet's engineering development includes not only projects that are designed from start to finish by Comet (called, "build-to-spec"), but also manufacturing projects Comet does for customers wherein the customer provides the entire design specification ("build-to-print").  Because the "build-to-print designs" are customer designs, and not Comet's own internal development, Mr. Malackowski excluded "build-to-print"-related costs from his calculation of Comet's R&D.  Ex. 2 at 39-43.  Relying on Comet's interrogatory response setting forth the proportion of "build-to-print" versus "build-to-spec" costs, Mr. Malackowski adjusted Comet's R&D costs downward accordingly.  Ex. 2 at Appxs. 5.3.1, .5.4.1, 5.5.1, 5.6.1; Ex. 4 at 15-16.

Finally, Mr. Malackowski accounted for the relatedness and iterative nature of Comet's trade secrets through his allocation of R&D costs, consistent with Comet's interrogatory response and fact and expert witness testimony.  Ex. 2 at 39-45; *see, e.g.*, Ex. 5 at 12:1-13, 35:13-36:8, 56:1-20, 70:18-71:12.  For example, Mr. Malackowski explained that Comet's trade secret (trade secret L) was built and developed with the related component trade secrets (trade secrets M through Q) and therefore all of the

related costs are attributable to the higher-level trade secret (trade secret L).  Ex. 2 at 38, 41.  Moreover, because trade secret L "is built on, and depends upon the AMAT Matching Network GEN 1 and AMAT Matching Network GEN 2 (Asserted Trade Secret S) . . . the development costs associated with those projects . . . are also attributable to the Kiyo Product Family GEN 2 Asserted Trade Secret."  *Id.* at 42.  Likewise, for trade secret E, Mr. Malackowski explained that Trade Secret was built and developed with the related component trade secrets (trade secrets F through K) and therefore all of the related costs are attributable to the higher-level trade secret (trade secret E)  *Id.* at 38.  Additionally, because trade secret E "is built on, and depends upon, the Kiyo Product Family GEN 2 (Asserted Trade Secret L), the AMAT Matching Network GEN 1, and the AMAT Matching Network GEN 2 (Asserted Trade Secret S) . . . the development costs associated with those project . . . [are] attributable to Asserted Trade Secret (E)."  *Id.* at 43.  Mr. Malackowski then further explained that because trade secret E "is built on, and depends upon the DaVinci RF Generator (Asserted Trade Secret A) . . . the project costs associated with that project . . . is also attributable to the NextGen Matching Network Trade Secrets."  *Id.* at 43.

Applying all of the foregoing information and considering the information cited in his reports, Mr. Malackowski determined that Comet is entitled to unjust enrichment damages totaling $32.5 million because XP's misappropriation allowed it to save at least those costs.  Ex. 16 at Figure 1.  Mr. Malackowski's opinions are designed to and do provide the jury with the ability to select the amount of unjust enrichment—including amounts less than the total $32.5 million—should the jury disagree that XP misappropriated all the Asserted Trade Secrets or that Trade Secret E is not based on the development work for Trade Secret L (for example).  *See id.*  (including a breakdown of unjust enrichment damages should the jury only find XP liable on some, but not all, of Comet's trade secrets).

2.      Reasonable Royalty

As an alternative to his unjust enrichment opinion, Mr. Malackowski calculated a reasonable royalty by utilizing the hypothetical negotiation construct and applying the factors set forth in *Univ. Computing Co. v. Lykes-Youngtown Corp.*, 504 F.2d 518 (5th Cir. 1974).  Mr. Malackowski first analyzed the parties' competitive position, determining that Comet had substantially more experience in the RF power market than XP's essentially zero experience at the time of the hypothetical negotiation, and that XP would cause Comet competitive harm if it were able to enter the market.  Ex. 2 at 49-50.

Mr. Malackowski also analyzed Comet's intercompany licenses, and determined that those licenses are not economically comparable and therefore would not inform the hypothetical negotiation.  *Id.* at 51; Ex. 16 at 28-34.  Additionally, Mr. Malackowski considered the value of Comet's trade secrets and XP's use of the trade secrets, both of which he found weighed in Comet's favor.  Ex. 2 at 52-55.

After analyzing each factor in detail, Mr. Malackowski determined that the appropriate royalty would be no less than a lump sum payment of XP's avoided R&D costs tied to its misappropriation— indeed, Mr. Malackowski determined that the reasonable royalty Comet should expect would be substantially greater than XP's cost savings, particularly given the substantial revenues XP anticipated (and continues to anticipate) earning from products developed using Comet's trade secrets.  *Id*. at 56.

### 3.    Injunctive Relief

Mr. Malackowski also offered economic analysis related to factual considerations that ultimately relate to whether injunctive relief is appropriate.  First, as it relates to whether or not XP's misappropriation caused irreparable harm, Mr. Malackowski analyzed the parties' competitive relationship and determined that, although XP has not yet released its competing products, ████████ ██████████████ will adversely impact Comet's customer relationships, market share, sales, and profits.  *Id*. at 56-57.  Mr. Malackowski also analyzed the importance of Comet's trade secret to Comet's business.  *Id.* at 57-58.  Second, as it relates to the adequacy of monetary damages, Mr. Malackowski determined that XP's misappropriation would cause price erosion, would harm Comet's goodwill, would cause Comet to lose market share, and would cause Comet to lose business opportunities; all of which cannot be adequately remedied through monetary relief in this case.  *Id.* at 58.

## III.    LEGAL STANDARD

An expert's opinion testimony must be relevant and reliable.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993).  In order for an expert's testimony to be relevant, it need only have a "valid connection to the pertinent inquiry." *United Energy Trading, LLC v. Pac. Gas & Elec. Co.*, 2018 WL 5013580, at *1 (N.D. Cal. Oct. 16, 2018).  And an expert's "opinion testimony is reliable if such knowledge has a 'basis in the knowledge and experience of [the relevant] discipline.'"  *Id.* (*quoting Daubert*, 509 U.S. at 590).  But the "focus of the [*Daubert*] inquiry is [] on the principles and methodology employed, not the conclusions reached by the expert."  *Id.*  The question is not whether the

expert is right or wrong, and "Courts may not exclude testimony because it is impeachable." *Id.*

## IV.   ARGUMENT

XP's motion to exclude largely tracks the opinions set forth by XP's damages expert, Carlyn Irwin, and amounts to factual disputes or disagreements with Mr. Malackowski's conclusions on a bevy of different issues. This type of "battle of the experts" should be resolved by the factfinder, not through exclusion of Mr. Malackowski's opinions. *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014). Likewise, XP repeatedly mischaracterizes Mr. Malackowski's opinions or improperly takes those opinions out of context to argue for exclusion. While XP is free to argue its version of the facts to the jury, those fact-based disagreements with or challenges to Mr. Malackowski's opinions likewise do not justify exclusion. *See United Energy*, 2018 WL 5013580, at *1.

**A.     Mr. Malackowski's Avoided Cost Analysis, Which Supports His Unjust Enrichment and Royalty Opinions, Is Reliable**

**1.     The Avoided Costs Mr. Malackowski Calculates Are Causally Linked to XP's Misappropriation (Mot. § V.A)**

In his avoided costs analysis, Mr. Malackowski "connected each of the Asserted Trade Secrets with the cost savings XP Power realized via its misappropriation using Comet's actual R&D investment as a proxy." Ex. 16 at 5. As explained in § II.C.1, above, he did so by analyzing Comet's interrogatory responses and financial documents related to the trade-secret technology, reviewing XP's R&D expenditures and employee salaries, and discussing XP's acquisition and use of Comet's trade secrets with Comet's technical experts. Based on that analysis, Mr. Malackowski arrived at the amount of costs XP avoided through its misappropriation for each of the Asserted Trade Secrets. Courts consistently approve methodologies like the one Mr. Malackowski employed here. *See, e.g.*, *Finmeccanica S.p.A. v. Gen. Motors Corp.*, 2008 WL 11336141, at *10 (C.D. Cal. Dec. 17, 2008) (trade secret damages expert's opinion calculating unjust enrichment in the form of avoided research costs, "meets the *Daubert* 'relevant and reliable' standard."); *see also GlobeRanger Corp. v. Software AG United States of Am., Inc.*, 836 F.3d 477, 499 (5th Cir. 2016); *Carbo Ceramics, Inc. v. Keefe*, 166 F. App'x. 714, 723 (5th Cir. 2006); *see also Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, 980 F.3d 1117, 1130 (7th Cir. 2020).

With no basis for challenging the analysis that Mr. Malackowski actually conducted, XP argues for exclusion based on a mischaracterization of Mr. Malackowski's opinions. For example, XP claims

that Mr. Malackowski "did not review any of the" trade secrets XP misappropriated and "could not identify a single instance were XP used one of" Comet's trade secrets.  Mot. 11.  Yet Mr. Malackowski's reports describe the Asserted Trade Secrets and discuss XP's use in detail.  Ex. 2 at 20-34, 37-38, 52-55; Ex. 16 at 22-26.  He also confirmed the descriptions and use with Dr. Shanfield, who discusses XP's use in unchallenged opinions spanning hundreds of pages of his report.  XP also incorrectly argues that Mr. Malackowski "did not analyze XP's design process to determine whether it was similar to Comet's and could not describe the steps XP has taken to design its next generation products."  Mot. 10.  Mr. Malackowski explained that he "considered business considerations" related to XP's development work, and because he is not a technical expert, he "confirm[ed] with Dr. Shanfield that the trade secrets at issue are, in fact, applicable to the process that he understood was being used at XP."  Mot., Ex. A at 111:13-25, 113:3-8; *see also id.* at 110:12-111:10; *see, e.g.*, Ex. 2 at 55.

XP also contends that Mr. Malackowski failed to "calculate the amount of time or money that XP saved as a result of using [Comet's] documents."  Mot. 11.  That argument ignores his analysis, which specifically quantifies the amount of money that XP saved as a result of its misappropriation and considers XP's significant time savings.  *See* § II.C.1, *supra*.  As Mr. Malackowski explained:

> My analysis is not detailed down to the level of a given trade secret and cost or hours for that document, say, as an example, but ***it does reflect the cost saved for those groupings of trade secrets*** which escalate over time.  And my reference to ***Comet's development time is intentional*** because I believe that that ***is a minimal estimate of what it would have taken*** Comdel -- I'm sorry, ***XP but for the misappropriation***.

Mot., Ex. A at 120:6-18 (emphasis added)).  Mr. Malackowski explained that as an economic matter, he could not disentangle the amount of time XP believed it would take to develop comparable technology on its own because XP's RF Match and Power development plan "was developed with an understanding of the trade secrets."  *Id*. at 116:8-23.  And, as a technical matter, Dr. Shanfield explained that XP was incapable of developing technology comparable to Comet's trade secrets on its own.  Ex. 6 ¶ 294.  XP's own documents acknowledge as much.  Ex. 18 at slide 2 ███████████████████ ███████████████████████████████████████████████  While XP's experts disagree and opine that it would have taken XP only a few hours and a few thousand dollars to recreate a handful of Comet's documents (as opposed to Comet's trade secrets), whether that theory is credible is for the jury to decide.  *See Huawei Techs. Co., Ltd. v. Yiren Huang*, 2019 WL2395276, at *4 (E.D. Tex.

June 6, 2019) (factual dispute was "best handled on cross-examination.").

XP next claims that Mr. Malackowski's opinion should be excluded because he calculated avoided costs for 20 "categories of technology" that are untethered to Comet's Trade Secrets and that he was unaware of whether "each of the documents in his twenty categories was" a Trade Secret. Mot. 11. That is flat out wrong. The 20 "categories of technology" for which Mr. Malackowski calculated XP's avoided costs *are* the 20 Asserted Trade Secrets. His report could not be clearer on that point. Ex. 2 at 38-46. XP nonetheless mischaracterizes Mr. Malackowski's testimony to argue he "did not do anything do determine" how Comet's trade secrets "correspond" to the documents in its disclosure or compare to the documents XP stole. Mot. 11. That is not what Mr. Malackowski said or did. When asked about this very topic, Mr. Malackowski explained:

> A. No. ***I think that is primarily dealt with by the technical experts. My work confirmed that correlation through the interviews that are cited in my report,*** but I did not do a further detailed comparison of the specific documents to the categories.

Mot., Ex. A at 102:17-103:2; *see also id.* at 103:3-14 (explaining that he "confirm[ed] with Dr. Shanfield … that the information that was misappropriated and regarded as a trade secret is seen within the XP product development records so that there is evidence of that causal link or nexus."). Consistent with Mr. Malackowski's testimony, his report describes Comet's trade secrets and XP's use of those trade secrets, as confirmed by a discussion with Dr. Shanfield. Ex. 2 at 20-34, 37-38, 52-55; Ex. 16 at 22-26; Ex. 17 at 88:10-24. He then analyzed the Comet R&D project codes specific to each Asserted Trade Secret and apportioned on a trade-secret-by-trade-secret basis. Ex. 2 at 38-46. That analysis is well-grounded in the law, and XP cites no case holding otherwise. *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, 2012 WL 13170064, at *2 (denying *Daubert* motion because Mr. Malackowski "appropriately relied on technical experts" and "sufficiently calculated damages for each trade secret.").

XP's argument that Mr. Malackowski did not consider the "value" of the trade secrets is misplaced. XP points (repeatedly) to a single sentence from Mr. Malackowski's reply report in which he explained that his calculation of Comet's R&D expenditures, as a proxy for XP's cost savings, is not the same as conducting a lifetime valuation of the trade secrets. Ex. 16 at 13. As he explained, the trade secrets are far more valuable than the avoided costs that he calculated. *See* Ex. 17 at 147:8-17 (Comet's trade secrets had value, "both in an absolute sense but also as represented by the cost of development as

an indication of value.  The ultimate ***value would of course be <u>greater</u> than just the cost***…"); *see GlobeRanger*, 836 F.3d at 499.  While Mr. Malackowski's avoided costs opinion is not intended to be "a value" of the trade secrets (because they are worth far more than XP's avoided costs), that is because the purpose of avoided costs (like other forms of unjust enrichment) is to determine the benefit the misappropriator received.  *See Epic Sys. Corp.,* 980 F.3d at 1129-1130.

With no merits-based argument to exclude Mr. Malackowski, XP seeks a shortcut, arguing that the Court should exclude Mr. Malackowski's opinions because other, different opinions in other, different cases have been excluded.  But "the fact that [Mr. Malackowski] has been excluded in other, unrelated cases has little relevance as to whether his current report and testimony satisfy the requirements of . . . the Federal Rules of Evidence." *Dyson v. United States*, 2021 WL 291284, at *4 (E.D. La. Jan. 28, 2021).  None of the cases XP cites relate to the opinions he offers here, and instead deal with inapposite factual circumstances.  In *Rembrandt Soc. Media, LP v. Facebook, Inc.*, 22 F. Supp. 3d 585, 594 (E.D. Va. 2013), and *Prism Techs. LLC v. AT&T Mobility, LLC*, 2014 WL 4705403, at *6 (D. Neb. Sept. 22, 2014), damages were based on revenues for multi-feature products, which was determined not to have been sufficiently apportioned.  Here, Mr. Malackowski's avoided costs calculation started with, and is based on, project codes specific to the Asserted Trade Secrets.  In *Bio-Rad Lab'ys., Inc. v. 10X Genomics, Inc.*, 2018 WL4691047, at *6 (D. Del. Sept. 28, 2018), a patent infringement case, the issue was the application of the *Panduit* test and whether a two-player market had been established, neither of which are at issue here.[3]

2.    Mr. Malackowski Properly Apportioned between the Trade Secrets (Mot. § V.B)

XP's assertion that "Mr. Malackowski has not apportioned his damages calculations to trade secrets actually listed in Comet's trade secret identification, [and] has instead aggregated them into broad categories of technology" is again flat out wrong.  *Compare* Mot. 13, *with* Ex. 2 at 38, 56 ("I have considered what should occur in the event that fewer than all the Asserted Trade Secrets are found to be misappropriated and have provided calculations for those scenarios.").  Comet's trade secret

---

[3] *Bracco Diagnostics Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 444 (D.N.J. 2009), and *Juicy Couture, Inc. v. L'Oreal USA, Inc.*, 2006 WL 1359955, at *3 (S.D.N.Y. May 18, 2006), are likewise inapposite, as discussed *infra*.

identification lists out Trade Secrets A-T. Mr. Malackowski calculates avoided costs for each of Trade Secrets A-S based on the relevant project codes and relies on the Comdel acquisition for Trade Secret T.[4] In doing so, he explains that the amount of avoided costs he calculates for Trade Secret A is attributable to each of Trade Secrets B-D (and likewise, Trade Secret E is attributable to each of Trade Secrets F-K, and Trade Secret L is attributable to each of Trade Secrets M-Q) because "all of these components must work together to provide the required performance, which means the R&D for the overall RF generator . . . is attributable to its components . . . and the R&D for the overall RF matching network . . . is attributable to its components. . . ." Ex. 2 at 38. Dr. Shanfield confirmed such a calculation was appropriate. Ex. 6 ¶¶ 56, 111, 196. XP makes no challenge to Dr. Shanfield's opinion on that point, nor does XP's damages expert criticize Mr. Malackowski on it. *See* Ex. 14 at 22-45. Courts have affirmed avoided costs calculations with similar factual support. *See Steves and Sons, Inc. v. JELD-WEN, Inc.*, 2018 WL 2172502, at *6 (E.D. Va. May 10, 2018) (avoided costs "appropriately considered" a part "unjust enrichment damages" recoverable under the DTSA). Mr. Malackowski additionally calculated avoided R&D limited to the trade-secret project codes and to include prior development work that led to, and was necessary for the development of the trade secrets. Ex. 2 at 39, 40. This too, was confirmed by Comet's technical experts and witnesses. Thus, while XP misleadingly paraphrases Mr. Malackowski's deposition to suggest he made no effort to confirm that what he was quantifying related to the trade secrets, his report and testimony confirm that he relied on the technical experts for that information. Mot. Ex. A at 102:17-22, 103:3-9.

Undeterred, XP attempts to convert Mr. Malackowski's opinion into an all-or-nothing proposition, claiming that "no matter what factual determinations the jury makes, he will opine that Comet is entitled to damages of $32.5 million." Mot. at 13; *see also id.* at 14. That is simply not correct. Mr. Malackowski does *not* opine that damages should be $32.5 million regardless of what the jury finds misappropriated. Indeed, his opinion on avoided costs for Trade Secret A, B, C, or D is $4.73 million; his opinion for Trade Secrets L, M, N, O, P, or Q is $21.7 million; his opinion for Trade Secret

---

[4] *Rembrandt* and *Prism* are irrelevant for the reasons explained above. *Hilderman v. Enea Teksci, Inc.*, is similarly irrelevant because there, the expert assigned the entire "goodwill" value from an acquisition to the trade secrets but there was no information about how that goodwill was allocated to specific categories of intangible assets like trade secrets, 2010 WL 546140, at *1 (S.D. Cal. Feb. 10, 2010).

R is $7.8 million, and his opinion for Trade Secret S is $10.6 million.[5]  Ex. 2 at 39-45.  While Mr. Malackowski's opinion is that in certain scenarios, damages should be $32.5 million, his report makes clear, that opinion only applies if (i) the jury finds at least Trade Secret E, F, G, H, I, J, or K misappropriated; (ii) the jury finds that in misappropriating those trade secrets, XP avoided R&D costs specific to those trade secrets; (iii) the jury finds that XP also avoided all of the R&D costs that led up to, and were necessary for, the development of those trade secrets; and (iv) the jury agrees with Mr. Malackowski's calculation of the amounts associated with (ii) and (iii).  *Id.* at 42-44.  Mr. Malackowski's report discloses alternative calculations should the jury disagree with (ii) or (iii).  *Id.*

As a result, neither *LivePerson* nor *Bracco*, on which XP relies, is relevant here.  In *LivePerson*, the bellwether trial was on 15 of the 28 asserted trade secrets, and the Court decided the damages expert "offer[ed] no methodology for the jury to calculate trade secret misappropriation damages on fewer than all of the 28 alleged trade secrets in the case."  *LivePerson, Inc. v. [24]7.AI, Inc.*, 2018 WL 6257460, at *2 (N.D. Cal. Nov. 30, 2018).  Similarly, in *Bracco*, Mr. Malackowski calculated false-advertising damages based on an advertisement that the Court had concluded was not false as a matter of law, and he did not have opinions related to other advertisements.  627 F. Supp. 2d at 444.  Here, Mr. Malackowski calculated damages specific to each trade secret, provided lesser calculations to apply if the jury finds that less than all of the trade secrets misappropriated, and provided his basis for doing so.

XP also argues that if its employee Chris Mason did not "show[] anyone at XP" Comet's trade secrets and if "no one at XP was aware that Mr. Mason" had them, it cannot be unjustly enriched.  Mot. 14.  That is legally and factually wrong.  XP tasked Chris Mason (and Doug Beuerman, Eiji Mori, and Yibing Ma) with developing RF power products; they did so, in senior leadership positions, albeit with Comet's trade secrets.  XP is responsible for those actions.  *See Language Line Servs., Inc. v. Language Servs. Assocs. Inc.*, 944 F. Supp. 2d 775, 785 (N.D. Cal. 2013) ("*respondeat superior* can apply in trade secrets cases").  And others at XP *were* aware that Mr. Mason had and was using Comet materials, as explained in Comet's opposition to XP's summary judgment motion.  Dkt. 173 at 4-5, 7-10.

XP raises two additional quibbles with Mr. Malackowski's analysis.  For one, XP claims that Mr.

---

[5] For each of these trade secrets, Mr. Malackowski also provides an alternative amount should the jury disagree that R&D beyond the trade-secret specific projects was necessary.  Ex. 2 at 39-41.

Malackowski did not apportion between the Asserted Trade Secrets and other Comet IP, which is incorrect. Mot. 13. Comet spent over $57.2 million in R&D for PCT from 2013 to 2017, yet Mr. Malackowski only attributes an average of 46.2% of that to the Asserted Trade Secrets.[6] Ex. 16 at 10, Appx. 8.1; *see also id.* (over $49.9 million for U.S. PCT R&D expenditure from 2007 through 2017, and only attributing 55.3% to the Asserted Match Trade Secrets). That is ample apportionment for any other IP that Comet developed in connection with its RF Power products, particularly given Comet's general preference to protect its technology through trade secrets, as opposed to patents. *Id.* at 46. XP ignores this apportionment, and does not identify anything unreliable about it. XP's second complaint is that Mr. Malackowski "did not consider the 'value' of th[e] Asserted Trade Secrets." Mot. 13. XP's argument is not only irrelevant, it is incorrect, as explained in Section IV.A.1, *supra*.

3.     Mr. Malackowski's Reference to the Option Value Is Not a New Opinion

Mr. Malackowski's opinion related to the value of the trade secrets—i.e., the benefit XP unfairly received by way of having access to a complete set of Comet's trade secret documents—is not a new opinion that was not previously disclosed. Mr. Malackowski's shorthand description at his deposition (i.e. "option value") was not a new opinion, and XP's argument otherwise should be rejected.

XP questioned Mr. Malackowski about how XP benefited from its misappropriation if it did not use a particular trade secret or document. The premise of that question is wrong: as Dr. Shanfield sets forth in detail, XP used *all* of Comet's trade secrets. Nonetheless, XP points to testimony suggesting that Mr. Malackowski came up with the optionality concept in response to Ms. Irwin's sur-reply report, But that ignores his testimony, which explained that while he did not create an "options pricing model,"

> inherent in [his] first report and [his] second report is the notion that there is option value that has been created as a result -- or captured as a result of the trade secret misappropriation which is in part reflected by the fact that the employees didn't just take the end solution, they took the entire compilation of trade secrets representing thousands of documents because that was understood to be important as they went through the development process, including potentially leapfrogging and, I think the words they used, 'burying Comet in the process.' So, yes, there is value even if they didn't need it, to use

---

[6] *Bio-Rad* did not relate to apportionment, as XP suggests. Rather, that case dealt with the proper application of the *Panduit* analysis (not at issue here) and whether there was sufficient evidence of a two-player market when other competitors existed. 2018 WL 4691047, at *6.

your word, because of that optionality, which is explicit in my work from the beginning. Mot., Ex. A at 188:7-24. Indeed, Mr. Malackowski's reports explain that thousands of documents were stolen by engineers knowledgeable about the documents and their value, and how those documents reveal critical details regarding Comet's RF Match and Generator products. *See* Ex. 2 at 11, 20-34, 55; Ex. 16 at 22-34. Mr. Malackowski also explained that because the trade secrets are (1) integrated (R&D for components affects development of the higher-level trade secrets), and (2) interrelated (R&D for various trade secrets builds on earlier developments or developments across categories, such as generator technologies benefitting from matching network), XP's access to a set of Comet trade secret documents related to each of the various trade secrets allowed it to avoid R&D for all trade secrets. Ex. 2 at 37-45, 55. Mr. Malackowski also explained that XP received value by misappropriating the collection of Comet trade secrets: "one of the benefits provided by the theft of trade secrets is the opportunity for misappropriators to re-allocate R&D resources to build upon the misappropriated technologies and leapfrog the market positions of trade secret owners." Ex. 16 at 19-20, 22-27.

That understanding was informed by and is fully supported by the factual record. Mr. Malackowski explained that he spoke with Comet's engineers, Gary Russell and Andre Grede, and also spoke with Dr. Shanfield, all of whom confirmed the relatedness of Comet's trade secrets. Mr. Malackowski also identified Comet documents showing the relatedness of its trade secret technologies. *See, e.g.*, Ex. 2 at 37, n. 269 (citing e.g., COMET_04158388). It is the relatedness and integrated nature of Comet's trade secret technologies and the underlying documents that support Mr. Malackowski's opinion that XP derived value from all of the misappropriated trade secrets, even in the event it did not directly copy each and every one, because it had the entire store of knowledge from which it could choose. Accordingly, Mr. Malackowski's use of the shorthand "option value" at his deposition was nothing new, and he should be permitted to testify about this properly disclosed opinion.

## B. Mr. Malackowski's Reasonable Royalty Analysis Also Was Proper

1. Mr. Malackowski's Reasonable Royalty Is Apportioned and Ms. Irwin's Disagreement with His Analysis Is Not Grounds for Exclusion (Mot. § V.C.)

Mr. Malackowski's reasonable royalty opinion is based on the costs that XP avoided incurring through its theft, which apportions the value of the Asserted Trade Secrets between Comet and XP. *See*

§ II.C.2, *supra*.  To arrive at his reasonable royalty in this case, Mr. Malackowski utilized the hypothetical negotiation construct to determine the appropriate royalty amount, and as part of that analysis considered the factors set forth in *Univ. Computing*, which specifically includes a factor regarding development costs of the trade secrets.  504 F.2d at 538.  *See* Ex. 2 at 46-56.  Courts have deemed that analysis a reliable approach time and time again.  *See, e.g.*, *DiscoverOrg Data LLC v. Bitnine Glob., Inc.*, 2020 WL 6562333, at *9 (N.D. Cal. Nov. 9, 2020); *Atlantic Inertial Sys., Inc. v. Condor Pac. Indus. of California, Inc.*, 2015 WL 3825318 (C.D. Cal. June 18, 2015).

XP, however, claims that this type of royalty is "atypical" and therefore should be excluded.  Mot. at 14-15.  Nothing in the DTSA or CUTSA mandates a particular formula for calculating reasonable royalties, as XP suggests.  Rather, both statutes state that a royalty may be awarded "for the misappropriator's unauthorized disclosure or use of the trade secret[.]"  18 U.S.C. § 1836(b)(3)(B)(ii); Cal Civ. Code § 3426.3(b).  Courts have eschewed imposing a strict formulation and instead recognize that trade secret cases "require[] a flexible and imaginative approach to the problem of damages."  *Univ. Computing*, 504 F.2d at 538.  The fact that XP's expert is unfamiliar with basing a royalty on development costs has no bearing on the reliability of Mr. Malackowski's analysis.  Indeed, Ms. Irwin's lack of familiarity with a royalty based on development costs is unsurprising: she has never valued trade secrets outside the context of litigation.  Ex. 19 at 53:13-20.  Moreover, XP's reliance on its own expert in this *Daubert* motion confirms that its challenge goes to the weight of Mr. Malackowski's testimony, not its admissibility.  *See SPS Techs., LLC v. Briles Aerospace, Inc.*, 2021 WL 4913509, at *2 (C.D. Cal. Sept. 8, 2021) ("when the facts 'are subject to reasonable dispute where . . . there is sufficient basis for disagreement,' challenges go to the weight of the expert's opinion, not admissibility").[7]

XP's final argument relies on *Looksmart Grp., Inc. v. Microsoft Corp.*, but XP ignores critical distinctions that make *Looksmart* inapplicable here.  2019 WL 4009263 (N.D. Cal. Aug. 5, 2019).  In *Looksmart*, which was a patent infringement case, plaintiff's expert calculated a reasonable royalty based on costs Microsoft avoided spending using the entirety of Microsoft's backward-looking and

---

[7]     XP also asserts that Mr. Malackowski's opinion should be excluded because he "admitted that his calculation of avoided costs was not 'based on the value of [Comet's alleged trade secrets]' to XP." Mot. at 15.  Comet has addressed this mischaracterization in § IV.A.1, *supra*, and there is no requirement that a damages expert calculate the full value of the trade secrets in a royalty analysis.

*forward-looking* costs savings as a base for the reasonable royalty. *Id.* ("the '530 patent's technology allowed Microsoft to save approximately . . . over the period from the initial infringement to the expected trial date, and . . . from post-trial to the expiration of the patent"). Because the royalty was the entire amount of Microsoft's savings through past or future infringement, "Microsoft would gain nothing by its use" of the invention and the Court concluded the royalty was improper. *See id.*, at *3.[8]

That is not the case here. Mr. Malackowski's reasonable royalty calculation in this case does not rely on XP's backward and forward looking avoided costs resulting from using efficient technology, but instead recognizes the significant R&D savings that XP obtained at the time of the hypothetical negotiation. *See* Ex. 2 at 47 (explaining that the hypothetical negotiation would have occurred at the time of the initial misappropriation in early 2018). XP continues to benefit from that misappropriation in ways that Mr. Malackowski's royalty did not account for. As explained above, XP obtained a decades-worth of Comet's work in one fell swoop, which gave XP the "certainty of solution and certainty as to calendar." Ex. 17 at 233:15-25. Thus, the value to XP "would be greatly in excess of 32 million." *Id.* at 233:8-25. Mr. Malackowski's royalty does not include future efficiencies and savings XP will realize due to its theft and knowledge gain, which are benefits that XP will reap for as long as it continues its misappropriation (including today). *Id.* at 237:15-238:5. Mr. Malackowski's opinion also does not include the value XP ascribes to the trade secrets in the form of ███████████ in expected revenue from products developed with the trade secrets. However, in order to apportion the value of the trade secrets between the parties at the time of the hypothetical negotiation, Mr. Malackowski limited the royalty to XP's avoided R&D costs. *See id.* at 230:8-15.

Because the situation here is unlike the situation in *Looksmart* and XP has identified no reliability issues with Mr. Malackowski's reasonable royalty calculation, but merely disagrees with his conclusion, Mr. Malackowski's royalty opinion is proper and should not be excluded. [9]

---

[8] The Court recognized, however, that the costs savings approach to a reasonable royalty calculation may be appropriate. *Looksmart*, 2019 WL 4009623, at *3 (citations omitted).

[9] In a footnote, XP also argues that Mr. Malackowski's identification of January/February 2018, i.e., when Comet's documents were stolen and taken to XP, as the date of the hypothetical negotiation is an independent ground that requires exclusion of his entire royalty opinion. Mot. at 16, n. 6. Arguments in footnotes are waived. *See Cheever v. Huawei Device USA, Inc.*, 2019 WL 8883942, at *3 (N.D. Cal. Dec. 4, 2019). Even if the Court considers this argument, XP's cited case does not exclude an *entire*

2.     Mr. Malackowski Reliably Concluded Comet's Intercompany Licenses Were Not Relevant (Mot. § V.D)

XP also claims that Mr. Malackowski's entire royalty opinion should be excluded because he concluded that Comet's intercompany licenses were not informative of the royalty in this case and because he did not analyze XP's acquisition of Comdel.  Mot. at 16-17.  XP is wrong on both counts.

*First*, Mr. Malackowski considered all of the intercompany licenses XP identifies in its motion. Although XP's expert relied on those licenses to arrive at her $0 royalty opinion, Mr. Malackowski explained why they are not comparable and why he disagrees with XP's expert's reliance on them.  *See* Ex. 2 at 51; Ex. 16 at 28-34.  The purpose of these licenses was to ensure Comet paid appropriate taxes in different jurisdictions when Comet was moving manufacturing from one Comet location to another— entirely distinct from the circumstances here.  Ex. 17 at 242:12-243:12; Ex. 20 at 160:11-161:3.  These licenses are also between two, non-competitor Comet affiliates (again, not the circumstances here).  *Id.* The fact that these licenses are intended to reflect "arm's length transactions" does not convert them into the one and only reasonable royalty or even make them relevant to the hypothetical negotiation, as XP argues.  Mot. 16-17; *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1373 (Fed. Cir. 2008), *modified on other grounds*, 557 F.3d 1377 (Fed. Cir. 2009) ("[w]hile taxing authorities requested that the license rate be one that simulates the rate that would have been reached in an arm's-length negotiation between independent enterprises, there is no evidence that suggested that the [selected] rate would have been the rate at which [Comet] would have licensed a competitor.").

*Juicy Couture*, on which XP relies, does not hold otherwise and has no relevance here.  In that case, no licenses existed and in Lanham Act cases, the sole example of a "royalty calculation outside of the context of a previous licensing agreement involved an extraordinary situation" that was not applicable.  *See* 2006 WL 1359955, at *4.  By contrast, in this case, the existing licenses are not relevant, as explained above, and the case law provides a framework for arriving at royalties in these circumstances, which Mr. Malackowski relied on.  *See Univ. Computing*, 504 F.2d 518.

royalty opinion based on the hypothetical negotiation date (which, in that case, was alleged to have occurred over "several years," not a two-month period).  *Dynetix Design Sols., Inc. v. Synopsys, Inc.*, 2013 WL 4537838, at *6 (N.D. Cal. Aug. 22, 2013).  Mr. Malackowski's identification of the hypothetical negotiation is proper, and XP's unsupported argument should be rejected.  *Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*, 2006 WL 1390416 (N.D. Cal. May 18, 2006).

*Second*, Mr. Malackowski considered XP's acquisition of Comdel and determined that the acquisition was not relevant. *See* Ex. 16 at 17-19. As he explained, Comdel's technology was outdated and XP itself acknowledged ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮. *Id.*; Ex. 10. XP decided to move forward with a new development rather than try to salvage the antiquated Comdel technology. Other than falsely claiming Mr. Malackowski did not consider the Comdel acquisition, XP offers no reason his analysis is unreliable. Any disagreement XP has with Mr. Malackowski's conclusions is, at most, fodder for cross-examination. *See United Energy*, 2018 WL 5013580, at *1.

**C.    Comet Disclosed Substantial Documentary and Testimonal Evidence Supporting Mr. Malackowski's Opinions (Mot. § V.E)**

Mr. Malackowski's opinions in this case are based on the entire factual record, including Comet's document productions and discovery responses, in addition to testimony and other information from Comet employees, and were detailed in Mr. Malackowski's reports, as explained in Section II, *supra*. XP, however, asks the Court to exclude Mr. Malackowski's opinions based on a disingenuous narrative that it knows is untrue (because Comet told XP as much months ago) and because he did not make the same adjustments that XP's own expert did. None of that warrants exclusion.

XP's assertion that Mr. Malackowski's arbitrarily increased avoided costs based "solely" on Mr. Russell's say-so is also untrue. Mot. at 19. Mr. Malackowski's specific, numerical adjustments to avoided costs are based on his analysis of Comet's financial information, including comparison of Comet's various documents, the testimonial evidence as well as extensive personal experience.[10] As Mr. Pfeiffer confirmed at his deposition, the fact that Comet's R&D project code expenditures understates its overall R&D investment was apparent by comparing Comet's R&D expenditures from its project code spreadsheets with its overall Match R&D (as disclosed in other materials produced by Comet such as Comet's profit and loss statements as well as other financial reports, that the project code spreadsheets result in a quantifiable lower amount of R&D than what Comet actually spends. Ex. 20 at 120:8-25. Mr. Malackowski then reviewed Comet's "contemporaneous financial data" (which again,

---

[10] Comet informed XP as early as June 21, 2021 that its R&D project code expenditures understate Comet's overall R&D investment. Ex. 23 at 10-13.

was produced by Comet) and confirmed based on his own analysis of the data that Mr. Pfeiffer's assessment was accurate. Ex. 16 at 39-41, 43. He therefore concluded based on those materials and analyses it was appropriate to adjust those project-code expenditures for RF Match upward because XP avoided the entire cost associated with these R&D employees, i.e., had XP not stolen Comet's trade secrets, it would have had to pay employees full salaries to perform this R&D work. *Id.* at 7. For the same reason, he concluded it was appropriate to include depreciation costs and corporate overhead associated with R&D because XP avoided incurring costs liked those through its theft, too. *See* Mot. 20. He also explained that such an attribution was based on *his own experience* that such an approach is a "common cost accounting method." Ex. 16 at 7. Thus, Mr. Malackowski did not "ignore" Mr. Pfeiffer's testimony, as XP claims. Mot. 20. Rather, he considered it in view of all of the evidence and also his experience, and made the adjustment he determined based on all of those considerations to be appropriate. *Id.* Moreover, because he did not see the same difference between the project-code expenditures (reflected in the project-code data) and the R&D expenditures (reflected in the broader data) for generator, Mr. Malackowski made no upward adjustment for those calculations. Ex. 16 at 44-45. XP's cited cases differ significantly (and dispositively) from the situation here and they do not in any way support exclusion of Mr. Malackowski's opinions here.[11]

With respect to Comet's pre-July 2010 R&D expenditures, XP once again mischaracterizes the facts. XP suggests that Mr. Malackowski purposefully "did not review Comet's detailed accounting records or general ledger entries" for pre-July 2010 R&D. Mot. at 21. But the reason Mr. Malackowski did not review R&D project-code information for that time period is because Comet did not begin tracking R&D on a project basis until July 2010. So, to determine the amount of R&D Comet expended related to the trade secrets in that time period, Mr. Malackowski once again corroborated Comet's interrogatory response and available financial data with Mr. Russell—something XP had ample opportunity to do at his deposition. *See* Ex. 16 at 8-11. And Mr. Malackowski went one step further

---

[11] *Doe by & through Pike v. Pike*, 405 F. Supp. 3d 243, 251-252 (D. Mass. 2019) (precluding expert's opinion about what a fact witness might have known because the fact witness could provide same testimony); *see also Trustees of Bos. Univ. v. Everlight Elecs. Co.*, 141 F. Supp. 3d 147, 149 (D. Mass. 2015) (requiring fact witness to provide his own testimony during trial that expert would rely on); *cf. Waymo LLC v. Uber Tech. Inc.*, 2017 WL 5148390 (N.D. Cal. Nov. 6, 2017) (excluding expert where expert would not add anything helpful for the jury beyond what a document itself says).

and confirmed that Mr. Russell's "representation [was] consistent with the annual R&D costs." *Id.* at 8. Moreover, to be conservative, Mr. Malackowski reduced the pre-2011 R&D costs by half. *Id.* The fact that Comet has different financial data available for different time periods is no barrier to Mr. Malackowski's damages analysis. Indeed, the opposite result would reward XP's extensive theft dating back to a time period when Comet maintained its financial records differently and encompassing a vast amount of Comet's R&D investment in its RF Match and Generator products. While the amount of Mr. Malackowski's adjustments for each year may vary based on the available data, XP is free to cross-examine him on that point and present its own expert's critique (as it did in her responsive report).

XP also claims that Mr. Malackowski surreptitiously obtained information from Mr. Russell regarding how Comet's R&D project codes relate to its trade secrets, and that Comet "strategic[ally]" denied XP discovery on this issue. Mot. 18-19. Not so—as XP knows. Nearly three months ago, when XP made the identical assertion, Comet explained that XP was mischaracterizing the record and that the factual support for its damages theories were properly disclosed. Ex. 21. That, however, did not deter XP from making the same argument here. As Comet previously explained to XP, while Mr. Pfeiffer could not personally correlate project cost codes to specific trade secrets, he explained that "was more on the R&D side" and required "technical expertise" to answer.[12] Ex. 20 at 51:3-13. After Mr. Pfeiffer's deposition, Comet designated Mr. Grede on topic XP's 30(b)(6) topic regarding, among other things, Comet's "research and development expenses and any studies or analysis of such costs, relating to the Alleged Comet Information," and Comet specifically stated that he would "be prepared to explain how the project codes relate to Comet's trade secrets." Ex. 22. To facilitate questioning on this topic, Comet provided an interrogatory response prior to Mr. Grede's deposition setting forth the relationship between Comet's project codes and the asserted trade secrets. *See* Ex. 4 at 15-19. Mr. Grede testified that he spoke with Mr. Russell during his preparation, including about Comet's R&D projects. Ex. 5 at 11-12. But XP did not ask Mr. Grede any questions about Comet's R&D project codes or even mark the interrogatory response as an exhibit. XP's strategic deposition decision does not render Mr.

---

[12] To the extent XP argues in reply that Mr. Russell was unprepared to testify on the R&D project codes is also wrong. After realizing that Mr. Russell was designated on "facts . . . about Beuerman's projects and budget *at XP*" (a topic Comet confirmed with XP before the deposition), XP chose not to ask him any questions in his personal capacity regarding Comet's projects and budgets. Ex. 24 at 124:3-125:25.

Malackowski's opinions unreliable or based on undisclosed information.

Because Comet properly disclosed the factual bases on which Mr. Malackowski's opinions are predicated, this case is nothing like *Therasense, Inc. v. Becton, Dickinson and Co.*, 2008 WL 2323856 (N.D. Cal. May 22, 2008), on which XP relies.  There, Abbott's expert relied on three experiments conducted by Abbott employees that (i) the expert "did not participate in, observe, or supervise" and (ii) Abbott kept "secret" during fact discovery by claiming privilege over the tests.  *Id.* at *3.  Here, every document, interrogatory response, and witness on whom Mr. Malackowski relied was available to XP.  Mr. Malackowski analyzed this information himself, and Comet did not withhold any of this information under a claim of privilege.  By contrast, XP refused to disclose the basis of any of its damages theories during discovery.  Thus, after reviewing Ms. Irwin's report, in which XP for the first time disclosed that it disagreed with Comet's reliance on its R&D project expenditures, Mr. Malackowski properly confirmed his analysis in his opening report remained appropriate with Mr. Pfeiffer and Mr. Russell.

*CareDxInc. v. Natera, Inc.*, 2021 WL 1840646 (D. Del. May 7, 2021) similarly does not support XP's position.[13]  In *CareDx*, another false advertising case, Mr. Malackowski was unable to review CareDx's ledger or invoices, or interview personnel who could provide more specifics than the CEO's testimony regarding the "rough[]" marketing and sales spend.  *See id.*, at *2-*3.  Here, Mr. Malackowski reviewed and analyzed the financial information produced in this case and confirmed his understanding of the documentary and testimony evidence against one another and with various Comet employees.  *See* Ex. 17 at 11:16-14:15, 15:14-21:4.  Although XP claims Mr. Malackowski "failed to interview the Comet engineers in the United States who were actually doing th[e] work," Mot. 20, Mr. Russell and Mr. Grede, whom Mr. Malackowski interviewed and XP deposed, are the engineers who have supervised and performed the R&D work for 9+ years (Mr. Russell) and 4+ years (Mr. Grede).

XP's remaining complaints are based on its expert's criticisms of Mr. Malackowski, which is not a basis for *Daubert*.  Mot. 20-22; *See United Energy*, 2018 WL 5013580, at *1.  Specifically, Ms. Irwin criticizes Mr. Malackowski for not depreciating the amount of avoided costs that he calculates; for including so-called "sustaining R&D"; ██████████████████████;

---

[13] *Bio-Rad* and *Rembrandt* are irrelevant as explained in Section IV.A.1, *supra*. And in *Rembrandt*, data correlating survey usage data with revenues was not available.  22 F. Supp. 3d at 596.

*Compare* Ex. 14 at 34-36, *with* Mot. at 21 (citing same).  Mr. Malackowski addressed each of Ms. Irwin's arguments in his reply report based on his experience and the facts and data available in this case.  Mr. Malackowski explained that depreciating the amount of costs XP avoided was inappropriate because the passage of time only *increases* the amount of money in present value that would be required if XP started from square one at the time of the initial misappropriation, and Comet's increasing annual revenues confirmed the continued value of Comet's early, foundational trade secrets had increased over time. Ex. 16 at 13-14.   Mr. Malackowski also explained that due to the iterative nature of Comet's technological developments, R&D does not end with the first sale of a product and XP benefits from any customer-specific development work because XP is targeting those very same customers. *Id.* at 14-17. Finally, Mr. Malackowski's determination that ███████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████. *Id.* at 17-19.  Ms. Irwin's (or XP's) disagreement with Mr. Malackowski's conclusions should be resolved by a jury and not through exclusion.  *City of Pomona*, 750 F.3d at 1049.

### D.   Mr. Malackowski's Opinions Related to Injunctive Relief Are Permissible and Based on the Facts (Mot. § V.F)

Mr. Malackowski's opinions regarding economic issues that are related to Comet's request for injunctive relief are legally permissible and are reliable.  To be clear, Mr. Malackowski will not opine that Comet has suffered irreparable harm at the jury trial.  Should Comet succeed at trial, it intends to request a permanent injunction from the Court and will likely present supporting evidence from Mr. Malackowski on irreparable harm in support of that request.  There is therefore no need for the Court to exercise its "gate-keeping" function and XP's motion to exclude should be denied as moot.

Should the Court consider XP's motion on this issue, it can be denied on the merits, too.  XP claims that Mr. Malackowski's irreparable harm opinions should be excluded because "he does not quantify any actual losses Comet has suffered as a result of XP's misappropriation." Mot. 22.  But that is precisely the point: losses that "are difficult—if not impossible—to quantify," are the type of loss that "constitute[s] irreparable harm." *Synopsys, Inc. v. AzurEngine Techs., Inc.*, 401 F. Supp. 3d 1068, 1074 (S.D. Cal. 2019).  As Mr. Malackowski explained,

███████████████████████████████████████ will adversely impact Comet's customer relationships, market share, sales, profits. Like Comet, a vast majority of XP Power's customers are semiconductor OEMs. Thus, ██████████████████ ████████████████████████████████████

Ex. 2 at 57. Courts routinely recognize that threatened loss of customers and loss of market share demonstrates irreparable harm. *See Brocade*, 2013 WL 890126, at *9 (N.D. Cal. Jan. 23, 2013); *Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp.*, 593 F. Supp. 2d 1088 (N.D. Cal. 2009); *see also I-Flow Corp. v. Apex Med. Techs., Inc.*, 2010 WL 141402, at *1 (S.D. Cal. Jan. 8, 2010). Additionally, Mr. Malackowski responded to Ms. Irwin's criticism related to irreparable harm, explaining that XP's entry into the market with competing products using Comet's trade secret technology will create pricing pressure. Ex. 16 at 38-39. Thus, contrary to XP's reliance on *Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 2014 WL 4312021, at *10 (N.D. Cal. Aug. 28, 2014), Mr. Malackowski does not simply declare that irreparable harm occurred, he explains the evidence supporting that conclusion.

XP ignores this express disclosure in his report and claims Mr. Malackowski's irreparable harm opinions are limited to "harm by XP hiring [Comet's] employees" and "Comet management [being] 'distracted] by figuring out how to respond to" XP's misappropriation. Mot. 23. That is simply untrue as explained above. Moreover, XP cites testimony related to general questions regarding how XP's misappropriation harmed Comet, which Mr. Malackowski explained related to the theft of thousands of confidential documents, i.e., the reason Comet brought this case and what it intends to prove at trial. Ex. 17 at 26:6-29:20. XP may disagree with these facts, but it cannot simply exclude them through *Daubert*.

XP is thus left chiding Mr. Malackowski for not reciting examples of how XP used the Asserted Trade Secrets at his deposition. Mot. 23. Not only does Mr. Malackowski's report identify specific examples of such use, but his testimony that XP cites directs XP to the best source of that evidence: Comet's technical expert, Dr. Shanfield, whose opinions on use XP does not challenge. *See* Ex. 17 at 111:11-25. Mr. Malackowski properly analyzed irreparable harm, and XP's motion should be denied.

## V.    CONCLUSION

For the foregoing reasons, Comet respectfully requests that XP's motion to exclude Mr. Malackowski's opinions and testimony its answer be denied.

DATED:  December 10, 2021

Respectfully submitted,
KIRKLAND & ELLIS LLP


By: */s/ Sharre Lotfollahi*
Adam R. Alper (SBN 196834)
*adam.alper@kirkland.com*
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone:    (415) 439-1400
Facsimile:    (415) 439-1500

Michael W. De Vries (SBN 211001)
*michael.devries@kirkland.com*
KIRKLAND & ELLIS LLP
555 S. Flower Street
Los Angeles, CA 90071
Telephone:    (213) 680-8400
Facsimile:    (213) 680-8500

Sharre Lotfollahi (SBN 258913)
*sharre.lotfollahi@kirkland.com*
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, CA 90067
Telephone:    (310) 552-4200
Facsimile:    (310) 552-5900

Leslie M. Schmidt (pro hac vice)
*leslie.schmidt@kirkland.com*
KIRKLAND & ELLIS LLP
601 Lexington Ave.
New York, NY 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Attorneys for Plaintiffs
COMET TECHNOLOGIES USA INC., COMET AG
AND YXLON INTERNATIONAL GMBH