# EXHIBIT 17

HIGHLY CONFIDENTIAL-OUTSIDE COUNSELS' EYES ONLY

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

COMET TECHNOLOGIES USA INC., A    )
DELAWARE CORPORATION, COMET AG,   )
A SWISS CORPORATION, AND YXLON     )
INTERNATIONAL GmbH, A GERMAN       )
CORPORATION,                       )
                                   )
         PLAINTIFFS,               )
                                   )
              VS.                  ) CASE NO.
                                   ) 5:20-cv-06408-NC
XP POWER LLC, A CALIFORNIA         )
LIMITED LIABILITY COMPANY,         )
                                   )
         DEFENDANT.                )
_____)

*** HIGHLY CONFIDENTIAL-OUTSIDE COUNSELS' EYES ONLY ***

REMOTE PROCEEDINGS OF THE

VIDEOTAPED EXPERT DEPOSITION OF

JAMES E. MALACKOWSKI, CPA, CLP

TUESDAY, NOVEMBER 2, 2021

JOB NO.  4847100

REPORTED BY KIMBERLY EDELEN,

CSR. NO. 9042, CRR, RPR.

PAGES 1 - 291

Page 1

HIGHLY CONFIDENTIAL-OUTSIDE COUNSELS' EYES ONLY

Q    Okay.  Let's take a look at Page 15 of    10:06:53

your -- of Appendix 2.  If you're on the online    10:07:00

version, it's PDF Page 138.    10:07:07

A    And here the online version may be helpful    10:07:20

because I need the page numbers -- there's several    10:07:22

sets of page numbers within the appendix, so...    10:07:25

Q    I'm looking at the bottom right-hand    10:07:28

corner.  It says "15 of 16," if you're looking at    10:07:29

the paper copy.    10:07:32

A    Great.  I have that.    10:07:33

Q    Okay.  So I want to ask you some questions    10:07:34

about this section of Appendix 2 that's titled    10:07:36

"Interviews."    10:07:39

Do you see that?    10:07:40

A    I do.    10:07:41

Q    And is this a complete listing of the    10:07:42

individuals that you spoke with or interviewed in    10:07:47

forming the opinions contained in your opening    10:07:51

expert report?    10:07:54

A    It is.    10:07:56

Q    Let's go through these in turn and start    10:07:57

with your interview with Mr. Gary Russell.  Who is    10:08:01

Mr. Gary Russell?    10:08:05

A    Mr. Russell is the director of engineering    10:08:06

for matching networks for Comet Technologies USA.    10:08:34

Page 11

Q    And you spoke with Mr. Russell on July 15th 10:08:39
of 2021? 10:08:41

A    Correct. 10:08:42

Q    And what did you discuss with Mr. Russell? 10:08:43

A    The details of that conversation are 10:08:46
reflected throughout my report but summarized for 10:08:48
you on Page 3 of my report. 10:08:52

Mr. Russell provided information regarding 10:08:55
Comet's operations in San Jose and the R&D projects 10:08:57
that resulted in match networks' trade secrets. 10:09:01

Q    And did you discuss anything else with 10:09:04
Mr. Russell? 10:09:06

A    There would be subsets of that conversation 10:09:08
that are noted by footnote throughout my report, but 10:09:11
that's generally the topic. 10:09:14

Q    Okay.  The next interview that you list is 10:09:17
with Mr. André Grede.  Who's Mr. Grede? 10:09:19

A    Mr. Grede is the vice president for global 10:09:26
research and development for plasma control 10:09:29
technologies for Comet Technologies USA. 10:09:30

Q    And what did you discuss with Mr. Grede on 10:09:32
July 16th? 10:09:35

A    Similar to the reference to Mr. Russell, 10:09:37
the specifics of that conversation are referenced 10:09:39
throughout my report either in the text or the 10:09:42

Page 12

HIGHLY CONFIDENTIAL-OUTSIDE COUNSELS' EYES ONLY

footnote, but generally speaking, Mr. Grede provided    10:09:44

information concerning Comet's R&D efforts    10:09:48

concerning its RF generator products in Europe.    10:09:51

    Q    Did you discuss anything else with    10:09:55

Mr. Grede?    10:09:56

    A    Again, the specifics would be noted in the    10:09:58

report but all generally fall under that topic.    10:10:00

    Q    Next on your list is an interview with    10:10:05

Mr. Markus Pfeiffer.  Who is Mr. Pfeiffer?    10:10:07

    A    Mr. Pfeiffer is the vice president of    10:10:13

controlling and strategic development for PCT for    10:10:15

Comet Technologies USA.    10:10:17

    Q    And what did you discuss with Mr. Pfeiffer?    10:10:19

    A    Similar to the other interviews, there are    10:10:22

references throughout my report detailing those    10:10:24

conversations, but generally speaking, Mr. Pfeiffer    10:10:27

provided information concerning Comet's financial    10:10:30

data.    10:10:32

    Q    Did you discuss anything else with    10:10:33

Mr. Pfeiffer?    10:10:34

    A    Not that wouldn't fall under that category.    10:10:36

    Q    Next on your list it looks like you have a    10:10:40

second interview with Mr. Grede and then a second    10:10:42

interview with Mr. Russell; is that correct?    10:10:47

    A    Yes.  They were continuations of the same    10:10:49

Page 13

HIGHLY CONFIDENTIAL-OUTSIDE COUNSELS' EYES ONLY

topics, though, in further detail.                    10:10:52

Q    And why did you decide that you needed to    10:10:57

speak with Mr. Grede a second time?                   10:11:00

A    Simply as I continued to develop my work     10:11:03

and report, there were follow-up questions or         10:11:06

details that I wanted to include within the report    10:11:10

and I sought confirmation of my understanding.        10:11:12

Q    And can you recall specifically what          10:11:15

follow-up questions you had for Mr. Grede?            10:11:17

A    Again, I would refer to the report, but       10:11:24

more specific questions as it related to the          10:11:26

iterative nature of the R&D process, the fact that    10:11:29

subsequent R&D efforts built upon the R&D that comes  10:11:34

before it, Comet's use of the trade secrets at issue  10:11:39

in this case.  Those topics generally.                10:11:42

MR. MANGAS:  Sorry.  I'm getting a battery            10:11:55

message on my computer.  Let me see if I can fix      10:11:57

that without going off the record.                    10:11:59

Do you mind if we go off the record just              10:12:40

briefly?                                              10:12:42

MR. BLAKE:  Yeah.  Off the record.                    10:12:43

THE VIDEOGRAPHER:  Going off the record.              10:12:48

The time is 10:12 a.m.                                10:12:48

(Off the record from 10:12 - 10:30 a.m.)              10:12:51

THE VIDEOGRAPHER:  Back on the record.  The           10:30:09

Page 14

HIGHLY CONFIDENTIAL-OUTSIDE COUNSELS' EYES ONLY

time is 10:30 a.m.                                    10:30:10

BY MR. MANGAS:                                        10:30:12

    Q    Okay.  Mr. Malackowski, we were --          10:30:13

         MR. BLAKE:  Before we get started, I just   10:30:15

want to note that there are a couple folks on the    10:30:17

Zoom who did not make their appearances when we      10:30:19

first got on.  And so I figured now, after this      10:30:22

15-minute technical break, technical issue break,    10:30:26

maybe we can have them announce.                      10:30:29

         MR. MANGAS:  Sure.  We've also got Dixie     10:30:33

Tauber from Latham & Watkins and Lindsay Schick from  10:30:35

Cornerstone.                                          10:30:40

BY MR. MANGAS:                                        10:30:45

    Q    Mr. Malackowski, when we broke we were      10:30:45

talking about the interview section on your          10:30:47

Appendix 2.                                           10:30:50

    A    Yes, sir.                                    10:30:52

    Q    And I was getting ready to ask you some     10:30:53

questions about your second interview with Mr. Gary  10:30:57

Russell.                                             10:30:59

         How did you decide you needed to have a     10:31:01

second interview with Mr. Russell?                   10:31:03

    A    So if you note for the interview schedule,  10:31:07

there were a period of time between the first and    10:31:11

the second interviews.  During that period, I was    10:31:13

Page 15

HIGHLY CONFIDENTIAL-OUTSIDE COUNSELS' EYES ONLY

finalizing my opinions and reports.  As I mentioned, the purpose of the second interview was to confirm my understandings both as it related to each individual, but then also as it related between the various individuals that I had discussed with or the documents that I had seen.

So asking, for example, Mr. Grede about Mr. Russell's experience and work and what I learned from him and vice versa.

Q    Okay.  And do you recall what follow-up questions you had for Mr. Russell as you were finalizing your report?

A    Not to that level of detail as I sit here, except to note that I've tried to reference, I believe, including by date the reliance on each of the interviews throughout the report.  So if you look to the footnotes you'll see specific citations to those conversations and you can distinguish between the two, if that's of importance.

Q    The next person on your list is Mr. Anthony Oliveti.  Who is Mr. Oliveti?

A    Mr. Oliveti is a senior RF specialist for Comet Technologies USA.

Q    And what did you speak to Mr. Oliveti about?

Page 16

A   Again, as it relates -- same for the other   10:32:39
witnesses.  There are references throughout my   10:32:42
report discussing those conversations.  But   10:32:44
generally speaking, Dr. Oliveti provided information   10:32:46
concerning Comet's patent strategy and, in more   10:32:49
detail, the distinction between filing patents or   10:32:53
trade secrets for select technologies.   10:32:58

Q   Did you discuss anything else with   10:33:00
Mr. Oliveti?   10:33:02

A   We discussed the IP management process   10:33:08
generally so licensing policies and practice.   10:33:10
Again, there are references throughout the report   10:33:14
related to such subjects.   10:33:16

Q   Did you discuss anything else with   10:33:19
Mr. Oliveti other than what you've described to me?   10:33:20

A   Nothing else comes to mind.   10:33:25

Q   Next person on your list is   10:33:27
Dr. Stan Shanfield.  Who is Dr. Shanfield?   10:33:28

A   Dr. Shanfield is an expert -- technical   10:33:32
expert for the defendants -- or plaintiffs, rather.   10:33:35

Q   And what did you discuss with   10:33:38
Dr. Shanfield?   10:33:40

A   So that is also described throughout my   10:33:42
report, but generally speaking, Dr. Shanfield   10:33:45
provided information concerning the nature, benefits   10:33:47

Page 17

HIGHLY CONFIDENTIAL-OUTSIDE COUNSELS' EYES ONLY

and advantages of the asserted trade secrets.      10:33:51

Q   Did you discuss anything else with      10:33:55

Dr. Shanfield?      10:33:59

A   Well, that's a fairly broad category as      10:34:01

detailed throughout my report by a number of      10:34:04

specifics.  So in general, it relates, from my      10:34:07

perspective, to the whole chain of causation between      10:34:10

the original research that generated the trade      10:34:13

secrets at Comet, Comet's use of those trade      10:34:17

secrets, the importance of those trade secrets to      10:34:20

their commercial applications, the transfer of those      10:34:23

trade secrets as evidenced by the record in this      10:34:27

case to XP, the importance of such trade secrets to      10:34:29

XP's business, and then ultimately, the access and      10:34:33

utilization of those trade secrets as reflected in      10:34:37

the computer forensics and the technical documents      10:34:40

of XP which Dr. Shanfield has reviewed.      10:34:45

Q   And the things that Dr. Shanfield told you      10:34:49

about those topics, is the information you relied on      10:34:52

from Dr. Shanfield described in the body of your      10:34:56

report?      10:35:00

A   It -- it is certainly with respect to my      10:35:00

first report.  There may be further references in      10:35:04

the second report as well.      10:35:09

Q   I guess what I'm asking is, in forming your      10:35:17

Page 18

opinions in your August 6th report, did you rely on    10:35:19

any other information from Dr. Shanfield that's not    10:35:23

described or reflected in that report?    10:35:27

A    Nothing material.  I can't say that there    10:35:30
wasn't some insight that I learned from    10:35:33
Dr. Shanfield that helped me understand other    10:35:35
aspects of the record, but I'm not relying upon that    10:35:37
insight specifically.  What I relied upon is cited    10:35:41
in the report.    10:35:46

Q    The next person listed on your interview    10:35:47
list is Dr. Dariush Rafinejad.  Who is    10:35:50
Dr. Rafinejad?    10:35:54

A    Also an expert for plaintiffs.    10:35:57

Q    What was the area of his expertise?    10:36:04

A    I categorize him generally as an industry    10:36:07
expert, someone knowledgeable of the RF power    10:36:11
industry generally.    10:36:13

And anticipating your next question, my    10:36:14
conversations with Dr. Rafinejad related to the    10:36:17
industry generally.    10:36:21

Q    And what did you discuss with Dr. Rafinejad    10:36:25
about the industry generally?    10:36:28

A    There are references throughout my report    10:36:29
that cite to those specific topics, but generally    10:36:31
speaking, the importance of the technology at issue,    10:36:34

Page 19

the iterative nature of developments in this

industry, the reliance generally upon trade secret

protected information, the stickiness of customers,

those sort of things.

Q    And did you discuss anything else with

Dr. Rafinejad?

A    Again, I would defer to the report where I

detailed those questions -- or detail those

discussions through the text in the footnotes.

Nothing comes top of mind as I sit here today.

Q    And I'll ask you the same question I was

asking you about Dr. Shanfield but with respect to

all the interviewees on this list.

        To the extent that those interviewees

provided you with information you relied on in

forming the opinions in your August 6th report, is

that information described in your August 6th

report?

A    I believe so, yeah.  That was my intention.

Q    Is there any information that you received

from any of these individuals on the interview list

that you relied on in forming the opinions in your

August 6th report that is not described in that

report?

A    Nothing of a material nature.  As with

Page 20

Veritext Legal Solutions
866 299-5127

reference to the other witnesses, there certainly    10:37:53

may have been insights they provided to help me to    10:37:56

understand documents or the like, but nothing that I    10:37:58

specifically relied upon them for.    10:38:01

Q    And did Comet's attorneys from Kirkland &    10:38:03

Ellis provide you with any facts or data that you    10:38:06

considered that is not contained in the documents    10:38:09

you list in Appendix 2?    10:38:12

A    I don't believe so.  I don't specifically    10:38:16

rely upon Comet's attorneys as part of the    10:38:18

foundation of my opinions.    10:38:23

Q    Did Comet's attorneys from Kirkland & Ellis    10:38:25

ask you to make any assumptions when forming your    10:38:27

opinions?    10:38:30

MR. BLAKE:  Objection to the extent it    10:38:33

calls for privileged communications.    10:38:34

But I don't know if it does, so if you can    10:38:38

answer without revealing privileged communications,    10:38:40

feel free to answer.    10:38:42

BY MR. MANGAS:    10:38:43

Q    And just I'll clarify.  I'm not asking for    10:38:43

any discussions about strategy or impressions of the    10:38:46

evidence.  I'm asking if you were asked to make    10:38:50

assumptions for the purpose of forming any of your    10:38:53

opinions.    10:38:57

Page 21

evidence, is it still correct that you have not    10:44:14

quantified any actual losses suffered by Comet as a    10:44:17

result of XP Power's alleged misappropriation?    10:44:20

    A    Yes.  That's true as described in my first    10:44:26

report as well as my second.    10:44:28

    Q    And is it also correct that, as you sit    10:44:29

here today, that you're not aware of any actual    10:44:31

losses suffered by Comet as a result of XP Power's    10:44:34

alleged misappropriation?    10:44:38

        MR. BLAKE:  Objection.  Vague.    10:44:39

        THE WITNESS:  No.  You remove the    10:44:42

quantitative parameter in your last question, so I'm    10:44:44

not able to quantify the actual losses that have    10:44:47

occurred, but throughout my report in particular, as    10:44:50

it relates to the injunction section, I do describe    10:44:54

the qualitative harm that is occurring and will    10:44:58

continue to occur.    10:45:01

BY MR. MANGAS:    10:45:04

    Q    And my understanding from that section is    10:45:04

that that -- that harm is contingent on XP Power    10:45:09

releasing a next generation product that both    10:45:15

incorporates Comet's trade secret -- alleged trade    10:45:19

secrets and competes with Comet's products; is that    10:45:25

accurate?    10:45:29

    A    No.  I don't believe that the qualitative    10:45:30

Page 26

HIGHLY CONFIDENTIAL-OUTSIDE COUNSELS' EYES ONLY

harm is contingent.  I believe the qualitative harm                 10:45:33

is already occurring.  But the quantitative measure                 10:45:36

of that harm will be best revealed to a reasonable                  10:45:40

degree of economic certainty once the sales occur,                  10:45:44

if, in fact, they do.                                               10:45:47

    Q    And what qualitative harm, in your opinion,               10:45:49

is occurring currently?                                             10:45:51

    A    I defer you to my report that describes                   10:45:56

that.  But, generally speaking, XP has already                      10:45:58

obtained confidential insight into Comet's business,                10:46:02

both its technical specifications, its commercial                   10:46:09

strategies, its pricing, all of which are a benefit                 10:46:17

to XP qualitatively in the market today and                         10:46:21

quantitatively will be ascertainable if and when                    10:46:27

they launch their next generation product.                          10:46:30

    Q    So you described all of those things as                   10:46:40

being a benefit to XP qualitatively in the market                   10:46:43

today.                                                              10:46:47

         And I'm asking you a slightly different                    10:46:48

question, which is how are those things harming                     10:46:51

Comet currently?                                                    10:46:54

    A    I think it's directly related and                         10:46:57

equivalent, that having your competitor understand                  10:46:59

the confidential nature of your products, your                      10:47:04

pricing strategy, who your customers are, your                      10:47:08

Veritext Legal Solutions
866 299-5127

long-range plans is an immediate qualitatively    10:47:11

competitive disadvantage even as to current products    10:47:18

and activities, let alone if, in fact, the    10:47:21

competitor launches a new product that uses your    10:47:23

technology.    10:47:28

    So I think there's not only benefit to XP    10:47:29

today qualitatively, there is also benefit to --    10:47:32

there's also harm to Comet today qualitatively.    10:47:36

Q   And what is that harm?    10:47:42

A   I just explained that to you and it's    10:47:46

detailed further in my report.  I don't know if you    10:47:48

have a more specific question.    10:47:50

    I think it's relatively intuitive that    10:47:52

businesses would view it as harmful to have    10:47:54

disclosure of all of their confidential technical    10:47:59

and business information to a competitor at any    10:48:01

point in time.  That is, in essence, the whole    10:48:04

reason why companies go through great lengths to    10:48:08

keep that information confidential and protected.    10:48:11

Q   But I'm asking you -- so you say    10:48:16

"relatively intuitive that businesses would view it    10:48:19

as harmful to have the disclosure of their    10:48:24

confidential technical and business information to a    10:48:28

competitor."    10:48:28

    I'm asking you how Comet actually has been    10:48:31

Page 28

HIGHLY CONFIDENTIAL-OUTSIDE COUNSELS' EYES ONLY

harmed by that alleged disclosure.                         10:48:34

    A    Well, qualitatively they've been harmed          10:48:37

because, A, they have lost key technical resources         10:48:39

in the folks that were hired away, so those                10:48:43

resources are either absent and/or have to be              10:48:45

replaced.  That's an immediate harm.                       10:48:49

         Second, there's been disclosure of                10:48:51

thousands of documents describing the innermost            10:48:53

technical secrets of the company.  That presents           10:48:57

immediate harm in trying to respond, given that            10:49:01

circumstance.                                              10:49:06

         It's also difficult to know how to approach       10:49:08

your customers in the marketplace who are now likely       10:49:14

being approached by your competitor with the benefit       10:49:19

of your own insight.  All of that is distracting,          10:49:21

and I mentioned this specifically in my report, to         10:49:24

what the company would rather be doing, which is           10:49:27

continuing to innovate on its products.                    10:49:29

         So it's diverting management, attention,          10:49:32

resources and the like.                                    10:49:35

    Q    The first thing you mentioned was the fact        10:49:41

that Comet lost key technical resources in the folks       10:49:43

that were hired away.                                      10:49:47

         Are you referring to Mr. Beuerman,                10:49:49

Mr. Mason and Mr. Mori?                                     10:49:51

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL-OUTSIDE COUNSELS' EYES ONLY

misappropriating all of those 20 categories of    12:31:53

alleged trade secrets?    12:31:57

    A   Yes, sir.    12:31:59

    Q   And in -- do you understand from reading    12:32:00

Dr. Shanfield's report that each of those    12:32:04

20 categories of alleged trade secrets is comprised    12:32:08

of various different documents that Dr. Shanfield    12:32:12

cited and considered in his report?    12:32:16

    A   Generally, yes.    12:32:18

    Q   And is it your understanding that each of    12:32:24

the documents comprising those 20 categories of    12:32:26

alleged trade secrets individually each comprise a    12:32:29

trade secret themselves?    12:32:35

    MR. BLAKE:  Objection.  Form.    12:32:37

    THE WITNESS:  So that's better a question    12:32:41

for Dr. Shanfield.  My analysis was to look at the    12:32:42

collections of trade secrets that he identified.  So    12:32:45

I'm not drawing an opinion as to whether each    12:32:50

individual document does or not -- does or does not    12:32:52

constitute a trade secret.    12:32:56

    My understanding is that those documents    12:32:58

collectively may be characterized or described as a    12:32:59

technology or a business asset that was    12:33:05

misappropriated and I use it in that fashion.    12:33:08

\\\

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL-OUTSIDE COUNSELS' EYES ONLY

the RF business and, therefore, would not have a     13:36:51

preexisting R&D approach to the problem and that     13:36:56

their attempt to supplement that lack of experience  13:37:02

through Comdel was insufficient because of Comdel's  13:37:06

de minimis and nonexistent R&D after certain periods 13:37:11

of time.                                             13:37:14

So all of that went into my conclusion that          13:37:15

the Comet cost would be a strong proxy.  Frankly,    13:37:18

you don't usually get as much evidence as I just     13:37:22

cited for you.                                       13:37:25

Q    My question is focused on the process           13:37:35

itself.                                              13:37:38

Did you do anything to analyze or review             13:37:39

the process that XP undertakes to design products,   13:37:43

the steps that it takes, the information that it     13:37:47

considers, the resources that it uses, et cetera?    13:37:49

A    Well, the process is divided into both          13:37:54

business and technical considerations.  I considered 13:37:56

the business considerations I just referenced you    13:37:59

to.  I did not do a technical process assessment or  13:38:01

comparison.  That is outside my scope.               13:38:06

But I did confirm with Dr. Shanfield that            13:38:08

the trade secrets at issue are, in fact, applicable  13:38:11

to the process that he understood was being used at  13:38:15

XP.                                                  13:38:18

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL-OUTSIDE COUNSELS' EYES ONLY

otherwise.

And that's also true because, as we discussed before the lunch break, the time frame and budgets that XP is using are informed by the very employees who are utilizing and took the trade secrets. So there is no but-for benchmark to compare it to.

Q   So what I'm asking is:  Did you identify -- did you analyze or identify any specific instance where there was evidence that XP received or used the Comet trade secret and then took a step or decided not to take a step that resulted in XP saving a quantifiable amount of time or money as a result of that misappropriation?

MR. BLAKE:  Objection.  Form.

THE WITNESS:  I would just refer you back to my last answer.  I think all the evidence does confirm that.  But there is no but-for analysis that shows what they would have done without the trade secrets because their very plan was developed with an understanding of the trade secrets.

So there's nothing more that could be done as I understand it.

BY MR. MANGAS:

Q   Okay.  So you didn't do anything -- I think

Page 116

HIGHLY CONFIDENTIAL-OUTSIDE COUNSELS' EYES ONLY

secrets that have allegedly been used and analyze 13:48:25

each one and say there's evidence that XP -- that XP 13:48:28

saved two hours by using this trade secret or saved 13:48:32

$10,000 by using this trade secret, correct? 13:48:36

     MR. BLAKE:  Objection.  Form. 13:48:39

     THE WITNESS:  My analysis is not detailed 13:48:41

down to the level of a given trade secret and cost 13:48:45

or hours for that document, say, as an example, but 13:48:49

it does reflect the cost saved for those groupings 13:48:53

of trade secrets which escalate over time. 13:48:59

     And my reference to Comet's development 13:49:01

time is intentional because I believe that that is a 13:49:03

minimal estimate of what it would have taken 13:49:09

Comdel -- I'm sorry, XP but for the 13:49:12

misappropriation. 13:49:16

13:49:48

Page 120

HIGHLY CONFIDENTIAL-OUTSIDE COUNSELS' EYES ONLY

A    It would include Comet's witnesses, but I believe also the XP witnesses talk about the development process.  And the reason for their purchase of Comdel was to build upon the prior generation as their way of gaining early entry into the market.  But, as I said, that just didn't work out as planned.

Q    And in calculating your unjust enrichment damages, you assumed that every bit of confidential information included in Comet's prior generation product codes that Mr. Russell identified, was valuable or useful to XP; is that correct?

A    That all of that information had value, both in an absolute sense but also as represented by the cost of development as an indication of value. The ultimate value would of course be greater than just the cost, but generally, yes.

Q    And so it's your understanding that as we sit here today -- or, actually, let me strike that.

It's your understanding that as of February 2018 when Comet and XP were each developing their next generation products, it's your understanding that none of the alleged trade secret information from those prior generation of technologies was expired or outdated or valueless?

Page 147

HIGHLY CONFIDENTIAL-OUTSIDE COUNSELS' EYES ONLY

Q    Well, let's put aside whether it's relevant    16:44:49

later in the analysis or not.    16:44:52

My question is focused on the first step    16:44:53

here.  And in the first step, you determined that    16:44:55

the royalty base was $32.5 million, correct?    16:44:59

A    Yes.    16:45:03

Q    And -- all right.    16:45:07

And by -- your opinion is that the lump sum    16:45:35

royalty that XP should pay to Comet is greater than    16:45:40

that $32.5 million that you started with, correct?    16:45:47

A    No.  I think the value is much greater, but    16:45:51

as a compromise to the negotiation, I said it equal    16:45:54

to the R&D cost and understand that that R&D cost    16:46:01

wasn't the sole input into the calculus.  It was an    16:46:05

input.    16:46:09

Q    Well, but you determined that XP Power was    16:46:12

unjustly enriched to the tune of $32.5 million,    16:46:15

correct?    16:46:19

A    No.  I determined they were unjustly    16:46:22

enriched due to an amount greatly exceeding that,    16:46:23

but the only amount that I could calculate with    16:46:26

reasonable certainty was the 32.5 million, which is    16:46:28

why I also believe there should be an injunction for    16:46:31

the irreparable harm that I can't calculate.    16:46:35

Q    But in terms of the opinion that you plan    16:46:40

Page 230

following because I'm a little confused here.    16:49:38

Your testimony is that XP could invest    16:49:41
$32.5 million to create those trade secrets, but in    16:49:45
a hypothetical negotiation, XP Power would be    16:49:51
willing to pay greatly in excess of $32.5 million to    16:49:54
one of its competitors for those trade secrets.    16:49:59

Am I understanding that correctly?    16:50:03

A    That the value would be greatly in excess    16:50:05
of 32 million and the results of that negotiation,    16:50:07
in my opinion, would be to set it equal to the    16:50:09
32 million.  That would provide a great benefit to    16:50:14
XP because they would get the full understanding of    16:50:17
the trade secrets immediately.  They wouldn't have    16:50:19
to wait ten-plus years to develop them.    16:50:22

Q    Why in the world would XP want to hand its    16:50:25
competitor 32 and a half million dollars instead of    16:50:27
investing that in developing the trade secrets on    16:50:30
its own?    16:50:33

A    Because they can get to the market a heck    16:50:33
of a lot quicker, maybe a decade quicker, or perhaps    16:50:35
at all.  If they decide not to take the hypothetical    16:50:40
license, they have to go spend this money, it will    16:50:44
take them years and they may never figure it out.    16:50:46

Now they have certainty of solution and    16:50:53
certainty as to calendar.    16:50:55

Page 233

HIGHLY CONFIDENTIAL-OUTSIDE COUNSELS' EYES ONLY

Even though that Comet has at least two more current product families and one under development, and Comdel has at least one product family and one under development that are more current than that 2007 technology, your testimony is that XP would pay full development cost for that 2007 technology?

A   Yes, for all the reasons we talked about at great length today, including the iterative nature of the technology, the fact that it would cost more today than to recreate what was done -- or create from scratch what was done in 2007.

But the short answer to your question is yes.

Q   You would agree that if XP paid Comet a hundred percent or more of Comet's cost of development of the alleged trade secrets and Comet retained full rights to use those trade secrets, that that would be a windfall to Comet, correct?

A   No.  I don't think if Comet really had the choice they would take that deal, because although they would be recouping their development costs, they would have put their future product at great risk from a now informed competitor selling their own solution or perhaps a leapfrog solution.

Page 237

HIGHLY CONFIDENTIAL-OUTSIDE COUNSELS' EYES ONLY

So in the but-for world, if XP had talked into Comet's door, offered them 32 and a half million for all of their know-how reflected by these trade secrets, my expectation is Comet would have turned down the offer.

Q    And your testimony is that in this hypothetical negotiation, XP would be willing to pay Comet far in excess of $32.5 million and continue to allow Comet to capitalize on the alleged trade secret information?

A    You've asked me this so many times.

My opinion is that there would be much greater value than the 32 and a half million that could be paid but that ultimately the parties would agree to pay the 32 and a half.  I'm not suggesting they would have agreed to pay anything different.

Q    Okay.  So your testimony today is that the reasonable royalty that XP should pay Comet is equal to 32 and a half million dollars?

A    Yes.  I think that's pretty clear.

Q    And it's your testimony today that in this hypothetical negotiation XP would be willing to pay Comet $32.5 million and allow Comet to continue using the alleged trade secret information?

A    Yes.  There's no restriction on Comet's

Page 238

HIGHLY CONFIDENTIAL-OUTSIDE COUNSELS' EYES ONLY

third-party publicly available agreements and were 17:10:26

not able to find any and so moved to other 17:10:30

indicators of value for the negotiation. 17:10:35

Q    And you understand that Ms. Irwin found 17:10:42

that the Comet intercompany licenses were comparable 17:10:45

because, one, Dr. Phinney has opined that they 17:10:50

contained comparable technology; and, two, that the 17:10:55

royalty rates in those licenses were set to reflect 17:10:59

arm's length negotiating principles, correct? 17:11:02

A    I'm generally familiar with her position, 17:11:05

yes. 17:11:08

Q    And to inform your understanding of how 17:11:09

those royalty rates in the Comet intercompany 17:11:12

licenses were set, you relied on the testimony of 17:11:15

Comet employee Markus Pfeiffer, correct? 17:11:20

A    I did.  But also importantly, I reviewed 17:11:23

the agreements in detail, so I think in many cases 17:11:26

the agreements speak for themself loudly. 17:11:30

But, yes, I also relied on the deposition 17:11:33

of Mr. Pfeiffer. 17:11:35

Q    Well, do the agreements explain how the 17:11:36

royalty rates were set? 17:11:38

A    I believe they explain either in the 17:11:40

agreement or more likely in the deposition that they 17:11:43

were sent by the tax department. 17:11:46

Page 242

HIGHLY CONFIDENTIAL-OUTSIDE COUNSELS' EYES ONLY

Q    The agreements themselves don't say anything about being sent by the tax department, correct?

A    I don't believe they specifically identify that.  You would not expect that in the agreement given the intercompany nature of these agreements; though, my experience is similar that these rates are typically set by the tax department.

Q    Okay.  So your understanding of how those royalty rates were set is based on Mr. Pfeiffer's testimony as well as your general experience?

A    Fair, yes.

Q    And Mr. Pfeiffer claimed that Comet did not perform any in-house valuation of its intellectual property when determining the royalty rates in those intercompany agreements, correct?

A    I believe that is his testimony.

Q    But Mr. Pfeiffer acknowledged in his deposition that in 2011 and 2014, licenses were negotiated before his time at Comet, correct?

A    I believe that's true.

Q    In your report -- and I'm looking at your reply report, Exhibit 2, on Page 30.

A    I have it.

Q    You write that Mr. Pfeiffer testified that

17:11:54
17:11:55
17:11:59
17:12:00
17:12:01
17:12:03
17:12:06
17:12:09
17:12:12
17:12:16
17:12:20
17:12:26
17:12:31
17:12:36
17:12:39
17:12:44
17:12:47
17:12:50
17:12:53
17:12:58
17:13:02
17:13:18
17:13:21
17:13:29
17:13:34

Page 243