Adam Alper (SBN: 196834)
adam.alper@kirkland.com
Akshay Deoras (SBN: 301962)
akshay.deoras@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone:     (415) 439-1400
Facsimile:     (415) 439-1500

Michael W. De Vries (SBN: 211001)
michael.devries@kirkland.com
KIRKLAND & ELLIS LLP
555 South Flower Street
Los Angeles, CA 90071
Telephone:     (213) 680-8400
Facsimile:     (213) 680-8500

Attorneys for Plaintiffs
COMET TECHNOLOGIES USA INC.,
COMET AG AND YXLON
INTERNATIONAL GMBH

Sharre Lotfollahi (SBN: 258913)
sharre.lotfollahi@kirkland.com
KIRKLAND & ELLIS LLP
2049 Century Park East, Suite 3700
Los Angeles, CA 90067
Telephone:     (310) 552-4200
Facsimile:     (310) 552-5900

Leslie M. Schmidt (*pro hac vice*)
leslie.schmidt@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Ave.
New York, NY 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Kat Li (*pro hac vice*)
kat.li@kirkland.com
KIRKLAND & ELLIS LLP
401 Congress Avenue
Austin, TX 78701
Telephone:     (512) 678-9100
Facsimile:     (512) 678-9101

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

COMET TECHNOLOGIES USA INC., a Delaware corporation, COMET AG, a Swiss corporation, and YXLON INTERNATIONAL GMBH, a German corporation,

        Plaintiffs,

   v.

XP POWER LLC, a California Limited Liability Company,

        Defendant.

CASE NO. 5:20-cv-6408

**PLAINTIFFS' MOTION FOR ATTORNEY FEES FROM XP POWER**

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ...........................................................................................1

II.    BACKGROUND ............................................................................................2

     A.     XP Willfully and Maliciously Misappropriated Comet's Trade Secrets ..............2

     B.     XP Purposefully Concealed Its Theft from Comet ....................................6

     C.     XP's Defenses Have Been Objectively Unreasonable ..............................7

     D.     XP's Unreasonable Litigation Positions Forced Comet to Spend Many Additional Hours on this Case .................................................................................9

III.   ARGUMENT ................................................................................................12

     A.     Comet Should Be Awarded Its Attorneys' Fees under the Law ..........................12

     B.     Comet's Attorneys' Fees Are Reasonable ..............................................15

         1.     Legal Standard ..................................................................................16

         2.     Comet's Attorney Hours Are Reasonable ...............................................16

         3.     Comet's Proposed Rates Are Reasonable ...............................................18

IV.   CONCLUSION..............................................................................................19

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Banas v. Volcano Corp.*,
    47 F. Supp. 3d 957 (N.D. Cal. 2014) ......................................................................19

*Blanchard v. Bergeron*,
    489 U.S. 87 (1989)...................................................................................................16

*Camacho v. Bridgeport Fin., Inc.*,
    523 F.3d 973 (9th Cir. 2008) .............................................................................16, 18

*El du Pont de Nemours and Co. v. Kolon Indus., Inc.*,
    No. 3:09-cv-58, 2014 WL 792137 (E.D. Va. Feb. 25, 2014) ............................14, 17

*Extreme Reach, Inc. v. Spotgenie Partners, LLC*,
    No. CV13-07563-DMG, 2013 WL 12081182 (C.D. Cal. Nov. 22, 2013) ...............8

*Language Line Servs., Inc. v. Language Servs. Assocs., LLC*,
    No. C 10-02605 JW, 2010 WL 2764714 (N.D. Cal. July 13, 2010) .......................8

*Liqwd, Inc. v. L'Oreal USA, Inc.*,
    No. CV 17-14-JFB-SRF, 2019 WL 6840353 (D. Del. Dec. 16, 2019)....................12

*Mathis v. Spears*,
    857 F.2d 749 (Fed. Cir. 1988).................................................................................19

*Mattel, Inc v. MGA Entm't, Inc.*,
    705 F.3d 1108 (9th Cir. 2013)..................................................................................17

*Mattel, Inc. v. MGA Entm't, Inc.*,
    No. CV 04-9049 DOC .............................................................................................17

*Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*,
    No. 1:17-CV-01973, 2021 WL 3076780 (N.D. Ill. Mar. 10, 2021) ......................12

*Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*,
    No. 1:17-CV-01973, Dkt. No. 1250 (N.D. Ill. Oct. 15, 2021)................................17

*Nasiri v. T.A.G. Protective Serv's Inc.*,
    No. 18-cv-01170-NC, 2021 WL 4226207 (Sept. 16, 2021) ...................................13

*OmniGen Research, LLC v. Yongqiang Wang*,
    No. 6:16-CV-268-MC, 2017 WL 5505041 (D. Or. Nov. 16, 2017)........................13

*Oracle USA, Inc. v. Rimini St., Inc.*,
   209 F. Supp. 3d 1200 (D. Nev. 2016), *aff'd in part, vacated in part, rev'd in part*, 879
   F.3d 948 (9th Cir. 2018), *rev'd in part*, 139 S. Ct. 873, 203 L. Ed. 2d 180 (2019)................17

*Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*,
   549 F.3d 1381 (Fed. Cir. 2008).................................................................................17

*View Eng'g, Inc. v. Robotic Vision Sys., Inc.*,
   208 F.3d 981 (Fed. Cir. 2000).................................................................................18

**Statutes**

18 U.S.C. § 1836(b)(3)(D) .................................................................................12

## I.   INTRODUCTION

There is no serious question that this is the quintessential type of case in which substantial attorneys fees should be awarded.  As shown at trial and by the jury's highly-detailed and decisive verdict, XP engaged in a years-long scheme to blatantly steal Comet's industry-leading semiconductor manufacturing equipment technologies, to create a "next-generation" product line to replace its outdated Comdel products and boost its flagging corporate profits at the expense of Comet's hard-earned market position and reputation.  XP's bad faith is confirmed not only by the sheer volume of materials it stole—amounting to thousands of confidential files, schematics, specifications, computer aided designs, and code—but also by its calculated attempts to conceal its use of Comet's trade secrets for nearly four years.  Contrary to one of XP's central trial themes, this theft was perpetrated by *XP*:  as the evidence confirmed, XP's senior-most executives—including its former and present CEOs, numerous senior vice presidents, its CTO, and its Board of Directors—all knew of XP's "willful conduct,"[1] and yet allowed it to freely progress.  This went on for years and involved many at the company, well beyond those who had come from Comet:  as shown at trial, two years after the theft began, XP's CTO and Director of Engineering were still studying Comet's technologies to design their new products.  And even *after* this lawsuit was filed, XP took aggressive measures to avoid responsibility—evading discovery, hiding evidence, dragging out and multiplying the proceedings, baselessly challenging essentially every issue in the case, and refusing to admit even the most basic (and internally undisputed) facts.  XP also repeatedly (and improperly) re-raised issues it had lost, and attempted to introduce excluded evidence at trial to mislead the jury—all the while claiming that "there's nothing wrong" with what happened here, and that it reflects "normal" corporate conduct (Trial Tr. 55:24-56:8), a claimed state of affairs it knew was false.

Yet in all of that, XP has never once accepted responsibility for its wrongdoing, instead choosing to blame *Comet*—the victim of XP's illegal acts—for what happened.  *See* Trial Tr. 1330:11-1331:3 (XP closing argument).  Such indifference to the facts and law—and disregard of any notion of corporate responsibility—is precisely why the law provides for fee shifting in a case like this one.  That is

---

[1]   Trial Tr. 841:23-842:4 ("Q. And you admit now, four years after that lawsuit [against Doug Beuerman] was filed, that of the four engineers indicated as working on XP's RF match technology here, [XP] has concluded that three of the four have engaged in wrongful conduct with respect to [Comet's] information.  Do you agree? [XP CEO]: Willful conduct, yes.").

particularly so here, where XP's chosen litigation strategy greatly complicated these proceedings and came at a tremendous, undue legal cost to Comet in its attempts to vindicate its lawful rights.

The law fully supports awarding Comet's requested fees. First, as to *whether* Comet is entitled to recoup its fees, it undisputedly is. Under the DTSA, "reasonable attorney's fees [can be awarded] to the prevailing party" if "the trade secret was willfully and maliciously misappropriated." That requirement was satisfied when the jury awarded punitive damages sought by Comet, which per the Court's jury instructions required the jury to find "XP's acts of trade secret misappropriation were willful and malicious." Trial Tr. 1260:7-10.

Second, as to the *amount* of fees, Comet proposes that the Court adopt the widely accepted "lodestar method," under which the number of hours reasonably expended on the litigation is multiplied by reasonable hourly rates. In this case, Comet seeks compensation for 15,466 attorney hours and 5,624 paralegal hours that it spent overcoming XP's numerous unjustified attempts to evade legal responsibility for its malfeasance—an amount that does not include any of its attorney time spent on the prior 2018 lawsuit, and includes significant voluntary reductions from the actual attorney time spent on this suit as well. Using industry rates confirmed by industry databases, such as the commonly-used database provided by the legal-consultancy firm Valeo Partners ("Valeo"), as well as those actually agreed to by Comet, this totals at least $16,630,931.25 in reasonable attorneys' fees. These hours were fully justified, considering the breadth and scope of XP's theft and extent of XP's litigation misconduct. They are also at least in-line with—and likely lower than—XP's attorney fees relating to its chosen counsel, Latham & Watkins, as discussed below. Comet respectfully requests that its motion for attorneys' fees be granted.

## II.    BACKGROUND

### A.    XP Willfully and Maliciously Misappropriated Comet's Trade Secrets

As confirmed by the jury's verdict, XP willfully and maliciously misappropriated Comet's trade secrets. Dkt. No. 406 at 5; *see also* Dkt. No. 469 (permanent injunction order finding that "the record contains myriad evidence, credited by the jury, that XP made use of the trade secret information in developing its future products"). The scope of XP's theft is vast. XP stole ***thousands*** of highly-confidential materials—including technical documents, schematics, designs, internal presentations, and code—that disclosed Comet's most valuable and secret RF matching network and generator technology.

*E.g.*, Trial Tr. 444:19-445:11, 443:15-21.  Indeed, lead XP engineer Mr. Chris Mason copied "every single bit of information that was on his [Comet] laptop" to a disk drive and then brought that drive to work with him at XP.  *E.g.*, Trial Tr. 457:6-12 (Shanfield), 390:4-391:8 (Faulkner).  XP cannot dispute that Comet's trade secrets were improperly taken and possessed by the leaders of XP's next-generation RF development—Mr. Beuerman and Mr. Mason; and XP encouraged that theft, including by providing Mr. Beuerman and Mr. Mason lucrative employment offers after receiving their promise to deliver a "turnkey match design" to XP.  *See* PX3004 at 12:19-22; Dkt. No. 253-33, Warner Dep. Tr. at 192:14-20.  At trial, XP's technical expert addressing liability issues admitted that these XP leaders "took Comet trade secret materials from Comet when they left and, in that regard, stole Comet's trade secrets."  Trial Tr. 1043:3-8.  This undisputed theft of Comet's trade secrets was independently and separately confirmed by significant factual, technical, and forensic evidence and testimony.  *E.g.*, Trial Tr. 161:8-162:8, 498:11-14, 499:11-500:24, 505:20-509:6, 526:7-10, 385:8-17, 938:3-18, 957:25-958:24, 975:25-976:5, 959:9-21; 960:1-4, 1053:13-18, 1054:20-1055:9.

XP did not just willfully ***acquire*** Comet's trade secrets, it willfully and brazenly ***used*** them.  Its engineers admitted to accessing and using Comet's trade secrets (including years after Comet sued for misappropriation), and openly asked themselves "[w]hat are we going to do when the expert witness looks at what we are doing and we are using what Comet is using?"  PX3360; Dkt. No. 253-28, Mason Dep. Tr. 164:15-18, 286:10-15; Dkt. No. 253-23, Beuerman Dep. Tr. 107:23-108:1, 108:4-108:11, 254:3-272:21.  At trial, Comet's technical and forensic experts explained how XP executed its years-long campaign to use Comet's trade secrets to develop competing next-generation RF technology.  This included testimony from technical expert Dr. Shanfield, who explained how his analysis of XP's technical documents confirmed XP's use of Comet's trade secrets.  *E.g.*, Trial Tr. 498:11-14 (Da Vinci RF Generator Control); 508:1-520:11 (Kiyo matching network).  It also included forensic analysis conducted by Mr. Faulkner, who explained that for years after XP had been informed of the theft, XP continued to possess and access volumes of trade secret files stolen from Comet, distribute Comet's trade secrets among its engineers, and then tried to conceal its use by hiding and creating copies of the drives that were purportedly sequestered.  *E.g.*, Trial Tr. 389:10-390:3, 391:4-8, 395:11-18, 481:12-482:5, 841:3-7; *see also* Dkt. No. 253-28, Mason Dep. Tr. at 184:1-17 (explaining that he maintained external drives like the ones containing Comet's trade

secrets so that he could share with other XP engineers).  And XP's own liability experts confirmed XP's use of Comet's trade secrets—acknowledging that these engineers XP hired from Comet to lead XP's development took and accessed Comet's confidential technical information while working at XP and "still had . . . and continued to access certain Comet source documents" until at least July 2021, years after Comet first sued XP for trade secret theft.  Trial Tr. 1092:24-1093:7 (Spencer), 1041:18-24, 1043:3-15, 1044:4-10 (Phinney), 1150:24-1152:6 (Cowen).   In view of this overwhelming evidence, XP was ultimately forced to admit during the trial its willful misappropriation of Comet's trade secret materials.  Trial Tr. 841:23-842:4.

Despite after-the-fact attempts to claim ignorance, XP's senior-most executives were fully aware that the Comet engineers they tasked with developing XP next-generation technology to replace XP's legacy Comdel equipment were using Comet's trade secrets to implement XP's technological overhaul.  As the Court's permanent injunction order noted, XP's theft went up to the highest levels of the company.  Dkt. No. 469 at 5 (finding that the jury's verdict "implicates much of XP's leadership team, not just a few bad apples, making a company-wide injunction appropriate and not unduly harmful").   In particular, although XP **claimed** that it diligently investigated Comet's claims, ensured that Comet's trade secrets did not and would not make their way into XP, and did not know about the massive theft carried out by its senior engineers, *e.g.*, Trial Tr. 62:23-65:4, 1324:14-16, the evidence showed that the engineers hired from Comet **told** XP, including XP President Mike Laver and Vice President Jay Warner, in 2018 that they had taken and used Comet documents (*see, e.g.*, Trial Tr. 840:6-8, 854:20-23 (Penny), 1096:7-10 (Spencer); Dkt. No. 253-26, Laver Dep. Tr. at 170:24-171:4; Dkt. No. 253-33, Warner Dep. Tr. at 55:6-19; Dkt. No. 253-23, Beuerman Dep. Tr. at 137:15-138:8), they presented technical development materials that raised "red flags" to XP (Trial Tr. 948:15-949:5), and they left forensic data on their XP laptops that confirmed for XP that Comet's trade secrets had been loaded onto XP's systems.  Trial Tr. 856:10-13 (Penny) (learned in 2018 that external drives plugged into Mr. Beuerman's XP laptop had "Comet" files on it); PX3535-3536 (email to XP Power President, Mike Laver, regarding internal investigation of Mr. Beuerman's XP laptop, noting that "I did find a suspicious USB hard drive" and that "this is most likely the USB stick Comet mentioned").  The record is replete with examples confirming that senior engineers and executives at XP knew about the theft and use of Comet's technology: a former-Comet contractor and

current XP engineer, Mr. Ma, distributed source code to XP's senior engineers and executives, including XP CTO Paul Rummel, that was "instantly recognizable" as Comet code (Trial Tr. 481:16-482:12), Mr. Beuerman emailed Comet 3D sensor designs to XP's president with a note stating that the sensor would "be the same as the one presented to me in a different setting [at Comet] earlier this year" (PX3234), and XP's own Board of Directors, which included former CEO Duncan Penny and current CEO Gavin Griggs, acknowledged in 2019 that Mr. Beuerman had brought Comet "data into XP Power." PX3524.5. Despite knowing that the leaders of its next generation RF power development had stolen and used Comet's trade secrets, and despite acknowledging that it would have been "more prudent" to have fired them earlier, XP allowed its engineers to continue to develop XP's next-generation RF generator and match products based on Comet's trade secrets for *years*. *E.g.*, Trial Tr. 860:23-861:1 ("Q: Despite concluding that Mr. Beuerman had done something wrong with respect to Comet data at XP, XP took no steps against Mr. Beuerman based on that, right? [XP CEO]: Correct."), 859:20-860:11 (XP's CEO acknowledging that XP did not reassign Mr. Beuerman, Mr. Mason, or any other XP employee to a different group or change their responsibilities in response to Comet's lawsuit), 861:2-9 (XP's CEO admitted that it would have been "more prudent" to have terminated Mr. Mason earlier), 961:5-16 (engineer confirming that XP did not make any changes to development of next generation RF products in response to Comet's allegations).

When XP finally terminated Mr. Beuerman, it did not set the development based on Comet's trade secrets to the side and start from scratch. Instead, the XP executives tasked with carrying the next-generation RF development forward (Mr. Rummel and Mr. Irvine), picked up right where Mr. Beuerman left off with the use of Comet's trade secrets, including by gathering, studying, and "distilling down" all of the stolen Comet technology in order to continue using Comet's trade secrets to develop XP's next-generation RF products. Trial Tr. 950:25-951:19, 953:22-23, 954:23-955:7, 956:5-10 (Rummel). These executives had no answer for their reprehensible conduct, shockingly claiming they "did not pay attention" to the fact that XP's engineers had stolen Comet's trade secrets, because it was not their responsibility, and never did anything to change course, even after being sued by Comet. Dkt. 253-32, (Rummel Dep Tr.) at 151:7-14; Dkt. No. 253-33, (Warner Dep. Tr.) at 38:24-39:2; Trial Tr. (Penny) at 859:20-23.

### B.      XP Purposefully Concealed Its Theft from Comet

From the time Comet first informed XP that it had discovered the theft, XP made every effort to conceal the extent of that theft and continued use of Comet's trade secrets.  Indeed, soon after Comet first informed XP of the theft in March 2018, Doug Beuerman told XP that he not only stole Comet's trade secret documents, but had used them to create roadmap presentations that he presented to XP's development team.   *E.g.*, Dkt. No. 253-23 (Beuerman Dep. Tr.) at 120:22-121:8, 121:18-20 (acknowledging that he told XP that he had "screwed up when it came to using Comet's documents at XP").  Yet, XP repeatedly denied for nearly three years that there was any evidence that any Comet materials touched XP's systems, made their way into XP's documents, or were shared with other XP engineers.  *See, e.g.*, Dkt. No. 254-50, XP Dec. 20, 2018 Resp. to Interrog. No. 11; Dkt. No. 25 at 3-5 (XP Dec. 9, 2020 Case Management Statement); Dkt. No. 140-8, XP Feb. 19, 2021 Resp. to Interrog. No. 7.  These efforts to conceal XP's misappropriation show the willfulness of XP's conduct and exemplify the necessary fees Comet was forced to incur to prosecute that theft.[2]

XP took many steps to keep the truth from coming out.  For example, XP delayed termination of Mr. Beuerman so that, in addition to continuing to develop XP's next-generation products with Comet's trade secrets, he would not turn on XP and reveal to Comet (or others) the extent of XP's misappropriation.  Trial Tr. 857:6-858:19 ("Q. You were concerned that if you gave [Mr. Beuerman] a written warning, he might turn states evidence and tell Comet that he had brought a lot of Comet materials over to XP, right? [XP's CEO:]. Yes. In exchange for getting immunity from Comet, yes, that was my concern.  Q. XP, your company, decided that although it concluded Mr. Beuerman did something wrong, it wanted to wait to do anything about it because it was worried that Mr. Beuerman might turn around and say, to [Comet], 'Oh, yes, I did have a lot of information, and I did bring it in.'? [XP's CEO:]. Or even worse. Even worse. That he could do something even worse than that."); PX3524 (October 2019 XP Board meeting minutes noting that Mr. Beuerman brought third party data into XP Power but would receive a written warning only after the "conclusion of the Comet legal case").

---

[2]   As the Court knows, Comet had previously filed a lawsuit against XP, which after several years of litigation and attempted mediation to no avail, was refiled in 2020 before this Court.  Comet is not requesting its fees incurred during that litigation and mediation process, during which XP obstructed Comet's attempts to discover the extent of XP's use of its trade secrets.  Dkt. No. 25 at 2-3.

XP also waited several months following Comet's initial trade secret lawsuit to implement any document preservation measures, permitting the destruction of relevant documents and data showing the extent of XP's misappropriation. *See* Dkt. No. 183 at Ex. 33, R. Mangas 3/23/21 email to K. Calhoun. For example, after Comet first filed suit in March 2018, Mr. Beuerman instructed Mr. Mason to "delete anything from Comet," which Mr. Mason acknowledged would have included Comet proprietary information brought to XP. Dkt. No. 253-28 (Mason Tr.) at 228:16-20, 229:20-230:1, 230:8-25. Expert forensic analysis confirms that not only did these senior XP engineers delete and wipe their personal laptops and external storage devices after they had been caught, but that XP deleted or otherwise altered forensic data on Mr. Beuerman's XP laptop after determining that he had used it to access Comet documents, destroying valuable evidence that would have expedited the investigation into and discovery of XP's expansive misappropriation. Trial Tr. 384:1-21, 395:11-396:1.

These efforts allowed XP to use Comet's trade secrets for years, which would have continued had Comet not incurred significant fees to investigate and uncover XP's misappropriation. Indeed, XP repeatedly assured Comet in the prior litigation and in this one that any stolen materials were sequestered by at least June 2018. Dkt. No. 25 at 4 (XP CMC statement: "None of these former Comet employees had access to any device containing any alleged Comet confidential information since June 2018 at the latest…."). But intensive discovery and forensic analysis—much of which was obtained over XP's objection, after numerous conferrals and several motions to compel—showed that XP had not sequestered those materials, as repeatedly claimed, but instead surreptitiously made copies of them and transferred them over to other, previously-undisclosed external drives, thus allowing XP to continue reaping the benefits of its theft. *See, e.g.*, Trial Tr. 392:3-395:18 (Comet's forensic expert testifying that Mr. Mason deleted Comet trade secret documents from a drive that was turned over for discovery but only after he had cloned Comet trade secret materials over to a separate drive that he withheld from discovery and continued to use at XP).

## C.    XP's Defenses Have Been Objectively Unreasonable

Instead of denying that Comet's trade secrets were stolen and used by XP's engineers for the development of XP's next generation RF products (which XP denied through discovery but could not credibly deny at trial), XP attempted to excuse its willful theft through a litany of baseless defenses that

1   were not supported by the law or the facts.  Comet was forced to spend years litigating and investigating

2   this case to uncover the extent of XP's theft, only to have XP walk its earlier denials back at trial and rely

3   on defenses that were stricken or had no factual foundation.

4         For example, XP claimed that it could not be responsible for the theft carried out by the leaders of

5   its RF development because XP had no knowledge of it.  *See, e.g.*, Trial Tr. 1306:1-1312:10, 1329:24-

6   1330:10.  But Mr. Beuerman and Mr. Mason knew that they took and used Comet's trade secrets so that

7   they could do what XP hired them to do: develop XP's next-generation RF power products.  *E.g.*, Trial

8   Tr. 1044:15-1045:10 (Phinney).  As a matter of well-established respondeat superior principles, XP "the

9   company" is undisputedly responsible for that willful conduct.  *Language Line Servs., Inc. v. Language*

10   *Servs. Assocs., LLC*, No. C 10-02605 JW, 2010 WL 2764714, at *3 (N.D. Cal. July 13, 2010) (corporation

11   is liable for its employee's conduct whenever the employee is acting "within the scope of [their]

12   employment."); *Extreme Reach, Inc. v. Spotgenie Partners, LLC*, No. CV13-07563-DMG (JCGX), 2013

13   WL 12081182, at *7 (C.D. Cal. Nov. 22, 2013).  Indeed, XP's CEO admitted at trial, as he must, that "the

14   way that XP acts is through its employees."  Trial Tr. 842:5-15 (Penny).  And as XP's own expert

15   acknowledged, "if the jury finds that Mr. Beuerman and Mr. Mason were using Comet trade secrets for

16   the purposes of the tasks they were hired to perform, XP is liable for trade secret misappropriation."  Trial

17   Tr. 1046:2-21.  And this Court recognized that XP's theft went to the highest levels of the company.  Dkt.

18   No. 469 at 5.

19         These excuses were joined by numerous other baseless defenses, including XP's claim that none

20   of Comet's trade secrets were in fact trade secrets, that the trade secrets were publicly known (*e.g.*, Trial

21   Tr. 1323:11-18), that Comet's trade secrets were readily ascertainable by just opening up its products (*e.g.*,

22   *id*. 1319:19-24), that Comet did not treat its trade secrets as secret (*e.g.*, *id*. 1321:25-1322:21, 1324:21-

23   23), and that Comet did not own certain of its trade secrets (*e.g.*, *id*. 1320:12-14).

24         As a last-ditch plea to the jury, and emblematic of its refusal to take responsibility, XP argued that

25   it acted in good faith all along by investigating the theft and telling its engineers not to use Comet's trade

26   secrets, and then contended that "maybe none of this [lawsuit] would have happened" had ***Comet*** "been

27   more transparent" or "told XP about [Comet's] specific allegations."  Trial Tr. 1330:11-1331:3.  Not so.

28   XP was aware of the theft and use of Comet's trade secrets since at least March 2018, and its attempts to

blame its engineers as well as the victim of the theft (Comet) instead of taking corrective action harmed Comet. *See supra.* XP's attempt to shift the blame and feign ignorance was not reasonable.

**D.** **XP's Unreasonable Litigation Positions Forced Comet to Spend Many Additional Hours on this Case**

Since March 2018, Comet has sought to efficiently resolve this matter in a way that protected its valuable trade secrets and compensated it for the significant harm caused by XP's theft. Indeed, in January 2019, Comet agreed to a joint dismissal of the original lawsuit to allow the parties to mediate Comet's claims; but after attempting for more than a year to resolve this dispute out of Court, Comet was forced to refile the litigation in September 2020 and present its case to the jury in March 2022. As explained above and below, in the four years between Comet first notifying XP of the theft and a jury confirming XP's misappropriation, XP continued using Comet's trade secrets, took affirmative steps to conceal the extent of its theft and use, delayed and obfuscated discovery, and advanced litigation positions that lacked any valid basis and/or had already been rejected by the Court. XP's chosen litigation strategy and efforts to buy more time as it attempted to bury the extent of its misappropriation forced Comet to incur significant unnecessary attorneys' fees.

XP worked to prevent efficient resolution of Comet's claims by taking unreasonable litigation positions. For example, XP repeatedly attempted to raise its unclean hands defense despite the Court's order denying XP's motion for leave to amend its answer to include that defense. Dkt. No. 242 (Order denying XP motion to amend, finding that "XP was not diligent in presenting its unclean hands defense"). XP opposed Comet's motion for summary judgment regarding XP's unclean hands defense and motion to exclude XP's experts' opinions regarding unclean hands, despite XP being aware that its unclean hands defense was no longer viable. Dkt. Nos. 170 (XP's Opp. to Comet's Mot. to Exclude Expert Opinions), 175-2 (XP's Opp. to Comet's Mot. for Partial Summary Judgment). And XP opposed Comet's motion *in limine* regarding XP's unclean hands defense despite the Court's denial of XP's motion to amend. Dkt. No. 274 (XP MIL Opp.). The Court ruled in Comet's favor on all three motions. Dkt. Nos. 247 (SJ Order), 290 (*Daubert* Order), 303 (MIL Order). Despite those rulings, XP persisted in designating deposition testimony and attempting to introduce exhibits related to its unclean hands defense at trial. *See, e.g.*, Trial Tr. 230:9-232:13 (ruling that XP could not present deposition designations because the

exclusion of that "defense has been granted at summary judgment and is not an issue for trial"), 892:21-893:5, 905:13-908:4.  XP's relentless attempts to reintroduce its unclean hands defense forced Comet and the Court to waste time and resources constantly relitigating a long-settled matter.  And despite those efforts to police XP, its attorneys still displayed excluded evidence relating to its unclean hands defense to the jury.  *See, e.g.*, Trial Tr. 1073:12-22, 1076:25-1077:6.[3]

XP also attempted to use the parties' previous mediation efforts to shield itself from evidence and testimony establishing XP's knowledge of its misappropriation—an issue it hotly contested throughout the litigation.  In particular, XP claimed that the company's knowledge regarding Mr. Beuerman's delivery of Comet's trade secrets to XP, and then use of Comet's trade secrets at XP, was only revealed to XP during the parties' mediation in 2019.  *See, e.g.*, Dkt. No. 338 at 1 ("XP's only awareness of certain evidence and the specific allegations arising from it came through mediation communications.").  By tying its knowledge of the misappropriation to those mediation efforts, XP argued in its pre-trial objections that such evidence should be excluded under the Court's ruling on Comet's MIL 3—which barred introduction of the parties' mediation communications.  *See* Dkt. No. 303 at 3.   But XP was aware of the misappropriation well before any mediation was initiated in 2019, including because Mr. Beuerman told XP about his theft and use of Comet trade secrets in ***2018***.   *See* Trial Tr. 854:6-23, 856:10-13 (XP CEO, Penny), Dkt. No. 253-26, (Laver Dep. Tr.) at 170:24-171:4; Dkt. No. 253-33, (Warner Dep. Tr.) at 55:6-19; Dkt. No. 253-23 (Beuerman Dep. Tr.) at 120:22-121:8, 121:18-20.  The Court ultimately permitted introduction of this evidence (Trial Tr. 424:9-428:25), but only after Comet was forced to expend resources fighting XP on facts that XP's own executives admitted.

XP's wasteful pre-trial motion practice also included moving for summary judgment on multiple, highly-factual issues—including whether XP misappropriated Comet's trade secrets, whether Comet adequately identified certain trade secrets, and whether Comet owned its trade secrets. Dkt. No. 111.  The Court denied each of XP's summary judgment arguments and concluded that there was "***significant evidence*** from which a reasonable trier of fact could conclude that XP accessed and used Comet trade

---

[3]   XP also violated the Court's MIL rulings by eliciting testimony and making closing arguments regarding communications between Comet and XP during the parties' mediation, despite the Court's prohibition of "mediation communications to be brought up during the trial."  Trial Tr. 428:20-25, 817:3-6, 819:3-16, 1309:25-1310:9; 1330:18-1331:5; Dkt. No. 303 at 3.

secrets to develop XP products." Dkt. No. 247 at 6-7 (emphasis added).  As another example of XP's wasteful pre-trial motion practice, XP filed *three* separate *Daubert* motions, each on multiple issues, which the Court found to be "excessive."  Dkt. No. 163.  Undeterred by the Court's denial of all three of those motions (Dkt. Nos. 247, 290), XP continued to advance the same rejected arguments in its motions *in limine* (Dkt. No. 261 at MILs 6-8), which were again denied.  Dkt. No. 303.

XP also intentionally caused other unnecessary delays and expenses during the course of discovery.  For example, despite repeated representations that Mr. Mason did not have access to Comet's trade secrets since June 2018, forensic data produced from Mr. Mason's XP laptop on June 20, 2021 confirmed that he continued accessing and using Comet's trade secrets to develop XP's competing next-generation RF products.  While this information had been known to XP, Comet's counsel promptly notified XP's counsel with this discovery, including by identifying individual Comet materials by file path and file name as it was stored and accessed on Mr. Mason's laptop, and requested that the previously-undisclosed external devices used to transfer Comet's trade secrets be turned over.  Dkt. 126-17, K. Calhoun 6/22/2021 email to XP counsel at 4-6.   Despite having this information in hand, Mr. Mason (represented by XP's counsel) offered false testimony on XP's theft and ongoing use of Comet's trade secrets by initially denying under oath that he had any Comet files.  Dkt. No. 253-28 (Mason Dep. Tr.) at 63:10-64:2, 80:23-81:15, 82:18-84:11.  But when confronted with the forensic evidence, Mr. Mason was forced to admit to XP's ongoing use of Comet materials.  *Id.* at 157:15-160:5; 286:3-15.  XP then remarkably claimed that it first learned of Mr. Mason's continued use of Comet's trade secrets at his deposition, *e.g.*, Dkt. No. 64 at 3-5, and then used the timing of this belated "discovery" to justify their refusal to produce the external devices containing Comet's trade secret materials, forcing Comet to move to compel.  *Id.*  The Court granted Comet's motion (Dkt. No. 79), but only after Comet was forced to expend significant resources uncovering additional misappropriation evidence that had been readily available to XP.  After XP finally provided those devices per the Court's order, Comet discovered that they contained volumes of Comet trade secret information, including a cloned-image of Mr. Mason's Comet laptop that he took with him to XP, causing Comet to expend additional resources on supplemental expert discovery.

As another example, despite being required to complete its core technical production by February 19, 2021 (Dkt. No. 30), XP's "core technical production" inexplicably excluded technical materials created by the XP engineers directly involved in the theft, including by collecting documents from internal repositories that XP knew those engineers did not contribute to or use.  *See* Ex. 1, at 13-16 (P. Park 3/16/2021 email to R. Mangas and P. Young).  Comet repeatedly identified these deficiencies to XP, but XP refused to supplement its core technical production, forcing Comet to spend time and resources uncovering the gaps in XP's technical production, drafting discovery gripe email after discovery gripe email, participating in several meet and confers, and drafting a motion to compel that ultimately led to XP's agreement to supplement its deficient production nearly two months after it was ordered to do so. *Id*. (3/25/2021 email) at 1-12.  Other examples of XP's discovery tactics include delaying its ESI productions until the eve of fact depositions, over-reporting the number of ESI search term hits to unilaterally limit Comet's discovery efforts under the ESI order, failing to timely produce Comet documents that were stored on XP's own laptops, and failing to produce external devices used to store Comet's trade secret materials during XP's RF development efforts. *See, e.g.*, Dkt. 126-17, K. Calhoun 6/22/2021 email to XP counsel.  At bottom, despite having all the evidence and knowledge of its extensive theft in its possession, XP forced Comet's attorneys to spend months investigating and piecing together XP's expansive and egregious misappropriation of Comet's trade secrets over XP's repeated objections.

## III. ARGUMENT

### A. Comet Should Be Awarded Its Attorneys' Fees under the Law

Under the DTSA, "reasonable attorney's fees [can be awarded] to the prevailing party" if "the trade secret was willfully and maliciously misappropriated."  18 U.S.C. § 1836(b)(3)(D).  Here, the jury explicitly found that "Comet proved that XP ***willfully and maliciously misappropriated*** one or more of Comet's trade secrets," and awarded $20 million in exemplary damages. Dkt. No. 406 at 5 (emphasis added).  Courts routinely find that such exemplary-damages awards support an award of attorney fees under the DTSA. *See, e.g.*, *Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*, No. 1:17-CV-01973, 2021 WL 3076780, at *3 (N.D. Ill. Mar. 10, 2021) (finding an award of attorney's fees under the DTSA was appropriate and "further supported by the jury's verdict awarding exemplary damages"); *Liqwd, Inc. v. L'Oreal USA, Inc.*, No. CV 17-14-JFB-SRF, 2019 WL 6840353, at *11 (D. Del. Dec. 16, 2019)

(awarding fees under DTSA where "jury found in favor of the plaintiffs on the issue" of exemplary damages). Moreover, the Court held that Comet is entitled to a permanent injunction in order to it protect from further irreparable harm caused by XP's willful and malicious misappropriation, further confirming that an award of attorneys' fees is appropriate. Dkt. No. 469.

There is no question that an award of fees is the right result here. XP's wrongful conduct, its disregard of the facts and law, unnecessary complications of the proceedings, evasive tactics, and refusal to take any responsibility for its actions all unequivocally support an attorneys' fees award. *See, e.g.*, *OmniGen Research, LLC v. Yongqiang Wang*, No. 6:16-CV-268-MC, 2017 WL 5505041, at *28 (D. Or. Nov. 16, 2017) (granting attorneys' fees in trade secret case where "Defendants' conduct in this case was unjustifiable"; defendants asserted "defenses which had no basis in fact" and "repeatedly disobeyed the Court's orders").

To the extent XP argues that Comet is not entitled to fees, or that a downward adjustment of fees is warranted, because Comet prevailed on less than the number of trade secrets originally asserted—*i.e.* in light of (1) Comet's good faith efforts to streamline the case for trial by withdrawing certain component-level trade secrets generally encompassed by those asserted at trial; (2) the jury's finding that Comet's AMAT trade secret was not improperly acquired or used by XP (Dkt. No. 406); and/or (3) the Court's judgment regarding Comet's cost and pricing information trade secret ("Trade Secret T") (Trial Tr. 757:13-758:5)—that argument would be wrong under the law. "When a plaintiff is a prevailing party because he or she succeeded on only some claims for relief, courts conduct a two-part analysis: 'First, did the plaintiff fail to prevail on claims that were unrelated to [those] on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?'" *Nasiri v. T.A.G. Protective Serv's Inc.*, No. 18-cv-01170-NC, 2021 WL 4226207, at *6 (Sept. 16, 2021) (internal citation omitted). Here, Comet's only claim against XP in this case was for trade secret misappropriation, and Comet prevailed on that claim when the jury determined that XP willfully and maliciously misappropriated Comet's trade secrets. Second, Comet's level of success—an award of more than half its requested compensatory damages, exemplary damages that doubled compensatory damages, and an order permanently enjoining XP from continuing to use or disclose Comet's trade secrets to develop XP's competitive next generation RF technology— readily supports the

fees incurred by Comet, particularly in light of XP's efforts to conceal its misappropriation and conduct during discovery.

Moreover, the intertwined and iterative relationship among Comet's trade secrets confirms that fees were appropriately spent on discovery into information related to trade secrets that were withdrawn prior to trial and the AMAT trade secret because that information was directly relevant to the trade secrets the jury found misappropriated and the jury's damages award.  As the Court will recall, Comet's trade secrets were related in at least two respects: ***First***, each generation of Comet's RF technology "all build on each other," such that Comet's next generation RF technology builds off its Kiyo trade secret technology, and its Kiyo trade secret technology builds off its trade secret AMAT technology.  Trial Tr. 141:15-24.  Accordingly, discovery into and fact development of Comet's first generation AMAT trade secret would have been necessary regardless of whether Comet asserted or prevailed on that trade secret at trial.  ***Second***, the next generation and Kiyo matching network trade secrets Comet prevailed on at trial covered entire systems comprised of component-level technology that Comet also maintains as trade secret.  Thus, Comet withdrawing those component-level trade secrets to streamline the case for trial while it presented the system-level encompassing those components trade secrets at trial likewise cannot reasonably be argued to have wasted discovery efforts.

Moreover, Comet's efforts to narrow the number of trade secrets for trial was conducted in response to XP's request, *see* Dkt. No. 252 at 26 (asking the Court to order Comet to reduce the number of asserted trade secrets by half), and in response to the Court's recommendation that Comet reduce the number of trade secrets and trial exhibits (which were primarily driven by the large number of trade secret documents misappropriated by XP).  *See* Ex. 2, Pretrial Conf. Tr. at 36:11-37:5.  Under similar facts, courts refuse to reduce fees for trade secrets that were withdrawn as part of efforts to present a concise case at trial.  *See, e.g.*, *El du Pont de Nemours and Co. v. Kolon Indus., Inc.*, No. 3:09-cv-58, 2014 WL 792137, at *3-5 (E.D. Va. Feb. 25, 2014) (refusing to reduce fees based on trade secrets withdrawn prior to trial, where at the urging of the Court, the trade secret plaintiff "reduced the number of trade secrets to be tried in an effort to present a concise case that could be understood by a jury").

Although a reduction to Comet's fee request is not warranted based on the successful outcome of its claim for trade secret misappropriation, Comet nevertheless conservatively implemented a blanket

1   reduction of $2 million, which is in addition to another approximately $2 million in reductions relating to

2   hours spent on the matter (explained in further detail below).

### B.      Comet's Attorneys' Fees Are Reasonable

4          As set forth above, it is indisputable that XP's theft was sprawling in scope and that its tactics

5   unnecessarily complicated these proceedings.  Comet was thus required to expend substantial attorney

6   resources in prosecuting its claims—both in terms of the size of its attorney team and the number of hours

7   it spent on the matter.  To calculate the amount of attorneys' fees it should be awarded, Comet proposes

8   that the Court adopt the widely accepted lodestar method, under which the number of hours reasonably

9   expended on the litigation is multiplied by reasonable hourly rates.  Using this method, Comet seeks

10  compensation for 18 attorneys that spent a total of 15,466 hours over the course of the nearly two-years

11  that *this* case has been pending, and eight paralegals who spent a total of 5,624 hours over that same

12  period.  Comet further proposes that the Court adopt attorney rates and fees based on those actually agreed

13  to and incurred by Comet (Jardim Decl. ¶ 3),  the reasonableness of which is confirmed by published,

14  widely used industry databases, such as the Valeo database.  Using these metrics, Comet seeks a total of

15  $16,630,931.25 in attorneys' fees, which represents a nearly 20% discount of the total fees Comet incurred

16  in this case.  Jardim Decl. ¶ 3; Lotfollahi Decl. ¶¶ 7-8.  This request is consistent with the complexities of

17  this case, as reflected by XP's own legal fees in this case, which totaled at least £10.5 million (~$13.6

18  million) by the end of 2021 (*i.e.* does not include XP's 2022 fees, including for the two-week-long trial

19  beginning on March 14, 2022, the months of intensive litigation that preceded it, and any post-trial work).

20  Ex.   3   (https://corporate.xppower.com/~/media/Files/X/XP-Power/reports-and-presentations/all-year-

21  ar/annual-reports/ar2021.pdf) at 39.[4]

22          Although the hours spent by all of Comet's attorneys in this case were necessary to deal with XP's

23  actions, Comet proactively made several additional reductions totaling approximately $2 million in fees

24  (in addition to the $2 million blanket reduction discussed above in Section III.A), to ensure that its request

25  is conservative.  Lotfollahi Decl. ¶¶ 7-8.  For example, Comet's fee calculation excludes hours spent by

---

27  [4]   As part of the parties' meet and confer process, XP would not confirm whether it disputed the
28        reasonableness of Comet's requested attorneys hours worked and rates.  XP would also not disclose
        the total fees it has incurred for this case, which may be greater than Comet's requested fees.

attorneys second-chairing depositions (including where such attendance allowed for junior attorneys to gain experience taking and defending depositions), excludes hours attorneys spent assisting or attending Court hearings, and limited hours for trial attendance to only the six attorneys who were seated at counsels' table. *Id*. Moreover, while attorneys from Kirkland and Ellis conducted weekly team meetings to allow for efficient communication and allocation of responsibilities, Comet excluded all hours related to these regularly-occurring internal meetings. *Id*. And as previously stated, Comet is not seeking its fees for the years it spent litigating this dispute before the current lawsuit was re-filed in 2020.

### 1.   Legal Standard

"'District courts must calculate awards for attorneys' fees using the "lodestar" method,' and the amount of that fee must be determined on the facts of each case." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 978 (9th Cir. 2008) (citations omitted). "[T]he established standard when determining a reasonable hourly rate is the 'rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation.'" *Id.* at 979. The lodestar figure is presumptively a reasonable fee award. *Id.* District courts may "adjust [the] lodestar calculation by other factors" *Blanchard v. Bergeron*, 489 U.S. 87, 94 (1989), such as the experience, reputation and ability of the attorneys, as well as the difficulty of the issues presented and the amount at stake. *Hensley*, 461 U.S. at 430 n.3.

### 2.   Comet's Attorney Hours Are Reasonable

As explained below, the hours included in Comet's request were reasonable, devoted to this litigation alone, and necessary to prove XP's theft, particularly in light of XP's efforts to conceal the theft and hide behind unreasonable defenses. *First*, the number of attorneys and total hours per attorney is reasonable in view of the size of this case. Comet is only seeking compensation for 18 attorneys[5] and on average 35 hours per month per attorney over the nearly-two-year period since filing the complaint in this case. Considering the size of this case—*e.g.,* nearly 500 court filings, over one million documents produced, 196 hours of depositions, over 800 trial exhibits—those numbers are very reasonable. It is also

---

[5]   Due to the departure of or leave taken by certain team members that began working on this matter when the Complaint was filed, several team members were added to the case during the course of discovery and then pre-trial, such that the number of attorneys who consistently worked the majority of the matter is closer to 10.

reasonable by comparison to XP—which had over 10 attorneys formally appear and incurred at least over $13 million in legal fees months before this case even reached the pretrial and trial phases.  Indeed, numerous other cases of similar scope have been found to support larger teams, hours, and total fees.  *See, e.g.*, *Mattel, Inc. v. MGA Entm't, Inc.*, No. CV 04-9049 DOC RNBX, 2011 WL 3420603, at *2 (C.D. Cal. Aug. 4, 2011), aff'd sub nom. *Mattel, Inc v. MGA Entm't, Inc.*, 705 F.3d 1108 (9th Cir. 2013) (awarding over $100 million in fees in copyright case); *Oracle USA, Inc. v. Rimini St., Inc.*, 209 F. Supp. 3d 1200, 1216 (D. Nev. 2016), *aff'd in part, vacated in part, rev'd in part*, 879 F.3d 948 (9th Cir. 2018), *rev'd in part*, 139 S. Ct. 873, 203 L. Ed. 2d 180 (2019), and *vacated in part*, 922 F.3d 879 (9th Cir. 2019) (awarding $28.5 million in fees in copyright case); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 2014 WL 792137, at *12 (E.D. Va. Feb. 25, 2014), *vacated on other grounds* (June 12, 2014) (awarding $18.3 million in fees to plaintiff in trade secret case); *Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*, 549 F.3d 1381, 1391 (Fed. Cir. 2008) (affirming an award of $16.8 million fee award in litigation that lasted two years and required nine days of trial); Ex. 4, *Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*, No. 1:17-CV-01973, Dkt. No. 1250 at 3-7 (N.D. Ill. Oct. 15, 2021) ($34.3 million fee award in trade secret case where plaintiff was represented by several of the same Kirkland attorneys representing Comet).

*Second*, Comet's attorney hours are justified.  There can be no question that XP's theft was extensive: XP stole thousands of Comet's confidential files which collectively took over a hundred engineers years to develop.  *E.g.*, Trial Tr. 97:6-98:23, 600:4-16.  This material included Comet's trade secrets related to the Da Vinci RF Generator Control, Digital Measurement, and Software, and the Next Generation RF Matching Network, both of which comprised, and relied upon, years of research and development in both previous-generation and next-generation technology.  *Id*.  Moreover, the case required complex forensic analysis to trace the stolen materials from the numerous external devices used to execute the theft, through XP's computers where they were saved and accessed, and into XP's research and development of next-generation RF products, requiring substantial attorney hours both in terms of requesting and obtaining forensic and technical materials in discovery, reviewing and analyzing them, and working with experts to fully understand their import with regard to XP's willful misappropriation.  *E.g.*, Trial Tr. 364:1-8, 373:18-396:1, 482:23-483:16, 486:21-487:21.  This work could have been avoided had XP disclosed what it knew all along: that the leaders of its next generation RF development stole,

1   maintained, and used Comet's trade secrets to create a competing product.  XP's continued concealment

2   and denial of its theft required further, significant time to uncover and address.  *See* Section II *supra*.

3     *Third*, the litany of bad faith tactics XP deployed throughout the case multiplied the proceedings

4   and drove up Comet's legal expenses.  This includes re-raising its unclean hands defense multiple times

5   both before and during trial, refusing to produce relevant documents and forensic data, forcing Comet to

6   prepare and/or file multiple motions to compel and exclude on the same subjects, to name just a few.  This

7   is compounded by XP's ultimate bad faith: its continued use of Comet's trade secret information.  Dkt.

8   No. 469 at 3-5 (injunction order finding that the "record contains myriad evidence, credited by the jury,

9   that XP made use of the trade secret information in developing its future products, leaving Comet

10   vulnerable to further future market share loss" and that "the record at trial amply demonstrates that Comet

11   has faced and will continue to face significant hardship from the disclosure of their trade secrets, including

12   the loss of market shares, reputational harm, and loss of customers").

13   3.  Comet's Proposed Rates Are Reasonable

14     The rates for Comet's attorneys—which range from $625 to $1,765—are reasonable for a matter

15   like this and are consistent with those of comparable attorneys at similar firms.  *Camacho v. Bridgeport*

16   *Fin., Inc.*, 523 F.3d 973, 980 (9th Cir. 2008) ("'To inform and assist the court in the exercise of its

17   discretion, the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's

18   own affidavits—that the requested rates are in line with those prevailing in the community for similar

19   services by lawyers of reasonably comparable skill, experience and reputation.'  As we have noted,

20   '[a]ffidavits of the plaintiffs' attorney[s] and other attorneys regarding prevailing fees in the community,

21   and rate determinations in other cases . . . are satisfactory evidence of the prevailing market rate.'")

22   (citation omitted).  Indeed, Courts in other districts have found that similar rates charged by several of the

23   same attorneys representing Comet were reasonable.  Ex. 4, (finding that Kirkland & Ellis's 2017-2019

24   rates, which ranged between $1565 to $555, were reasonable).

25     For example, Kirkland's rates are in line with the rates reported by Valeo Partners, a consulting

26   firm that maintains a database with the actual rates and legal fees charged by attorneys as reported in court

27   filings.  Courts often use the rates set forth in Valeo's database to determine attorneys' fee awards.  *See,*

28   *e.g.*, *View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981, 987 (Fed. Cir. 2000) (using economic

survey as evidence of reasonable fees and awarding fees based on rates shown in survey); *Mathis v. Spears*, 857 F.2d 749, 755–56 (Fed. Cir. 1988) (reliance on industry surveys is proper); *Banas v. Volcano Corp.*, 47 F. Supp. 3d 957, 965 (N.D. Cal. 2014); *Regeneron*, 2018 WL 3425013, at *4.  Per the 2022 Valeo Attorney Hourly Rate Report, senior partners at AmLaw 10 firms nationwide charged $1,536 per hour in 2022; partners charged $1,314; senior associates charged $1,025; and associates charged $769. Ex. 5 (Valeo Attorney Hourly Rate Report) at 162; *compare with* Lotfollahi Decl. ¶¶ 5-6 (Kirkland rates). Valeo's reported rates for XP's counsel Latham and Watkins (an AmLaw 2 firm), are again consistent with Kirkland's rates here, with senior Latham and Watkins partners charging on average $1,882, partners charging $1,289, senior associates charging $1,028, and associates charging $638. *Id.* at 396.  Kirkland's rates (ranging from $1,765 to $625), when combined with the reasonable hours and skill level of the attorneys required for this case, provides a reasonable amount of fees, particularly in view of circumstances present here.

## IV.     CONCLUSION

For the reasons stated above, Comet respectfully asks the Court to hold that it is entitled to its requested reasonable attorneys' and paralegal fees.

DATED: November 4, 2022

Respectfully submitted,

KIRKLAND & ELLIS LLP

By: */s/ Sharre Lotfollahi*

Adam R. Alper (SBN: 196834)
*adam.alper@kirkland.com*
Akshay Deoras (SBN: 301962)
*akshay.deoras@kirkland.com*
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone:    (415) 439-1400
Facsimile:    (415) 439-1500

Michael W. De Vries (SBN: 211001)
*michael.devries@kirkland.com*
KIRKLAND & ELLIS LLP
555 S. Flower Street
Los Angeles, CA 90071
Telephone:    (213) 680-8400
Facsimile:    (213) 680-8500

Sharre Lotfollahi (SBN: 258913)
*sharre.lotfollahi@kirkland.com*
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, CA 90067
Telephone:    (310) 552-4200
Facsimile:    (310) 552-5900

Leslie M. Schmidt (*pro hac vice*)
*leslie.schmidt@kirkland.com*
KIRKLAND & ELLIS LLP
601 Lexington Ave.
New York, NY 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Kat Li (*pro hac vice*)
*kat.li@kirkland.com*
KIRKLAND & ELLIS LLP
401 Congress Avenue
Austin, TX 78701
Telephone:    (512) 678-9100
Facsimile:    (512) 678-9101

Attorneys for Plaintiffs
COMET TECHNOLOGIES USA INC., COMET AG
AND YXLON INTERNATIONAL GMBH

1

## CERTIFICATE OF SERVICE

2        I, Sharre Lotfollahi, an attorney, hereby certify that on November 4, 2022, I caused a true and

3    correct copy of the foregoing document to be served via the Court's ECF system upon all counsel of

4    record.

5      DATED:  November 4, 2022                 */s/ Sharre Lotfollahi*
6                                        Sharre Lotfollahi

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28