Adam Alper (SBN: 196834)
adam.alper@kirkland.com
Akshay Deoras (SBN: 301962)
akshay.deoras@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone:    (415) 439-1400
Facsimile:    (415) 439-1500

Michael W. De Vries (SBN: 211001)
michael.devries@kirkland.com
KIRKLAND & ELLIS LLP
555 South Flower Street
Los Angeles, CA 90071
Telephone:    (213) 680-8400
Facsimile:    (213) 680-8500

Attorneys for Plaintiffs
COMET TECHNOLOGIES USA INC.,
COMET AG AND YXLON
INTERNATIONAL GMBH

Sharre Lotfollahi (SBN: 258913)
sharre.lotfollahi@kirkland.com
KIRKLAND & ELLIS LLP
2049 Century Park East, Suite 3700
Los Angeles, CA 90067
Telephone:    (310) 552-4200
Facsimile:    (310) 552-5900

Leslie M. Schmidt (*pro hac vice*)
leslie.schmidt@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Ave.
New York, NY 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Kat Li (*pro hac vice*)
kat.li@kirkland.com
KIRKLAND & ELLIS LLP
401 Congress Avenue
Austin, TX 78701
Telephone:    (512) 678-9100
Facsimile:    (512) 678-9101

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COMET TECHNOLOGIES USA INC., a Delaware corporation, COMET AG, a Swiss corporation, and YXLON INTERNATIONAL GMBH, a German corporation,<br><br>Plaintiffs,<br><br>v.<br><br>XP POWER LLC, a California Limited Liability Company,<br><br>Defendant. | CASE NO. 5:20-cv-6408<br><br>**PLAINTIFFS' OPPOSITION TO XP POWER LLC'S MOTION TO ALTER OR AMEND JUDGMENT OR FOR A NEW TRIAL ON DAMAGES** |

# TABLE OF CONTENTS

**Page**

I.   FACTUAL BACKGROUND ........................................................................................... 3

    A.   The Development of Comet's Trade Secrets ....................................................... 3

    B.   XP Needed Comet's Trade Secrets to Develop Next Generation RF Power Products .............................................................................................................. 5

    C.   Comet's Damages Theory at Trial and XP's Criticisms ..................................... 6

    D.   The Jury's Verdict .............................................................................................. 8

    E.   The Permanent Injunction .................................................................................. 9

II.  LEGAL STANDARD ................................................................................................... 9

III. ARGUMENT ............................................................................................................. 10

    A.   The Jury's Damages Award is Supported by the Evidence and is Not Excessive ......... 10

    B.   The Jury's Punitive Damages Award Should be Left Intact ............................ 14

    C.   The Permanent Injunction Does Not Constitute Double Recovery Because It Addresses Harms Not Compensated By The Jury's Damages Award ........... 18

        1.   The Permanent Injunction Is Not a Double Recovery with the Damages Award .................................................................................. 19

        2.   Entry of the Permanent Injunction Does Not Entitle XP to a Do Over on Damages ................................................................................... 22

IV.  CONCLUSION ........................................................................................................... 23

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alexander v. McKnight*,
7 Cal. App. 4th 973 (1992) ...............................................................................................21

*Asbury Hosp. v. Cass Cnty.*,
326 U.S. 207 (1945)...........................................................................................................16

*BMW of North America, Inc. v. Gore*,
517 U.S. 559 (1996)...........................................................................................................16

*Boehm v. Am. Broad. Co.*,
929 F.2d 482 (9th Cir. 1991) .............................................................................................11

*Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*,
2013 WL 890126 (N.D. Cal. Jan. 23, 2013) ................................................................21, 22

*Cheever v. Huawei Device USA, Inc.*,
2019 WL 8883942 (N.D. Cal. Dec. 4, 2019)......................................................................14

*ClearOne Communication, Inc. v. Bowers*,
643 F.3d 735 (10th Cir. 2011) ...........................................................................................19

*Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*,
532 U.S. 424 (2001)...........................................................................................................16

*Corbrus, LLC v. 8th Bridge Capital, Inc.*,
2022 WL 4239055 (C.D. Cal. Sept. 13, 2022) ...................................................................10

*Cush-Crawford v. Adchem Corp.*,
271 F.3d 352 (2d Cir. 2001)...............................................................................................17

*D & S Redi–Mix v. Sierra Redi-Mix and Contracting Co.*,
692 F.2d 1245 (9th Cir. 1982) ...........................................................................................10

*Del Monte Dunes at Monterey, Ltd. v. City of Monterey*,
95 F.3d 1422 (9th Cir. 1996) ........................................................................................10, 14

*Diaz v. Tesla, Inc.*,
2022 WL 1105075 (N.D. Cal. Apr. 13, 2022) ....................................................................10

*Drew v. Equifax Information Servs., LLC*,
2010 WL 5022466 (N.D. Cal. Dec. 3, 2010).......................................................................16

*Eldorado Stone, LLC v. Renaissance Stone, Inc.*,
2007 WL 2403572 (S.D. Cal. Aug. 20, 2007)..................................................................3, 15

*Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*,
980 F.3d 1117 (7th Cir. 2020) ...........................................................................................17

*Fenner v. Dependable Trucking Co., Inc.*,
716 F.2d 598 (9th Cir. 1983) ...................................................................................10, 15, 16

*Fujifilm Corp. v. Motorola Mobility LLC*,
182 F. Supp. 3d 1014 (N.D. Cal. 2016) .................................................................................12

*Hill Phoenix v. Classic Refrigeration SoCal, Inc.*,
2021 WL 8820858 (C.D. Cal. Dec. 12, 2021) .......................................................................13

*Landes Const. Co. v. Royal Bank of Canada*,
833 F.2d 1365 (9th Cir. 1987) ...............................................................................................9

*Lewis v. Cont'l Bank Corp.*,
494 U.S. 472 (1990)...........................................................................................................2, 15

*Masimo Corp. v. Tyco Health Care Grp.*,
350 F. App'x. 95 (9th Cir. Oct. 28, 2009) .......................................................................19, 23

*Modine Mfg. Co. v. Allen Grp., Inc.*,
1989 WL 205782 (N.D. Cal. Nov. 30, 1989), aff'd, 917 F.2d 538 (Fed. Cir. 1990)...............15

*Molski v. M.J. Cable, Inc.*,
481 F.3d 724 (9th Cir. 2007) .................................................................................................9

*Morgan v. Woessner*,
997 F.2d 1244 (9th Cir. 1993) ..............................................................................................15

*Motorola Sols., Inc. v. Hytera Comm'cns Corp.*,
2020 WL 6554645 (N.D. Ill. Oct. 19, 2020)...........................................................................16

*Netlist Inc. v. Diablo Techs. Inc.*,
2015 WL 153724 (N.D. Cal. Jan. 12, 2015) ...........................................................................22

*Payne v. Jones*,
711 F.3d 85 (2d Cir. 2013)....................................................................................................16

*Plexxikon Inc. v. Novartis Pharms. Corp.*,
2022 WL 4591792 (N.D. Cal. Sep. 29, 2022) .....................................................................2, 14

*Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp.*,
272 F.3d 1335 (Fed. Cir. 2001)..............................................................................................17

*Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*,
1993 WL 286484 (N.D. Ill. July 29, 1993)............................................................................22

*In re Roundup Prod. Liab. Litig.*,
385 F. Supp. 3d 1042 (N.D. Cal. 2019) ................................................................................11

*Simpson Strong-Tie Company, Inc. v. Oz-Post Int'l*,
411 F. Supp. 3d 975 (N.D. Cal. 2019) ..................................................................................14

*Spaulding v. Cameron*,
239 P.2d 625 (Cal. 1952) ......................................................................................................21

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003)..........................................................................................................16

*Steves and Sons, Inc. v. JELD-WEN, Inc.*,
    2018 WL 6272893 (E.D. Va., Nov. 30, 2018)...............................................................19, 21

*Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*,
    2021 WL 1553926 (S.D.N.Y. Apr. 20, 2021)............................................................17, 19, 20

*Thomas v. iStar Fin., Inc.*,
    652 F.3d 141 (2d Cir. 2011)...............................................................................................16

*TransPerfect Glob., Inc. v. MotionPoint Corp.*,
    2014 WL 6068384 (N.D. Cal. Nov. 13, 2014) ..........................................................1, 10, 11, 12

*Wilhelm v. Associated Container Transp. (Australia) Ltd.*,
    648 F.2d 1197 (9th Cir. 1981) ............................................................................................11

*Williams v. Gaye*,
    895 F.3d 1106 (9th Cir. 2018) ............................................................................................10

*Zhang v. American Gem Seafoods, Inc.*,
    339 F.3d 1020 (9th Cir. 2003) ......................................................................................19, 23

**Statutes**

18 U.S.C. § 1836...................................................................................................16, 17, 22

As shown at trial and in the jury's carefully considered verdict, XP engaged in a years-long scheme to steal Comet's industry-leading semiconductor manufacturing equipment technologies to create a "next-generation" product line to replace its outdated products and boost its flagging corporate profits.  For over four years, XP refused to acknowledge that Comet owned any trade secrets, that XP misappropriated those trade secrets, or that XP benefited from its theft, forcing Comet to expend time and resources litigating this case.  Even at trial, XP claimed that "there's nothing wrong" with what happened here, and that its actions reflected "normal" corporate conduct.  Having lost at trial, XP no longer disputes that it is a misappropriator (at least as to Trade Secrets E and L), that it benefited from its theft, and that its misappropriation was willful and malicious.  XP still, however, does not take responsibility for its actions, asking the Court to reduce the jury's damages award, reconsider the injunction, or some combination of both.  As discussed below, in view of the evidence at trial and the jury's verdict, XP's arguments lack merit and fail to acknowledge the now-admitted fact that XP is a willful and malicious misappropriator that engaged in a years-long plan to steal Comet's trade secrets to unfairly compete with Comet.  Comet proved that at trial and the jury's verdict is supported by substantial evidence.  There is no basis for a new trial, and XP's motion should be denied.

*First*, XP claims that the jury's $5 million damages award for Trade Secret D should be reduced to $4.9 million, and the jury's $15 million damages award for Trade Secret E should be reduced to $6 million.  Comet sought $32.5 million in damages for XP's theft, and XP claimed that damages should be $0 (or at most $4.1 million).  The jury's award thus reflects "an amount between those advocated by [the parties'] experts" and is amply supported by the record evidence.  *TransPerfect Glob., Inc. v. MotionPoint Corp.*, 2014 WL 6068384, at *10 (N.D. Cal. Nov. 13, 2014) (denying motion for new trial on damages).  As to Trade Secret E, XP disputes that the jury could have properly credited the undisputed testimony from Comet's engineers and technical expert that Comet's work on earlier trade secrets contributed to the development of Trade Secret E and that its inclusion of at least a portion of those costs (from Trade Secrets S and L) was appropriate.  According to XP, the jury could not have credited this testimony because Trade Secret S was not misappropriated, and Trade Secret L was not a "substantial factor" in causing damages.  But this ignores a key aspect of Comet's damages theory (and one XP tried and failed to exclude on *Daubert*), *i.e.* that due to the iterative nature of the trade-secret development process, the development

work for the earlier trade secrets was necessary to the development of Trade Secret E. As a result, by misappropriating Trade Secret E, XP necessarily avoided the years of development and associated costs for Trade Secrets S and L that led up to, and were necessary for, development of Trade Secret E. As a result, regardless of whether XP misappropriated Trade Secret S or Trade Secret L was a substantial factor in causing damages, XP still received the benefit of the work on those trade secrets when it misappropriated Trade Secret E. Critically, XP's experts were entirely silent on this aspect of Comet's case at trial, and XP does not challenge it here (let alone acknowledge it). Tellingly, XP does not contest the jury's reliance on the very same reasoning in reaching its award for Trade Secret D, which included development costs for trade secrets that XP was not alleged to have misappropriated. Although XP may wish to pay less for its theft, that is not a reason to grant a new trial. *See Plexxikon Inc. v. Novartis Pharms. Corp.*, 2022 WL 4591792, at *13 (N.D. Cal. Sep. 29, 2022) ("Novartis again obviously disagrees with the jury's interpretation of the evidence, and its choice to discount the testimony proffered by Novartis' damages expert. But that does not make the award illegal or a windfall.").

As to Trade Secret D, which XP addresses in a footnote, XP asserts that damages should be reduced by $100,000 to coincide with the precise amount of R&D Comet expended to develop this trade secret. But the jury could have reached this higher amount by crediting Mr. Malackowski's testimony that XP would have been required to expend at least as much as Comet to develop the trade secret it misappropriated. Trial Tr. at 701:2-12, 702:14-20. Moreover, damages do not require mathematical precision, and the jury was instructed on that point, without objection by XP. Thus, the jury's decision to award $5 million for Trade Secret D reflects an appropriate exercise of its discretion based on the record evidence, as contemplated by the jury instructions, and there is no reason to disturb the damages award for Trade Secret D.

*Second*, XP concedes that its willful and malicious conduct supports the jury's 1:1 ratio of punitive to compensatory damages. As a result, if the Court rejects XP's challenge to the jury's compensatory damages award, it can affirm the jury's punitive damages award. In the event that the Court decides a new trial on damages is warranted (which it is not), XP asks the Court to limit punitive damages to that ratio, regardless of the amount of compensatory damages. Federal courts, however, may not "advis[e] what the law would be upon a hypothetical state of facts." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477

(1990). In the event the Court believes a new trial or remittitur on compensatory damages is warranted, the same would apply to punitive damages. *Eldorado Stone, LLC v. Renaissance Stone, Inc.*, 2007 WL 2403572, at *1 (S.D. Cal. Aug. 20, 2007) ("The denial of the motion for new trial is conditioned on Eldorado accepting the remittitur on compensatory and punitive damages.").

*Third*, XP rehashes the double recovery argument it made in opposing Comet's motion for an injunction, and claims that it cannot be required to pay unjust enrichment damages and be enjoined. The Court already rejected this argument in entering the injunction, and XP identifies no reason for the Court to revisit that conclusion now. Specifically, the Court explained that Comet would be irreparably harmed in the future if XP were to launch a competing product with the misappropriated trade secrets. Dkt. 469 at 4. While "the damages awarded by the jury compensated for past harm, [] they did not address ongoing or future harm from the future development of XP products based on Comet trade secrets." *Id.* at 4. XP's contrary argument once again ignores that XP already benefitted from its theft, and preventing XP from continuing to do so (and further harming Comet in the process) is precisely the type of relief the DTSA was designed to provide. XP's motion for a new trial should be denied.

## I.    FACTUAL BACKGROUND

### A.    The Development of Comet's Trade Secrets

For over 50 years, Comet has developed critical technology for the semiconductor industry. Comet expanded its offerings to RF matches in the mid-2000s, and RF generators in 2011. Trial Tr. at 92:3-10; 201:17-19; 1184:3-6 (Ms. Irwin testifying that Comet began work on Cito in 2011 as part of Stolberg acquisition); *see also id.* at 130:23-131:1 (Mr. Grede testifying that Comet has been developing RF match and generators for over 15 years). By that time, Comet's RF power technologies were competing with the leading suppliers in the semiconductor fabrication industry, and Comet led the market of RF matching networks. *Id.* at 95:3-96:13, 147:1-6, 489:6-490:19. Comet largely relies on trade secrets to protect the innovations that led to its success in the RF power market, which it developed through significant R&D investments over nearly two decades. *Id.* at 98:24-101:2. Over the last 17 years, for example, Comet has invested over $100 million and the time and effort of approximately 100 engineers in its RF match and RF generator technologies. *Id.* at 97:6-13, 153:25-154:7.

The jury was asked to decide whether XP misappropriated four of Comet's trade secrets.[1]  Trade Secret D relates to the Generator Control, Digital Measurement, and Software that was developed as part of Comet's next generation RF Generator platform, Da Vinci.  Trial Tr. at 167:5-10, 443:2-11.  Trade Secret S relates to Comet's AMAT Matching Network, which was the first match Comet designed.  *Id.* at 201:17-25.  Work on the AMAT Matching Network began in 2006.  *Id.*  Trade Secret L relates to Comet's Kiyo Matching Network; and development work for this trade secret began in 2012.  *Id.* at 202:1-9.  Trade Secret E relates to Comet's Next Generation Matching Network.  *Id.* at  252:21-25, 443:2-11.  Comet began working on this trade secret in 2015.  *Id.* at 202:10-23.

Comet's engineer witnesses explained that its RF matching network and generator technology was an evolutionary process, with each successive generation building on the prior research and development that Comet had performed on the earlier generation.[2]  Trial Tr. at 174:19-175:10, 202:24-203:2.  For example, Comet's Director of Engineering, Gary Russell worked on development of all of Comet's matching network trade secrets.  *Id.* at 203:3-5.  Mr. Russell testified that later generation RF matching network technologies built upon the research and development of prior generations.  *Id.* at 202:24-203:2.  Andre Grede, Comet's Vice President of Global R&D for Plasma Control Technologies, explained that the work for earlier generation generators, Cito and Cito plus, contributed to the development work for the next generation RF generator.  *Id.* at 174:19-175:10.  Comet's industry expert Dariush Rafinejad likewise testified about the iterative development process, and how Comet's latest generation trade secrets (D and E) built upon its prior years of work on early generations.  *Id*. at 589:25-591:21.

Comet maintains financial records related to its R&D.  Beginning in mid-2010, Comet tracked R&D expenditures on a project-by-project basis, and Mr. Russell personally identified the 143 RF match project codes (out of 346) that related to Trade Secrets E, L, and S.  Trial Tr. at 266:20-268:8; PX2627;

---

[1]  The Court granted JMOL as to Trade Secret T prior to the jury's deliberations.  Trial Tr. at 757:9-758:9.  Trade Secret T was related to manufacturing and pricing information, not the development of Comet's RF matching networks and generators.  *Id.* at 534:18-22, 699:1-5.  The damages for Trade Secret T were also calculated separately from the damages for Trade Secrets D, E, L, and S.  *Id.* at 699:1-23, 704:1-5.

[2]  Comet's engineers also explained that due to the iterative nature of the development process for RF power products, the development work for Comet's overall matching or generator trade secrets (trade secrets D, E, and L) is attributable to their respective components.  *See* Trial Tr. at 175:5-10.  XP does not contest this in its motion.

PX3561; PX3565; Ex. 1 (PDX4.14-4.15).  Prior to that time, Mr. Russell explained that approximately 70% of Comet's match R&D related to Trade Secret S.  Trial Tr. at 267:15-268:1.  Mr. Grede identified the 3 RF generator project codes (out of 13) that related to Trade Secret D.  *Id.* at 174:10-175:10; PX2640; PX3561; PX3565; Ex. 2 (PDX3.8).

Mr. Russell's, Mr. Grede's, and Dr. Rafinejad's testimony on the iterative development process for Comet's trade secrets and cost-code identification was largely unchallenged by XP.  Indeed, XP had Mr. Grede confirm that development of the trade-secret technologies takes months and years of work.  *See, e.g., id*. at 186:7-22.  The only critique that XP raised regarding Mr. Russell's testimony was the possibility that some portion of Comet's development work related to patented technology.  *See, e.g., id.* at 296:18-297:6.  Yet Mr. Malackowski (Comet's damages expert) explained that as part of his investigation, he confirmed with Comet's technical experts that Comet's patents related to different technology than the trade secrets and was not included in the cost codes that he used.  *Id.* at 702:21-703:6.

**B.     XP Needed Comet's Trade Secrets to Develop Next Generation RF Power Products**

In stark contrast to Comet, XP had no RF power products until it purchased Comdel in 2017.  Trial Tr. at 446:7-22.  XP saw substantial benefits from entering the near-billion-dollar RF power market, but Comdel's products were severely outdated and hindered XP's entry into that market.  *Id.* at 446:15-447:15, 447:21-448:3; PX3517; PX3518.  XP projected hundreds of millions of dollars of profits from its RF power products, but given the Comdel failure, XP needed to introduce new RF power products in a short time frame to keep the RF power business afloat.  *See id.* at 703:9-19; PX3246; PX3279.  XP knew it did not have the quality of engineers necessary to develop those next generation products on its own.  Trial Tr. at 684:14-686:8.  So XP decided to take an illegal shortcut, hatching a plan to steal Comet's trade secrets and use them to develop RF match and generator products that would compete with Comet's.  *See, e.g., id.* at 444:19-445:11 (Comet's technical expert, Dr. Shanfield, summarizing evidence that XP had acquired and used Comet's trade secrets), 686:18-23.  XP intentionally targeted Comet and encouraged its engineers to bring a "turnkey match design" from Comet over to XP.  PX3004; Trial Tr. at 449:24-450:9.  XP's CEO agreed that this conduct was willful.  *Id.* at 841:23-842:4.

After forcing Comet to litigate for over four years, XP now concedes that it misappropriated at least Trade Secret E, and that its theft was willful and malicious.  *See* Dkt. 497 at 1 (XP's Motion to Alter

or Amend Judgment stating, "XP does not dispute the jury's liability findings in this motion," which as discussed *infra* found XP had misappropriated Comet Trade Secrets D, E, and L).

### C.    Comet's Damages Theory at Trial and XP's Criticisms

At trial, Comet sought compensatory damages for XP's misappropriation in the form of unjust enrichment or a reasonable royalty. Mr. Malackowski calculated the amount of unjust enrichment by calculating the "cost that was saved by XP as a result of using the Comet trade secrets." Trial Tr. at 688:18-689:13.[3] Mr. Malackowski used Comet's R&D as a proxy for the amount of R&D costs XP avoided spending through its theft. To do so, Mr. Malackowski "gather[ed] the research and development costs for Comet" that were recorded in its financials, and he relied on Comet's engineers to identify how those costs related to the development of the trade secrets. *Id.* at 692:5-693:3. Mr. Malackowski was also clear that XP would have had to spend at least as much as Comet to develop these trade secrets, and that XP saved time in addition to money through its theft. *Id.* at 701:2-12, 702:14-20; 709:1-12.

From 2006 to mid-2010 (the time period before Comet's project code-based financial information was instituted), Mr. Malackowski relied on Comet's overall R&D costs information for RF match and attributed only a portion of that amount to Comet's Trade Secret S, based on Mr. Russell's testimony. *Id*. From mid-2010 through 2017, Mr. Malackowski allocated Comet's R&D costs to the trade secrets based on the project codes that corresponded with the trade secrets, which were identified by Comet's engineers. *Id.* at 692:7-694:13; PX2627; PX2640; PX3561; PX3565. The amount of those costs for the four trade secrets presented to the jury was over $23 million. *See* PX3561; PX3565. Mr. Malackowski then adjusted the costs related to Comet's RF matching network trade secrets (Trade Secrets E, L, and S) to account for engineering costs expended by Comet that were not allocated to specific projects due to engineers underreporting their time, but were nonetheless invested into development of the trade secrets. *Id.* at 695:13-696:4. Finally, Mr. Malackowski reduced the total unjust enrichment amounts for the RF matching network trade secrets by removing manufacturing costs associated with third-party designs, called "build-to-print" projects, to avoid overcounting Comet's investment in its trade secrets. *Id.* at

---

[3]    Mr. Malackowski offered opinions on what appropriate reasonable royalty damages would be if the jury found that compensatory damages was not the appropriate measure of damages. Trial Tr. at 704:8-15. The jury awarded compensatory damages in the form of unjust enrichment damages, but did not award damages in the form of a reasonable royalty. Dkt. 406 at 5.

697:1-10.  Mr. Malackowski did not make any adjustments to the cost figures associated with the RF generator trade secret (Trade Secret D).  Based on his quantitative analysis, Mr. Malackowski concluded that XP had avoided approximately $32.5 million in R&D costs with the asserted trade secrets.  *Id.* at 704:1-5.  The following chart summarizes the steps in Mr. Malackowski's analysis:

|  | Trade Secret D | Trade Secret E | Trade Secret L | Trade Secret S |
|---|---|---|---|---|
| R&D Costs | $4.9M | $3.5M | $5.6M | $9.7M |
| After P&L Adjustment for under-reported time | $4.9M | $6.7M | $12.4M | $13.4M |
| After built-to-print adjustment | $4.9M | $6M | $11.1M | $10.5M |

Mr. Malackowski further explained that the avoided R&D costs for the various trade secrets were integrated.  *Id.* at 697:24-698:13.  Specifically, the amount of costs saved for Trade Secret E included both the R&D costs directly attributable to that trade secret by project codes, but could also include the R&D spent developing earlier trade secrets.  *Id.*  To further emphasize this point, Mr. Malackowski explained that if the jury found "any of the next generation trade secrets [were] misappropriated, it's not just the $6 million. it's everything, because those were built upon all of that work."  *Id.* at 698:10-13, 744:9-11 ("So there's $6 million reflected in the top box, but that builds upon the technology below it.  So it would be $32.5 million."); *see also* Ex. 3 (PDX9.21) (below).  Moreover, even if XP did not use every page from every misappropriated document, they still obtained a significant benefit from having the full "library" of information at their fingertips.  Trial Tr. at 700:1-14, 739:16-740:16.

As shown in Mr. Malackowski's demonstrative exhibit PDX9.21, Ex. 3, XP avoided approximately $5 million in costs by misappropriating Trade Secret D (Da Vinci RF Generator Control, Digital Measurement, and Software) and avoided $6 million by misappropriating Trade Secret E (Next Generation RF Matching Network), ***as well as the integrated R&D costs associated with the earlier trade secrets***—up to an additional $21.6 million.  As Mr. Malackowski explained, the potential avoided R&D for Trade Secret E alone could have been up to the entire $32.5 million based on the interrelated nature of Comet's development of its trade secrets.



XP did not cross-examine Mr. Malackowski on his opinion that the R&D associated with earlier generation trade secret could be attributed to later generation trade secrets. Instead, XP cross-examined Mr. Malackowski on his adjustment for the underreporting of engineer time and for built-to-print related-work, which it does not challenge in its motion. Trial Tr. at 718:15-731:12.

XP's damages expert, Carlyn Irwin, likewise did not challenge the evidence about the interrelatedness of the R&D spent on Comet's trade secrets and earlier generation technologies. Instead, Ms. Irwin testified that XP had not saved any costs, and made various corrections to Mr. Malackowski's calculations to arrive a total unjust enrichment of $4.1 million ($1.4M for Trade Secret D and $2.7M for Trade Secret E).[4] *Id.* at 1166:4-1185:12.

**D.    The Jury's Verdict**

After carefully considering the testimony and evidence, the jury found that four trade secrets (Trade Secrets D, E, L, and S) were trade secrets and that XP had misappropriated Trade Secrets D, E, and L. Dkt. 406. The jury awarded $20 million in compensatory damages in the form of avoided costs for XP's misappropriation of trade secrets D and E, and an additional $20 million in punitive damages.

---

[4]    Alternatively, if the jury were to award reasonable royalty damages, Ms. Irwin testified that the appropriate royalty would be zero. *Id.* at 1195:9-19.

*Id.* Specifically, the jury awarded $5 million (the full amount of avoided costs for Trade Secret D) and $15 million (less than the $27.5 million of avoided costs Comet sought for Trade Secret E).

### E.    The Permanent Injunction

After trial, Comet moved for a permanent injunction to enjoin XP's ongoing misappropriation and future irreparable harm to Comet. Dkt. 409. The Court granted Comet's motion and enjoined XP from use of Trade Secrets D, E, and L. Dkt. 469. The Court specifically rejected XP's argument that an injunction, in addition to the jury's damages award, would amount to "double recovery," reasoning that Comet would be irreparably harmed in the future if XP were to launch a competing product with the misappropriated trade secrets. *Id.* at 4. The Court also explained that the jury's damages award did not address the future harm because "the damages awarded by the jury compensated for past harm, but they did not address ongoing or future harm from the future development of XP products based on Comet trade secrets." *Id.* at 4. Despite the Court directly addressing and rejecting XP's double-recovery argument, XP raises the same arguments in its motion here.

To be clear, XP used and continues to possess Comet's trade secrets. Although XP's primary defense throughout this case was that it had conducted a privileged investigation into Comet's allegations and determined Comet's information was never on XP's systems, Trial Tr. at 822:24-823:23; Dkt. 429 at 10, XP has now acknowledged that this "investigation" was woefully inadequate. XP's declaration in support of its request to extend the time for XP to comply with the injunction confirmed that XP's investigation failed to determine the level of involvement of "approximately 60 employees … in RF Power and the events giving rise to this litigation" and failed to perform a search and remediation plan and protocol for Comet's trade secrets across XP's data sources—including USB devices (despite XP's claim that all such devices had been collected and quarantined for years). Dkt. 524-1 at 1.

## II.    LEGAL STANDARD

Under Ninth Circuit law, a Court may grant a new trial if "the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (citation omitted). While "[t]he judge can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party," a new trial should not be granted unless the court "on the entire

evidence is left with the definite and firm conviction that a mistake has been committed." *Landes Const. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987). Moreover, when reviewing a jury's damages award, the Court "allow[s] substantial deference to a jury's finding of the appropriate amount of damages . . . . [and] must uphold the jury's finding unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996).

If the Court determines that damages are excessive, the Court may "deny the motion [for a new trial] conditional upon the prevailing party accepting a remittitur." *Fenner v. Dependable Trucking Co., Inc.*, 716 F.2d 598, 603 (9th Cir. 1983). "A remittitur is a device which the court may invoke to correct an excessive verdict." *Id.* at 603 n. 3. But "[i]n determining whether damages are excessive, the court 'afford[s] great deference to a jury's award of damages and will uphold the award unless it is clearly not supported by the evidence or only based on speculation or guesswork.'" *Diaz v. Tesla, Inc.*, 2022 WL 1105075, at *7 (N.D. Cal. Apr. 13, 2022) (quoting *Williams v. Gaye*, 895 F.3d 1106, 1128 (9th Cir. 2018) (internal quotation marks and citations omitted)). Should the Court deem a remittitur appropriate, "[t]he proper amount of a remittitur is the maximum amount sustainable by the evidence." *Corbrus, LLC v. 8th Bridge Capital, Inc.*, 2022 WL 4239055, at *21 (C.D. Cal. Sept. 13, 2022) (citing *D & S Redi–Mix v. Sierra Redi-Mix and Contracting Co.*, 692 F.2d 1245, 1249 (9th Cir. 1982)).

## III.   ARGUMENT

XP's motion asks the Court to reject the jury's careful assessment of the evidence and replace it with *XP's view* of the amount of damages that should be awarded. That, however, is not grounds for a new trial as XP requests. XP's punitive damages argument fares no better, as it concedes that its willful and malicious conduct warrants the very 1:1 multiplier that the jury awarded. Finally, XP identifies no reason for the Court to reconsider its injunction order, which already rejected XP's argument that the jury's past damages award and prospective injunctive relief constitutes double recovery. XP's motion should be denied and the jury's verdict should be upheld.

### A.   The Jury's Damages Award is Supported by the Evidence and is Not Excessive

The jury carefully considered the evidence presented at trial, "heard [] full testimony and cross-examination" of the parties' witnesses, and awarded damages in "an amount between those advocated by

[the parties'] experts. It was within the jury's province to do so." *TransPerfect Glob.,* 2014 WL 6068384, at *10 (denying motion for new trial on damages). XP does not cite a single case holding that a jury's damages award that compromised between the parties' damages theories was excessive. XP nonetheless argues that the jury's conclusion on damages was "inexplic[able]" because it could have awarded lower amounts of damages. Dkt. 497 at 7. But "a trial court, in assessing whether to grant a new trial, does not properly do so merely because it might have come to a different result from that reached by the jury." *Wilhelm v. Associated Container Transp. (Australia) Ltd.*, 648 F.2d 1197, 1198 (9th Cir. 1981). As explained below, XP "has failed to raise an argument sufficient to overcome the considerable deference given to jury verdicts" and its motion for a new trial should be denied. *Boehm v. Am. Broad. Co.*, 929 F.2d 482, 488 (9th Cir. 1991); *see also In re Roundup Prod. Liab. Litig.*, 385 F. Supp. 3d 1042, 1046 (N.D. Cal. 2019) (denying motion for a new trial on damages even where jury's award was "borderline" because "the Court cannot conclude, after weighing the evidence presented at trial, that the jury clearly should not have awarded $2 million").

For Trade Secret E, XP mischaracterizes the evidence and argument at trial, claiming that "Comet's own expert and counsel told the jury that XP was unjustly enriched by $6 million" for Trade Secret E but "the jury inexplicably" concluded that unjust enrichment was $15 million for that trade secret. Dkt. 497 at 6. XP's argument, however, reurges one of its myriad of failed *Daubert* grounds, once again failing to acknowledge Comet's actual damages theory, and the fact and expert evidence supporting it— none of which XP rebutted. *See* Dkt. 118 at 12-14; *see also* Dkt. 290 at 9 (Order denying XP's *Daubert* motion and holding that Mr. Malackowski's opinions were permissible, recognizing that, "Comet notes that Mr. Malackowski made [] adjustments . . . to account for the iterative nature of the development process."). Specifically, Mr. Malackowski testified, consistent with evidence presented by Comet's engineers and expert, that, in his opinion, even if only Trade Secret E was misappropriated, the total amount of damages would be $32.5 million. Trial Tr. at 698:10-13; *see also id.* at 202:24-203:2, 744:9-11. Comet's counsel explained the same. *Id.* at 1337:4-21. The jury awarded less than half this amount for Trade Secret E ($15 million), which demonstrates the reasonableness of the jury's award. *See TransPerfect*, 2014 WL 6068384, at *10.

As explained in Section I(C), *supra*, Mr. Malackowski arrived at the $32.5 million amount by relying on (i) Comet's R&D expenditures that were specific to each of Trade Secrets D, E, L, and S, based on Comet engineer testimony (from Mr. Russell); (ii) upward and downward adjustments to those expenditures based on analysis of Comet's financials and Comet engineer testimony; and (iii) Comet engineer and expert testimony (from Dr. Rafinejad) that the development process for Comet's trade secrets was iterative, and thus later trade secrets built upon, and were made possible by, earlier trade secrets.  In its motion, XP does not dispute the allocation specific to each trade secret or the upward and downward adjustments or any of the supporting fact or expert evidence.  Dkt. 497 at 7-8.  Instead, XP asserts that Mr. Malackowski's testimony concerning the iterative nature of the trade secrets was "conclusory" and that the jury's findings on Trade Secrets S and L foreclose reliance on that theory.  *Id.*  Neither assertion has merit.

*First*, Mr. Malackowski's opinion regarding the iterative nature of Comet's trade-secret development was not conclusory; it was based on testimony from Comet engineers and its technical expert. *See* Section I(C), *supra*.  XP did not challenge any of this testimony at trial, and it did not cross-examine Mr. Malackowski regarding his opinion that the R&D costs associated with Comet's trade secrets were iterative.  XP's own witnesses, both fact and expert, likewise failed to offer any contradictory testimony. Thus, the evidence on this point was not conclusory, as XP claims—it was undisputed and amply supports the verdict.  *See Fujifilm Corp. v. Motorola Mobility LLC*, 182 F. Supp. 3d 1014, 1041-42 (N.D. Cal. 2016) (denying request for new trial on damages because jury's damages award was "within the range encompassed by the record as a whole . . . and is supported by substantial evidence.").

*Second*, XP asserts that the jury could not have found that XP obtained any benefit from the R&D work for Trade Secret S, because the jury found it was not misappropriated, or for Trade Secret L, because the jury concluded that it was not a "substantial factor" in causing damages.  Dkt. 497 at 7-8.  XP's argument, however, fails to address Comet's actual theory of damages for Trade Secret E.  Regardless of whether XP misappropriated Trade Secret S, Comet presented evidence that the development work for that trade secret contributed to, and was necessary for, the development of Comet's later trade secrets, L and E.  *See* § I(A), *supra*.  As a result, by misappropriating, and using Trade Secret E, XP benefited from, and avoided the costs associated with, the R&D work Comet did to develop Trade Secret S.  Similarly,

Comet presented evidence that the development work for Trade Secret L contributed to, and was necessary for, the development of Trade Secret E. *See* § I(A), *supra*. So, even if XP's misappropriation of Trade Secret L was not a "substantial factor" in causing damages with respect to that trade secret (*e.g.*, if the jury believed that XP acquired, but did not use Trade Secret L), the jury still could have concluded that, in misappropriating Trade Secret E, XP benefited from, and avoided the costs to develop, Trade Secret L, which the undisputed evidence showed were necessary to incur in developing Trade Secret E.

The jury's $15 million damages award for XP's misappropriation of Trade Secret E **confirms** that it credited the evidence on the iterative nature of the development of Comet's trade secrets, and that Trade Secret E would not have been possible without the earlier work on Trade Secrets S and L. Dkt. 406. For each of the matching network trade secrets, Mr. Malackowski calculated individual avoided costs of $6 million (Trade Secret E), $11.1 million (Trade Secret L), and $10.5 million (Trade Secret S). *See* Trial Tr. at 697:24-698:13; PX3561; PX3565. The jury's award of $15 million for Trade Secret E reflects its conclusion that XP avoided the R&D costs specific to Trade Secret E, and that at least some portion of the R&D specific to Trade Secrets L and S was attributable to Trade Secret E, consistent with the undisputed evidence. That is not excessive as XP claims; rather, the amount of compensatory damages the jury awarded is **less** than the total amount the jury could have awarded for XP's misappropriation. *See, e.g.*, *Hill Phoenix v. Classic Refrigeration SoCal, Inc.*, 2021 WL 8820858, at *4 (C.D. Cal. Dec. 12, 2021) (where "the jury award is less than the maximum sustainable by the proof . . . remittitur is not appropriate.").

Moreover, XP's assertion that the jury could not, as a matter of law, credit the evidence regarding the iterative nature of Comet's trade-secret development for the matching network trade secrets because Trade Secret S was not misappropriated cannot be squared with its acceptance of the jury's methodology for Trade Secret D. As explained above, *see* § I(C), *supra*, the $4.9 million awarded for Trade Secret D reflects R&D expenditures for Trade Secret D **and** for earlier generations of generators, Cito and Cito Plus because the technologies in those earlier generations was iteratively developed into Comet's Next Generation RF Generator trade secret. Trial Tr. at 174:19-175:10. Although XP was not alleged to have misappropriated Cito or Cito Plus, it does not dispute the jury's inclusion of Cito and Cito Plus R&D in the damages award for Trade Secret D. XP has no principled reason for claiming the jury could not have

awarded avoided costs for earlier developed technology for Trade Secret E but could have done so for Trade Secret D, and its disagreement with the jury's award for Trade Secret E amounts to a belief that the award should be lower.  That, however, is not grounds for a new trial.  *See Plexxikon,* 2022 WL 4591792 at *13, ("Novartis again obviously disagrees with the jury's interpretation of the evidence, and its choice to discount the testimony proffered by Novartis' damages expert. But that does not make the award illegal or a windfall.").

With respect to Trade Secret D, XP's sole complaint is that the jury awarded $5 million instead of $4.9 million.  Dkt. 497 at 9 n.5.  As an initial matter, XP raises this argument in a footnote, and arguments raised in footnotes are waived.  *See Cheever v. Huawei Device USA, Inc.*, 2019 WL 8883942, at *3 (N.D. Cal. Dec. 4, 2019).  Moreover, even if the Court considers this argument, it is not grounds for a new trial on damages.  The jury could have reached the $5 million by crediting Mr. Malackowski's testimony that the precise amount Comet spent to develop its trade secrets (including Trade Secret D) was the floor, and that XP likely would have had to spend far more to do, and taken more time, to do the same.  Trial Tr. at 701:2-12, 702:14-20, 709:1-12; PX2769; PX3667.  The jury was also instructed that the amount of damages did not require "mathematical precision," Dkt. 391 at 12, and XP raised no objection to this instruction.  Thus, the jury, as it was entitled to do, increased the damages figure to the nearest $100,000. XP motion for a new trial as to Trade Secret D should be denied.

Accordingly, there is no reason to undo the jury's compensatory damages award and order a new trial.  *Del Monte*, 95 F.3d at 1435 ( The Court "must uphold the jury's finding unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork.").

**B.      The Jury's Punitive Damages Award Should be Left Intact**

XP concedes that its willful and malicious misappropriation warrants a 1:1 ratio of compensatory to punitive damages.  Its only challenge to the jury's punitive damages award is that it "should be reduced in kind" if the Court reduces the compensatory damages award.  Dkt. 497 at 9.  Thus, if the Court denies XP's motion with respect to the compensatory damages award (which it should, as explained in Section III(A), *supra*), it can likewise deny XP's motion with respect to the punitive damages award.  *See, e.g., Simpson Strong-Tie Company, Inc. v. Oz-Post Int'l*, 411 F. Supp. 3d 975, 991 (N.D. Cal. 2019) ("Because

OZCO's argument is contingent on the absence of the Smith report—which I have declined to strike—it is DENIED."). If, however, the Court decides that the compensatory damages award is excessive (which it is not), then Comet should be given the choice between remittitur and a new trial as to punitive damages, too, as discussed below. *Eldorado Stone,* 2007 WL 2403572, at *1 ("The denial of the motion for new trial is conditioned on Eldorado accepting the remittitur on compensatory and punitive damages."); *see also Fenner,* 716 F.2d at 603 ("The prevailing party is given the option of either submitting to a new trial or of accepting a reduced amount of damage which the court considers justified.").

First, XP's motion asks the Court to decide an issue not before it, *i.e.*, whether a 1:1 ratio is the maximum possible punitive damages ratio the jury could have awarded regardless of the amount of damages. Dkt. 497 at 9-12. Federal courts may not "advis[e] what the law would be upon a hypothetical state of facts." *Lewis,* 494 U.S. at 477. XP's motion acknowledges that this is a hypothetical inquiry, arguing that "the jury's intent" must have been that only a 1:1 ratio was appropriate. Dkt. 497 at 10. To be sure, that was jury's intent based on the facts before it and the compensatory damages that it awarded. But the jury was not asked whether a 1:1 ratio was the only appropriate ratio, and usurping the jury's role to hold otherwise would violate the Seventh Amendment.[5] *See Morgan v. Woessner*, 997 F.2d 1244, 1258-59 (9th Cir. 1993) ("To avoid any conflict with the Seventh Amendment, the preferable course is to afford the party awarded the grossly excessive punitive damages . . . the option of either accepting the remittitur of the punitive damage award or a new trial on that issue"). Indeed, the jury was instructed that the amount of punitive damages was related to the amount of compensatory damages they awarded, meaning that if the amount of compensatory damages differed, so too, might the punitive damages award or the ratio of punitive damages to compensatory damages. Dkt. 391 at 12 (instructing jury that unjust enrichment was form of compensatory damages, and asking jury to consider relationship of punitive damages award to amount of harm to Comet ).

---

[5] XP's only cited case, *Modine*, was a patent case that says nothing about remittitur of punitive damages. *Modine Mfg. Co. v. Allen Grp., Inc.*, 1989 WL 205782, at *15 (N.D. Cal. Nov. 30, 1989), aff'd, 917 F.2d 538 (Fed. Cir. 1990). In *Modine*, the court ordered a new trial on damages where the compensatory damages award exceeded the accused infringer's company-wide profits for a 10-year period. *Id.* at *15. Here, by contrast, the $20 million award is less than 2.5% of XP's companywide profits in the 8 year period from 2013-2020.

XP attempts to skirt the Seventh Amendment by arguing that the Court can decide the ratio of compensatory to punitive damages as a matter of constitutional due process. Dkt. 497 at 10-11. Although whether a punitive damages award comports with due process is not a jury question, *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 437 (2001), that does not change the fact that courts "will not decide constitutional issues which are hypothetical." *See Asbury Hosp. v. Cass Cnty.*, 326 U.S. 207, 213 (1945). Here, whether a ratio other than 1:1 comports with due process is hypothetical because a jury awarded a 1:1 ratio. And even if the Court orders a new trial on compensatory damages, that retrial must occur before the new ratio is known. The proper approach is for Comet to elect, at that later point in time, between a new trial and a remittitur. *Fenner*, 716 F.2d at 603.

Second, contrary to XP's suggestions, there is no bright-line limit on punitive damages at a ratio of 1:1 with compensatory damages when damages are "substantial." That position directly contravenes the DTSA, which expressly contemplates up to 2X in punitive damages, 18 U.S.C. § 1836(b)(3)(C), and Supreme Court precedent, which has "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award." *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 582 (1996). None of the cases XP cites hold otherwise. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 426 (2003) (limiting punitive damages to 1X compensatory damages because compensatory damages were for emotional distress and thus "already contain [a] punitive element"); *Payne v. Jones*, 711 F.3d 85, 93 (2d Cir. 2013) (remanding "for a new trial on punitive damages unless [plaintiff] accept[ed] a reduced award of $100,000" or 1.6X multiplier); *Thomas v. iStar Fin., Inc.*, 652 F.3d 141, 149 (2d Cir. 2011) (remittitur of compensatory damages not challenged and ratio higher than 1:1 would have been inconsistent with relevant civil fines). While the *Campbell* Court "hinted that a single-digit ratio between punitive and compensatory damages is most likely to satisfy due process . . . there is no reason to think that *Campbell* stands for the proposition that anytime a compensatory damages award fully compensates a plaintiff then the punitive damages cannot exceed the compensatory damages." *Drew v. Equifax Information Servs., LLC*, 2010 WL 5022466, at *8 (N.D. Cal. Dec. 3, 2010) (affirming jury's punitive damages award because "ratio of punitive damages to compensatory damages is close to 2:1, which falls well within the case's single-digit rule of thumb").

The damages award in this case is also far less substantial than the awards in other DTSA cases, like *Motorola Sols., Inc. v. Hytera Comm'cns Corp.*, 2020 WL 6554645, at *12-15 (N.D. Ill. Oct. 19, 2020), in which $209 million in trade-secret damages were awarded along with 2X punitives, and *TriZetto* ($280 million), in which 1X punitives were awarded, belying any notion of a bright-line rule.  And contrary to XP's assertion, the court in *Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, 980 F.3d 1117, 1145 (7th Cir. 2020) (a case in which compensatory damages were $140 million), did not hold that punitive damages cannot *ever* exceed a 1:1 ratio to compensatory damages when damages are based on unjust enrichment, as opposed to lost profits.  Dkt. 497 at 11.  That argument was not before the court, *Epic*, 980 F.3d at 1143 ("TCS makes no argument here—and did not argue to the district court—that we should compare any number besides compensatory damages to the punitive-damages award."), and, in any event, the court recognized that unjust enrichment can be a proxy for the plaintiff's harm.  *Id.*  The court reduced the punitive damages award from $280 million to $140 million because defendant's "conduct, while reprehensible, was not egregious."  *Id.* at 1144.

Moreover, XP's claim that Comet "could not quantify any actual economic harm" is incorrect, and irrelevant to the amount of punitive damages.  Dkt. 497 at 11; *see Cush-Crawford v. Adchem Corp.*, 271 F.3d 352, 359 (2d Cir. 2001) ("There is some unseemliness for a defendant who engages in malicious or reckless violations of legal duty to escape either the punitive or deterrent goal of punitive damages merely because either good fortune or a plaintiff's unusual strength or resilience protected the plaintiff from suffering harm."); *Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp.*, 272 F.3d 1335, 1350-51 (Fed. Cir. 2001) (rejecting argument that the ratio between unjust enrichment and punitive damages is not "the proper point of comparison").  The DTSA specifically permits punitive damages up to 2X the amount of compensatory damages, including when those damages are based on unjust enrichment, like here.  18 U.S.C. § 1836(b)(3)(C).  There is also no requirement that a plaintiff lose a sale or customer to suffer economic harm, as XP suggests.  In this case, Comet experienced economic harm by XP's unfair advantage in the form of avoided costs—both time and money.  Trial Tr. at 97:6-98:23, 149:14-23, 153:9-154:7, 166:12-19, 243:16-23, 250:2-19, 338:9-19, 450:10-17, 458:20-459:3, 514:17-515:19, 600:5-16, 689:4-18, 700:4-14, 1199:8-13, 1200:19-1201:1; *see* Dkt. 391 at 12 (Closing Jury Instructions explaining that the jury "must decide how much money will reasonably compensate Comet for the harm" and that

Comet sought compensatory damages based on XP's unjust enrichment because "XP [] receive[d] a benefit that they otherwise would not have achieved.").

Third, XP's conduct here was reprehensible and could certainly support a higher ratio, if such was found by a jury on retrial. XP targeted and hired Comet's engineers to bring over Comet's trade secrets so that XP could compete directly with Comet. XP stole thousands of highly confidential information and materials related to Comet's most valuable and secret RF matching network and generator technology. *See, e.g.*, Trial Tr. 444:19-445:11, 443:15-21. Despite being put repeatedly on notice of its misappropriation, XP pressed on and continued using Comet's trade secrets for years even after XP's own employees admitted to using Comet's technology at XP. *Id.*; *see also id.* at 840:6-8, 854:20-23 (Penny), 948;15-949:5, 1096:7-10 (Spencer); Dkt. No. 253-26, Laver Dep. Tr. at 170:24-171:4; Dkt. No. 253-33, Warner Dep. Tr. at 55:6-19; Dkt. No. 253-23, Beuerman Dep. Tr. at 137:15-138:8. XP's engineers admitted to knowingly accessing and using Comet's trade secret information. PX3360 ("[w]hat are we going to do when the expert witness looks at what we are doing and we are using what Comet is using?"); Dkt. No. 253-28, Mason Dep. Tr. 164:15-18, 286:10-15; Dkt. No. 253-23, Beuerman Dep. Tr. 107:23-108:1, 108:4-108:11, 254:3-272:21. XP's Board was unequivocally aware of XP's ongoing misappropriation, but did nothing. PX3524 at 5; Trial Tr. at 859:20-860:11, 860:23-861:1, 861:2-9, 961:5-16. XP's CEO admitted that XP's actions were willful. Trial Tr. at 841:23-842:4 ("Q. . . . you admit now, four years after that lawsuit was filed, that of the four engineers indicated as working on XP's RF match technology here, the company has concluded that three of the four have engaged in wrongful conduct with respect to my client's information? [XP CEO]: ***Willful conduct, yes.***") (emphasis added).

Because the amount of compensatory damages is well-supported and XP concedes a compensatory to punitive damages ratio of 1:1 is appropriate, no new trial or remittitur is necessary for punitive damages.

C. **The Permanent Injunction Does Not Constitute Double Recovery Because It Addresses Harms Not Compensated By The Jury's Damages Award**

XP does not dispute that Comet will suffer irreparable injury in the absence of an injunction; that this injury cannot be compensated with monetary damages; or that the balance of the hardships and public interest favor entry of an injunction. XP also does not dispute the jury's conclusion that XP's acquisition or use of Trade Secrets D and E was "a substantial factor in causing any damages" to Comet. Dkt. 406 at

4. XP nonetheless asks for reconsideration of an argument that these concessions foreclose, and that the Court has already rejected: whether awarding an injunction in addition to unjust enrichment damages would constitute double recovery. Dkt. 429 at 3-4; Dkt. 469 at 4. XP's rehash of its double recovery argument fails for the same reasons it failed before: the jury awarded past damages for harm XP's misappropriation had caused and the injunction precludes XP from irreparably harming Comet in the future. Dkt. 469 at 4.

XP alternatively asks for a redo on damages so it can introduce evidence that it has been permanently enjoined from continuing its misappropriation. XP chose to dispute that Comet owned any trade secrets, that it misappropriated any trade secrets, and that those trade secrets had any value. XP is not entitled to a new trial because it wants to change its theory of the case. *See Masimo Corp. v. Tyco Health Care Grp.*, 350 F. App'x. 95, 97 (9th Cir. Oct. 28, 2009) (district court's denial of new trial was not abuse of discretion because "Masimo chose to proceed on a single theory of liability . . . [so] it is not now entitled to a new trial of the issue on a different theory."); *see also Zhang v. American Gem Seafoods, Inc.*, 339 F.3d 1020, 1028–29 (9th Cir. 2003) ("The failure to raise [an] issue prior to the return of the verdict results in a complete waiver, precluding our consideration of the merits of the issue."). XP's argument is essentially that an injunction retroactively eliminates the benefit that the jury found XP obtained from its theft. But precluding XP from continuing to benefit from its theft (by stopping it from further acts of misappropriation and earning profits on the misappropriated technology) does not undo the benefit that XP *already* received from that theft (in the form of cost savings for developing that technology). Both the injunction and the jury's award should be undisturbed.

### 1.    The Permanent Injunction Is Not a Double Recovery with the Damages Award

XP continues to insist that the jury's damages award for XP's unjust enrichment between 2018 and trial is duplicative of the Court's permanent injunction prohibiting XP from continuing its misappropriation going forward. That is not the law. *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 2018 WL 6272893, at *5 (E.D. Va., Nov. 30, 2018) ("the DTSA … plainly permit[s] courts to award damages <u>and</u> to enjoin defendants who are found liable for misappropriating trade secrets"). Courts routinely award past damages and injunctions, including when damages are based on avoided costs, like here. *See, e.g.*,

*Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.,* 2021 WL 1553926, at *12-13 (S.D.N.Y. Apr. 20, 2021); *ClearOne Communication, Inc. v. Bowers*, 643 F.3d 735, 753 (10th Cir. 2011) (affirming injunction to prevent harm to market position and goodwill even where plaintiff "obtain[ed] multimillion dollar awards").

XP's arguments asking the Court to vacate the permanent injunction mirror the arguments it made in its opposition to Comet's Motion for Permanent Injunction. *Compare* Dkt. 497 at 12-13 ("Here, the 'unjust enrichment' damages that were awarded at trial were entirely forward looking, and so the Court should find that the permanent injunction and compensatory damages … amount to an impermissible double recovery"), *with* Dkt. 429 at 3 (Comet "had already been compensated for forward-looking harm" by the jury's award and issuing an injunction "would constitute an impermissible 'double recovery.'"). The Court rejected this argument, recognizing that "the damages awarded by the jury compensated for past harm, but they did not address ongoing or future harm from the future development of XP products based on Comet trade secrets." Dkt. 469 at 4; *see also TriZetto*, 2021 WL 1553926, at *13 ("Syntel asserts that an injunction is senseless here where the compensatory damages require Syntel to pay fully for the development of the trade secrets at issue. . . . This argument is incorrect because the purpose of the damages award is to compensate TriZetto for Syntel's past misappropriation, i.e., misconduct up to and concluding with the trial. An injunction is aimed at preventing harm from any future misappropriation. . . . the DTSA -- in permitting recovery of both compensatory damages based on loss and unjust enrichment -- acknowledges that TriZetto's actual harm and Syntel's unjust enrichment are not necessarily mutually exclusive.").

XP identifies no reason for the Court to reconsider that ruling now. XP's argument hinges on the incorrect assertion that the jury's award was based on "forward looking harm" simply because XP had not yet released a product. Dkt. 497 at 13. As the Court explained, however, neither "damages expert … urged the jury to consider future harm in awarding unjust enrichment damages." Dkt. 469 at 4. Instead, both experts focused their testimony on the costs that XP had avoided from the start of its theft through the trial. Mr. Malackowski explained that his unjust enrichment calculation addressed "compensatory damages," which refer to the "value that the defendant unfairly *received* as a result of the theft or misappropriation of trade secrets." Trial Tr. at 688:18-689:3; *see also id.* at 689:4-13 (Malackowski:

because XP had not yet sold products, he focused his analysis on cost savings rather than lost profits). XP received that benefit through its use of Comet's trade secrets, which allowed it to save time and money. *See id.* at 689:4-13, 697:11-21. XP's counsel reinforced this fact during cross-examination:

> Q. And isn't it true that even if XP was to introduce a product using Comet's alleged trade secrets in the future, you have also concluded that it's not possible to calculate, within a reasonable degree of certainty, how much market share Comet would lose if and when XP introduced that product?
>
> A. Not as we sit here today. That's what we would call an irreparable harm and would be in addition to what I've calculated. . . .
>
> Q. And here you were asked: 'Question: Well, but you determined that XP Power was unjustly enriched to the tune of $32.5 million, correct? Answer: No. I determined ***they were unjustly enriched to an amount greatly exceeding*** that, but the only amount that I could calculate with a reasonable certainty was ***the 32.5 million, which is why I also believe there should be an injunction for the irreparable harm that I can't calculate***.'"

Trial Tr. at 718:3-10, 735:17-24. Ms. Irwin opined that XP obtained no cost savings at all (which the jury rejected). *Id.* 1165:17-1166:3. This is in stark contrast with *Steves*, in which the damages expert testified that the reasonable royalty award would enable the defendant "to use the misappropriated information 'for as long as they want in any way that they want.'" 2018 WL 6272893, at *5.

XP's assertion that the injunction compensates Comet "for benefits that XP never received," Dkt. 497 at 13, misapprehends the purpose of an injunction, which is to prevent irreparable harm to Comet. Absent an injunction, XP could continue to use Comet's trade secrets and sell products made with the misappropriated trade secrets, those sales would cause additional harm to Comet, as the Court already found. Dkt. 469 at 4. The injunction ensures that additional harm to Comet does not occur. XP cites no case where an award of past damages forecloses entry of an injunction. In *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, 2013 WL 890126, at *4 (N.D. Cal. Jan. 23, 2013), the Court entered an injunction to halt continuing misappropriation, but noted that if the trade secrets "have become publicly known," an injunction may not be justified if "the defendant retains no unfair advantage." *Id.* at *4. XP does not seriously dispute that it would retain an unfair advantage absent an injunction; indeed its double recovery argument is premised on XP's assertion that the injunction eliminates that advantage (as it is supposed to).[6]

---

[6]   XP's reliance on nuisance cases, Dkt. 497 at 13-14, fares no better because those cases recognize the same principle that supports entry of an injunction here: "[i]f the plaintiff receives an injunction against

The jury's unjust enrichment award and the permanent injunction are also not punitive, as XP claims.[7]  Dkt. 497 at 14.  The DTSA expressly contemplates that injunctive relief and damages can be awarded in the same case.  18 U.S.C. § 1836(b)(3)(A) & (B).  Although XP claims in conclusory fashion that the unjust enrichment award "compensate[es Comet] for the head start allegedly enjoyed by misappropriating Comet's trade secrets," that is not correct.  Dkt. 497 at 14.  XP presented no evidence that it was capable of developing its next generation RF Power products without Comet's trade secrets.  Trial Tr. 680:24-682:7, 683:5-19, 685:5-686:8; Morin Dep. Tr. 140:21-141:13; PX3217, PX3229, PX3231.  Thus, the jury's damages award also does not account for XP's significant temporal head start from its theft, which is itself an irreparable harm that must be addressed by an injunction.  *See, e.g.*, *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 1993 WL 286484, at *6 (N.D. Ill. July 29, 1993) (although jury awarded "significant" damages, "it is not clear that they directly compensate Rockwell for the *head start that defendants achieved . . . .* Consequently, entry of this limited injunction is proper because it is appropriately aimed at reducing DEVs 'lead-time' competitive advantage.") (emphasis added); *Netlist Inc. v. Diablo Techs. Inc.*, 2015 WL 153724, at *7 (N.D. Cal. Jan. 12, 2015) ("An injunction may be used to eliminate any unfair head start a defendant may have gained by improper use of confidential information").  There is nothing punitive about stopping XP from continuing to harm Comet through its now undisputed theft.

The Court's permanent injunction is not impermissibly duplicative of the jury's damages award nor is it impermissibly punitive.  XP's request that the Court vacate its permanent injunction should be denied.

### 2.    Entry of the Permanent Injunction Does Not Entitle XP to a Do Over on Damages

XP's alternative request that the Court allow XP to retry damages related to Trade Secrets D and E so that it can present evidence of the permanent injunction should be denied.  *First*, XP does not cite a

---

the defendant which requires the defendant to abate the nuisance, the plaintiff can recover past and present damages, but not future damages, since the abatement order will terminate the nuisance for the future."  *Alexander v. McKnight*, 7 Cal. App. 4th 973, 979 (1992); *see also Spaulding v. Cameron*, 239 P.2d 625 (Cal. 1952) (similar).  Here, Comet was awarded past damages, not future damages and an injunction is therefore not double recovery.

[7]  In *Brocade*, the Court concluded that alerting the misappropriator's customers to the injunction would be punitive, not that the injunction itself was punitive.  2013 WL 890126, at *11.

single case granting a new trial so a party can pursue a different trial strategy. XP could have told the jury that it would stop using Comet's trade secrets and that it would not release a product based on those trade secrets, but it chose not to. Instead, XP disputed, *e.g.*, that Comet had trade secrets, that XP misappropriated them, and that those trade secrets had value. Now that the jury rejected these arguments, and the Court entered an injunction to halt XP's continued misappropriation, XP wants to try again with a different theory. That is not grounds for granting a new trial. *See Masimo Corp.*, 350 Fed. Appx. at 97; *see also Zhang*, 339 F.3d at 1028–29.

*Second*, XP claims that the injunction wipes out the ill-gotten benefit it received from its theft—because it cannot continue to benefit from its theft. Mot. at 14-15. Specifically, XP claims that it cannot benefit from its R&D cost savings because it cannot release a product "derived from" Comet's trade secrets. *Id.* That is incorrect. If XP continued to use Comet's trade secrets and released a competing product, that would cause Comet *more* harm that it had not yet been compensated for. This is why Mr. Malackowski only quantified the damages through trial and not in the future. And it is why the injunction halts XP from continuing to use Comet's trade secrets to harm Comet. Dkt. 469 at 6-9.

*Third*, XP claims that the injunction "nullifies Mr. Malackowski's . . . assertions to the jury." Dkt. 497 at 15-17. But there is nothing inconsistent about Mr. Malackowski's testimony and the entry of an injunction. Indeed, as explained in Sections I(C) and III(C)(1), *supra*, Mr. Malackowski's testimony was clear that he quantified only the costs that XP had avoided to date, and that his quantification of those costs was not contingent upon XP releasing a product. He also explained (at XP's behest) that there were other harms he had not quantified—like the irreparable harm from XP releasing a product based on Comet's trade secrets. That is the very type of harm that the Court found in entering an injunction, Dkt. 469 at 4, and thus the injunction is entirely consistent with Mr. Malackowski's presentation to the jury. XP has identified no basis for retrying damages for Trade Secrets D and E based on entry of the injunction.

## IV. CONCLUSION

For the foregoing reasons, XP's Motion to Alter the Judgment or for a New Trial should be denied.

DATED: December 2, 2022

Respectfully submitted,

KIRKLAND & ELLIS LLP

By: */s/Leslie Schmidt*
Adam R. Alper (SBN: 196834)
adam.alper@kirkland.com
Akshay Deoras (SBN: 301962)
akshay.deoras@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone:    (415) 439-1400
Facsimile:    (415) 439-1500

Michael W. De Vries (SBN: 211001)
michael.devries@kirkland.com
KIRKLAND & ELLIS LLP
555 S. Flower Street
Los Angeles, CA 90071
Telephone:    (213) 680-8400
Facsimile:    (213) 680-8500

Sharre Lotfollahi (SBN: 258913)
sharre.lotfollahi@kirkland.com
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, CA 90067
Telephone:    (310) 552-4200
Facsimile:    (310) 552-5900

Leslie M. Schmidt (*pro hac vice*)
leslie.schmidt@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Ave.
New York, NY 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Kat Li (*pro hac vice*)
kat.li@kirkland.com
KIRKLAND & ELLIS LLP
401 Congress Avenue
Austin, TX 78701
Telephone:    (512) 678-9100
Facsimile:    (512) 678-9101

Attorneys for Plaintiffs
COMET TECHNOLOGIES USA INC., COMET AG
AND YXLON INTERNATIONAL GMBH